DIVISION OF TAX APPEALS

IN RE:  Metro Enterprises Corp.                    :              DTA Nos. 828745, 828746
and John Scarfi

                                                                 :

                                                                 :

                                                                 :

                                                                 :

---

**PETITIONERS METRO ENTERPRISES CORP. AND
JOHN SCARFI'S MOTION TO REOPEN RECORD,
FOR REARGUMENT, AND TO RECUSE
OSBORNE JACK FROM REPRESENTING THE
TAX DEPARTMENT IN THIS PROCEEDING**

---

Comes now Petitioners, pursuant to Tax Appeals Rule 3000.16(a)(2), who seek to reopen

the record in this matter and to reargue the case at a further hearing.  This motion is made on the

grounds that Respondent New York State Department of Taxation and Finance engaged in fraud,

misrepresentation, and misconduct as described in the following memorandum, resulting in

inequitable proceedings which failed to serve the public interest as required by the State

Administrative Procedure Act ("SAPA"), § 100.[1] This motion is supported by the following

Memorandum and the accompanying affidavits and exhibits.

---

[1] "*** This act guarantees that the actions of administrative agencies conform with sound
standards developed in this state and nation since their founding through constitutional, statutory
and case law. *It insures that equitable practices will be provided to meet the public interest.*"
[Emphasis added.]

## I.       Introduction

The Third Department has held that scrip processed in adult nightclubs is not always subject to sales tax; rather, whether scrip is sales-taxable must be determined on a case-by-case basis by considering the relationship between the nightclub, the entertainers, and the scrip processing company. *See Metro Enterprises Corp. v. Dept. of Tax. & Fin.,* 171 A.D.3d 1377 (3rd Dept. 2019).

The Administrative Law Judge received evidence in this case as to that relationship on July 15, 2019 and closed the record that same day.  (T.p.[2] 213.)  However, as will be described in this memorandum, the Tax Department committed numerous incidents of fraud, misrepresentation, and misconduct that warrant reopening the hearing and allowing Petitioners Metro Enterprises LLC and John Scarfi (collectively "Metro") to present new evidence and arguments.  Metro also seeks an order disqualifying attorney Osborne Jack from representing the Tax Department in this proceeding, as he has offered factual testimony about the matters in dispute in this case in an affidavit to the federal court and is therefore a fact witness.  Lastly, Metro seeks to reopen the record to reflect significant exchanges that should have been, but were not, transcribed and therefore failed to be made part of the hearing record.

## II.      The Record Should Be Reopened and Reargument Granted on the Basis of Fraud, Misrepresentation, and Misconduct.

"The fundamentals of a fair hearing" must not be violated. *Rudner v. Board of Regents,* 105 A.D.2d 555 (3rd Dept. 1984) (citing *Matter of Sowa v. Looney,* 23 N.Y.2d 329 (1968)).  In *Sowa,* the Court of Appeals held that "no essential element of a fair trial can be dispensed with unless waived without rendering the administrative determination subject to

---

[2] References to "T.p." are to the transcript of the July 15, 2019 evidentiary hearing.

reversal upon review." *Rudner* continues to be good law. *See Moro v. Mills,* 70 A.D.3d 1269 (3rd Dept. 2010) ("no violation of the "*fundamentals of a fair hearing*" was shown) (citing *Rudner*).

At least one appellate decision has suggested that the "fundamentals of a fair hearing" *would* be deprived where evidence was offered without prior disclosure, i.e., by surprise. *See George v. New York State & Local Retirement Systems,* 285 A.D.2d 798 (3rd Dept. 2001) ("Consequently, there was no surprise and the fundamentals of a fair hearing [were] not violated...."). Implicit in this analysis is the premise that if there was surprise, the fundaments of a fair hearing would be violated.

Tax Appeals Rule 3000.16(a)(1) permits the Administrative Law Judge to reopen the record and permit the parties to reargue the case where there has been fraud, misrepresentation, or misconduct by the Tax Department. Such motions must be filed no later than 30 days after the ALJ's determination. *See* Tax App. R. 3000.16(b).

This motion is being filed before the issuance of a determination in the case and is therefore timely. In addition, given the numerous instances of fraud, misrepresentation, and misconduct by the Tax Department as described in this brief, reopening of the record and reargument are both warranted and justified.

## A. The Tax Department Failed to Conference with Petitioners as Required by Tax Appeals Rules 3000.11.

Tax Appeals Rule 3000.11 requires counsel for the Tax Department and the petitioners to confer in advance of the evidentiary hearing for the purpose of narrowing the factual issues in dispute and entering into appropriate factual stipulations. Metro's counsel scheduled such a meeting with the Tax Department's attorney, Osborne Jack. (T.p. 129.) The meeting was confirmed in June 20 correspondence from Metro's counsel to Mr. Jack. (*Id.*) Mr. Jack then

abruptly cancelled the meeting and did not return Metro's counsel's call to reschedule. (*Id.*) He therefore wholly abdicated his responsibility to meet as required by Rule 3000.11.

When confronted at the hearing about his failure to meet, Mr. Jack responded "that's beside the point" (*Id.*) and that he was too busy. Such a response is disrespectful to the Tribunal's Rules of Practice and Procedure and unacceptable. Moreover, in actuality, his failure to meet with Metro's counsel was extraordinarily prejudicial to Metro's case. Numerous factual contentions were raised by the Tax Department for the first time at the July 15th hearing without the prehearing conference required by the Tax Appeals Rules. For example, the Tax Department repeatedly alleged that the records provided by Metro, 44th Enterprises, MLB Enterprises, Lace, and Stiletto were "inadequate," without offering any explanation as to how they were deficient. (T.p. 29, 39, 40, 44, 46, 49, 131, 133, 134.) Had Metro been aware of the Tax Department's position, it would have presented the testimony of its audit attorney, Joe Endres, who could have testified as to the precise nature of the documents that were requested and presented during the audit period. (*See* Ex. 1 Endres Aff.) Per Mr. Endres' testimony, the records that were provided to the Tax Department were comprehensive and complete. (*Id.*) The same is true for the entities owned by Glen Orrechio. (*See* Ex. 4 Orrechio Aff.)

In addition, Metro was prejudiced by its inability to proffer factual stipulations already admitted by the Tax Department elsewhere. For example, the auditor determined in the course of the audit that the entertainers working at the clubs serviced by Metro are employees. (See MLB Audit Report, p. 11.) This fact was already conclusively determined by the audit. Nevertheless, the Tax Department's counsel disputed the employment relationship between the entertainers and the clubs at the hearing, without any evidence or factual (or legal) basis whatsoever to support his claim. (T.p. 202.) In addition, also contrary to the evidence, the Tax Department's attorney repeatedly claimed that the entertainers are not actually paid gratuities they receive from customers

in scrip, implying in the process that Metro simply pockets the money for itself illegally. (T.p. 196-7, 200-2.) This claim too arose for the first time at the hearing and could easily have been disputed factually. [*See* Ex. 1 Endres Aff. ¶¶ 9-20 (describing voluminous records that show cash payments to entertainers who redeem scrip, containing a visual image of those records, and describing copies of sample records made by the auditor.)]

Given the refusal of the Tax Department's attorney to meet with Metro to narrow the factual disputes in the case, and given the resulting ambush that occurred at the evidentiary hearing, the ALJ should permit reopening of the record to include the testimony of Mr. Endres and Mr. Orrechio. Alternatively, the ALJ should sanction the Tax Department by deeming the facts set forth in Metro's requested admissions – which would have been the subject of stipulations had Mr. Jack taken the actions required by Rule 3000.11 - to be admitted.

## B. The Tax Department Improperly Denied Requested Admissions that It Knew from Its Own Audit to Be True.

CPLR § 3123(c) provides penalties for parties that unreasonably deny admission requests. Where the party seeking the admission proves that the party denying the admission request did so unreasonably, the denying party must be ordered to pay the reasonable attorney fees of the party seeking the request unless the court finds good cause for the denial. *See id.*

Here, the Tax Department unreasonably denied a number of Metro's requested admissions on the basis that it did not know or could not ascertain the truth of the fact being asserted, when in reality it had evidence in its audit file and audit reports to support the admissions. In fact, the Tax Department denied every single admission request on the same basis, namely that it lacked knowledge. But these denials were unreasonable, because the Tax Department had been auditing Metro and the registered clubs for years and had already made findings consistent with the requested admissions. For example:

1. The Tax Department unreasonably denied Requests for Admissions Nos. 1 through 6, which deal with the officers, directors, and shareholders of Metro Enterprises, 44th Enterprises, MLB Enterprises, and Lace Entertainment Corp.  Based upon the audit reports, the Tax Department had full knowledge of the corporate ownership of each entity.

2. The Tax Department unreasonably denied Requests for Admissions Nos. 7 through 12, which deal with who signed checks for the various corporate entities.  Based on Ms. Scala's testimony, the Tax Department subpoenaed bank records for the various entities and had access to checks issued by each corporation. (T.p. 31, 105-9.)  In fact, the Tax Department actually offered checks as part of its case in chief against Metro. (*Id.* at 198-9.)

3. The Tax Department unreasonably denied Requests for Admissions No. 24, which indicates that patrons can rent party rooms from the clubs.  Ms. Scala testified to this exact fact at the hearing. (T.p. 30. 136.)

4. The Tax Department unreasonably denied Requests for Admissions No. 31 as to the employee status of the entertainers.   Case law is indisputable that dancers are employees of the clubs in which they work. *See* Note 2, *infra*.  But more importantly, the auditors already made a finding that dancers are employees. (Ex. 2 MLB Audit Report, p. 11.)

5. The Tax Department unreasonably denied Requests for Admissions No. 43, which indicated that scrip could only be used for gratuities and not to rent rooms or purchase dances.  The Tax Department had in its possession a copy of a scrip receipt indicating these exact limitations on usage and in fact had Mr. Scarfi read from the scrip receipt at the hearing. (T.p. 104; Hearing Ex. I).

6. The Tax Department unreasonably denied Requests for Admissions Nos. 32 and 47, which indicated that patrons rented rooms from the club and tipped dancers directly for entertainment.   This is the exact testimony offered by Ms. Scala on the Tax Department's behalf at the hearing. (T.p. 30, 136.)

7. The Tax Department unreasonably denied Requests for Admissions Nos. 53 and 54, which indicated that Metro and the clubs did not treat scrip payments to dancers as part of their gross receipts.  In fact, the Tax Department argued this exact thing at the hearing. (T.p. 200-2.)

8. The Tax Department unreasonably denied Requests for Admissions No. 58, which states "gratuities are not subject to sales tax."  The Tax Department already admitted this limitation on sales tax in the interpleader action and offered no explanation for why it did not do so here. (*See* Motion for Summary Determination Exhibit: Motion to Dismiss p. 15.)

It was wholly unreasonable for the Tax Department to deny facts it intended to prove and argue at the evidentiary hearing and even more unreasonable to deny facts it had already conclusively determined as part of the audit process. Under CPLR § 3123(c), the Tax Department is liable to Metro for its attorney fees for the preparation of this portion of the motion and for the time spent proving that the Tax Department baselessly and repeatedly denied admission requests.

### C. The Tax Department Misrepresented Anthony Capeci's Status, Resulting in the Improper Exclusion of Mr. Capeci and His Counsel from Significant Stages of the Hearing.

At the beginning of the July 15, 2019 evidentiary hearing, the Administrative Law Judge excluded all non-party witnesses from the hearing room. (Tp. 6.) There was immediately confusion as to whether Anthony Capeci, the owner of two club entities serviced by Metro, was a non-party and should therefore be excluded. (*Id.* at 6-7.) The ALJ resolved the dispute by inquiring of the Tax Department's attorney, Osborne Jack: "Well, Mr. Jack, do you know is – is he part of your proceeding?" (*Id.* at 7.) Mr. Jack responded "no." (*Id.*) As a result, both Mr. Capeci and his attorney were excluded from the hearing room.

While Mr. Capeci and his counsel were barred from attending the hearing, Mr. Jack presented key testimony from audit supervisor Christine Scala regarding Metro's business operations, the structure of the clubs Mr. Capeci owns, and how scrip is transacted, and also introduced voluminous documents from the audit file. (*Id.* at 8-53.) Ms. Scala was the Tax Department's sole witness. (*Id.* at 50.) As a result, Mr. Capeci and his attorney were unable to observe the entirety of the Tax Department's case in chief.

Following Ms. Scala's testimony, Mr. Capeci and his attorney approached the ALJ to seek reconsideration of their exclusion. (Ex. 3 Kinsley Aff. ¶ 6.) At that time, Mr. Capeci explained that he had been individually assessed sales tax as a responsible person of Metro and was therefore

7

personally impacted by the outcome of the proceedings.  (*Id.* at ¶¶ 6-7.)  On this basis, the ALJ then permitted Mr. Capeci and his counsel to remain in the hearing room.  (*Id.*)

As these facts demonstrate, Mr. Jack blatantly misrepresented to the ALJ that Mr. Capeci was not "a part of (his) proceeding." (T.p. at 7.)  Mr. Jack was well aware when he answered the Judge's question that Mr. Capeci had been personally assessed as a responsible person of Metro; in fact, he presented specific testimony and argument on that exact point. (*See id.* at 37, 136-7, 196-203) (arguing that Mr. Capeci and his companies are co-mingled with Metro).  Mr. Jack's blatant misrepresentation prejudiced Metro, because a person alleged to be responsible for its tax burden was unable to observe, offer commentary towards, or rebut the Tax Department's entire case in chief.  This serious misrepresentation warrants reargument in this case.

### D.  The Tax Department Questioned Witnesses about Documents it Did Not Identify in its Hearing Memorandum that were Produced by a Witness the Tax Department Knew Was Unavailable.

On June 14, 2019, Metro requested a continuance of the July 15, 2019 hearing in part because a necessary witness, Glen Orrechio, was unavailable to testify.  As Mr. Orrechio's affidavit details, his presence was required that same day in a pending bankruptcy proceeding in Florida. (*See* Ex. 4 Orrechio Aff. ¶.)  By virtue of Metro's motion for adjournment, the Tax Department was aware of Mr. Orrechio's unavailability and did not include documents derived from or related to Mr. Orrechio in its hearing memorandum.  (*See* Tax Department Hearing Memorandum, Exhibit List.)  Rather, the Tax Department waited until the evidentiary hearing – when it knew that Mr. Orrechio was not available to answer questions or provide factual information to counsel – to introduce financial records provided by Mr. Orrechio's businesses. (T.p. 125-30.)  For this reason, the record should be reopened to permit Mr. Orrechio's testimony in the form of his attached affidavit.

8

### E. The Tax Department Offered Improper Closing Argument about Facts that Were Either not in Evidence or Entirely Disproved by the Evidence.

Closing arguments in a trial must "remain within the four corners of the evidence and avoid irrelevant comments which have no bearing on any legitimate issue in the case." *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976). Specifically, in commercial trials, the parties maintain an appropriate balance for zealous advocacy and fair proceedings by "guarding against unfair prejudice that would result from references to matters not in evidence." 4 N.Y.Prac., Com. Litig. in New York State Courts § 46:3 (4th ed.).

In his closing argument, the Tax Department's attorney blatantly mispresented the facts on numerous occasions and argued facts not in evidence as well. This misconduct violated Metro's right to a fair trial and infected the proceedings with improper arguments and inferences. More specifically, the Tax Department's attorney offered the following false, fraudulent, and incorrect arguments in closing:

1. Mr. Jack falsely claimed that Metro did not bring a dancer to testify (T.p. 195-6.) However, the record was clear that Metro subpoenaed the dancers' attorney and that he failed to appear in response to the subpoena. (T.p. 184-5.)

2. Mr. Jack falsely claimed that there is no record of cash going from Metro to the entertainers (T.p. 197), when in fact the evidence proffered by him contains a 28-page exemplar of the voluminous daily records documenting cash paid to dancers upon the redemption of scrip. (*See* Ex. 1 Endres Aff. ¶¶ 13-16.)

3. Mr. Jack falsely claimed that patrons clearly pay a dance fee to the club (T.p. 197). There is literally no proof in the record whatsoever to support this point. In fact, the clear testimony of numerous witness was just the opposite: that customers pay dancers directly and that the club only accepts payments for drinks and room rentals. (T.p. 30, 73, 83, 91, 93, 94. 136.)

4. Mr. Jack falsely claimed that Mr. Scarfi and Mr. Capeci admit that no record exists to show that dancers were paid when they redeemed scrip. (T.p. 197.) This is wholly inaccurate. In fact, Mr. Scarfi and Mr. Capeci clearly testified to the exact opposite state of affairs, namely that records do exist that reflect daily payments. (T.p. 90, 184 "if you're asking me whether Metro Enterprises has records [showing cash payments to dancers], they do.")

9

5.  Mr. Jack falsely claimed that there was no explanation for why Metro wrote checks to MLB for $21,000 and $16,050. (T.p. 199.) In fact, both Mr. Scarfi and Mr. Capeci testified that these payments occurred due to a broken credit card terminal and that the payments were appropriately reflected on IRS 1099-K forms. (T.p. 96-7, 155.)

6.  Mr. Jack falsely claimed that there was no business reason whatsoever for having separate entities to operate the club and process scrip. (T.p. 200.) This statement is totally untrue. Mr. Capeci's attorney and Mr. Scarfi testified to numerous legitimate business reasons for this corporate structure, including offering a service to customers, avoiding ATM daily withdrawal limits, and distributing chargeback risks. (T.p. 65, 90.)

7.  Mr. Jack falsely claimed that Metro is the employer of the dancers, not the clubs. (T.p. 201.) This statement completely contravenes the consistent holding of courts across the country that dancers are employees of the nightclubs in which they work[3] and ignores the finding of the auditor that dancers are club employees. (*See* MLB Audit Report, p. 11.)

8.  Mr. Jack falsely claimed that there was nothing in the record to demonstrate that the entertainers are employees of the clubs. (T.p. 202.) This is untrue. Metro presented the dancers' class action complaint against 44th Enterprises which claims they are club employees, the admissions filed by 44th Enterprises in the interpleader action which admit that the entertainers are club employees, and the testimony of Mr. Capeci which verified that they are club employees. (T.p. 179, 184; Exhibits to Motion for Summary Determination.)

The record should be reopened and reargument permitted on the basis of these improper, fraudulent, and prejudicial assertions in Mr. Jack's closing argument.

## III.   Attorney Osborne Jack Should Be Disqualified from Representing the Tax Department in this Proceeding.

Rule 3.7 of the New York Rules of Professional Conduct prohibits lawyers from representing a party to a proceeding in which they are likely to be a witness, with some narrow exceptions. More specifically, the Rule states in pertinent part:

> (a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:

---

[3] Mr. Capeci testified that courts across the country have universally held dancers to be employees of the clubs. (T.p. 161-2.) Annexed as Appendix A is a non-exhaustive list of courts reaching the holding that dancers are employees of the clubs.

(1) the testimony relates solely to an uncontested issue;

(2) the testimony relates solely to the nature and value of legal services rendered in the matter;

(3) disqualification of the lawyer would work substantial hardship on the client;

(4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or

(5) the testimony is authorized by the tribunal.

In this case, Osborne Jack, the attorney representing the Tax Department, has become an essential fact witness in the case. To this end, Mr. Jack submitted an affidavit, under oath, in a related piece of federal litigation involving the very facts in dispute in this case. (Ex. 5 Jack Aff. at ⁋ 9). In his affidavit, Mr. Jack offers factual testimony about the nature of the transactions in dispute in this proceeding, noting in paragraph 9 that:

> Metro's purported receipts from [scrip] transactions were maintained in a bank account in MLB's name… [D]espite MLB's claim that scrip was solely used as gratuities to its exotic dancers, MLB had not maintained records demonstrating that any of the monies received by it with regard to its patrons' purchases of scrip on its premises were, in fact, remitted to the dancers as tips…

Mr. Jack also made conclusions as to the audit findings, also testifying that Metro and MLB failed to prove they actually provided cash to entertainers who redeemed scrip. *Id.* at ⁋ 9. These facts are highly contested[4], and Mr. Jack purports to offer first-hand knowledge about their validity.

---

[4] Not only is Mr. Jack's testimony contested, but it is provably false and will be the subject of a sanctions motion in federal court if not retracted. First, it is completely untrue that Metro's receipts were maintained in a bank account in MLB's name, and no proof whatsoever has been presented by the Tax Department to even remotely justify that statement. It is true that for a brief period of time, MLB used Metro's credit card terminal when its own machine was broken and that there were checks written to MLB for its credit card transactions on Metro's machine. (T.p. 96-7, 155.) An appropriate IRS Form 1099-K was issued for these transactions. (*Id.* at 97.) But this is a far cry from saying that Metro's proceeds were deposited in MLB's bank account, an assertion that is jaw-droppingly untrue. Second, Mr. Jack's assertion that MLB failed to account for monies

Given his factual testimony, Mr. Jack is an essential witness in both this case and the pending MLB federal lawsuit, and he is therefore is barred by NYRPR Rule 3.7 from representing the Tax Department. This is particularly the case given that none of the exceptions to the rule apply here. Mr. Jack testified as to highly contested disputes of fact related to scrip transactions in clubs serviced by Metro, so the Rule 3.7(a)(1) exception for testimony as to undisputed facts is inapplicable. Neither did Mr. Jack testify as to the facts surrounding legal representation and costs, so Rule 3.7(a)(2) also does not apply. Excluding Mr. Jack from representing the Tax Department here could hardly be said to prejudice it under the Rule 3.7(a)(3) exception. The Tax Department employs many other lawyers who could represent it here; in fact, several of them were present at the July 15, 2019 hearing and should therefore already be up to speed on the case. T.p. 7-8 (identifying Ed Gee and Elizabeth Lyons from the Office of Counsel). Mr. Jack's testimony is not merely related to a formality under Rule 3.7(a)(4) and will be highly contested, as evidenced by the Endres Affidavit. (*See* Ex. 1 Endres Aff.) And Mr. Jack's testimony was not authorized by this tribunal or by the federal court prior to its submission, so it does not qualify for the Rule 3.7(a)(5) exception either.

## IV.    The Transcript Should Be Corrected to Reflect Improper Omissions.

As described in Section II(C), *supra*, The ALJ initially excluded Mr. Capeci and his counsel, Jennifer Kinsley, from the hearing room. As Ms. Kinsley's Declaration details, they were eventually permitted back after more fully explaining that Mr. Capeci had been personally assessed

---

received by it from patrons' scrip transactions is also false. As an initial matter, MLB never received any money related to scrip, and Mr. Jack knows this. Based on the testimony he proffered at trial from the auditor, scrip was processed by Metro, not MLB, and the Tax Department used Metro's credit card receipts to compute the tax it alleges is due as to scrip. (T.p. 29.) Moreover, Metro did maintain daily records of cash payments to entertainers who redeemed scrip, and the Tax Department has inspected and made copies of those records. (Ex. 1 Endres Aff. ¶¶ 13-16; T.p. 184.)

as a responsible person for Metro. However, this exchange was not transcribed and does not appear in the transcript. The record should be expanded to include Ms. Kinsley's Declaration, so that it is clear as to which parts of the hearing Mr. Capeci and Ms. Kinsley were able to observe.

## V.    Conclusion

For the foregoing reasons, the record in this case should be reopened to include the testimony of Joe Endres, Jennifer Kinsley, and Glen Orrechio. The Tax Department committed numerous instances of fraud, misrepresentation, and misconduct, which taken together resulted in a trial by ambush for Petitioners Metro Enterprises LLC and John Scarfi - - the antithesis of the type of proceedings contemplated by SAPA and for which the Tax Appeals Rules were promulgated.

Specifically, the Tax Department: 1) failed to meet with Metro's counsel before the hearing, as required by Tax Appeals Rule 3000.11, without explanation or justification; 2) unreasonably denied admission requests for facts it knew to be true and actually argued and presented at the hearing; 3) blatantly ignored its own audit findings and the evidence clearly produced in its own records when it argued that entertainers in clubs serviced by Metro are not employees and that Metro failed to present proof that entertainers were actually paid when they redeemed scrip; 4) intentionally misrepresented Mr. Capeci's status in the action, which lead to his improper exclusion from the Tax Department's entire case in chief; and 5) improperly referenced exhibits and evidence it did not cite in its hearing memorandum and which it knew to relate to a witness who was unavailable to testify. This misconduct made a mockery of the Rules and the overarching standards of fairness and equity imposed by SAPA.

What is worse, the Tax Department's counsel has now inserted himself as a fact witness in a companion piece of federal litigation dealing with the exact facts in dispute here. And not only

that, but he has offered testimony, under oath, in a sworn affidavit that is demonstrably false.  Mr.

Jack is therefore in a conflicted role in this case, both as a witness who will be subject to rigorous

cross-examination and potential sanctions for his false testimony and as the attorney for the Tax

Department in this proceeding.  He is therefore ethically barred from continuing to represent the

Tax Department in this matter and should be disqualified.

For these reasons, the ALJ should grant Metro's Motion to Reopen the Record and for

Reargument, should expand the record to include the Endres, Orrechio, and Kinsley Affidavits,

and should disqualify Mr. Jack as counsel for the Tax Department.

Dated this __14th__ day of August, 2019.
New York, New York

Respectfully submitted,

Alvan L. Boborow
Akerman LLP
666 Fifth Avenue, 20th Floor
New York, NY 10103
(212) 880-3800 (telephone)
(212) 259-7191 (facsimile)
Alvan.boborow@akerman.com
Counsel for Petitioners Metro Enterprises LLC and
John Scarfi

cc:     Osborne Jack, Associate Attorney

14

CERTIFICATE OF SERVICE

The foregoing motion was served on Osborne Jack via regular mail on the 14th day of August, 2019.

Alvan L. Boborow
Akerman LLP
666 Fifth Avenue, 20th Floor
New York, NY 10103
(212) 880-3800 (telephone)
(212) 259-7191 (facsimile)
Alvan.boborow@akerman.com
Counsel for Petitioners Metro Enterprises LLC and John Scarfi

**Appendix A**

**Non-Exhaustive List of Courts Holding Perfomers to Be Employees of Clubs**

1.    *Hurst v. Youngelson*, 354 F. Supp. 3d 1362 (N.D. Ga. 2019);

2.    *Pizzareli v. Cadillac Lounge, L.L.C.*, No. CV 15-254 WES, 2018 WL 2971114, at *6 (D.R.I. Apr. 13, 2018);

3.    *Braxton v. Eldorado Lounge, Inc.*, No. CV ELH-15-3661, 2017 WL 4865476 (D. Md. Oct. 27, 2017);

4.    *Miller v. Centerfold Entm't Club, Inc.*, No. 6:14-CV-6074, 2017 WL 3425887 (W.D. Ark. Aug. 9, 2017);

5.    *Shaw v. Set Enterprises, Inc.*, 241 F.Supp.3d 1318 (S.D. Fla. 2017);

6.    *Kimbrel v. DEA Corp.*, No. 3:14-CV-161-TAV-CCS, 2016 WL 7799340 (E.D. Tenn. Aug. 2, 2016);

7.    *Dean v. 1715 Northside Drive, Inc.*, 224 F.Supp.3d 1202 (N.D. Ga. 2016);

8.    *Hanson v. Trop, Inc.*, 167 F. Supp. 3d 1324 (N.D. Ga. 2016);

9.    *Vaughan v. M-Entm't Properties, LLC*, No. l:14-CV-914-SCJ, 2016 WL 7365201, at *10 (N.D. Ga. Mar. 15, 2016);

10.    *Lester v. Agment LLC*, No. 1:15 CV 886, 2016 WL 1588654 (N.D. Ohio Apr. 20, 2016);

11.    *McFeeley v. Jackson St. Entm't*, LLC, 825 F.3d 235 (4th Cir. 2016);

12.    *Foster v. Gold & Silver Private Club, Inc.*, No. 7:14CV00698, 2015 WL 8489998 (W.D. Va. Dec. 9, 2015);

13.    *Gardner v. Country Club, Inc.*, No. 4:13-CV-03399-BHH, 2015 WL 7783556 (D.S.C. Dec. 3, 2015);

14.    *Degidio v. Crazy Horse Saloon & Rest., Inc.*, No. 4:13-CV-02136-BHH, 2015 WL 5834280 (D.S.C. Sept. 30, 2015);

15.    *Mason v. Fantasy, LLC*, No. 13-CV-02020-RM-KLM, 2015 WL 4512327 (D. Colo. July 27, 2015);

16.    *Henderson v. 1400 Northside Drive, Inc.*, 110 F.Supp.3d 1318 (N.D. Ga. 2015);

17.    *Whitworth v. French Quarter Partners, LLC*, No. 6:13-CV-6003, 2014 WL 12594213 (W.D. Ark. June 30, 2014);

18.    *Verma v. 3001 Castor, Inc.*, No. CIV.A. 13-3034, 2014 WL 2957453 (E.D. Pa. June 30, 2014);

19.    *Stevenson v. Great Am. Dream, Inc.*, No. 1:12-CV-3359-TWT, 2013 WL 6880921 (N.D. Ga. Dec. 31, 2013);

20.    *Collins v. Barney's Barn, Inc.*, No. 4:12CV00685 SWW, 2013 WL 11457080 (E.D. Ark. Nov. 14, 2013);

21.    *Butler v. PP & G, Inc.*, No. CIV.A. WMN-13-430, 2013 WL 5964476 (D. Md. Nov. 7, 2013);

22.    *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901 (S.D.N.Y. 2013);

23.    *Thornton v. Crazy Horse, Inc.*, No. 3:06-CV-00251-TMB, 2012 WL 217S753 (D. Alaska June 14, 2012);

24.    *Monteiro v. PJD Entm't of Worcester, Inc.*, No. 101930, 2011 WL 7090703 (Mass. Super. Nov. 23, 2011);

25.    *Cincy v. Galardi South Enterprises*, 808 F.Supp.2d 1326 (N.D. Ga. 2011);

26.   *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139 (D.D.C. 2011);

27.   *Morse v. Mer Corp*, 2010 WL 2346334 (S.D. Ind. 2010);

28.   *Harrell v. Diamond A Entm 't, Inc.*, 992 F.Supp. 1343 (M.D. Fla. 1997);

29.   *Reich v. Priba Corp.*, 890 F.Supp. 586,594 (N.D. Tex. 1995);

30.   *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993);

31.   *Martin v. Priba Corp.*, No. CIV.A.3:91-CV-2786-G, 1992 WL 486911, at *5 (N.D. Tex. Nov. 6, 1992);

32.   *Jeffcoat v. State of Alaska Dept. of Labor*, 732 P.2d 1073 (Ak. 1987).

DIVISION OF TAX APPEALS

IN RE:  Metro Enterprises Corp.                    :              DTA Nos. 828745, 828746
and John Scarfi
                                                   :

                                                   :

---

**AFFIRMATION OF JOSEPH N. ENDRES**

---

**JOSEPH N. ENDRES,** an attorney admitted to the practice of law in the States of New

York and New Jersey, hereby affirms the following to be true under the penalty of perjury:

      1.     I am a graduate of the State University of New York at Buffalo School of Law and

a partner in the firm of Hodgson Russ LLP ("Hodgson Russ").  My practice focuses almost

exclusively on state taxation issues, including sales tax issues.  I am the primary author of *What*

*To     Expect     in     a     New     York     Sales     and     Use     Tax     Audit*

(https://www.hodgsonruss.com/assets/htmldocuments/ Sales%20Tax%20Booklet.pdf), and a co-

editor together with Mark S. Klein of the *CCH 2019 Guidebook to New York Taxes*. My full

professional biography is published at https://www.hodgsonruss.com/professionals-Joseph-

Endres.html.

      2.     Hodgson Russ represented the petitioners in the above-captioned matter (the

"Petitioners") in connection with the sales tax audit conducted by Jennifer L. Genovese (the

"Auditor") in and about the year 2016 (the "Audit").

      3.     I was personally responsible for representing the Petitioners in the Audit together

with my law partner, Christopher Doyle.

      4.     Our representation of Petitioners in the Audit began in March, 2016.

      5.     I have personal knowledge of the facts set forth herein.

6.      I submit this affirmation at the request of the Petitioners to confirm the information provided to the Auditor, including but not limited to evidence of cash payments by petitioner Metro Enterprises Corp. ("Metro') to performers at various clubs upon redemption of scrip issued by Metro ("scrip" is an alternative currency that is usable at particular adult entertainment clubs and is used to tip performers for their services).

7.      I am not aware of any agreements between the Petitioners and the clubs that Metro serviced to perform any services for the clubs, other than to refer entertainers and to issue scrip charged to the clubs' patrons' individual credit card accounts pursuant to the "Entertainment Services Agreement".[1] (Exhibit A-1)

8.      To the best of my knowledge as a regular practitioner in connection with the reporting, auditing and payment of New York Sales Tax, and my experience in handling similar cases in the past, noncompulsory payments made by customers to individual workers (rather than to the business) are treated as gratuities as a matter of law and are not sales taxable.  This is so regardless of whether the workers are waiters / waitresses, bartenders, performers, or any other service provider.   This conclusion is underscored by the fact that in the 14 years that I have represented clients in sales tax audits of adult entertainment clubs, I do not recall a single instance when the Department attempted to impose sales tax liability on gratuities paid to performers in cash, and to the best of my knowledge (based upon my discussions with John Scarfi and review of the records produced) the performers did not report cash gratuities to Metro and Metro did not maintain any record of the same.

9.      In connection with the Audit, the Auditor made four (4) Information and Document Requests ("IDR"), as follows:

---

[1] Metro is also referenced in (though not a signatory to) the "Non-exclusive Lease of Entertainment Facilities" agreement between the performers and the clubs.  (Exhibit A-2)

      A.     IDR #1 dated April 21, 2014 (Exhibit B-1)

      B.     IDR #2 dated November 4, 2015 (Exhibit C-1)

      C.     IDR #3 dated May 20, 2016 (Exhibit D-1)

      D.     IDR #4 dated August 11, 2016 (Exhibit E-1).

10.    We provided written responses to the IDRs listed above in two separate submissions:

      A.     IDR #3 Response dated July 1, 2016 (Exhibit D-2)

      B.     IDR #4 Response dated September 22, 2016, including responses to outstanding items requested in previous IDRs (Exhibit E-2).

11.    All of the IDRs were duly and properly responded to on behalf of the Petitioners in two written submissions and during field meetings held on May 5, 2016 and July 19, 2016. In total, all requested information was provided and records produced, with the exception (as noted in the responses) of categories of records not applicable to the Petitioners (and therefore never maintained) or which we were still gathering when the Auditor informed us that the Department would be holding all of Metro's receipts as taxable and issued a Statement of Proposed Audit Change (Form AU-346) consistent with such position on October 19, 2016.[2]

12.    Due to an inadvertent typographical error, the response to IDR #2, Item 7, was incorrectly labeled as the response to IDR # 2, Item 6, in Exhibit D-2. In fact, the records responsive to Item 6 (payroll records) were produced at the meeting with the Auditor held (in my presence) at both Metro's Manhattan office and my firm's Manhattan office on July 19, 2016 and were part of responses to other requests (e.g., QuickBooks files, federal Forms 941, etc.).

---

[2] As noted in our IDR #4 Response dated September 22, 2016, we were investigating whether certain ledger notebooks were lost in a flood. At the time, we provided supporting documentation (a monthly sales report and a daily credit card audit) for these missing notebooks while we continued to attempt to locate the requested records. In is my understanding, based on conversations with Mr. Scarfi, that the missing ledger notebooks have been located and are available for inspection.

13.    In all, numerous cartons of records, consisting of thousands of ledger pages documenting cash paid to performers by Metro upon redemption of scrip issued by Metro, were produced.  The Auditor then selected approximately twenty-five (25) exemplar pages for inclusion in the Audit file (Exhibit F).  When opened and lying flat, the left-hand page of the ledger included a credit card settlement report detailing the credit card transactions for that day, as well as some related calculations, and the right-hand page of the ledger contained the performers' names, the corresponding scrip voucher numbers redeemed by the performers, the amount of Metro's redemption fee, the amount paid out to the performers in cash and the performers' signatures.

14.    The photograph below is a fair and accurate representation of the ledger notebooks provided to the Auditor for inspection during the July 19, 2016 meeting at Metro's office, which I personally attended.  These ledgers are organized by month and year and contain a full listing of all cash payments made to performers upon their redemption of scrip.



15.     Given Metro's production of voluminous ledgers documenting cash payments to entertainers who redeemed scrip, and given the Auditor's selection of a 25-page exemplar of these ledgers for inclusion in the Audit file, the assertion that Metro did not provide proof that entertainers were paid cash when they redeemed scrip is entirely false.  Moreover, it is my understanding, based on conversations with Mr. Scarfi, that Metro's corporate tax filings are consistent with this approach – i.e., the money paid to the performers was removed from Metro's receipts and excluded in the calculation of Metro's revenue.

16.     To the best of my knowledge, information and belief, there was no documentation or evidence submitted to the Auditor contradicting the information and documentation with which she was provided, i.e., there was nothing to suggest that the performers did not receive cash payments upon redemption of scrip (which is the normal, well-known method of tipping the performers in the industry using a credit card).

17.     As stated above, I have represented clients in sales tax audits by the Department for 14 years, encompassing hundreds of audits.  In my experience, and in my professional opinion, the industry norm (recognized in every "scrip" case), together with the business methodology explained to the Auditor, corroborated by Metro's corporate tax returns and the cartons of records provided to the Auditor (and the exemplar pages she chose to include in the Audit file), in the absence of any contradictory evidence, were more than sufficient to establish that the performers were paid by Metro in cash upon redeeming the scrip issued by Metro.

18.     Accordingly, any claim by the Department that Petitioners' proof of cash payments to the performers was inadequate, insufficient or speculative is inconsistent with the documentation and information provided to the Auditor, and not supported by the Audit record.

19.     We also provided copies of Metro's federal corporate tax returns to the Auditor establishing that John Scarfi was the sole shareholder of Metro for the period 2007 through 2014.

(Exhibit G)  Based on communications with Mr. Scarfi, and as referenced in the Audit's Tax Field Audit Record (DO-220.5), Metro did not record any cash or scrip paid by customers to performers as part of its gross receipts or income on its tax returns, but did report the Metro service charges as taxable income, and accounted for unredeemed scrip as a liability.  Moreover, based on Mr. Scarfi's federal personal income tax returns provided during the Audit, it does not appear that he received any income from any of the New York clubs at which Metro issued scrip. (Exhibit H).

20.     Upon information and belief, and based on a review of the Audit's Tax Field Audit Record (DO-220.5): (a) the Department did not have any of the documentation that was requested in the IDRs issued in the Audit prior to when our representation began (March 2016), (b) the only documents obtained by the Auditor in the Audit prior to our representation were bank statements which had been subpoenaed from the Bank of New Jersey, and (c) the decision to treat Metro as an agent/co-vendor of the clubs making taxable credit card sales was made in December 2014, apparently on the basis of the bank statements since they appear to be the only records in the Department's possession at the time.  In my opinion, these records would provide an insufficient basis on which to conclude that Metro was an agent/co-vendor of the clubs and was making taxable sales.  Moreover, such a conclusion is further undermined by the Auditor's statement in the DO-220.5 on 04/06/2016 to Christopher Doyle that "we have never audited [Metro] and to date have no clear picture of the business."

Dated: Buffalo, New York
        August 13, 2019

Joseph N. Endres

6

# EXHIBIT A-1
# TO AFFIRMATION OF
# JOSEPH N. ENDRES

# ENTERTAINMENT SERVICES AGREEMENT

I.     INTRODUCTION:

1.     **METRO ENTERPRISES CORP.** ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Lade Entertainment, Inc. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO. See Addendum "A".

2.     **THE SERVICES:** METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at CLUB.

3.     **CLUB REGISTRATION BENEFITS:**

        * Referrals of Professional Exotic Dancers
        * Delegation of scheduling duties and problems
        * Delegation of age verification requirements
        * Use of METRO issued "Funny Money"
        * Use of METRO credit card machines for purchase of "Funny Money"

II.    **CONTRACT FEES:** CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.   **OBLIGATIONS OF METRO:**

2.     Referrals of PROFESSIONAL DANCERS:   METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional Exotic Dancers for each available Performance Date.

3.     Funny Money:  METRO agrees to incur the expense for, and provide club with, adequate supplies of "Funny Money".

4.     Credit Card Machine placement:  METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.     METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.    **OBLIGATIONS OF CLUB:**

1.     Funny money: CLUB agrees that all customer credit card purchases of "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.     Credit Card Machine Placement:  CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001017

VI.   **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.   **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.   **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 1160 East Jericho Turnpike, Suite 117, Huntington, NY 11743

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY: _____
President – John Scarfi

DATED: 12.4.08

MLB ENTERPRISES CORP.

BY: _____
President – Anthony Capeci

DATED: 12/4/08

001018

## ENTERTAINMENT SERVICES AGREEMENT

I.  INTRODUCTION:

1.  METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Lace Entertainment, Inc. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO. See Addendum "A".

2.  THE SERVICES:  METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at CLUB.

3.  CLUB REGISTRATION BENEFITS:

* Referrals of Professional Exotic Dancers
* Delegation of scheduling duties and problems
* Delegation of age verification requirements
* Use of METRO issued "Funny Money"
* Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.  OBLIGATIONS OF METRO:

2.  Referrals of PROFESSIONAL DANCERS:   METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional Exotic Dancers for each available Performance Date.

3.  Funny Money:  METRO agrees to incur the expense for, and provide club with, adequate supplies of "Funny Money".

4.  Credit Card Machine placement:  METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.  METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.  OBLIGATIONS OF CLUB

1.  Funny money: CLUB agrees that all customer credit card purchases of "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.  Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001019

VI.    **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.    **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.    **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.    **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.    **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.    **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.    **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 1160 East Jericho Turnpike, Suite 117, Huntington, NY 11743

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY:
President – John Scarfi

DATED: 12·4·0B

44th ENTERPRISES CORP.

BY:
President – Anthony Capeci

DATED: 12/4/08

001020

*contracts w/
(1/19/16) HLB a 44th
Rec.
a other clubs
(5/5/16) Rec.*

# ENTERTAINMENT SERVICES AGREEMENT

I.   INTRODUCTION:

1.   **METRO ENTERPRISES CORP.** ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Mlb Enterprises. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO. See Addendum "A".

2.   **THE SERVICES:** METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at CLUB.

3.   **CLUB REGISTRATION BENEFITS:**

> \* Referrals of Professional Exotic Dancers
> \* Delegation of scheduling duties and problems
> \* Delegation of age verification requirements
> \* Use of METRO issued "Funny Money"
> \* Use of METRO credit card machines for purchase of "Funny Money"

**II. CONTRACT FEES:** CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.   **OBLIGATIONS OF METRO:**

2.   Referrals of PROFESSIONAL DANCERS: METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional Exotic Dancers for each available Performance Date.

3.   Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of "Funny Money".

4.   Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.   METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.   **OBLIGATIONS OF CLUB**

1.   Funny money: CLUB agrees that all customer credit card purchases of "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.   Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001143

VI.   **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX. **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X. **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 181 South Carolina Ave, Atlantic City, NJ 08401

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY: _____
John Scarfy, President

DATED: _6. 16. 17_

MLB Enterprises
BY: _____
Anthony Capeci, President

DATED: _____

001144

## ENTERTAINMENT  SERVICES AGREEMENT

I.    INTRODUCTION:

1.       METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. 44 Enterprises. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its  CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO.  See Addendum  "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3..    CLUB REGISTRATION  BENEFITS:

> * Referrals of Professional Exotic Dancers
> * Delegation of scheduling duties  and problems
> * Delegation  of  age verification requirements
> * Use of METRO  issued  "Funny Money"
> * Use of METRO  credit card machines  for purchase  of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.    OBLIGATIONS OF METRO:

2.     Referrals of PROFESSIONAL  DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional  Exotic Dancers for each available  Performance Date.

3.    ·  Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.     Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine  for all patron  purchases of "Funny Money".

5. ·    METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.    OBLIGATIONS OF CLUB

1.     Funny money: CLUB agrees that all customer credit card purchases of·· "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned  by METRO.

2.     Credit Card Machine Placement: CLUB agrees to allow METRO to ·place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001145

VI.   **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.   **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.   **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 689 8th Ave. New York, NY 10036

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY: _____
John Scarfi, President

DATED: _____

44th ENTERPRISES CORP.

BY: _____
Anthony Capeci, President

DATED: _____

## ENTERTAINMENT  SERVICES AGREEMENT

I.   INTRODUCTION:

1.     METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Stilletto entertainment LLC. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO. See Addendum "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.    CLUB REGISTRATION BENEFITS:

      * Referrals of Professional Exotic Dancers
      * Delegation of scheduling duties and problems
      * Delegation of age verification requirements
      * Use of METRO issued "Funny Money"
      * Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.   OBLIGATIONS OF METRO:

2.     Referrals of PROFESSIONAL  DANCERS: METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional  Exotic Dancers for each available  Performance Date.

3.     Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.     Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine  for all patron purchases of "Funny Money".

5.     METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.   OBLIGATIONS OF CLUB

1.     Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.     Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001147

VI.    **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.    **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.     **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.    **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.  **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 180 Route 59 Nanuet NY 10954

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.                    STILLETTO ENTERTAINMENT LLC

BY:                                        BY:
John Scarfi/President                         Glen Orecchio

DATED: 6 / 27 / 20                         DATED:

001148

## ENTERTAINMENT  SERVICES AGREEMENT

I.    INTRODUCTION:

1.    METRO ENTERPRISES CORP.  ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Lace Entertainment, Inc, operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO.  See Addendum "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.    CLUB REGISTRATION  BENEFITS:

    \* Referrals of Professional Exotic Dancers
    \* Delegation of scheduling duties and problems
    \* Delegation of age verification requirements
    \* Use of METRO issued "Funny Money"
    \* Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.    OBLIGATIONS OF METRO:

2.    Referrals of PROFESSIONAL DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional Exotic Dancers for each available  Performance Date.

3.    Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.    Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.    METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.    OBLIGATIONS OF CLUB

1.    Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.    Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001149

**VI.** **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

**VII.** **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

**IX.** **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

**X.** **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

**XI.** **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

**XII.** **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

**XIII.** **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ  07675

BY MAIL TO CLUB at 195 Route 303 W Nyack NY 10994

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY:_____
John Scarff, President

DATED:_____

Lace entertainment inc

BY:_____
Glen Orecchio

DATED:_____

001150

# ENTERTAINMENT  SERVICES AGREEMENT

I.   INTRODUCTION:

1.     METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Fizer Corp. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO.  See Addendum "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.    CLUB REGISTRATION BENEFITS:

    * Referrals of Professional Exotic Dancers
    * Delegation of scheduling duties and problems
    * Delegation of age verification requirements
    * Use of METRO issued "Funny Money"
    * Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.    OBLIGATIONS OF METRO:

2.     Referrals of PROFESSIONAL DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional Exotic Dancers for each available Performance Date.

3.     Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.     Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.     METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.    OBLIGATIONS OF CLUB

1.     Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.     Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

VI.   **BREACH OF CONTRACT:** In the event of a breach of this Agreement. the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received. this agreement shall renew automatically.

IX.   **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.   **MODIFICATION:** This Agreement may not be modified. in whole or in part. unless it is in writing and signed by both   parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other   party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue. Westwood, NJ  07675

BY MAIL TO CLUB at 9 Laurence Parkway, Laurence Harbor, NJ 08879

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY:

John Scark, President

DATED:  6 / 27 / 18

FIZER CORP

BY:

Glen Orrechio

DATED:  6 / 27 / 18

001152

# ENTERTAINMENT  SERVICES AGREEMENT

I.    INTRODUCTION:

1.     METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. Stilleto in Carlstadt corp. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO.  See Addendum "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.    CLUB  REGISTRATION  BENEFITS:

* Referrals of Professional Exotic Dancers
* Delegation of scheduling duties and problems
* Delegation of age verification requirements
* Use of METRO issued "Funny Money"
* Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

## III.    OBLIGATIONS OF METRO:

2.    Referrals of PROFESSIONAL  DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional  Exotic Dancers for each available Performance Date.

3.    Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.    Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine for all patron purchases of "Funny Money".

5.    METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines,

## IV.    OBLIGATIONS OF CLUB

1.    Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.    Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

001153

VI.    BREACH OF CONTRACT: In the event of a breach of this Agreement. the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   TERM: This Agreement is valid for ONE year from the date of its signing.  This Agreement may be terminated by either party on thirty (30) days written notice.  Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX. ENTIRE AGREEMENT: This Agreement constitutes the entire agreement between the parties.

X. MODIFICATION: This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   SEVERABILITY: If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   ASSIGNMENT: Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   NOTICE: Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue. Westwood. NJ  07675

BY MAIL TO CLUB at 325 Paterson Plank Rd., Carlstadt. NJ 07073

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY:
John Scarff, President

DATED: _6·25·20_7_

Stiletto in Carlstadt corp.

BY:
Glen Orrechio

DATED: _6·26·20_7_

001154

# ENTERTAINMENT SERVICES AGREEMENT

I.   INTRODUCTION:

1.     METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. 181 south inc. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform exotic dance entertainment at its CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment Services Agreement with METRO. See Addendum "A".

2.    THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified Professional Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.     CLUB REGISTRATION BENEFITS:

* Referrals of Professional Exotic Dancers
* Delegation of scheduling duties and problems
* Delegation of age verification requirements
* Use of METRO issued "Funny Money"
* Use of METRO credit card machines for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

III.   OBLIGATIONS OF METRO:

2.     Referrals of PROFESSIONAL  DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional  Exotic Dancers for each available Performance Date.

3.     Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.     Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine  for all patron purchases of "Funny Money".

5.     METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

IV.   OBLIGATIONS OF CLUB

1.     Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively owned by METRO.

2.     Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

VI.   **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.  **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X.  **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue, Westwood, NJ 07675

BY MAIL TO CLUB at 181 South Carolina Ave, Atlantic City, NJ 08401

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY: _____
John Searh, President

DATED: _____

181 SOUTH INC.

BY: _____
Glen Orrechio, President

DATED: _____

001156

# ENTERTAINMENT  SERVICES AGREEMENT

I.     INTRODUCTION:

1.       METRO ENTERPRISES CORP. ("METRO") is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities. GJJM Enterprises. operates a Nightclub ("CLUB") which seeks the referral of Professional Exotic Dancers to perform  exotic dance entertainment  at its  CLUB.

> Definition: A Registered Adult Nightclub is any Nightclub at which holds a current Entertainment  Services Agreement  with METRO.  See Addendum "A".

2.     THE SERVICES: METRO shall place CLUB on its registration list of nightclubs, and shall refer qualified  Professional  Exotic Dancers to CLUB for all performance dates available at  CLUB.

3.     CLUB  REGISTRATION  BENEFITS:

> * Referrals of Professional Exotic Dancers
> * Delegation of scheduling duties and problems
> * Delegation  of age verification requirements
> * Use of METRO issued "Funny Money"
> * Use of METRO  credit card machines  for purchase of "Funny Money"

II. CONTRACT FEES: CLUB agrees to pay to METRO a fee for the referral service, which shall consist of $10.

## III.    OBLIGATIONS OF METRO:

2.     Referrals of PROFESSIONAL  DANCERS:  METRO agrees to make all reasonable efforts to refer, and schedule, at least FIFTEEN (15) Registered Professional  Exotic Dancers for each available Performance Date.

3.     Funny Money: METRO agrees to incur the expense for, and provide club with, adequate supplies of  "Funny Money".

4.     Credit Card Machine placement: METRO agrees to place on the CLUB premises its credit card machine  for all patron  purchases of "Funny Money".

5.     METRO agrees to be solely responsible for all credit card transactions conducted on its credit card machines.

## IV.    OBLIGATIONS  OF CLUB

1.     Funny money: CLUB agrees that all customer credit card purchases of  "funny money" shall be made exclusively on METRO'S credit card machine, the income from which shall be exclusively  owned  by METRO.

2.     Credit Card Machine Placement: CLUB agrees to allow METRO to place its credit card machine on CLUB'S premises, and to make no claim of any right, title or interest in the proceeds there from.

VI.    **BREACH OF CONTRACT:** In the event of a breach of this Agreement, the Parties agree that the Liquidated Damages shall be $750.00 per day. The Parties agree that such amount is their estimate of the damage to them which a breach would cause.

VII.   **TERM:** This Agreement is valid for ONE year from the date of its signing. This Agreement may be terminated by either party on thirty (30) days written notice. Termination of the Agreement will result in CLUB'S immediate removal from the METRO'S Register of Adult Nightclubs, and METRO'S immediate removal of its credit card equipment. If no termination notice is received, this agreement shall renew automatically.

IX.  **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties.

X. **MODIFICATION:** This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

XI.   **SEVERABILITY:** If any provision of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this Agreement.

XII.   **ASSIGNMENT:** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

XIII.   **NOTICE:** Any notices of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at 286 Fairview Avenue. Westwood, NJ 07675

BY MAIL TO CLUB at 185 South Carolina Ave, Atlantic City, NJ 08401

IT IS HEREBY AGREED.

METRO ENTERPRISES CORP.

BY:

John Scarfi/President

DATED: 6/22/2007

GJM ENTERPRISES

BY:

Perry Baonagdaro, President

DATED: 6/22/2007

001158

# EXHIBIT A-2
# TO AFFIRMATION OF
# JOSEPH N. ENDRES

# NON-EXCLUSIVE LEASE OF

# ENTERTAINMENT FACILITIES

LESSOR: "THE CLUB"

NAME: MLB Enterprises Corp.
D/B/A: Lace
ADDRESS: 725 Seventh Avenue
New York, NY 10019

LESSEE: "ENTERTAINER"

NAME *Kathleen Fiorito*

ADDRESS *345 W. 86th St. Apt.14M*
*N.Y. NY 10024*
CITY, STATE, ZIP CODE

TELEPHONE *347-678-4615*

STAGE NAME(S) OR "D/B/A" *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*
SOCIAL SECURITY/ FEDERAL ID NUMBER

THIS LEASE IS DATED *12/4/13*

CLUB operates a business where adult entertainment is permissible. ENTERTAINER is a self-employed professional exotic dancer who desires to lease a facility where adult entertainment is permissible. THEREFORE, CLUB and ENTERTAINER agree:

1. **NON-EXCLUSIVE LEASE.**

ENTERTAINER agrees to lease the right to use THE CLUB's stages, dance areas and other portions of its facilities to market her entertainment.

2. **TERM OF AGREEMENT.**

The agreement is for one year, consisting of as many performance dates as ENTERTAINER chooses to schedule.

3. **OBLIGATIONS OF ENTERTAINER**

A. Proof of Age: ENTERTAINER WARRANTS SHE IS 18 YEARS OLD AND SHALL PROVIDE VALID IDENTIFICATION and PROOF OF AGE.

B. Rental Fees:
(1) ENTERTAINER shall pay CLUB ONE HUNDRED FIFTY ($150.00) DOLLARS PER PERFORMANCE DATE. ENTERTAINER agrees to pay these fees at the beginning of each performance date.

C. Scheduling: All scheduling shall be arranged through METRO ENTERPRISES CORP. Each performance date consists of one full eight (8) hour set. OnNce scheduled, neither party has the right to cancel or change a performance date without 24 hour notice to METRO ENTERPRISES CORP. to permit it to supply a qualified substitute in her place.

D. Stage Performances: ENTERTAINER agrees to perform eight stage shows per performance date.

E. Costumes: ENTERTAINER shall supply all her own costumes, which must comply with all laws.

F. Use of Premises: ENTERTAINER shall use CLUB's facilities in a professional and safe manner.

G. Illegal Substances & Alcohol: ENTERTAINER shall not bring to, or use illegal substances or alcohol while on CLUB property, and shall not be or intoxicated or under the influence of illegal drugs while on CLUB's property.

H. Licenses/Permits: ENTERTAINER shall maintain all personal licenses and/or permits required by any governmental agencies.

I. Laws: ENTERTAINER shall comply with all

001108

applicable laws.

J.      No Contact Rule:  ENTERTAINER shall not touch customers during her performance or permit customers to touch her during her performance.

VIOLATION OF ¶¶ G, H, I or J WILL RESULT IN IMMEDIATE TERMINATION OF LEASE.

K.      Assumed Risk: ENTERTAINER understands adult entertainment is offered at THE CLUB.  She understands she may be subjected to sexually suggestive conduct. She assumes this risk.

L.      Property Damage: ENTERTAINER shall be responsible for the actual cost of any damage caused by her to any of CLUB'S property on CLUB's presentation of proof of loss..

M.      Taxes:  ENTERTAINER agrees to be exclusively responsible for her federal, state and/or local taxes.

### 4.  OBLIGATIONS OF "THE CLUB".

A.      Facilities:    CLUB    shall    provide ENTERTAINER with the non-exclusive right to lease its licensed facilities for scheduled performance dates.

B.      Scheduling:  CLUB shall accept scheduling from METRO ENTERPRISES CORP.

C.      No Control: THE CLUB shall not direct or control ENTERTAINER'S performances, expression, or costumes except to maintain compliance with laws. ENTERTAINER also retains complete freedom to perform at any other businesses.

D.      Dance Fees & Tips:  CLUB agrees that ENTERTAINER is entitled to keep all dance fees paid to her and all "tip" (gratuities) given to her by patrons during her performance date, during any period during which she is considered a "tenant" and not an "employee".

E.      Stages, Lights, Dressing Rooms: CLUB shall provide stages, dance areas, lighting and dressing room facilities for ENTERTAINERS.

F.      Disc Jockey:  CLUB shall provide and pay for a disc jockey to play music selected by ENTERTAINER. Disc jockey shall introduce and promote ENTERTAINER.

G.      Club Employees: CLUB shall provide and pay for valet and/or door personnel, waitresses, and safety personnel at its sole and exclusive expense.

ENTERTAINER is never required to tip any worker employed by CLUB.

H.      Copyright fees: CLUB shall pay all copyright fees due relative to the music used on the PREMISES.

I.      Permits & Licensing:  CLUB shall pay for acquiring and maintaining club property and all club business permits, licensing, and zoning which are prerequisites to permitting adult oriented entertainment to take place on its PREMISES.

J.      Advertising: CLUB agrees to pay for all advertising in a commercially reasonable manner beneficial to both ENTERTAINER and CLUB.

K.      Privacy:  CLUB agrees to maintain ENTERTAINER'S privacy rights, and agrees that it shall not provide any party with ENTERTAINER'S true name, address or telephone without ENTERTAINER'S written permission or governmental order.

### 5.  OTHER TERMS OF THE CONTRACT

A.      Termination/Notice.  This LEASE may be terminated without cause on 30 days notice. If there is a *material breach of contract*, this LEASE may be terminated on 24 hours notice.

B.      Contract Damages
(1)  BREACH BY ENTERTAINER:  If the ENTERTAINER breaches the contract, THE CLUB may assess upon ENTERTAINER liquidated damages in the amount of $150.00.

(2) BREACH BY THE CLUB: If the club breaches the contract, ENTERTAINER may assess THE CLUB $150.00 liquidated damages.

001109

C.  BINDING ARBITRATION  Any and all controversies between the ENTERTAINER and the CLUB, regardless of whether such claims sound in contract, tort, and/or based upon a federal or state statute, shall be exclusively decided by binding arbitration held pursuant to and in accordance with the Federal Arbitration Act ("FAA") in conformity with rules and procedures s established by the American Arbitration Association and as may be modified by any state arbitration act, and shall be decided by a single neutral arbitrator agreed upon by the parties, who shall be permitted to award, subject only to the restrictions contained in this paragraph 5(B), any relief available in a court. All parties waive any right to litigate such controversies, disputes, or claims in a court of law, and waive the right to trial by jury.

In arbitration, all parties have the right to be represented by legal counsel the arbitrator shall permit *only* that minimal discovery which is necessary to prosecute/defend the claim then pending before the arbitrator and all discovery shall be deemed confidential. The arbitrator's decision shall be final.

D.  CLASS AND COLLECTIVE ACTION WAIVER  ENTERTAINER agrees that all claims or disputes between her and the club will be litigated individually and that she will not consolidate or seek class treatment for any claim. The ENTERTAINER expressly waives her right to prosecute, participate in, or pursue a class or collective action and/or other joint proceeding against the CLUB. This paragraph 5(C) survives termination of this lease and shall also survive any judicial determination that the arbitration agreement contained herein is unenforceable for any reason.

E.  SEVERABILITY.  If any part of this LEASE is declared unenforceable, it shall be interpreted as if that provision was not part of the LEASE.

F.  PRIOR LEASES   This lease supersedes and incorporates all prior leases between the parties.

6.  RELATIONSHIP OF THE PARTIES

A.  Lessor/Lessee.  The parties agree that their relationship is that of lessor and lessee.

B.  NO EMPLOYMENT RELATIONSHIP  The parties agree that ENTERTAINER is not an "employee" of THE CLUB. ENTERTAINER agrees CLUB will not pay her wages, overtime, expenses, benefits, or any other employee-related benefits, in exchange for permitting her to retain all dance fees paid to her by customers while on CLUB's premises.
ENTERTAINER further understands that she is entitled to retain all dance fees and gratuities paid to her by patrons on CLUB's premises ONLY during such periods as she is considered a non-employee.

C.  CHANGE IN STATUS:  IF ENTERTAINER claims, or any court or governmental agency determines, that the relationship between CLUB and ENTERTAINER is that of employer-employee, the parties agree:

(i) ENTERTAINER shall immediately convert to "employee status", and accept all the duties, responsibilities of same;

(ii) CLUB shall obtain proofs of comparable wage rates in this or a comparable industry;

(iii) CLUB shall provide ENTERTAINER an offer of employment at an industry standard rate;

(iv) ENTERTAINER must accept or reject within 3 days of CLUBS offer of employment.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BECAUSE OF LEGAL RESTRICTIONS, THE CLUB WILL NOT ENTER INTO AN AGREEMENT WITH AN ENTERTAINER WHO IS UNDER THE AGE OF 18 / 21 (circle one). ENTERTAINER SPECIFICALLY REPRESENTS THAT SHE IS OF LAWFUL AGE OR OLDER, THAT SHE HAS PROVIDED – OR WILL PROVIDE UPON REQUEST – APPROPRIATE IDENTIFICATION VERIFYING HER AGE, AND THAT SUCH IDENTIFICATION IS VALID AND AUTHENTIC.

001110

BY SIGNING THIS DOCUMENT, ENTERTAINER REPRESENTS THAT SHE HAS RECEIVED A COPY OF, AND HAS FULLY READ, THIS AGREEMENT; THAT SHE UNDERSTANDS, AND AGREES TO BE BOUND BY, ALL OF ITS TERMS; AND THAT SHE HAS BEEN PERMITTED TO ASK QUESTIONS REGARDING ITS CONTENTS AND HAS BEEN GIVEN THE OPPORTUNITY TO HAVE IT REVIEWED BY PERSONS OF HER CHOICE, INCLUDING ATTORNEYS AND ACCOUNTANTS.

AGREED: "ENTERTAINER"

_Kathleen Fiorito_
Signature of Entertainer

Print Name: _Kathleen Fiorito_

Date: _12/4/13_

AGREED: "THE CLUB"

_Anthony Capeci_
Title: _PRES_

Date: _12/4/13_

001111

## PROFESSIONAL EXOTIC DANCER
## REGISTRATION AND REFERRAL SERVICE CONTRACT

### I.      INTRODUCTION:

1.      METRO ENTERPRISES CORP. ("METRO" is in the business of registering and referring Professional Exotic Dancers to Registered Adult Nightclubs for performance opportunities.)

_Kryulopa Fotulo_ (PRINT NAME) is a Professional Exotic Dancers ("DANCER") who is in the business of performing professional exotic dance entertainment to patrons and seeks referrals for performance dates at Registered Adult Nightclubs. The parties desire to enter into a business relationship whereby METRO will refer DANCER to Registered Adult Nightclubs.

   Definition: A Registered Adult Nightclub is any Nightclub which holds a current Entertainment Services Agreement with METRO. See Addendum "A" for list of Registered Adult Nightclubs.

2.      THE SERVICES: METRO shall place DANCER on its Registration List of Professional Exotic Dancers, and shall refer DANCERS to Registered Adult Nightclubs who have dance performance dates available. METRO shall schedule DANCER for professional dates at any Registered Adult Nightclub selected by DANCER which has performance dates available.

3.      PROFESSIONAL EXOTIC DANCER REGISTRATION BENEFITS:
   - Access to Registered Adult Nightclubs
   - Advertising as Registered Professional Exotic Dancer
   - Privacy and confidentiality
   - Dance customers may use METRO credit card machine to purchase private dances

### II.      Referral Fee:

DANCER agrees that for its Daily Referral Fee METRO shall be entitled to retain ten (10%) percent of the face value of all "Funny Money" purchased by patrons at any Registered Adult Nightclubs and used to pay DANCER for her services of rendering private dances. This ten (10%) percent charge constitutes METRO's Daily Referral Fee for each performance date on which METRO refers DANCER.

### III.      OBLIGATIONS OF METRO:

1.      METRO agrees to make all reasonable efforts to provide Professional Exotic Dancers with a Referral to a Registered Adult Nightclubs for all Performance Dates requested by DANCER. DANCER may select from among the Registered Adult Nightclubs listed on Addendum "A".

      NOTE: METRO retains no rights and shall not impose any restrictions upon DANCER concerning her
      choice of nightclubs. This AGREEMENT relates only to performances at nightclubs to which METRO has referred DANCER.

2.      METRO's SCHEDULING PROCESS: REQUESTING PERFORMANCE DATES:

      _DANCER REQUESTS for performance dates must be by:_
      _Telephone call to METRO's Schedule Line @ -212-764-1505_

NOTE:    Each nightclub to whom DANCER is referred for performance dates has the exclusive right to accept or reject any Professional Exotic Dancer Referred by METRO. No nightclub is obligated to schedule any Professional Exotic Dancer referred by METRO.

3.      CONFIDENTAILITY AND PRIVACY: METRO agrees to keep all information concerning DANCER confidential and private. METRO agrees not to provide DANCER's name, address or telephone number to any person, business or government agency without DANCER's expressed permission except on order of a court or other authority.

## IV.   OBLIGATION OF DANCER:

1.   DANCER agrees to accept "Funny Money" from customers who purchase the same at any Registered Nightclubs

2.   DANCER agrees that METRO may retain its ten (10%) percent Daily Referral Fee from the face value of the "Funny Money" sold to a customer by credit card on the premises of any Registered Adult Nightclub, and used by any patron to pay DANCER for her services of rendering private dancers.

3.   DANCER agrees to provide METRO with her legal name, current address and telephone number.

4.   DANCER represents that she is at least Eighteen (18) years of age and agrees to provide METRO with valid photo-identification as verification that DANCER is at least Eighteen (18) years of age or older.

5.   DANCER agrees to obtain and maintain any required cabaret or adult business licenses.

6.   DANCER agrees to maintain and provide her own costumes, music, and props.

7.   DANCER agrees to make a Request for a Performance Date by telephone, Faxing or emailing METRO at the numbers highlighted above at IV2 at least SEVEN (7) DAYS in advance of any Requested for a Performance Date at any Registered Adult Nightclub.

8.   DANCER agrees to appear as scheduled for any audition or Performance Dates scheduled by METRO.

9.   DANCER agrees to perform for the full performance dates for which she has agreed to perform.

10.   DANCER agrees to perform in a professional manner, Safe and lawful manner at each Registered Adult Nightclub to which METRO refers DANCER.

11.   DANCER agrees to notify METRO AT LEAST 24 HOURS IN ADVANCE of any scheduled Performance Date on which she will be unable to perform, in any order that METRO can refer a substitute DANCER to that nightclub.

*ALL CANCELLATIONS MUST BE MADE 24 HOURS IN ADVANCE BY CALLING METRO's
212- 764-1505 SCHEDULING LINE*

## VI.   BREACH OF CONTRACT:

In the event DANCER breaches this Agreement failing to appear for any audition or Performance Date scheduled by METRO, METRO may, at its option terminate this Agreement.

FAILURE TO NOTIFY METRO AT LEAST 24 HOURS IN ADVANCE OF A SCHEDULE THAT DANCER WILL BE UNABLE TO APPEAR SHALL CONSTITUTE A BREACH OF CONTRACT.

IF YOU FAIL TO CALL TO CANCEL OR RESCHEDULE YOUR PERFORMANCE DATE, AND FAIL TO APPEAR AS SCHEDULED, METRO SHALL IMPOSE LIQUIDATED CONTRACT DAMAGES OF $150. THE PARTIES AGREE THAT THIS IS FAIR.

ESTIMATE OF THE DAMAGES TO METRO WHICH IS CAUSED BY A DANCER FAILING TO APPEAR AS SCHEDULED OR TIMELY NOTICE TO METRO. This fee is payable BY DANCER to METRO prior to METRO making any further referrals of DANCER.

INT____ Page 2 of 4

### VII.    NO COMPENSATION SHALL BE PAID BY METRO TO DANCER:

DANCER understands that METRO is a referral service for Professional Exotic Dance Entertainers. Compensation to DANCER for any performance is subject to negotiation between DANCER and any nightclub to whom she may be referred.

### VIII.    TERM:

This Agreement is valid for one year from the date of its signing. This Agreement may be terminated by either party by seven "7" Days written notice. Termination of the Agreement will result in DANCER's immediate removal from the METRO Registration of Professional Exotic Dancers.

### IX.    RELATIONSHIPS:

The parties agree that their relationship is strictly contractual in nature, and that METRO is serving as a Performance Date Referral Service. The parties specifically agree that they are not forming an employer-employee relationship.

### X.    ENTIRE AGREEMENT:

This agreement constitutes the entire Agreement between the parties.

### XI.    MODIFICATIONS:

This Agreement may not be modified, in whole or in part, unless it is in writing and signed by both parties.

### XII.    SEVERABILITY:

If any provisions of this Agreement is declared unenforceable for any reason, the AGREEMENT shall, to the extent possible, be interpreted as if the unenforceable provision(s) were not a part of this agreement.

### XIII.    ASSIGNMENT:

Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party.

### XIV.    BINDING ARBITRATION

Any and all controversies between the ENTERTAINER and METRO, regardless of whether such claims sound in contract, tort, and / or are based upon a federal or state statute, shall  be exclusively decided by binding arbitration held pursuant to and in accordance with the Federal Arbitration Act (FAA) in conformity with rules and procedures established by the American Arbitration Association and as may be modified by any state act, and shall be decided by a single neutral arbitrator agreed upon by the parties, who shall be permitted to award, subject only to the restrictions contained in paragraph XIV, any relief available in a court. *All parties waive any right to litigate such controversies, disputes and or claims in a court of law, and waive the right to trial by jury.* In arbitration, all parties have the right to be represented by legal counsel, the arbitrator shall permit *only* that minimal discovery which is necessary to prosecute/defend the claim then pending before the arbitrator and all discovery shall be deemed confidential. The arbitrator's decision shall be final, and shall also survive any judicial determinations that the arbitration agreement contained herein is unenforceable for any reason.

INT ____ *Page 3 of 4*

001114

## XV.   CLASS AND COLLECTIVE ACTION WAIVER:

ENTERTAINER agrees that all claims or disputes between ENTERTAINER and METRO will be litigated individually and she will not consolidate or seek class treatment for any claim. *The ENTERTAINER expressly waives her right to prosecute, participate in, or pursue a class action or collective action and/or other joint proceedings against Metro.* This paragraph 5(D) survives termination of this lease.

## XVI.  NOTICE:

Any notice of termination of this Agreement shall be made as follows:

BY MAIL TO METRO at: 286 Fairview Avenue, Westwood, NJ.  07675

BY MAIL TO DANCER at _345 W. 86th St. Apt. 1404_
_NY, NY 10024_

*IT IS HEARBY AGREED:*

*METRO ENTERPRISES CORP.*
286 Fairview Avenue
Westwood, NJ., 07675

BY: _____

INT: _____
      *pres*
      12/4/13

PROFESSIONAL EXOTIC DANCER

_Kathleen Fiorito_    12/4/13
DANCER SIGNATURE        DATE

_773-678-4615_ · TELEPHONE NUMBER
at which DANCER consents to being contacted.

DATE: _12/4/13_

INT. _____  Page 4 of 4
                    001115

*CRYSTAL*

*12/13*

# NON-EXCLUSIVE LEASE OF
# ENTERTAINMENT FACILITIES

LESSOR: "THE CLUB"

NAME: 44th Enterprises Corp.

D/B/A "Lace II"

ADDRESS : 689 Eighth Avenue

New York, NY 10036

LESSEE: "ENTERTAINER"

NAME *Rosalino*

*Reyes J.*

ADDRESS

*125 fW 2nd 205/21dark*

CITY, STATE, ZIP CODE

*646 - 626 - 3801*

TELEPHONE

*N.Y. NY*

STAGE NAME(S) OR "D/B/A"

*Cristal*

SOCIAL SECURITY/ FEDERAL ID NUMBER

THIS LEASE IS DATED _____.

CLUB operates a business where adult entertainment is permissible.  ENTERTAINER is a self-employed professional exotic dancer who desires to lease a facility where adult entertainment is permissible. THEREFORE, CLUB and ENTERTAINER agree:

1.     NON-EXCLUSIVE LEASE.    ENTER-TAINER agrees to lease the right to use THE CLUB's stages, dance areas and other portions of its facilities to

market her entertainment.

2.     TERM OF AGREEMENT.  The agreement is for one year, consisting of as many performance dates as ENTERTAINER chooses to schedule.

3.     OBLIGATIONS OF ENTERTAINER

A.     Proof of Age. ENTERTAINER WARRANTS SHE IS 18 YEARS OLD AND SHALL PROVIDE VALID IDENTIFICATION and PROOF OF AGE.

B.     Rental Fees.  ENTERTAINER shall pay CLUB ONE HUNDRED FIFTY ($150.00) DOLLARS PER PERFORMANCE DATE.    ENTERTAINER agrees to pay this fees at the end of each performance date.

C.     Scheduling.  All scheduling shall be arranged through METRO ENTERPRISES CORP.   Each performance date consists of one full eight (8) hour set.  ONCE SCHEDULED, neither party has the right to cancel or change a performance date without 24 hour notice to METRO ENTERPRISES CORP. to permit it to supply a qualified substitute in her place.

D.     Stage Performances. ENTERTAINER agrees to perform eight stage shows per performance date.

E.     Costumes.  ENTERTAINER shall supply all her own costumes, which must comply with all laws.

F.     Use of Premises.  ENTERTAINER shall use CLUB's facilities in a professional and safe manner.

G.     Illegal     Substances     &     Alcohol. ENTERTAINER shall not bring to, or use illegal substances or alcohol while on CLUB property, and shall not be or intoxicated or under the influence of illegal drugs while on CLUB's property.

H.     Licenses/Permits.   ENTERTAINER shall maintain all personal licenses and/or permits required by any governmental agencies.

I.     Laws. ENTERTAINER shall comply with all

001116

applicable laws.

J.      No Contact Rule.  ENTERTAINER shall not touch customers during her performance or permit customers to touch her during her performance.

K.      Assumed Risk. ENTERTAINER understands adult entertainment is offered at THE CLUB.  She understands she may be subjected to sexually suggestive conduct. She assumes this risk.

L.      Property Damage.  ENTERTAINER shall be responsible for the actual cost of any damage caused by her to any of CLUB'S property on CLUB's presentation of proof of loss..

M.      Taxes. ENTERTAINER agrees to be exclusively responsible for her federal, state and local taxes.

### 4.  OBLIGATIONS OF "THE CLUB".

A.      Facilities.  CLUB  shall  provide ENTERTAINER with the non-exclusive right to lease its licensed facilities for scheduled performance dates.

B.      Scheduling.  CLUB shall accept scheduling from METRO ENTERPRISES CORP.

C.      No Control.  THE CLUB shall have not direct or  control  ENTERTAINER'S  performances, expression, or costumes except to maintain compliance with laws.  ENTERTAINER also retains complete freedom to perform at any other businesses.

D.      DANCE FEES & TIPS. CLUB agrees that ENTERTAINER is entitled to keep all dance fees paid to her and all "tip" (gratuities) given to her by patrons during her performance date, during any period during which she is considered a "tenant" and not an "employee".

E.      Stages, Lights, Dressing Rooms. CLUB shall provide stages, dance areas, lighting and dressing room facilities for ENTERTAINERS.

F.      Disc Jockey.  CLUB shall provide and pay for a disc jockey to play music selected by ENTERTAINER. Disc jockey shall introduce and

VIOLATION OF ¶¶ G, H, I or J WILL RESULT IN IMMEDIATE TERMINATION OF LEASE.

promote ENTERTAINER.

G.      Club Employees.  CLUB shall provide and pay for valet and/or door personnel, waitresses, and safety personnel at its sole and exclusive expense. ENTERTAINER is never required to tip any worker employed by CLUB.

H.      Copyright fees.  CLUB shall pay all copyright fees due relative to the music used on the PREMISES.

I.      Permits & Licensing.  CLUB shall pay for acquiring and maintaining club property and all club business permits, licensing, and zoning which are prerequisites to permitting adult oriented entertainment to take place on its PREMISES.

J.      Advertising.  CLUB agrees to pay for all advertising in a commercially reasonable manner beneficial to both ENTERTAINER and CLUB.

K.      Privacy.  CLUB agrees to maintain ENTERTAINER'S privacy rights, and agrees that it shall not provide any party with ENTERTAINER'S true  name,  address  or  telephone  without ENTERTAINER'S written permission or governmental order.

### 5.  OTHER TERMS OF THE CONTRACT

A.      Termination/Notice. This LEASE may be terminated without cause on 30 days notice. If there is a *material breach of contract,* this LEASE may be terminated on 24 hours notice.

B.      Contract Damages.

(1) BREACH BY ENTERTAINER.  If the ENTERTAINER breaches the contract, THE CLUB may assess upon ENTERTAINER liquidated damages in the amount of $100.00.

–2–

001117

(2) BREACH BY THE CLUB: If the club breaches the contract, ENTERTAINER may

C.    ARBITRATION.  ALL DISPUTES ARISING FROM THIS LEASE SHALL BE EXCLUSIVELY DECIDED BY BINDING ARBITRATION IN ACCORDANCE WITH RULES   OF   THE   AMERICAN ARBITRATION ASSOCIATION AND AS MAY BE MODIFIED BY ANY STATE ARBITRATION ACT.  ALL FEES SHALL BE PAID BY NON-PREVAILING PARTY.

D.    Severability.  If any part of this LEASE is declared unenforceable, it shall be interpreted as if that provision was not part of the LEASE.

E. ENTERTAINER AGREES THAT ALL CLAIMS BETWEEN HER AND THE CLUB   WILL   BE   LITIGATED INDIVIUALLY AND THAT SHE WILL NOT CONSOLIDATE OR SEEK CLASS TREATMENT   FOR   ANY   CLAIM. ENTERTAINER FURTHER AGREES NOT TO COMMENCE ANY ACTION, SUIT OR ARBITRATION           PROCEEDING RELATING   IN   ANY   MANNER WHATSOEVER TO THIS LEASE OR TO HER PERFORMING AT THE PREMISES OF   THE   CLUB   MORE   THAN   SIX MONTHS   AFTER   SHE   LAST PERFORMED AT THE PREMISES AND FURTHER AGREES TO WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY.
This paragraph 5E survives termination of this lease.

6.    RELATIONSHIP OF THE PARTIES

A.    Lessor/Lessee. The parties agree that their relationship is that of lessor and lessee.

assess THE CLUB $100.00 liquidated damages.

B.    NO EMPLOYMENT RELATIONSHIP. The parties agree that ENTERTAINER is not an "employee" of THE CLUB. ENTERTAINER agrees CLUB will not pay her wages, overtime, expenses, benefits, or any other employee-related benefits, in exchange for permitting her to retain all dance fees paid to her by customers while on CLUB's premises.

ENTERTAINER further understands that she is entitled to retain all dance fees and gratuities paid to her by patrons on CLUB's premises ONLY during such periods as she is considered a non-employee.

C.    CHANGE   IN   STATUS.   IF ENTERTAINER claims, or any court or governmental agency determines, that the relationship      between      CLUB      and ENTERTAINER is that of employer-employee, the parties agree:

(i) ENTERTAINER shall immediately convert to "employee status", and accept all the duties, responsibilities of same;

(ii) CLUB shall obtain proofs of comparable wage rates in this or a comparable industry;

(iii) CLUB shall provide ENTERTAINER an offer of employment at an industry standard rate;

(iv). ENTERTAINER must accept or reject within 3 days of CLUBS offer of employment.

–3–

001118

I HEREBY ACKNOWLEDGE THAT I HAD AN
OPPORTUNITY TO CONSULT COUNSEL CONCERNING
THIS LEASE.

AGREED: "ENTERTAINER"

_____

Signature of Entertainer

Date: _____

AGREED: "THE CLUB"

By: _____

Its _pres._

Date: _12/14/13_

—4—

001119

# NON-EXCLUSIVE LEASE OF
# ENTERTAINMENT FACILITES

Lessor: "THE CLUB"

NAME:   44th Enterprises Corp
D/B/A/:   DIAMOND CLUB
Address:   689 Eighth Avenue
              New York, NY 10036
LESSEE: "ENTERAINER"

NAME *Catherine Matter* PRINT NAME
Address
*14 morgue place*
City *Congue* State *NY* Zip *14706*

Telephone *347 975 0509*
*Tiffany*
Stage Name(s) or D/B/A
*879 82 4765*
Social Security # / Federal ID #

This Lease is dated: *12/17/13*

CLUB operates a business where adult entertainment is
Permissible. ENTERTAINER is a self-employed
professional exotic dancer who desires to lease a
facility where adult entertainment is permissible.
THEREFORE, CLUB and ENTERTAINER agree:

1.              NON-EXCLUSIVE LEASE

ENTERTAINER agrees to lease the right to use THE
CLUB's stages, dance areas and other portions of its
facilities to market her entertainment.

2.              TERM OF AGREEMENT

The agreement is for one year, consisting of as many
performance dates as ENTERTAINER chooses to
schedule.

3.              OBLIGATIONS OF ENTERTAINER

A.   Proof of Age: ENTERTAINER WARRANTS SHE IS 18
YEARS OLD AND SHALL PROVIDE VALID IDENTIFICATION
and PROOF OF AGE.

B.   Rental Fees:
   (1) ENTERTAINER shall pay CLUB up to ONE HUNDRED FIFTY
($150.00) DOLLARS PER PERFORMANCE DATE. ENTERTAINER
agrees to pay rent at the beginning of each performance date.

C.   Scheduling:  All scheduling shall be arranged through METRO
ENTERPRISES CORP.  Each performance date consists of one full
eight (8) hour set.  ONCE SCHEDULED,
neither party has the right to cancel or change a performance date
without 24 hour notice to METRO ENTERPRISES CORP. to permit it
to supply a qualified substitute in her place.

D. Stage Performances: ENTERTAINER agrees to perform eight
stage shows per performance date.

E.  Costumes: ENTERTAINER shall supply all her own costumes,
which must comply with all laws.

F.  Use of premises:  ENTERTAINER shall use CLUB's facilities in a
professional and safe manner.

G.  Illegal Substances & Alcohol:  ENTERTAINER shall not bring to,
or use illegal substances or alcohol while on CLUB property, and
shall not be intoxicated or under the influence of illegal drugs
while on CLUB's property.

H. Licenses/Permits:  ENTERTAINER shall maintain all personal
licenses and/or permits required by any governmental agencies.

I.  Laws:  ENTERTAINER shall comply with all applicable laws.

J. No Contact Rule:  Entertainer shall not touch customers during
her performance or permit customers to touch her during her
performance.

VIOLATION OF #'S G, H, I, or J WILL RESULT IN IMMEDIATE
TERMINATION OF LEASE.

INT: *CM*   Page 1 of 3

001123

K. Assumed Risk: ENTERTAINER understands adult entertainment is offered at THE CLUB. She understands she may be subjected to sexually suggestive conduct. She assumes this risk.

L. Property Damage: ENTERTAINER shall be responsible for the actual cost of any damage caused by her to any of the CLUB's property on CLUB's presentation of proof of loss.

M. Taxes: ENTERTAINER agrees to be exclusively responsible for her federal, state and local taxes.

4. OBLIGATIONS OF "THE CLUB".

A. Facilities: CLUB shall provide ENTERAINER with the non-exclusive right to lease its licensed facilities for scheduled performance dates.

B. Scheduling: CLUB shall accept scheduling from METRO ENTERPRISES CORP.

C. No Control: THE CLUB shall not direct or control ENTERTAINER'S performances, expression, or costumes except to maintain compliance with laws. ENTERTAINER also retains complete freedom to perform at any other businesses.

D. Dance Fees & Tips: CLUB agrees that ENTERTAINER is entitled to keep all dance fees paid to her and all "tip" (gratuities) given to her by patrons during her performance date, during any period which she is considered a "tenant" and not an "employee".

E. Stages, Lights, and Dressing Rooms: CLUB shall provide stages, dance areas, lighting and dressing room facilities for ENTERTAINERS.

F. Disc Jockey: CLUB shall provide and pay for a disc jockey to play music selected by ENTERTAINER. Disc jockey shall introduce and promote ENTERTAINER.

G. Club Employees: CLUB shall provide and pay for valet and/or door personnel, waitresses, and safety personnel at its sole and exclusive expense.

ENTERTAINER is never required to tip any worker employed by the CLUB.

H. Copyright fees: CLUB shall pay all copyright fees due relative to the music used on PREMISES.

I. PERMITS & LICENSING: Club shall pay for acquiring and maintain club property and all club business permits, licensing, and zoning which are prerequisites to permitting adult oriented entertainment take place on Premises.

J. Advertising: Club agrees to pay for all advertising in a commercially reasonable manner to benefit both ENTERTAINER'S and CLUB.

K. Privacy: CLUB agrees to maintain ENTERTAINER'S privacy rights, and agrees that it shall not provide any party with ENTERTAINER'S true name, address or telephone without ENTERTAINER'S written permission or government order.

5. OTHER TERMS OF CONTRACT:

A. TERMINATION/NOTICE: This LEASE may be terminated without cause on 30 day notice. If there is a *material breach of contract*, this LEASE may be terminated on 24 hours' notice.

B. CONTRACT DAMAGES:
(1). BREACH BY ENTERTAINER: If the ENTERTAINER breaches the contract, THE CLUB may assess upon ENTERTAINER liquidated damages in the amount of $150.00.
(2). BREACH BY THE CLUB: If the CLUB breaches the contract, ENTERTAINER may assess THE CLUB $150.00 in liquidated damages.

C. BINDING ARBITRATION: Any and all controversies between the ENTERTAINER and the CLUB, regardless of whether such claims sound in contract, tort, and / or based upon a federal or state statute, shall be exclusively decided by binding arbitration held pursuant to and in accordance with the Federal Arbitration Act (FAA) in conformity with rules and procedures established by the American Arbitration Association and as may be modified by any state act, and shall be decided by a single neutral arbitrator agreed upon by the parties, who shall be permitted to award, subject only to the restrictions contained in paragraph 5(C), any relief available in a court. *All parties waive any right to litigate such controversies, disputes and or claims in a court of law, and waive the right to trial by jury.* In arbitration, all parties have the right to be represented by legal counsel, the arbitrator shall permit *only* that minimal discovery which is necessary to prosecute/defend the claim then pending before the arbitrator and all discovery shall be deemed confidential. The arbitrator's decision shall be final, and shall also survive any judicial determinations that the arbitration agreement contained herein is unenforceable for any reason.

D. CLASS AND COLLECTIVE ACTION WAIVER: ENTERTAINER agrees that all claims or disputes between her and club will be litigated individually and she will not consolidate or seek class treatment for any claim. *The ENTERTAINER expressly waives her right to prosecute, participate in, or pursue a class action or collective action and/or other joint proceedings against the CLUB.* This paragraph 5(D) survives termination of this lease.

E. SEVERABILITY: If any part of this LEASE is declared unenforceable, it shall be interpreted as if that provision was not part of the LEASE.

INT: _____   001124

Page 2 of 3

F. PRIOR LEASES: This lease will supersede and incorporates all prior leases between the parties.

6. RELATIONSHIP OF THE PARTIES:

A. LESSOR/LESSEE: The parties agree that their relationship is that of lessor and lessee.

B. NO EMPLOYEE RELATIONSHIP: The parties agree that ENTERAINER is NOT an "Employee" of THE CLUB. ENTERAINER agrees CLUB will not pay her wages, overtime, expenses, benefits, or any other employee-related benefits, in exchange for permitting her to retain all dance fees paid to her by customers while on CLUB's premises.

C. CHANGE IN STATUS: if ENTERAINER claims, or any court or government agency determines, that the relationship between CLUB and ENTERAINER is that of the employer-employee, the parties agree:

1.- ENTERAINER shall immediately convert to "employee status", and accept all the duties, responsibilities of same;

2.- CLUB shall obtain proofs of comparable wage rates in this or a comparable industry.

3.- CLUB shall provide ENTERAINER an offer of employment at an industry standard rate.

4.- ENTERAINER must accept or reject within 3 days of CLUBS offer of employment.

---

BECAUSE OF LEGAL RESTRICTIONS, THE CLUB WILL NOT ENTER INTO AN AGREEMENT WITH AN ENTERAINER WHO IS UNDER THE AGE OF EIGHTEEN "18"/ TWENTY ONE "21"(circle one). ENTERAINER SPECIFIALLY REPRESENTS THE SHE IS OF LAWFULL AGE OR OLDER, THAT SHE HAS PROVIDED - OR WILL PROVIDE UPON REQUEST - APPROPRIATE IDENTIFICATION VERIFYING HER AGE, AND THAT SUCH IDENTIFICATION IS VALID AND AUTHENTIC.
BY SIGNING THIS DOCUMENT, ENTERAINER REPRESENTS THAT SHE HAS RECEIVED A COPY OF, AND AGREES TO BE BOUND BY, ALL OF ITS TERMS; AND THAT SHE HAS PERMITTED TO ASK QUESTIONS REGARDING ITS CONTENTS AND HAS BEEN GIVEN THE OPPORTUNITY TO HAVE IT REVIEWED BY PERSONS OF HER CHOICE, INCLUDING ATTORNEYS AND ACCOUNTANTS.

AGREED: ENTERAINER

SIGNATURE OF ENTERTAINER

12/17/13 DATE

AGREED: "THE CLUB"

BY: _____
INT: Pres.

12/17/13 DATE

INT: CMA   Page 3 of 3

001125

# EXHIBIT B-1
# TO AFFIRMATION OF
# JOSEPH N. ENDRES



New York State Department of Taxation and Finance
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
State Office Building, 250 Veterans Memorial Highway, Hauppauge, NY
11788-5599
Phone: (631) 595-4203  Fax: (518) 435-8564

*COPY*

| | |
|---|---|
| | IDR #01 |

## Information Document Request

| | |
|---|---|
| Taxpayer name:  Metro Enterprises Corp. | Audit years: 03/01/2008 - 02/28/2014 |
| Identification number: 26-0411030 | Case ID: X459191032 |
| Auditor: Ms. Jennifer L. Genovese | Article(s): 28 & 29 |
| Requested of: | Date requested: April 21, 2014 |

Date(s) Provided column completed by:
_____

### Your response is due by: 05/01/2014

Name
_____

| Description of documents and information requested: | Date(s) Provided |
|---|---|
| 1.  Sales tax returns, worksheets, and canceled checks showing taxes paid | |
| 2.  Federal income tax returns (Forms 1120, 1065, or 1040) *y/e 2007, 2008, 2009 received* | *still need 2010 - 2014* |
| 3.  New York State corporation tax returns | |
| 4.  General ledger | |
| 5.  Sales invoices | |
| 6.  All exemption documents supporting non-taxable sales, including:<br>• resale, exempt use, exempt organization, and capital improvement certificates<br>• any other documentation necessary to prove non-taxable sales | |
| 7.  Fixed asset purchase/sales invoices | |
| 8.  Expense purchase invoices | |
| 9.  Merchandise purchase invoices | |
| 10. Bank statements, canceled checks, and deposit slips for all accounts | *see IDR #3* |
| 11. Cash receipts journal -- including sales journal, if applicable | |
| 12. Cash disbursement journal -- including purchase journal, if applicable | |
| 13. The corporate book, including minutes, board of directors, and articles of Incorporation | |

*Taxpayers are required to make all books and records available to the auditor, and they must remain available until the audit is complete, unless the auditor indicates that the records are no longer needed. An entry in the right column does not necessarily indicate that this portion of the request has been fully satisfied.*

Metro Enterprises Corp.
26-0411030

Audit Pe   03/01/2008 - 02/28/2014

X459191032

— COPY —

| | |
|---|---|
| 14. Depreciation schedules | |
| 15. Lease/Rental Agreements for the entire audit period | |
| 16. Guest Checks and Cash Register Tapes for entire audit period | |
| 17. SLA Licenses. | |
| 18. Utility Bills for entire audit period | |

# EXHIBIT C-1
# TO AFFIRMATION OF
# JOSEPH N. ENDRES



New York State Department of Taxation and Finance
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
State Office Building, 250 Vets Memorial Hwy Room 15, Hauppauge, NY
11787
Phone: (631) 595-4203  Fax: (518) 435-8564



*COPY*

IDR #2

## Information Document Request

| | |
|---|---|
| Taxpayer name:  Metro Enterprises Corp. | Audit years: 03/01/2008 - 02/28/2014 |
| Identification number: 26-0411030 | Case ID: X459191032 |
| Auditor: Ms. Jennifer L. Genovese | Article(s): 28 & 29 |
| Requested of: Mr. Anthony Capeci, POA | Date requested: November 4, 2015 |

### Your response is due by:
### November 20, 2015

Date(s) Provided column completed by:

_____
Name

| Description of documents and information requested: | Date(s) Provided |
|---|---|
| | |
| 1)  Responsible Person Questionnaires (enclosed) | *Rec'd* |
| 2)  Escalation Letter (enclosed) | |
| 3)  Sales Tax Questionnaire (enclosed) | |
| 4)  Copy of Agreement/Business Contract between Metro Enterprises Corp. and MLB Enterprises Corp. | |
| 5)  Copy of Agreement/Business Contract between Metro Enterprises Corp. and 44th Enterprises Corp. | |
| 6)  Payroll Records for the entire Audit Period | |
| 7)  Copy of invoice(s) for the printing of "funny money" | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

*Taxpayers are required to make all books and records available to the auditor, and they must remain available until the audit is complete, unless the auditor indicates that the records are no longer needed.  An entry in the right column does not necessarily indicate that this portion of the request has been fully satisfied.*

# EXHIBIT D-1
# TO AFFIRMATION OF
# JOSEPH N. ENDRES



New York State Department of
**Taxation and Finance**
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
NYS Office Building, 250 Veterans Memorial Highway, Hauppauge, NY 11788-
5599
Phone: (631) 595-4203 Fax: (518) 435-8564

May 20, 2016

Mr. Chris Doyle                          RE: Metro Enterprises Corp.
Hodgson Russ                             Taxpayer ID: 26-0411030
Suite 100                                Case ID: X459191032
140 Pearl Street                         Audit Period: 03/01/2008 - 02/28/2014
Buffalo, NY 14202


Dear Mr. Doyle:

Enclosed is Information Document Request, IDR# 3 which has a description of documents and
information needed. We request that the next field appointment be held at the location where the books
and records are maintained. You may provide the requested documents at this next field appt. Please
choose from one of the dates below:

      Thursday, June 16, 2016
      Tuesday, June 21, 2016
      Wednesday, June 22, 2016

Contact me *no later than May 31, 2016* with the date and location of the next field appointment. If none
of the dates listed are convenient, contact me as soon as possible so that a mutually acceptable
appointment date can be confirmed.

Responses to questions/inconsistencies must be submitted in writing. This must be provided at the next
field appointment or any time prior.

Also enclosed are updated IDR's #1 and #2, which were previously mailed, as all items requested have
not yet been provided. Please have this requested information available for review at the next field
appointment. Any records being requested that do not exist or were not maintained, needs to be
indicated on that IDR.

If you have questions feel free to contact me at the number listed below.

Sincerely,

Ms./Jennifer L. Genovese
Tax Auditor I
(631) 595-4080

Enclosures:    Information Document Request No. 3
               Information Document Request No. 1 - (dated 4/21/2014)
               Information Document Request No. 2 - (dated 11/4/2015)
               Sales Tax Examination Questionnaire
               Escalation Letter

cc:    John Scarfi



New York State Department of Taxation and Finance
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
NYS Office Building, 250 Veterans Memorial Highway, Hauppauge, NY
11788-5599
Phone: (631) 595-4203  Fax: (518) 435-8564

IDR #3

## Information Document Request

| | |
|---|---|
| Taxpayer name:  Metro Enterprises Corp. | Audit years: 03/01/2008 - 02/28/2014 |
| Identification number: 26-0411030 | Case ID: X459191032 |
| Auditor: Ms. Jennifer L. Genovese | Article(s): 28 & 29 |
| Requested of: Mr. Christopher Doyle | Date requested: May 20, 2016 |

*Date(s) Provided column completed by:*

Your response is due by: **May 31, 2016**  _____

*Name*

| *Description of documents and information requested:* | *Date(s) Provided* |
|---|---|
| | |
| 1.  1120's: 2010, 2011, 2012, 2013, 2014 (2007, 2008, 2009 received) | |
| 2.  ALL State(s) Corp returns (to reconcile to FITR's) | |
| 3.  Cancelled check for $8,045.00 of Corp. Tax paid on 2008 1120 | |
| 4.  Federal 941 for audit period | |
| 5.  Personal Income Tax Returns (for Mr. John Scarfi) show S-Corp/Partnership income. What business(es) is this income from? | |
| 6.  Contract(s), invoice(s), and/or schedule of payments along with the cancelled checks for the $1,655,260 and $999,432 of 2008 and 2009 Management fees as per 1120's | |
| 7.  Who are Complete Management, Midtown Management and Union 22 Management Corp.?  What service(s) do they provide for the corporation? | |
| 8.  List of all the clubs Metro refers or referred to, along with their location address, for the period of 3/1/08-2/28/14 | |
| 9.  Bank Statements for Chase account ending 0776 for March 2008 – December 2008 | |
| 10. Bank Statements for the audit period for all NY clubs including:<br>    Lace Entertainment, Inc. 195 Route 303, W. Nyack, NY<br>    Stiletto Entertainment LLC, 180 Route 59,  Nanuet, NY | |
| 11. Merchant application(s) and agreements for each location | |
| 12. Certificate of Authority for each location | |

*Taxpayers are required to make all books and records available to the auditor, and they must remain available until the audit is complete, unless the auditor indicates that the records are no longer needed.  An entry in the right column does not necessarily indicate that this portion of the request has been fully satisfied.*

| | |
|---|---|
| 13. Who are the individuals you are cutting checks to below? What services do they provide? Do you have written contracts with them? Where are their fees deducted?<br>    a. Keema Jamison<br>    b. Alyshia Holland<br>    c. Yvone Fenelli<br>    d. Sandra Harting<br>    e. Greg Alfredo<br>    f. Mohammed Uddin<br>    g. Daniella Vishocky<br>    h. Jacqueline Martino<br>    i. Barbara Gallo | |
| 14. Entertainment Services Agreement between Metro Enterprises and 44th Enterprises and MLB Enterprises | |
| 15. Provide "Addendum A" as stated in the contracts | |
| 16. What are the paragraphs V and VIII from the contracts "Entertainment Services Agreement" and why are they omitted? | |
| 17. Where are the books and records maintained? | |
| 18. Does your business maintain a NY office? | |
| 19. Schedules/Worksheets used to prepare 1120's, summarizing all business income (accountant's back-up) | |
| | |
| ___There are several inconsistencies, please provide an explanation and/or clarification:___ | |
| | |
| 1. Why does merchant agreement show Business Start Date of 5/2000 and 1120 show Date incorporated 6/21/2007? | |
| 2. Why does merchant agreement show Type of Ownership Partnership/S-Corp and 1120 is for a C-Corp? | |
| 3. Why does merchant agreement show Total # of Locations -4, yet you informed us (and provided contracts) for 8? | |
| 4. Explain why the 2008 and 2009 Federal withholding returns were filed (941), however no salary shown on same year 1120. | |
| 5. We were informed that there were no general ledgers or QuickBooks records maintained for the business, however, a charge was found for QuickBooks on 7/15/13 in the amount of $264.55 from acct. ending 2812, explain. | |



New York State Department of Taxation and Finance
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
State Office Building, 250 Veterans Memorial Highway, Hauppauge, NY
11788-5599
Phone: (631) 595-4203   Fax: (518) 435-8564

*COPY*

```
┌──────────┐
│  IDR     │
│  #01     │
└──────────┘
```

## Information Document Request

| | |
|---|---|
| Taxpayer name:  Metro Enterprises Corp. | Audit years: 03/01/2008 - 02/28/2014 |
| Identification number: 26-0411030 | Case ID: X459191032 |
| Auditor: Ms. Jennifer L. Genovese | Article(s): 28 & 29 |
| Requested of: | Date requested: April 21, 2014 |

*Date(s) Provided* column completed by:

### Your response is due by: 05/01/2014

_____
Name

| Description of documents and information requested: | Date(s) Provided |
|---|---|
| 1.  Sales tax returns, worksheets, and canceled checks showing taxes paid | |
| 2.  Federal income tax returns (Forms 1120, 1065, or 1040)  y/e 2007, 2008, 2009 received | still 2010 - 2014 |
| 3.  New York State corporation tax returns | |
| 4.  General ledger | |
| 5.  Sales invoices | |
| 6.  All exemption documents supporting non-taxable sales, including:<br>• resale, exempt use, exempt organization, and capital improvement certificates<br>• any other documentation necessary to prove non-taxable sales | |
| 7.  Fixed asset purchase/sales invoices | |
| 8.  Expense purchase invoices | |
| 9.  Merchandise purchase invoices | |
| 10. Bank statements, canceled checks, and deposit slips for all accounts | see IDR #3 |
| 11. Cash receipts journal -- including sales journal, if applicable | |
| 12. Cash disbursement journal -- including purchase journal, if applicable | |
| 13. The corporate book, including minutes, board of directors, and articles of Incorporation | |

*Taxpayers are required to make all books and records available to the auditor, and they must remain available until the audit is complete, unless the auditor indicates that the records are no longer needed.  An entry in the right column does not necessarily indicate that this portion of the request has been fully satisfied.*

Metro Enterprises Corp.
26-0411030

Audit Pe:   03/01/2008 - 02/28/2014

X459191032

- COPY -

| | |
|---|---|
| 14. Depreciation schedules | |
| 15. Lease/Rental Agreements for the entire audit period | |
| 16. Guest Checks and Cash Register Tapes for entire audit period | |
| 17. SLA Licenses. | |
| 18. Utility Bills for entire audit period | |



New York State Department of Taxation and Finance
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
State Office Building, 250 Vets Memorial Hwy Room 15, Hauppauge, NY
11787
Phone: (631) 595-4203   Fax: (518) 435-8564

*COPY*

IDR #2

## Information Document Request

| | |
|---|---|
| Taxpayer name:  Metro Enterprises Corp. | Audit years: 03/01/2008 - 02/28/2014 |
| Identification number: 26-0411030 | Case ID: X459191032 |
| Auditor: Ms. Jennifer L. Genovese | Article(s): 28 & 29 |
| Requested of: Mr. Anthony Capeci, POA | Date requested: November 4, 2015 |

**Your response is due by:**
**November 20, 2015**

*Date(s) Provided* column completed by:

_____
*Name*

| Description of documents and information requested: | Date(s) Provided |
|---|---|
| | |
| 1)  Responsible Person Questionnaires (enclosed) | *Rec'd* |
| 2)  Escalation Letter (enclosed) | |
| 3)  Sales Tax Questionnaire (enclosed) | |
| 4)  Copy of Agreement/Business Contract between Metro Enterprises Corp. and MLB Enterprises Corp. | |
| 5)  Copy of Agreement/Business Contract between Metro Enterprises Corp. and 44th Enterprises Corp. | |
| 6)  Payroll Records for the entire Audit Period | |
| 7)  Copy of invoice(s) for the printing of "funny money" | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

*Taxpayers are required to make all books and records available to the auditor, and they must remain available until the audit is complete, unless the auditor indicates that the records are no longer needed.  An entry in the right column does not necessarily indicate that this portion of the request has been fully satisfied.*



New York State Department of Taxation and Finance

# Sales Tax Examination Questionnaire

DO-1632
(8/14)

| Name of business | | |
|---|---|---|
| Metro Enterprises Corp. | | |
| Address (number and street) | | |
| 286 Fairview Ave | | |
| City | State | Zip |
| Westwood | NJ | 07675-1703 |

If you have any of the following identification (ID) numbers, enter them in the spaces below.

Sales tax ID number
26-0411030

State Liquor Authority ID number

NYS Lottery ID number

NYS DMV ID number

Corporation Tax ID number

Print or type your answers to the following questions. Attach additional sheets if necessary.

1. Whom should we contact to start our examination?

Name

Business address

Title                                         Telephone number
                                              (          )

2. What types of products or services does your company sell or provide? _____

3. Did you acquire this business (or assets of a business) from a registered sales tax vendor? .......................... Yes ☐   No ☐

   If Yes, have you filed Form AU-196.10, *Notification of Sale, Transfer, or Assignment in Bulk*, with the Tax Department?.... Yes ☐   No ☐

   Former owner's name                        Federal employer ID number (EIN)

   Address

4. Does your company have a Web site?..... Yes ☐   No ☐
   If Yes, provide Web address:

5. Does your company make sales through this Web site?........... Yes ☐   No ☐

6. Are sales made on the Internet through an affiliated company? Yes ☐   No ☐
   If Yes, complete the following:

   Name of affiliated company          Web address          Federal EIN

7. Do you make tax-exempt sales? ............. Yes ☐   No ☐
   If Yes, what is the basis for exemption? *(mark an X in all that apply):*
   Purchasers provide exemption certificates ☐          Sales delivered out-of-state ☐

   Sales are not taxable ☐   Explain: _____

   Other ☐   Explain: _____

8. Are there seasonal or other fluctuations in sales? ..................... Yes ☐   No ☐
   If Yes, explain: _____

Page 2 of 3  DO-1632 (8/14)

9. At what location(s) do you file your payroll records, sales invoices, sales journal, tax exemption certificates, and other sales records?

| City | State | City | State |
|---|---|---|---|
| City | State | City | State |

10. How are your sales invoices filed?   Date order ☐   Invoice number ☐   Alphabetically ☐   Batch ☐
    Other ☐  Explain: _____

11. Approximately how many sales invoices do you generate per year? _____

12. At what location(s) are your purchase invoices and other purchase records maintained?

| City | State | City | State |
|---|---|---|---|
| City | State | City | State |

13. How are your purchase invoices filed?   Date order ☐   Purchase order number ☐   Alphabetically ☐   Batch ☐
    Other ☐  Explain: _____

14. Is there a separate file maintained for capital purchases?........................................................  Yes ☐   No ☐

15. Do you have any affiliates, subsidiaries, or divisions whose records are kept with yours?............  Yes ☐   No ☐
    If Yes, what are their names and New York State sales tax ID numbers?

| Name | Sales tax ID number |
|---|---|
| Name | Sales tax ID number |
| Name | Sales tax ID number |

16. What facilities did your company have in New York State during the past three years (for example, administrative offices, sales offices, manufacturing facilities, storage facilities, retail/wholesale outlets)? What are their addresses? Attach additional sheets if necessary.

| Facility type | Address |
|---|---|
| Facility type | Address |
| Facility type | Address |

17. Are you registered and/or licensed as any one of the below?  Mark an X next to that item.

| | |
|---|---|
| ☐ Distributor of diesel motor fuel | ☐ Terminal operator |
| ☐ Retail seller of aviation gasoline | ☐ Aviation fuel business |
| ☐ Retailer of non-highway diesel motor fuel only | ☐ Distributor of motor fuel |
| ☐ Importing/exporting transporter | ☐ Residual petroleum product business |
| ☐ Distributor of kero-jet fuel only | ☐ Liquefied petroleum gas permittee |

18. If your company conducts any of the following activities related to fuel, mark an X next to that activity.

☐ Importing or causing to import fuel product owned, into NYS for use, distribution, storage, or sale in NYS
☐ Refining, manufacturing, compounding, blending, or otherwise producing fuel within NYS
☐ Selling fuel to other resellers in NYS
☐ Electric utility requesting use of a direct pay permit for fuel
☐ Selling fuel at retail in NYS (other than at a filling station)
☐ Owner of a vehicle powered by liquefied petroleum gas, compressed natural gas or propane
☐ Retailing aviation gasoline at an airport
☐ Retailing kero-jet fuel and no other diesel product
☐ Industrial user of diesel motor fuel (includes No. 2 heating oil) or residual petroleum product
☐ Importing kero-jet fuel into NYS in fuel tanks of aircraft
☐ Supplying passenger or cargo air carrier fuel services to others

Page 3 of 3  DO-1632 (8/14)

19. Provide the names, social security numbers, and titles of your principal officers for the past three years (include effective dates):

| Name | Social security number | Title | From: | To: |
|------|------------------------|-------|-------|-----|
| Name | Social security number | Title | From: | To: |
| Name | Social security number | Title | From. | To: |
| Name | Social security number | Title | From: | To: |

| Signature of preparer and title | Date |
|---------------------------------|------|

**Privacy notification**
New York State law requires all government agencies that maintain a system of records to provide notification of the legal authority for any request, the principal purpose(s) for which the information is to be collected, and where it will be maintained. To view this information, visit our Web site at *www.tax.ny.gov*, or, if you do not have internet access, call (518) 457-5431 and request Publication 54, *Privacy Notification*.



New York State Department of
**Taxation and Finance**
www.tax.ny.gov
Transaction Field Audit Bureau
Long Island Regional Office
NYS Office Building, 250 Veterans Memorial Highway, Hauppauge, NY 11788-5599
Phone: (631) 595-4203  Fax: (516) 435-8564

Re:  Metro Enterprises Corp.
X459191032

## Communication with the Tax Department during your audit

Efficient communication between the Tax Department's audit team and you (or your representative) is an important part of the audit process. We've listed our contact information below, and ask that you complete this form and provide us with contact information about you, your representative, and your managers or principals.

### Tax Department contact information
Your New York State audit is being conducted by the Long Island Regional Office of the Transaction Field Audit Bureau.

| | | |
|---|---|---|
| Jennifer L. Genovese | Tax Auditor I | (631) 595-4080 |
| Christine Scala | Sales Tax Auditor II | (631) 595-4234 |
| Frank Grillo | Sales Tax Auditor III | (631) 595-4239 |
| Scott Presser | Program Manager | (631) 595-4089 |
| Anthony Vano | District Audit Manager | (631) 595-4072 |

If issues arise during the audit that you're unable to resolve with the District Office staff, you may wish to contact one of these Audit Division managers.

| | | |
|---|---|---|
| Mario Scarpace | Program Manager Albany | (518) 530-4440 |
| Denise Palumbo | Program Manager Albany | (518) 530-4439 |

### Your contact information
Please provide contact information for your managers or principals so that we can include them in the resolution of issues if required.

| Name | Title/Relationship | Telephone |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Once you've completed your contact information, give this form to your auditor and keep a copy for your records.

# EXHIBIT D-2
# TO AFFIRMATION OF
# JOSEPH N. ENDRES



Christopher L. Doyle
Partner
Direct Dial: 716.848.1458
Direct Facsimile: 716.819.4658
cdoyle@hodgsonruss.com

July 1, 2016

**VIA FACSIMILE:  518-435-8564 and Regular Mail**

Jennifer L. Genovese
New York State Department of
  Taxation and Finance
Transaction Field Audit Bureau
Long Island Regional Office
NYS Office Building
250 Veterans Memorial Highway
Hauppauge, New York 11788-5599

Dear Ms. Genovese:

Re:   Metro Enterprises Corp. – Case ID X459191032

I am writing to respond to portions of the Department's IDR #3 dated May 20, 2016.  We are gathering other documentation requested in the IDR and will make it available at our next meeting scheduled for July 19.  Below we respond to the various questions raised in the IDR.  Our responses are based on our conversations with Mr. Scarfi and our review of the relevant documents.

*"Documents and Information Requested" Section*

Below we respond to the questions raised in the "Documents and Information Requested" section of the IDR.  The numbers below correspond to the numbers listed in the IDR.

1.) Items 6 and 7

We have been told that there were no invoices or written contracts associated with the management fees paid in 2008 and 2009.  Management fees were paid to Complete Management, Union 22 Management and Midtown Management.  Complete Management and Union 22 Management are owned by Mr. Scarfi's wife, while Midtown Management is owned by an unrelated third party.  These management fees were paid to the entities in exchange for their services in recruiting entertainers.

2.) Item 8

Below is a list of all clubs to which Metro referred entertainers between 3/1/08 through 2/28/14.

*The Guaranty Building  ◆  140 Pearl Street  ◆  Suite 100  ◆  Buffalo, New York 14202-4040  ◆  telephone 716.856.4000  ◆  facsimile 716.849.0349*

*Albany  ◆  Buffalo  ◆  New York  ◆  Palm Beach  ◆  Saratoga Springs  ◆  Toronto  ◆  www.hodgsonruss.com*

July 1, 2016
Page 2



| Diamond Club<br>44 Enterprises Inc.<br>689 8th Ave.<br>New York, NY 10036 | Lace<br>MLB Enterprise Corp.<br>725 7th Ave<br>New York, NY 10019 | Lace<br>Lace Entertainment, Inc.<br>195 Route 303.<br>W. Nyack, NY 10994 |
|---|---|---|
| Stilletto<br>Stilletto Entertainment LLC<br>180 Route 59<br>Nanuet, NY 10954 | Stilletto<br>Stilletto in Carlstadt Corp.<br>325 Paterson Plank Rd.<br>Carlstadt, NJ 07073 | Stilletto<br>GJJM Enterprises<br>185 South Carolina Ave.<br>Atlantic City, NJ 08401 |
| Lace<br>181 South, Inc.<br>181 South Carolina Ave.<br>Atlantic City, NJ 08401 | GoGoRama<br>Fizer Corp.<br>9 Laurence Pkwy.<br>Laurence Harbor, NJ 008879 | |

### 3.) Item 13

Metro issued checks to various individuals including Keema Jamison, Alyshia Holland, Yvone Fenelli, Sandra Harting, Greg Alfredo, Mohammed Uddin, Daniella Vishocky, Jacqueline Martino, and Barbara Gallo. You requested information regarding payments made to these individuals. These individuals are employees of certain clubs. When a patron of a club purchased script from one of Metro's machines, the patron would occasionally add a tip on the script receipt "tip" line. The payments made to these individuals represent tips paid by patrons on the script machine receipts. These individuals were not dancers at the clubs. This practice of leaving tips on script receipts lasted for a brief time and was discontinued several years ago. In any event, the tips were gratuities and not subject to sales tax.

### 4.) Item 15

Though the Services Agreements reference an "Addendum A" defining the clubs included in the defined term "Registered Adult Nightclub," the addendum was never drafted. Thus, no Addendum A exists for any of the contracts. However, it was widely understood what clubs were part of the Metro cohort.

### 5.) Item 16

Paragraphs V and VIII were never part of any of the contracts entered into by Metro. The gaps in the roman numerals are simply drafting errors in the contracts.

### 6.) Items 17 and 18

Metro maintains an office in New York City, located at 1600 Broadway, 12e, New York, New York 10019, as well as an office in New Jersey located at 286 Fairview Ave., Westwood, NJ 07675. The company's books and records are maintained at these locations.

July 1, 2016
Page 3



*Clarification of Alleged "Inconsistencies"*

### 1.) Item 1, 2 and 3

There are various errors in the Merchant Agreements executed during the audit period. Portions of the Merchant Agreements were completed by the service provider. As a result, some of the information is inaccurate. Indeed, some of the information is internally inconsistent. For example, under "Type of Ownership", one Agreement has the "partnership" box checked, but then the words "S corp." are written in. Obviously this information was not crucial to establishing the credit card processing services.

To be clear, Metro is a C corporation. It was incorporated on June 21, 2007. It serviced 8 clubs during the audit period, only four of which were located in New York State.

### 2.) Item 4

Metro is reviewing this issue with its accountants and will provide documentation and a response at our scheduled meeting.

### 3.) Item 5

There appears to have been a miscommunication. We do not recall indicating that the company did not maintain QuickBooks records. The company uses QuickBooks and we will have trial balances for each year under audit available at our next meeting. Metro is happy to provide whatever QuickBooks information you require.

Thank you.

Very truly yours,

Christopher L. Doyle

/jlb
cc:     John Scarfi

082935.00000 Business 15126496v2