Exhibit D

Mot. Seq. 3

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ALBANY

METRO ENTERPRISES CORP. and
JOHN SCARFI,

         *Plaintiffs*,

   v.

NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE and the
COMMISSIONER of the New York State
Department of Taxation and Finance,

         *Defendants*.

**ORAL ARGUMENT
REQUESTED**

Index No. 901347-17

Return Date:
_____, 2018

## AFFIDAVIT OF ANTHONY CAPECI IN SUPPORT OF MOTION FOR RENEWAL AND TO VACATE ORDER & JUDGMENT AND REINSTATE VERIFIED COMPLAINT

STATE OF NEW YORK    )
                               : ss.:
COUNTY OF NEW YORK  )

      **ANTHONY CAPECI**, being duly sworn, states as follows:

1. I am the President and Sole Shareholder of MLB Enterprises Corp. d/b/a Lace Gentlemen's Club ("MLB") and 44th Enterprises Corp. d/b/a Diamond

Club, f/k/a Lace II Gentlemen's Club ("44th Enterprises") (each a "Club" and collectively the "Clubs"); have personal knowledge of the facts and circumstances herein; and submit this affidavit at the request of counsel for Plaintiffs Metro Enterprises Corp. ("Plaintiff Metro") and John Scarfi ("Scarfi") (collectively "Plaintiffs"), in support of Plaintiffs' motion to renew Defendants' motion to dismiss this declaratory judgment action, vacate the Decision and Order summarily determining the action on the merits; reinstate the Complaint, and permit the parties to litigate the action on the merits.

2. MLB is an entity that I formed in 1998 to own and operate Lace Gentlemen's Club located at 725 7th Ave, New York, New York 10019. 44th Enterprises is an entity that I formed in 2007 to own and operate Lace II Gentlemen's Club, subsequently known and operated until February 2017 as Diamond Club, which was located at 689 8th Avenue, New York, New York 10036.

3. I am a certified public accountant and have acted as the accountant for the Clubs since they were founded.

4. The Clubs, on the one hand, and Plaintiffs Metro and Scarfi, on the other hand, are and were completely and totally independent of one another. Neither Plaintiff Metro nor John Scarfi has or had any ownership or financial

interest in the Clubs whatsoever. The only relationship between the Clubs and the Plaintiffs is and was contractual, as further explained below.

5. The Clubs normally charge patrons an admission fee upon entry. That fee is paid in cash or credit card processed by the Clubs (not Plaintiff Metro), and is the property of the Clubs. Neither Plaintiff Metro nor Scarfi has or had any interest in or receives any portion of the admission fee.

6. The Clubs sell drinks to patrons, who pay cash or charge the cost of the drinks. The minor risk of charge-backs on such transactions is the Clubs'. Neither Plaintiff Metro nor Scarfi has any interest in or receives any portion of any amounts paid to the Clubs for drinks, regardless of the medium of payment.

7. Between 1999 and 2007, the Clubs obtained dancers, and patrons who wished to obtain scrip on credit, did so through Pacific Club Services, Inc. (PCS), which maintained a registry of professional exotic dancers and furnished a credit card processing machine for the convenience of dancers.

8. PCS would charge the patrons a percentage fee ("Service Fee") for each credit transaction processed by PCS, and charge dancers a percentage fee ("Referral Fee") for scrip redeemed by them (all as more fully described below). While customers could always use cash to pay dancers, they sometimes prefer to

use scrip to provide documentation of business expenses or if they are short on cash.

9. When Plaintiff Metro took over as the scrip vendor at the Clubs, it followed the exact same practices and procedures as PCS.

10. To the best of my knowledge, based upon numerous conversations with principals of, first, PCS, and later, Plaintiff Metro, each performer who desires to be registered enters into a Professional Exotic Dancer Registration and Referral Service Contract, and each club desiring to register likewise enters into a standard form Entertainment Services Agreement with the scrip vendor (PCS or Metro).

11. Each of the Clubs entered into such agreements with Plaintiff Metro. Copies are submitted as **Exhibits K-2 and K-3**. Pursuant to those agreements, Plaintiff Metro (a) would refer at least fifteen (15) qualified performers to each Club for possible employment as Professional Exotic Dancers on performance dates designated by the Clubs, after vetting the dancers as to age, performance date availability, and experience, and (b) placed a credit card processing machine at each Club, at no cost to the Club whatsoever, for use in connection with extensions of credit to patron in exchange for scrip.

12. Pursuant to the Entertainment Service Agreements, each Club agreed to give Plaintiff Metro the exclusive right to extend credit for scrip at the Club during the agreement term and Plaintiff Metro agreed to accept the risk of all credit extended for scrip using its processing machine and credit card accounts. The dancers redeem their scrip for cash during the same shift in which they receive it. It may take up to three days for Plaintiff Metro to be reimbursed by the credit card companies.

13. This is an important aspect of the agreement between the Clubs and Plaintiff Metro. The Clubs have and had their own credit card processing agreements with American Express® and processing agents for Visa® and MasterCard®. All of these agreements include "fraud" chargeback provisions that apply to instances when patrons challenge the charge(s) to their account(s). This is a known risk in the adult entertainment industry, due to customer inebriation and (on occasion) the need of customers to explain charges at home or in business. When a credit card customer claims "fraud," American Express® (which has the most stringent rules in these regards) automatically reverses the disputed charge. However, the "Dancers' Net Cash from Scrip" (as hereafter defined) is still be paid to the dancer, regardless of the chargeback. This is a significant business risk which Plaintiff Metro, as the credit intermediary, assumes instead of the registered

clubs.

14. Once Plaintiff Metro refers a registered dancer to one of our Clubs, (a) the Club has and had the unconditional right to accept or reject the dancer, and (b) the dancer has and had the unconditional right to decline to work for the Club. If the Club offers and the dancer accepts the referral, the Club and dancer enter into an agreement regulating their relationship, which (i) requires the dancer to remit a pre-determined amount in exchange for the use of the club's facilities to perform exotic dancing for the club's patrons, and specifies that (ii) the dancer's scheduling will be negotiated between the dancer and the club, (iii) the dancer is entitled to retain all dance fees and gratuities paid to her by patrons during her performance, and (iii) the dancer agrees to accept scrip from patrons of the club. Exemplars of the agreements utilized at the Clubs are submitted as **Exhibits M-2 and M-3.**

15. I understand from Plaintiffs' attorneys that the period of time relevant to this action is 2008-2014. During this period, neither Plaintiff Metro nor Plaintiff Scarfi had any direct or indirect interest in any of the Clubs. Specifically, during this period, neither Plaintiff Metro nor Plaintiff Scarfi (a) owned or operated any of the Clubs, (b) were an agent of any of the Clubs, (c) shared office space, telephone numbers, or addresses with either MLB or 44th Enterprises, (d) shared

revenue or expenses with or pay (or paid) expenses for either one of these entities, or provide the Clubs with any portion of scrip sale proceeds, or (e) had any authority over the entities that owned the Clubs. Furthermore, (f) Plaintiff Metro maintained books and records separate from the Clubs and (g) there was no overlap in ownership, officers, or directors between Metro and the entities that owned the Clubs.

16. At our Clubs, no one is or was required to utilize scrip. When a patron enters either Club, he (or she) pays an admission fee to the Club (not to Plaintiff Metro) in cash or by credit card processed by the Club (i.e., not scrip). Once inside the Club, there is no requirement that the patron spend any amount of money whatsoever, and each patron has the choice of paying for drinks in cash, as well as paying dancers for performances and additional gratuities in cash (i.e., not scrip). Scrip is only used by patrons to make payments to dancers, if the patrons prefer this method of payment instead of cash. There are also bank ATMs available for patron use if they prefer a cash advance instead of scrip.

17. A patron in the Clubs is permitted to rent a party room from the club (not Plaintiff Metro) without purchasing private entertainment from a dancer. In the event a patron wishes to partake of private entertainment in a party room, he/she would pay a room rental fee to the Club (not Plaintiff Metro) and a gratuity,

in scrip or cash, directly to the dancer.

18. I have owned MLB and 44th Enterprises, and been their accountant, since they were organized. To my personal knowledge, many patrons of the Lace and Diamond Clubs pay dancers or tip in cash, while others prefer to pay dancers in scrip.

19. Neither Plaintiff Metro nor any dancer has any interest in the admission charges or either Club's charges for drinks. As required by Federal and State law, all payments to dancers are and were gratuities (including so-called "dancer fees" and "tips") and are and were the property of the dancers, and neither Plaintiff Metro nor the Clubs have or had any interest in them.

20. Patrons who choose to utilize scrip do so by charging the amount of scrip on a credit card. Plaintiff Metro charges a percentage fee for the transaction ("Service Fee"). At our Clubs, a paper receipt is generated and converted to the amount of scrip requested by the patron, or the patron receives pre-printed "house money". Scrip requested specifically for the purpose of paying a gratuity to a dancer is separately noted.

21. At the patron's discretion, scrip may then be used to pay the dancers. Scrip which is given to dancers is exclusively their property and later redeemed by them, less a percentage charge ("Referral Fee") by Plaintiff Metro. (The net paid

to the performers is referred to as "Dancers' Net Cash from Scrip".) The Clubs do not share or have any interest in the Referral Fee, which is exclusively the property of Plaintiff Metro and its compensation for placement of the dancer.

22. The fact that "table dance charges" and other dancer performance fees are gratuities which are the property of the performers, and not the club or scrip vendor, is well-known in the adult entertainment industry. Owners and operators of adult clubs are very familiar with the series of rulings by Federal and State agencies and various courts that "table dance charges are tips, not service charges" and "[t]ips are the property of the employee." It is, furthermore, my understanding that the New York Department of Labor takes the position that all such charges are gratuities unless the patron is notified to the contrary. No such notice is given in our Clubs.

23. As noted above, patrons are not required to obtain scrip, nor are they required to pay dancers in scrip. Many patrons pay dancers in cash. In my experience, cash payments to dancers have never been claimed to be subject to sales tax on any theory, and, as a club owner and certified public accountant, and having gone through multiple sales tax audits on the issue, I do not understand how Defendants can assert that a transaction is subject to sales tax if it is paid for in scrip (house money), but not if paid for in cash.

24. In any event, in our Clubs:

    A. No portion of the Dancers' Net Cash from Scrip was transferred to Plaintiff Metro (or PCS) or otherwise retained by Plaintiff Metro (or PCS).

    B. We do not and did not account for, or otherwise monitor any cash payments to dancers received directly from club patrons. Nevertheless, as previously stated, to the best of my knowledge, Defendants have never claimed or attempted to collect sales tax on any transactions between a Club patron and a dancer, *i.e.,* payments for dances and gratuities, if cash was the method of payment.

25. To the best of my knowledge, neither PCS nor Plaintiff Metro was or is registered as a sales tax vendor; and it is my understanding that PCS, like Plaintiff Metro, treated all of its commissions as nontaxable for purposes of NYS sales tax.

26. It is likewise my understanding that the primary purpose of the business model adopted by PCS and followed by Plaintiff Metro is to eliminate any implication that the scrip provider is the (or the *alter ego* of the) owner, operator or manager of the club and, therefore, an "employer" liable for compliance with the

Fair Labor Standards Act and New York Labor Law, which imposes substantial and burdensome obligations on employers.

27.  Most significantly, MLB and 44th Enterprises (and Club VIP, which I also owned for a portion of the time period covered by the audit) were party to the sale tax audit of PSC by the Department of Taxation and Finance ("DTF") for the period December 1, 1999 through November 30, 2004. This audit commenced in 2006 and concluded in 2011. At the conclusion of this audit, the DTF concluded that the customers' payments to dancers (cash or scrip) were properly treated as nontaxable. See **Exhibit O**.

28.  To the best of my knowledge, there is no material difference between PCS's business model and Plaintiff Metro's business model. Moreover, to my knowledge, there has been no change in the applicable Tax Law or regulations since the PSC audit. It is simply irrational and fundamentally unfair, and a violation of any notion of equal treatment under law, to conclude that PSC's collections were nontaxable but Plaintiff Metro's collections are taxable.

29.  It is my understanding that Defendants have proposed to hold Plaintiffs Metro and Scarfi liable for sales tax on (a) Service Fees, Referral Fees and the cash value of the scrip redeemed by the dancers (less the Referral Fee) ("Dancers' Net Cash from Scrip"), and (b) a portion of the Clubs' sales during the

11

period covered by the assessment on an *alter ego* and/or agency theory.

30. No distinction has been made by Defendants between scrip tendered to dancers as performance fees and scrip paid as an additional gratuity.

31. Be that as it may, I wish to state definitively that at no time has Plaintiff Metro (or PCS) been the *alter ego* or agent of MLB and/or 44th Enterprises.

32. I am advised by Plaintiffs' attorneys that Defendants have raised a number of questions in connection with this action, and that Plaintiffs have also raised certain questions, and have been asked to answer them based on my knowledge and experience as described above. My answers are as follows:

> A. *Were Plaintiff Metro and the clubs "wholly independent of each other," or did they "work under some kind of agreement, formal or otherwise?*
> The Clubs are and were wholly independent of Plaintiffs. The only agreements are the Entertainment Service Agreements (**Exhibit K**).
>
> B. *Was the sale of Plaintiff Metro's scrip "integral to the operation" of these clubs?*

No. It was incidental, not integral, since patrons can pay dancers in cash and scrip is not used for admission fees or the purchase of drinks.

C. *Why would these clubs need Plaintiff Metro to install a credit card station for selling scrip?*

The installation is required under the Entertainment Services Agreement, as a condition of referral of performers. Furthermore, Plaintiff Metro assumes the risk of the credit card charge transaction made through its (and not the Clubs') account, and the advancement of cash redemptions at the end of shifts.

D. *Did the clubs have "the capability for conducting their own credit card transactions"?*

Yes.

E. *Why would the clubs engage Plaintiff Metro to "refer" dancers?*

Our Clubs are and were liquor licensed and located in a jurisdiction (the First Department) that permits topless dancing and does not enforce the "Six Foot Rule." Accordingly, we require dancers who perform topless and have the experience and/or personalities appropriate for this type of operation. Plaintiff Metro acts as a clearinghouse and registry, matches the Clubs with the type of dancer needed, and relieves the Clubs of the burden of vetting

13

dancers as to age, performance date availability, and experience, etc.

F. *Were the dancers "actually recruited by some other entity"?*

I understand that Plaintiff Metro receives referrals from third-parties.

G. *How did Plaintiff Metro "administer its business on a day-to-day basis"?*

I was not involved in the business of Plaintiff Metro (except as a customer) and do not know the answer to this question.

H. *How did Plaintiff Metro "collect its receipts"?*

The Clubs paid registration fees to Plaintiff Metro by cash. My understanding is that Plaintiff Metro collected its percentage Service Fees and Referral Fees through its bank in exchange for patron charges, by retaining (i) the difference between the amount charged and the scrip value returned to the patron, and (ii) the difference between the value of the scrip returned and the cash payment to the dancers redeeming the scrip.

I. *Were "the individuals who processed the sale of scrip ... employed by [Plaintiff] Metro or by the various clubs"?*

At our Clubs, physical scrip was issued by Club employees, except that during the years 2007-2013 a Metro employee was stationed at Lace to personally oversee the charge and issuance process due to the high volume of business and concern about excessive "fraud" chargebacks.

J. *If the former, "why were [Plaintiff] Metro's employees working at the clubs if the two entities were wholly independent"?*

I have already answered this in paragraph I above.

K. *"If the latter, under what arrangement was [Plaintiff] Metro using club employees to process the sale of its scrip?"*

There was no "arrangement". This was the practice of PCS. When Plaintiff Metro took over these accounts, the practice continued. The only exception was as noted above.

L. *"Did [Plaintiff] Metro pay the clubs' employees?"*

No.

M. *"Were these employees empowered to resolve disputes with customers regarding such sales on behalf of these plaintiffs?"*

No. Only Plaintiff Scarfi and employee referred to above were empowered to resolve such disputes.

N. *"Why would a customer interested in tipping someone not simply tender additional scrip?"*

Gratuities to performers could be tendered in scrip or cash, at the customer's discretion. Patrons often use scrip for "tips" in addition to "dancer fees" (both of which are "gratuities" as a matter of law). The advantages to patrons of using scrip charged to their credit card include documentation of business expenses and avoidance of cash advance limits. Gratuities to hosts, waitresses and other non-performers could be tendered in cash or on a club credit card terminal (not scrip).

O. *"Would the money tendered toward the tip result in additional tokens?"*

I have no idea what "tokens" refers to. Our Clubs do not issue or accept "tokens" for any purpose.

P. *"How did scrip tipping work in practice at plaintiffs' Enterprise Corps.?"*

I assume this question is directed to MLB and 44th Enterprises. Tipping of dancers at these Clubs generally works as follows: The patron can tip the dancers in cash or using scrip. The patron charges scrip through Plaintiff Metro and physically receives either house money or a voucher for the amount charged, less the Service Fee. The patron decides whether or not to tip the dancer. If so, the patron tenders the scrip or voucher to the dancer. If the

patron wishes to tender additional scrip (or an additional) voucher, the patron does so.

Q. *"Were these payments made directly from Metro to the club or someone at the club for some other purpose?"*
At our Clubs, scrip is used only for payments to dancers. All other club transactions (food, drink, souvenirs) are paid in cash or using charge accounts.

R. *Why is there no sales tax on cash payments to the dancers?*
To my understanding, these payments are not taxable - - whether made by cash or scrip.

S. *How does a customer leave a non-sales taxable gratuity on a credit card?*
To my understanding, all payments to dancers are gratuities.

T. *May a patron not use scrip for any purpose at all after it is purchased?*
Yes. There is no requirement that the scrip actually be tendered to the dancers.

U. *Does DTF ever assess sales tax against dancers?*
I have never heard of DTF doing so.

V. *If the sale of scrip was held not sales taxable, how would this in fact affect the collection of sales tax on taxable transactions (if any) utilizing the scrip?*

It would not.

Further deponent sayeth not.

*Anthony Capeci* (signature)
Anthony Capeci

Sworn to before me this
29th day of January, 2018.

*(signature)*
Notary Public

SAGIRAH M SYMISTER
Notary Public - State of New York
NO. 01SY6267662
Qualified in Suffolk County
My Commission Expires 8/20/2020

18