Metro Enterprises/John Scarfi - 7-15-19

NEW YORK STATE
TAX APPEALS

IN THE MATTER OF THE PETITION
OF
METRO ENTERPRISES CORP.

for redetermination of a deficiency/revision
of a determination or for Refund of Sales
and Use Tax under Article 28 & 29 of the
Tax Law for the period March 1 -
February 28, 2014


IN THE MATTER OF THE PETITION
OF
JOHN SCARFI.

for redetermination of a deficiency/revision
of a determination or for Refund of Sales
and Use Tax under Article 28 & 29 of the
Tax Law for the period March 1 -
February 28, 2014


_____/

          DATE:                 July 15, 2019

          PRESIDING:            BARBARA RUSSO, A.L.J.

800.523.7887                              Associated Reporters Int'l., Inc.

```
 1            Metro Enterprises/John Scarfi - 7-15-19

 2   APPEARANCES:

 3   FOR THE PETITIONER:

 4   ACKERMAN, LLP
     BY:  ALVIN BOBROW
 5   666 Fifth Avenue
     New York, New York
 6
     FOR NYS TAX APPEALS:
 7
     OFFICE OF COUNSEL
 8
     BY:  OSBORNE JACK
     Agency Building One
 9
     Albany, New York 12223
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 3

1            Metro Enterprises/John Scarfi - 7-15-19

2          I N D E X   O F   P R O C E E D I N G S

3  Opening statement by Mr. Jack                    14
   Opening statement by Mr. Bobrow                  16
4
   CHRISTINE SCALA:  Sworn
5  Direct Examination by Mr. Jack                   19
   Cross Examination by Mr. Bobrow                  126
6  Redirect Examination by Mr. Jack                 130
   Recross Examination by Mr. Bobrow               143
7
   JENNIFER KINSLEY; Sworn
8
   Direct Examination by Mr. Bobrow                 54
   Cross Examination by Mr. Jack                    73
9
   Redirect Examination by Mr. Bobrow              83
10
   JOHN SCARFI:  Sworn
11 Direct Examination by Mr. Bobrow                 87
   Cross Examination by Mr. Jack                    92
12 Redirect Examination by Mr. Bobrow          102
   Recross Examination by Mr. Jack                 105
13 Redirect Examination by Mr. Bobrow              124
   Redirect Examination by Mr. Bobrow              194
14

15
   ANTHONY CAPECI
   Direct Examination by Mr. Bobrow                150
16
   Cross Examination by Mr. Jack                   175
   Redirect Examination by Mr. Bobrow             184
17
   Recross Examination by Mr. Jack                 186
18 Redirect Examination by Mr. Bobrow             192
   Examination by the A.L.J.                       193
19
   Closing argument by Mr. Jack                    203
20 Closing argument by Mr. Bobrow                  218

21

22

23

24

25

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 4

1              Metro Enterprises/John Scarfi - 7-15-19

2                    E X H I B I T   I N D E X
     Marked as
3    Description

4    Division

5    A                                                    12
     Petition
6
     B                                                    12
7    Answer

8
     C                                                    12
     Notice of hearing memo
9

10   D                                                    13
     Scarfi petition
11
     E                                                    13
12   Answer

13   F                                                    13
     Notice of hearing, Scarfi
14
     G                                                    32
15
     Audit case file
16
     H                                                    106
     Cancelled checks
17

18   I                                                    107
     94 page bank statements
19
     J                                                    110
20   Metro bank account statements, 180 pgs

21   K                                                    111
     22 pages Metro detail accts
22
     L                                                    112
23
     Metro bank records
24
     M                                                    112
25   Metro bank records

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 5

1              Metro Enterprises/John Scarfi - 7-15-19

2    N                                              130
     Audit files
3
     O                                              138
4    286 pages

5    P                                              217
     Notice to admit
6
     Q                                              217
7    Notice to admit

8
     Petitioner's
     One                                             71
9
     Petitioner's motion for summary judgment
10
     Two                                            102
11   1-7-11 audit

12   Three                                          102
     7-30-04 audit
13
     Four                                           149
14   Document, no specific description

15

16

17

18

19

20

21

22

23

24

25

Page 6

1        Metro Enterprises/John Scarfi - 7-15-19

2                    A.L.J. RUSSO:  Before we get started,

3        I see that we have a number of people in the

4        audience.  We have some seats set up outside and I'm

5        going to ask that any non-party witnesses, sit in the

6        hallway until you're called for testimony.

7                    MR. CAPECI:  Judge, what is the

8        definition of non-party?  I was subpoenaed to come

9        here so I --.

10                   A.L.J. RUSSO:  Yes.  If you're not a

11       petitioner in this case, then you are a non-party

12       witness.  If you're not a petitioner or with the

13       State of New York, because the State of New York is a

14       party, then you're a non-party witness.

15                   MR. JACK:  Judge, it only pertains to

16       people who are going to be called as witnesses?

17                   A.L.J. RUSSO:  Yes.

18                   MR. JACK:  Okay.

19                   A.L.J. RUSSO:  Correct.

20                   MR. BOBROW:  May I clarify something?

21                   A.L.J. RUSSO:  Yes.

22                   MR. BOBROW:  Coming for P.C. who is

23       here is the owner of one of the related entities.

24       And he's going to be called.  I -- I subpoenaed him,

25       he is one of my witnesses.  So I assume he could stay

```
1              Metro Enterprises/John Scarfi - 7-15-19
2       or should he wait outside?
3                     A.L.J. RUSSO:  No, he should -- he
4       should wait outside, if he's -- if he's not a party
5       to the proceeding today.
6                     MR. BOBROW:  Okay.
7                     A.L.J. RUSSO:  Are you named in this
8       -- this proceeding or is that a separate --?
9                     MR. CAPECI:  Metro is -- and I don't
10      know -- I don't know I'm --.
11                    A.L.J. RUSSO:  Well, Mr. Jack, do you
12      know, is -- is he part of your proceeding?
13                    MR. JACK:  No, Judge.
14                    A.L.J. RUSSO:  Okay, then that would
15      be a separate petition.
16                    MR. CAPECI: Okay.
17                    A.L.J. RUSSO:  And for the record, the
18      remaining people in the room.  I just want to say, we
19      have two of our new A.L.J.s observing today, in the
20      back.  So you can note that.  We have a Judge DiFiore
21      and Judge Behuniak.  And if the rest of the
22      individuals here could just give the Court reporter
23      your name so that she has that for the record, sir.
24                    MR. GEE:  My name is Eric Gee, Office
25      of Counsel, last name is spelled G-E-E.
```

Page 8

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                   MS. LYONS:  Elizabeth Lyons, Office of
 3      Counsel.
 4                   MR. JACK:  Osborne Jack, Office of
 5      Counsel.
 6                   MR. BOBROW:  Alvan Bobrow, attorney
 7      for petitioners.
 8                   MR. SCARFI:  John Scarfi.
 9                   MS. SCALA:  Christine Scala (phonetic
10      spelling).
11                   A.L.J. RUSSO:  Okay.
12                   MR. JACK:  Judge, may I get Mr.
13      Grillo.  He's not going to testify today so is it
14      okay if he stays then?
15                   A.L.J. RUSSO:  I'm sorry, could you
16      say that again?
17                   MR. JACK:  Mr. Grillo who left and
18      he's not testifying.
19                   A.L.J. RUSSO:  Oh, he's not
20      testifying.
21                   MR. JACK:  No.
22                   A.L.J. RUSSO:  Okay.  If -- if you
23      would like him in the room.
24                   MR. JACK:  Okay.
25                   A.L.J. RUSSO:  That's fine, as long as
```

800.523.7887                              Associated Reporters Int'l., Inc.

Page 9

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       he's not testifying.
 3                      MR. JACK:  Thank you.
 4                      A.L.J. RUSSO:  Can you just let the
 5       Court reporter know his name.
 6                      MR. JACK:  Frank Grillo, G-R-I-L-L-O.
 7                      A.L.J. RUSSO:  Okay.  I call the
 8       matter of the petitions of John Scarfi and Metro
 9       Enterprises Corp. under D.T.A. numbers eight two
10       eight seven four five and eight two eight seven four
11       six.  The petition is for re-determination of the
12       deficiency, revision of a determination or for refund
13       of sales and used tax under Articles 28 and 29 of the
14       Tax Law for the periods December 1st, 2008 through
15       February 28th, 2014 and March 1st, 2008 through
16       February 28th, 2014.
17                      My name is Barbara Russo and I'm the
18       Administrative Law Judge assigned to hear and make a
19       determination in this matter.  Before we begin, I'm
20       going to outline the procedures that we will follow.
21       First, I will ask Mr. Jack, who is representing the
22       Division of Taxation to introduce the jurisdictional
23       documents.
24                      After that, each party will have the
25       opportunity to present witnesses and documents to
```

1       Metro Enterprises/John Scarfi - 7-15-19

2       support your position.  For this matter, the Division

3       will present their witnesses first, followed by the

4       Petitioner's witnesses.

5                    Any witness who testifies will be

6       subject to cross-examination.  At the conclusion of

7       testimony, each side may make open -- excuse me, each

8       side may make closing arguments and make, request

9       additional time to submit briefs.  Please bear in

10      mind to the following points.  The burden of proof is

11      generally on the petitioner.  The only evidence upon

12      which I can base my decision must be presented to me

13      at the hearing today.

14                    Any documents submitted previously

15      either during the audit or the conciliation

16      proceedings must be presented today or I will not be

17      able to consider them.

18                    If you have any objections during the

19      proceedings, please state so and I will rule

20      accordingly.  Also, any requests to go off the record

21      must be made to me and I will determine whether it is

22      appropriate.  If there's any questions regarding the

23      procedures we are going to follow, those questions

24      should be presented to me as well.  At this point in

25      time, are there any questions regarding the

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 11

1              Metro Enterprises/John Scarfi - 7-15-19

2        procedures?

3                      MR. BOBROW:  Motions that have been

4        filed, are they considered part of the record or not?

5                      A.L.J. RUSSO:  The motion of summary

6        determination, are you referring to --

7                      MR. BOBROW:  No.  Yes.

8                      A.L.J. RUSSO:  -- that -- that will be

9        considered a part of the record.  In fact, when you

10       submit your documents you can present it as an

11       exhibit if you wish and we can -- we can mark it so

12       that that way it makes it easier to refer to.

13                     Any other questions regarding the

14       procedures?

15                     MR. JACK:  No, Judge.

16                     A.L.J. RUSSO:  Okay.  At this point,

17       Mr. Jack, if you could please begin with the

18       jurisdictional documents.

19                     MR. JACK:  Sure.  The Division would

20       offer the petition filed by Metro Enterprises

21       Corporation and -- which includes copies of the

22       Notice of Determination issues of the business.

23                     A.L.J. RUSSO:   The petition for Metro

24       Enterprise Corp. stamped received by Division of Tax

25       Appeals June 8th, 2018 will be accepted as the

Page 12

1           Metro Enterprises/John Scarfi - 7-15-19

2     Division's Exhibit A.

3                 MR. JACK:  The Division next offers

4     their answer dated August 8th, 2018, filed by the

5     Division in response to the petition.

6                 A.L.J. RUSSO:  The Division's answer

7     and cover letter dated August 8th, 2018 for the

8     matter of Metro Enterprises is accepted as the

9     Division's Exhibit B.

10                MR. JACK:  And the final

11    jurisdictional document from Metro Enterprises Corp.

12    is the Notice of Hearing for that matter.

13                A.L.J. RUSSO:  Notice of Hearing in

14    the matter of Metro Enterprises Corp. dated June

15    10th, 2019 is accepted as the Division's Exhibit C.

16                MR. JACK:  The Division would now

17    offer the jurisdictional documents for John Scarfi

18    starting with their petition filed by Mr. Scarfi.

19    And again, this includes the Notices of Determination

20    issued to Mr. Scarfi.

21                A.L.J. RUSSO:  The petition in the

22    matter of John Scarfi and attached documents dated

23    June 8th, 2000 and -- excuse me, stamped received by

24    Division of Tax Appeals June 8th, 2018 is accepted as

25    the Division's Exhibit D.

Page 13

    1              Metro Enterprises/John Scarfi - 7-15-19

    2                      MR. JACK:  The Division next offers

    3        the answer together with a cover letter dated August

    4        8th, 2018 filed by the Division in response to the

    5        petition.

    6                      A.L.J. RUSSO:  Division's answer and

    7        cover letter dated August 8th, 2018 for the matter of

    8        John Scarfi is accepted as the Division's Exhibit E.

    9                      MR. JACK:  And the final

   10        jurisdictional document is the Notice of Hearing in

   11        the matter of John Scarfi.

   12                      A.L.J. RUSSO:  The Notice of Hearing

   13        in the matter of John Scarfi dated June 10th, 2019 is

   14        accepted as the Division's Exhibit F.

   15                      Mr. Jack, is that all of the --?

   16                      MR. JACK:  That -- that completes the

   17        jurisdictional documents, Judge.

   18                      A.L.J. RUSSO:  Okay, thank you.  If

   19        you could please state the issue and your opening

   20        argument.

   21                      OPENING STATEMENT

   22                      MR. JACK:  The first issue is whether

   23        or not the sale of -- first of all funny money used

   24        to pay for entertainment or amusement in -- in the

   25        strip club is subject to sales tax and I think that

Page 14

1           Metro Enterprises/John Scarfi - 7-15-19

2      -- that issue is well-settled and that the strip is,

3      in fact, taxable.  But a related issue to that is

4      who, in this scenario, is responsible for the taxes

5      that are due on such sales.  And whether or not the

6      Division properly assessed Metro Enterprises

7      Corporation and Mr. Scarfi as a responsible person

8      for Metro for the sale of script that was used in the

9      strip club for pay for entertainment of the pre-

10     admission charges.  And the Division also assessed

11     tax against Metro Enterprises Corporation and Mr.

12     Scarfi for the additional tax due on the sale of

13     beverages and other taxable items in the strip club

14     that the Division contends were operated by Mr.

15     Scarfi, Metro and the strip clubs themselves.

16                  And the question here is whether or

17     not the Division properly determine that Metro

18     Enterprises Corporation and Mr. Scarfi were

19     responsible persons for the additional taxes due from

20     those.  And petition also raise an issue in -- in --

21     it's here in memorandum as -- as to whether or not

22     the consents that were executed during the audit

23     would extend the statute of limitations, whether

24     those consents were properly executed.

25                  And again, the Division maintains that

1          Metro Enterprises/John Scarfi - 7-15-19

2      this is an issue that has been raised many times

3      before and -- and is well-settled that consents

4      extend the statutory limitation and other agreements.

5      The unilateral consents by a taxpayer that gives the

6      Division additional time to determine if there is

7      additional tax due.  And the Division maintains these

8      consents were actually properly executed either by

9      petitioners or petitioner representatives.  And --

10     and then that issue is well-settled.  And those are

11     the issues as the Division sees them, Judge.

12                 A.L.J. RUSSO:  Thank you, Mr. Jack.

13     Mr. Bobrow --

14                 MR. BOBROW:  Yes.

15                 A.L.J. RUSSO:  -- if you would like to

16     phrase the issues differently and your opening

17     statement as well, please.

18                 OPENING STATEMENT

19                 MR. BOBROW:  Yes, I also wanted to ask

20     you another procedural question.  May my witness use

21     a laptop to refer to documents?

22                 A.L.J. RUSSO:  He can to the extent

23     that it's documents that you're going to be giving me

24     copies of, if they're going into the record.

25     Certainly, I'm not going to be privy to any digital

Page 16

1          Metro Enterprises/John Scarfi - 7-15-19
2      information he's looking at.  So if it's something
3      that you want to put in as evidence, you -- you will
4      need to submit a hard copy of it.
5                MR. BOBROW:  Okay, thank you.  Good
6      morning, everyone.  In his opening remarks, Mr. Jack
7      said that this is a well-settled case.  And it really
8      is not an expression that I could use or would like
9      to use, as this is a case of first impression.  And
10     that's because the prior cases that dealt with the
11     sale of funny money, as it's described, had a
12     different set of facts from the facts that we're
13     going to present in this case.
14                And the key fact that's different, to
15     keep in mind, is that the entertainers in the prior
16     cases were independent contractors.  And in our case
17     they were employees.  Another thing that
18     differentiates our case from the prior cases is that
19     any of the receipts, I'll say, or -- or revenue which
20     is -- it really was when the card is used to purchase
21     the funny money, nothing runs through the profit and
22     loss or the income of Metro.
23                In some of the other cases, the
24     taxpayer reported the income or the receipts from the
25     sale as part of his income in his income tax -- in

    1            Metro Enterprises/John Scarfi - 7-15-19
    2       his income books.  The point we want to make here is
    3       that Metro is neither an agent or co-vendor of
    4       M.L.B., the related entity, that was audited by the
    5       auditor here.
    6                        And finally, and I would almost say
    7       most importantly, last April, there was a memorandum
    8       and order by the petitioner from the Third
    9       Department.  And in that order from the Third
   10       Department, the Court said that it is not
   11       automatically true that the sale of the script is
   12       subject to sales tax.  We're going to put this into
   13       evidence and I will have witnesses to address this.
   14                        The Third Department said where the
   15       script is subject to sales tax or the sale of script
   16       depends upon the parties involved, the parties being
   17       the entity that distributes the script, the club, the
   18       entertainers.  And when that question was put to the
   19       Third Department, they had the opportunity to come
   20       out and say that funny money is subject to tax and
   21       they didn't.
   22                        And the last point we want to make --
   23       and again, I have witnesses who will address this.
   24       This is not truly the first audit of Metro
   25       Enterprises.

1       Metro Enterprises/John Scarfi - 7-15-19

2                       Metro Enterprises had a predecessor

3       that where this issue was raised and after raising

4       the issues with Office of Counsel and senior

5       management within the tax department, while under

6       audit, the predecessor of Metro received a no change

7       letter, which really meant to this businessman that

8       he should continue what he's doing.  Nothing was

9       wrong.  And this no change letter when even further,

10      and it basically said that Metro, the predecessor of

11      Metro did not -- was not even a vendor, did not have

12      to register, did not have to file returns.

13                      So the petitioner here is very upset

14      to say the least, that he sees the agency advising

15      him that he's doing everything correctly in 2011.

16      And then now, the agency comes back and says, oh, we

17      think you owe ten million dollars.  So that's why

18      this is a very serious case.

19                      A.L.J. RUSSO:  Thank you.  Mr. Jack,

20      if you could call your first witness, please.

21                      MR. JACK:  Sure.  I am -- the Division

22      would like to call Christine Scala as its witness.

23                      A.L.J. RUSSO:  Okay.  Take the witness

24      stand.

25                      MS. SCALA:  Good morning.

800.523.7887                          Associated Reporters Int'l., Inc.

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2                    A.L.J. RUSSO:  Good morning.  Can you
 3       please raise your right hand.  Do you swear or affirm
 4       to tell the truth, the whole truth and nothing but
 5       the truth?
 6                    MS. SCALA:  I do.
 7                    WITNESS; CHRISTINE SCALA; Sworn
 8                    A.L.J. RUSSO:  Thank you.  You may
 9       proceed, Mr. Jack.
10                    DIRECT EXAMINATION
11                    BY MR. JACK:
12                    Q.   Good morning, Ms. Scala.
13                    A.   Good morning.
14                    Q.   Will you be comfortable if I call
15       you Ms. Scala or Christine?
16                    A.   You can call me Christine.
17                    Q.   By whom are you currently
18       employed?
19                    A.   Sorry.  New York State,
20       Department of Taxation and Finance.
21                    Q.   And what do you do for the
22       department?
23                    A.   I'm a sales tax auditor II, which
24       is a first line team leader, supervisor.
25                    Q.   And how long have you worked for
```

1              Metro Enterprises/John Scarfi - 7-15-19

2       the department?

3                      A.    Twelve years, exactly.

4                      Q.    And what are your duties as a

5       first line audit supervisor?

6                      A.    I have auditors currently five

7       auditors that I oversee their -- their audits and

8       review their cases.

9                      Q.    And what's -- what's typically

10      involved in the review of a -- of a case that's done

11      by your auditors?

12                     A.    It -- it varies.  But usually

13      it's overseeing the auditor, making decisions on

14      audit, looking for research and -- and any additional

15      information from management when necessary.

16                     Q.    So are you involved also in the

17      conduct of the audit, I mean, when the audit is -- is

18      being conducted?

19                     A.    For the most part, yes.

20                     Q.    And what's typically that

21      involvement?

22                     A.    It varies from case to case.

23      Some cases are -- are simpler than others.  But it's

24      involved with audit methodology, research, Tax Law.

25                     Q.    In Metro Enterprises Corporation,

1            Metro Enterprises/John Scarfi - 7-15-19

2       I mean, how did you become involved in that -- in

3       that matter?

4                 A.   I went with the -- originally, I

5       went with the auditor on the first appointment.

6                 Q.   And so who was the auditor?

7                 A.   Jennifer Genovese.

8                 Q.   And where is Ms. Genovese?

9                 A.   She is no longer with the

10      department.

11                Q.   So do you recall how Ms. Genovese

12      came about to conduct an audit of Metro Enterprises

13      Corporation?

14                A.   Yes.  She was auditing two other

15      entities, two other strip clubs.  And through

16      meetings with the then power of attorney, we were

17      told that there was another entity that process the

18      -- the transactions for the sale of script.  And we

19      were given the information, the name, the I.D. number

20      and we decided to get the best overall picture of all

21      the transactions that we needed to call that entity

22      down for audit as well.

23                Q.   So you -- you said a minute ago

24      that Ms. Genovese was conducting an audit -- audit of

25      the strip club.  And when the Division is conducting

Page 22

1                  Metro Enterprises/John Scarfi - 7-15-19

2         an audit of the strip club, what is it looking for?

3                         A.   The Department's position is

4         everything is -- is taxable.  So we want to see all

5         the transactions and review that books and record.

6                         Q.   When you say that everything is

7         taxable, what -- what exactly is taxable it is --

8                         A.   You -- I'm sorry.

9                         Q.   -- in a -- in a strip club?

10                        A.   Usually, there are few different

11        revenue streams.  There are door admissions, there's

12        the sale of like --.

13                        Q.   So let -- let's talk about the

14        door admission.

15                        A.   Okay.

16                        Q.   Are the door admissions taxable?

17                        A.   Yes.

18                        Q.   Okay.  What else is there?

19                        A.   The sale of liquor.

20                        Q.   Is the sale of liquor taxable?

21                        A.   Yes.

22                        Q.   And what -- what other revenues

23        streams do you look at?

24                        A.   There are sales of private rooms

25        for private dances.

```
1              Metro Enterprises/John Scarfi - 7-15-19
2                        Q.   And are those taxable?
3                        A.   Yes.
4                        Q.   Again, what else?
5                        A.   And then there's could be coat
6       check, some other little things but there's also the
7       sale of script which is admission to -- well, it's to
8       pay for a stripper in -- in one of these private
9       rooms.
10                       Q.   When you say pay for a stripper,
11      you mean, are those fees that are due to the stripper
12      for their performances that they give to patrons?
13                       A.   Yes.  So there's a -- a sale of
14      -- of script and the -- the script is what is used to
15      pay the stripper or dancer.
16                       Q.   And are -- are those taxable?
17                       A.   Yes.
18                       Q.   Those sales?
19                       A.   Yes.
20                       Q.   Okay.  So Ms. Genovese was
21      conducting an audit of -- of a strip club.  And then,
22      did she request books and records from that -- from
23      that strip club?
24                       A.   Yes.
25                       Q.   And did the taxpayer provide
```

Page 24

1                Metro Enterprises/John Scarfi - 7-15-19

2        books and records?

3                        A.   The books and records, are we

4        talking about this from the strip clubs?

5                        A.   From the strip club, yes.

6                        A.   We -- no.

7                        Q.   No books and records --

8                        A.   Initially, no.

9                        Q.   -- whatsoever?

10                       A.   No.

11                       Q.   So how exactly did she come

12       across any information then with regard to Metro

13       Enterprises Corporation?

14                       A.   It was through conversations with

15       the power of attorney when we were told how the whole

16       operations of the club work and he informed us of the

17       other entity.

18                       Q.   And is that -- is that a typical

19       thing that you would do when you conduct an audit?

20       Have conversations with the taxpayers'

21       representative?

22                       A.   Absolutely.

23                       Q.   By the way, who was that

24       representative on that particular strip club audit?

25                       A.   Initially, it was Anthony Capeci.

Page 25

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                    Q.   And -- so Mr. Capeci informed the
 3       Division that -- so -- well, Ms. Genovese is looking
 4       at the strip club and she's trying to determine what
 5       when she got that information from Mr. Capeci, what
 6       was she trying to determine?
 7                    A.   Initially, we want to get all the
 8       books and records and determine his total --
 9                    Q.   And specific to the information
10       that she got that led her to Metro Enterprises Corp.,
11       what was she looking at at that particular time?
12                    A.   I don't know if I understand what
13       you mean.
14                    Q.   I'm sorry?
15                    A.   I don't know if I understand what
16       you would mean.
17                    Q.   Okay.  You -- you testified
18       earlier that there were certain transactions in this
19       report that's subject to sales tax.  The coat check,
20       the bar sales, the room rentals and -- and also the
21       sale of strip.  Which one of those areas, I mean, was
22       being questioned when Ms. Genovese's received
23       information that there was a separate entity
24       involved?
25                    A.   Okay.  So when we were -- well,
```

1                Metro Enterprises/John Scarfi - 7-15-19

2        how we were told was that Metro, when -- when we were

3        informed of Metro, that Metro processed the credit

4        card charges which was the sale of the script.  So

5        that was Metro's portion of -- of the transactions.

6                       Q.    So is it that Ms. Genovese

7        inquired about the dance fees paid by the dancers?

8                       A.    Yes.

9                       Q.    And then was she looking for

10       information about the dance fees or -- or where the

11       receipts for the dance fees were?

12                      A.    Yes.  We -- we wanted to know

13       everything that transpired in -- in the -- in the

14       club itself.

15                      Q.    And so Ms. Genovese gets this

16       information that there was a separate entity involved

17       and what does she then do?

18                      A.    We ended up calling it down for

19       audit in order to have the full picture of -- of

20       everything that -- that was going on within the --

21       the club itself.

22                      Q.    Would it have been possible for

23       the -- the Division to conduct a complete audit of

24       this strip club without looking at the books and

25       records from Metro?

1              Metro Enterprises/John Scarfi - 7-15-19

2                        A.   I don't think so because it --

3        it's not, it would be an incomplete audit.  It would

4        -- would not be the whole picture.

5                        Q.   Do you know what's typically

6        offered for -- for sale in a strip club?  I mean,

7        you've -- you've mentioned certain things like the

8        beverage and -- and the coat check and whatever else.

9        But the people go to the strip club just to check

10       your coat in?

11                       A.   No.  I -- I -- it's too expensive

12       to do that.

13                       Q.   Why do people go to strip clubs?

14                       A.   I -- I would guess, the primary

15       reason is to see very scantily-dressed women.

16                       Q.   And -- and so was the Metro's --

17       in your estimation, from looking at the conduct in

18       the audit, was Metro's role in the strip club an

19       integral role?

20                       A.   Yes.  I -- I -- the two entities

21       really -- the way it's structured cannot really exist

22       without the other.

23                       Q.   And why exactly do you think that

24       way?

25                       A.   Because if -- if someone's going

```
 1                 Metro Enterprises/John Scarfi - 7-15-19
 2      to go to a strip club to see a strippers, there need
 3      to be strippers there.  And if -- if one entity has
 4      the strippers and one doesn't, they -- they need --
 5      and the strippers need the club.  So they -- they
 6      needed each other.
 7                      Q.   Okay.  So -- so in -- I mean, the
 8      Division is now conducting an audit of Metro
 9      Enterprises Corporation.  And did Ms. Genovese's
10      request books and records from the Metro Enterprises?
11                      A.   Yes.
12                      Q.   And did she receive books and
13      records from Metro?
14                      A.    Not initially, but eventually.
15                      Q.    And what books and records, if
16      you remember, did the -- the Division receive from --
17      from Metro?
18                      A.    Approximately two years into the
19      audit, we received daybooks, handwritten daybooks,
20      contracts signed between the entertainers and -- and
21      Metro.
22                      Q.    And were you able to use those
23      contracts and the daybooks to determine how much, if
24      any, tax Metro owed?
25                      A.    Well, the nature of Metro's
```

1          Metro Enterprises/John Scarfi - 7-15-19

2     business is credit card transactions.  So because the

3     books and records that were provided were

4     handwritten, which we considered them to be

5     inadequate, we picked up the credit card charges from

6     the bank statements.

7                    Q.   So you weren't able to use the

8     records you described to determine whether or not

9     there was a tax liability?

10                   A.   No.

11                   Q.   What then did you do?  How did

12    you determine -- so I mean, you testified.  I mean,

13    you testified a couple of minutes ago that you

14    determined that the books and the records were

15    inadequate.  How then did you determine how much, if

16    any, tax Metro owed?

17                   A.   We took the bank statements,

18    Metro has a bank account for each one of the clubs

19    that it works with or it's -- it's -- it provides the

20    transactions for.  And we took all the credit card

21    charges and held them as -- as taxable sales.

22                   Q.   All right.  So -- so two things.

23    First, I mean, can you go back and -- and describe

24    the structure of Metro and -- and these strip clubs,

25    I mean, how did they function?

1          Metro Enterprises/John Scarfi - 7-15-19

2                    A.   From what we were told, we did

3     get a tour of the clubs involved.  And from what we

4     were told, the -- once you walk into the club,

5     everything is within the -- each individual club.

6     And when a patron wants a private dance in a private

7     room with an entertainer, he is -- and he's paying

8     with a credit card.  He is charged a fee for the room

9     and a fee for the dance.  And we were told that the

10    fee for the dance runs through Metro's credit card

11    and Metro's bank and the fee for the room went

12    through the club's credit card and the club's bank.

13    But needed the two of them together.

14                    Q.   Were you able to determine how

15    many clubs Metro had that arrangement with in New

16    York?

17                    A.   We were --- we were told four

18    clubs.

19                    Q.   So did Metro provide the bank

20    accounts to you that you -- you described earlier?

21                    A.   The majority of the bank accounts

22    we subpoenaed and got the bank statements on our own.

23                    Q.   And how did you then use the --

24    the bank statements to determine the tax liability?

25                    A.   We transcribed the bank

1            Metro Enterprises/John Scarfi - 7-15-19

2       statements for the audit period and picked up the

3       total credit card receipts and held a tax of it.

4                    Q.   And those receipts you taxed on

5       -- on what basis again?

6                    A.   That was the sale of script,

7       dance fees that's -- that we hold taxable as part --

8       prior court cases.

9                    MR. JACK:  At this time, Judge, the

10      Division would like to offer a two hundred and

11      eighty-one page document for the auditor for

12      identification marked as Division's Exhibit --

13                   A.L.J. RUSSO:  G.

14                   MR. JACK:  -- G.

15                   A.L.J. RUSSO:  We'll mark for

16      identification purposes Division's Exhibit G.  You

17      did give a copy to Mr. Bobrow?

18                   MR. JACK:  Yes.

19                   A.L.J. RUSSO:  Do you want me to show

20      G to the witness?

21                   MR. JACK:  Yes, please, Judge.

22                   BY MR. JACK:  (Cont'g.)

23                   Q.   Christine, could you tell us what

24      this document is, please?

25                   A.   I believe it's the entire audit

Page 32

```
 1                    Metro Enterprises/John Scarfi - 7-15-19
 2            case file.
 3                         Q.   And does it include the audit
 4            report that would have been prepared by the Division
 5            in conjunction with the audit?
 6                         A.   Yes.
 7                         Q.   And if you just -- roughly,
 8            what's included in here other than -- other than the
 9            audit report?
10                         A.   The audit report, the A.U. three
11            forty-six, D.O. two twenty, correspondence, some
12            internal closing documents, work papers, federal
13            returns.
14                         Q.   Okay.  And is this a document
15            that was prepared by the Division in -- during the
16            conduct of the audit?
17                         A.   Yes.
18                         Q.   And was prepared by the Division
19            in its normal course of business?
20                         A.   Yes.
21                         MR. JACK:   If there are no objections,
22            Judge, the Division moves that Exhibit G be admitted
23            into evidence.
24                         MR. BOBROW:   No objection.
25                         A.L.J. RUSSO:   I accept the Division's
```

1              Metro Enterprises/John Scarfi - 7-15-19

2       Exhibit G.  Do you want her to keep it to refer to?

3                   MR. JACK:  Yes, if you can, I'm going

4       to present an exact copy of that document to the

5       witness if you wanted to get Exhibit G so you can

6       follow on, Judge.

7                   A.L.J. RUSSO:  Thank you.

8                   BY MR. JACK:  (Cont'g.)

9                   Q.   Christine, so you testified

10      earlier that you obtained bank information from Metro

11      and based on that information you determined that

12      Metro owes additional tax on the sale of script --

13                  A.   Yes.

14                  Q.   -- used to pay admission charges

15      in the strip club.

16                  And could you tell -- tell us and walk

17      us through the -- the audit file, if necessary.  How

18      much tax was determined due from Metro for the sale

19      of script?

20                  A.   Okay.  So I have to look at some

21      of these, I'm sorry, just give me a second.

22                  Q.   Well -- well, let's ask the

23      question a different way.

24                  A.   Okay.

25                  Q.   How much -- did Division

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       determine that Metro had sales that were subject to
 3       sales tax?
 4                    A.   Yes.
 5                    Q.   And how much sales from the sale
 6       of script did the Division determine was subject to
 7       tax?
 8                    A.   Well, I'm sorry, that's taken me
 9       a minute, it's --
10                    Q.   Take your time.
11                    A.   -- because of the different --
12       because of the -- the way that they -- she did it and
13       the two revenue streams, I just want -- hopefully
14       answer your question.  I'm sorry.
15                    Q.   All right.  If you -- if you look
16       at the first page in the -- in Exhibit G, if you look
17       towards the bottom of the page where it says, before
18       and after audit figures.
19                    A.   I'm sorry, I thought -- okay.
20       I'm sorry.  So the -- the total tax was --
21                    Q.   No, I -- I have to ask you --
22                    A.   Oh, I'm sorry.
23                    Q.   -- a question first.  If you look
24       there towards the bottom of the page, there's a
25       number that says gross sales and it seems to say,
```

1                    Metro Enterprises/John Scarfi - 7-15-19

2          reported after audit.  What did those numbers mean?

3                         A.    The after audit is forty-four

4          million four hundred thirty-eight thousand five

5          hundred and sixty-six dollars and five cents.

6                         Q.    And before audit is what?

7                         A.    Zero.

8                         Q.    Did Metro file any sales tax

9          returns?

10                        A.    No.

11                        Q.    Did Metro pay any sales tax

12         during the period at issue?

13                        A.    No.

14                        Q.    So does that mean that the

15         Division looked at certain books and records and

16         determined that Metro had sales of forty-four million

17         dollars that were subject to sales tax?

18                        A.    Yes.

19                        Q.    Was that forty-four million

20         dollars from the sale of script?

21                        A.    No.

22                        Q.    Okay.  How much of those sales

23         were from the sale of script?

24                        A.    So that's what I'm trying to find

25         for you.  I want to say, I have it individually I

```
 1                Metro Enterprises/John Scarfi - 7-15-19
 2       don't have it totaled up.  Can I give you an
 3       approximate or that's not good?
 4                     Q.   Just answer the question the best
 5       you can.
 6                     A.   I'm sorry.  It was about thirty-
 7       six million dollars.
 8                     Q.   And you testified that the --
 9       these -- this Exhibit G contains the work papers that
10       the Division used?
11                     A.   Yes.
12                     Q.   And can you locate the work --
13       take your time.  Locate the work papers and -- and
14       see if you can tell me how much of the sales were
15       from the sale of script?  All right.  The pages are
16       all numbered.  Can you turn to page sixty-nine,
17       please?
18                     A.   Okay.
19                     Q.   And on page sixty-nine there is
20       -- why don't you tell us what it is?  What is --?
21                     A.   Okay.
22                     Q.   What is -- what is this on page
23       sixty-nine?
24                     A.   This -- okay, this is what I was
25       looking for.  Okay.  So this has the four strip clubs
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       that Metro worked with or -- or had their sold script
 3       to in New York.  And this is the breakdown of all
 4       four of them for the audit period.  So this would be
 5       the bank deposits for all four, totaled up and the
 6       combined deposits of all four of them were forty-four
 7       million three eighty-six.  Okay.  Wait a minute, I'm
 8       sorry.  That's the total including the clubs.  These
 9       are a little confusing to me, I'm sorry.  The total
10       for just the Metro transactions for the sale of
11       script was thirty-eight million two eighty-one seven
12       forty-six.
13                   Q.   Okay.  And how did the Division
14       come to that thirty-eight million dollar number?
15                   A.   That was strictly taking the
16       credit card deposits from those four bank accounts.
17                   Q.   So -- so at the bottom of page
18       sixty-nine there is a number that says total -- total
19       Metro deposits four clubs, thirty-eight million
20       dollars, that same number across from it is number
21       that says total additional taxable sales clubs.  And
22       that's a six point one million dollar number.  Where
23       does that six point one million dollar number come
24       from?
25                   A.   So in addition to picking up the
```

1               Metro Enterprises/John Scarfi - 7-15-19

2        sale of script on the bank accounts from Metro, we

3        also were auditing the individual I.D. for the clubs

4        and there was additional taxable sales that were

5        found due from a review of register tapes for a

6        quarter and we -- well, there was a register tapes

7        for a quarter for two of the clubs and the other two

8        were point of sale documents.  But this was for

9        beverages, room rentals, admission over and above

10       what the clubs had reported to us is tax for sales.

11                    Q.   So on the top of the page, the

12       same page sixty-nine across the top in parenthesis,

13       the Division has M.L.B., 44th, Lace, Stiletto.  I

14       mean, and that's repeated on the -- on the right side

15       of the page also.  What are those -- what are -- what

16       are those names mean?  Are those the clubs with which

17       -- in which Metro sold the script?

18                    A.   Yes, those are the clubs and that

19       is their -- their corp. name.  It was very, as you

20       can see, confusing audit with a lot of entities and a

21       lot of transactions.  So we did our best to separate

22       them as -- in order to hopefully make some sense out

23       of it.

24                    Q.   So if you -- if you take M.L.B.

25       then can you tell us how much additional sales the

1                    Metro Enterprises/John Scarfi - 7-15-19

2        Division -- that M.L.B. did not report?

3                         A.    For -- okay, so when you say

4        M.L.B., you're talking about the -- the corporation

5        for M.L.B.?

6                         Q.    Yes.

7                         A.    Four million two hundred two thou

8        -- two thousand eighty-five dollars.

9                         Q.    And how did you determine those

10       sales for M.L.B. or those additional sales that were

11       subject to tax?

12                        A.    So for M.L.B. and 44th, it was

13       the same --

14                        Q.    No, just --

15                        A.    Just -- okay, I'm sorry.

16                        Q.    -- just M.L.B. --

17                        A.    So for M.L.B. --

18                        Q.    -- how did you determine the tax,

19       I mean, the sales, sorry, the additional sales that

20       was subject to tax from M.L.B.

21                        A.    We reviewed a quarter of register

22       tapes and we added them up.  We got -- compared that

23       to the reporting for that quarter and developed an

24       error rate and extrapolated that.  The reason why we

25       did that was the records were inadequate.  We did

1              Metro Enterprises/John Scarfi - 7-15-19
2       attempt to go in and -- and do a point of sale
3       extraction to get the original source documents and
4       they were no longer on the computer.  So we were
5       unable to -- to use the original source document.
6                    Q.   Did you look at the computer?
7                    A.   Yes.
8                    Q.   So you -- you actually went in to
9       M.L.B. Enterprises Corporation, looked at the
10      computer, the records weren't there and then you used
11      -- did you say two months or two --
12                   A.   A quarter.
13                   Q.   A quarter.  And so did you -- did
14      the Division conduct an audit of M.L.B. Enterprises?
15                   A.   Yes.
16                   Q.   And we requested the books -- did
17      the Division request books and records from M.L.B.
18      Enterprises?
19                   A.   Yes.
20                   Q.   And the records we received were
21      they adequate to determine if M.L.B. Enterprises
22      reported the proper amount of tax due?
23                   A.   No.
24                   Q.   So did you make a determination
25      then that the records were inadequate?

1              Metro Enterprises/John Scarfi - 7-15-19

2                        A.   Yes.

3                        Q.   And -- and you say that we used

4         that quarter to determine whether or not there was

5         any additional sales subject to tax?

6                        A.   Yes.

7                        Q.   Where did you get the information

8         for that quarter?

9                        A.    The power of attorney --

10        actually, not the power of attorney, the owner gave

11        us envelopes that he keeps with all his day's

12        receipts in an envelope.  And within that envelope

13        there were many receipts and we did our best to go

14        through them and take the sales.  But within those

15        receipts were receipts for M.L.B. and receipts for

16        Metro and a lot of the receipts -- the individual

17        credit card receipts would all be stapled together.

18        So within this one envelope that we received on the

19        audit of M.L.B., we were finding receipts for Metro.

20        It was pretty much at that time we determined that

21        it's one entity, but that's where we got the receipts

22        and we transcribed them, compared it to his reporting

23        and developed an error rate and extrapolated that.

24                       Q.   And is -- I mean, that error rate

25        that you just referred to, is that summarized

1                Metro Enterprises/John Scarfi - 7-15-19

2        anywhere in the work papers?  Is that --?

3                        A.   I'm not sure if it's in the work

4        papers here, but it would be in the work papers for

5        the -- for the other entity itself, the M.L.B.

6                        Q.   And if you look at page seventy

7        then, can you -- can you tell us what -- what's

8        there?

9                        A.   Yes, that would be it.  So that

10       shows the taxable sales reported that error rate on

11       that of one point four seven eight zero would have

12       been what, which would be on page seventy-one.  So

13       that would be how we determined it.

14                       Q.   What is on page seventy-one?

15                       A.   Seventy-one shows the gross

16       receipts for the quarter ending -- test quarter

17       ending 11/30/13, how those register tapes we saw,

18       which was a million fifty-one thousand seven hundred

19       and forty-three dollars.  He -- we took out sales tax

20       remitted as the taxpayer did not charge tax.  So

21       there was no tax separately stated on any of these

22       receipts.  And we got audited taxable sales

23       subtracted out what was recorded and that's how the

24       error rate was determined.

25                       Q.   So does page seventy-one show the

1                    Metro Enterprises/John Scarfi - 7-15-19

2          error rate, you are saying that the error rate was

3          one point four seven eight o?

4                         A.   Yes.

5                         Q.   What did you then do with that

6          error rate?

7                         A.   So being it was computed on

8          reported taxable sales, we applied it to reported

9          taxable sales to get our audited taxable sales.  So

10         it would have increased taxable sales by that

11         percentage and that was the additional taxable sales

12         of four point two million dollars.

13                        Q.   And let's go back to page sixty-

14         nine then, and the next entity that you have listed

15         there is Metro -- 44th.  Did you do a similar

16         computation to determine the additional tax due from

17         44th Enterprises?

18                        A.   Yes.

19                        Q.   And is that computation included

20         in the -- in the work papers that you have before

21         you?

22                        A.   Yes, it is.

23                        Q.   And by the way, for 44th

24         Enterprises, I mean, what did you look at to

25         determine the error rate?

```
 1              Metro Enterprises/John Scarfi - 7-15-19

 2                        A.   It would be the same thing.  So a

 3      -- receipts that were provided in envelopes that we

 4      received from the taxpayer of quarter, quarter ending

 5      11/30/13 and we reviewed those.

 6                        Q.   And did the Division conduct an

 7      audit of 44th Enterprises Corporation?

 8                        A.   Yes, we did.

 9                        Q.   Did the Division request books

10      and records from 44th Enterprises?

11                        A.   Yes, we did.

12                        Q.   Did the Division make a determine

13      -- determination with regard to the adequacy of those

14      records?

15                        A.   Yes.

16                        Q.   And were the records adequate or

17      inadequate?

18                        A.   Not adequate.

19                        Q.   And on page seventy-four, is that

20      the error rate that you computed for 44th Enterprises

21      Corporation?

22                        A.   Yes.

23                        Q.   And did you do the same thing

24      that you had done with Metro Enterprises Corporation?

25      Did you apply that error rate to the taxable sales
```

1              Metro Enterprises/John Scarfi - 7-15-19

2        reported by 44th?

3                      A.   Yes, we did.

4                      Q.   Can you please tell us how you

5        determine the additional sales from --?

6                      A.   Yes.  That was a little

7        different.  We did attempt to get the point of sale

8        data from 44th and M.L.B., but that was not

9        available.  But we were able to get point of sale

10       data for Lace and Stiletto.  So we used that, so on

11       page seventy-six it shows the additional taxable

12       sales that we found when looking at the point of sale

13       records.  I don't know where it is on -- the other

14       one is probably right in front of it.

15                     Q.   I'm sorry, I didn't --

16                     A.   Yeah.

17                     Q.   -- get the last thing you said.

18                     A.   I was looking for -- for

19       Stiletto, but on page seventy-six shows the

20       additional taxable sales we determined from the

21       review of the point of sale records.

22                     Q.   And did you conduct an audit of

23       Lace Entertainment Incorporated?

24                     A.   Yes.

25                     Q.   And did the -- did the Division

Page 46

1                   Metro Enterprises/John Scarfi - 7-15-19

2          request books and records for Lace?

3                        A.    Yes.

4                        Q.    And were the records adequate to

5          determine if Lace had paid the proper amount of sales

6          tax?

7                        A.    I -- I have to say I -- I am not

8          a hundred percent sure if the records for Lace were

9          adequate.

10                       Q.    So this method that you used here

11         on page seventy-six, what were you looking at?

12                       A.    We looked at the point of sale.

13         So the transactions that occurred in the club were

14         recorded on the taxpayers' point of sale computer.

15         So that's what we looked at.

16                       Q.    And so if you look at page

17         seventy-six then where it says, Q.E., what does that

18         mean?

19                       A.    P.O.S.?

20                       Q.    No, Q.E.   Towards the middle of

21         the page there is a column that says, Q.E. there.

22                       A.    I'm sorry, quarter ending.

23                       Q.    So where it says Q.E. and you

24         have November 13, what does that mean?

25                       A.    That was that -- that was

1           Metro Enterprises/John Scarfi - 7-15-19

2     September, October, November of 2013.

3                 Q.    And there's a number there one

4     hundred and twenty dollars and eight hundred and

5     twenty-seven dollars and seventy-four cents.   What is

6     that number?

7                 A.    That shows the amount of sales

8     that was over and above what was reported and that

9     should be coming from -- from page seventy-seven

10    right behind it.

11                Q.    So if you go to page seventy-

12    seven then, can you show us where that one hundred

13    and twenty thousand dollars came from?

14                A.    Right.   It's -- it's in that last

15    column.   So I would have to go back to the page.   So

16    I think it -- it -- I'm sorry, I think it really

17    comes from the next page, which was seventy-eight

18    where there was three -- the three months in each of

19    those quarters that were -- the dollar amounts that

20    were transcribed are here.   And the -- that came to

21    the -- the totals that you see there.

22                Q.    Can you tell us what the totals

23    are, please?

24                A.    I'm trying.   So it looks like the

25    total for those three months are seven fifty-six nine

1         Metro Enterprises/John Scarfi - 7-15-19

2    ninety-six ten.  And I apologize because these are

3    not my work papers.  So I'm reading them, trying to

4    figure them out as I go.  Okay.  So that would be

5    gross receipts.  So that's why you don't see that

6    number.  And there were other information that was

7    subtracted out and so we finally come to that five

8    ninety-four five forty-eight as the whole sales

9    reported.  There was an error rate though, because

10   the gross sales per the point of sale was six eighty-

11   seven.  So the gross sales per the point of sale were

12   higher than what was reported and that's -- we put

13   the error rate on the reporting and that you'll see

14   on page seventy-seven.

15              Q.   So is it that the taxpayer

16   reported five hundred and ninety-four thousand five

17   hundred and forty-eight dollars in gross sales, but

18   the Division found that it should have been six

19   hundred and eighty-seven thousand dollars for that

20   quarter?

21              A.   Yes.

22              Q.   And you said that tax for

23   Stiletto was determined similar to the tax for Lace?

24              A.   Yes.

25              Q.   And can you tell us then what's

1        Metro Enterprises/John Scarfi - 7-15-19

2     on page eighty, eighty-one -- pages eighty, eighty-

3     one and eighty-two?

4              A.   So it's -- looking at it now,

5     it's -- it's the same methodology and I'm starting to

6     remember a little bit now that we only received point

7     of sale information for a certain period.  We did not

8     receive it for the entire period, which is why we

9     developed that error rate.

10              Q.   So back to the original question

11     that I asked, were the records -- the books and

12     records for Lace Entertainment adequate?

13              A.   Now, after looking at that, I'm

14     going to say, no.

15              Q.   Well -- anyway.  So the method

16     for -- for Lace and Stiletto was -- was similar --

17              A.   Correct.

18              Q.   -- and from your recollection

19     though, you think that the books and records were

20     inadequate that were provided to the Division?

21              A.   Correct.  Yes.

22              Q.   So the methods you just described

23     with regard to M.L.B., 44th, Lace and Stiletto.  Is

24     that what Division used to determine the six million

25     dollars in additional sales, roughly?

1              Metro Enterprises/John Scarfi - 7-15-19

2                    A.    Yes.

3                    Q.    And did those two numbers

4     together the thirty eight million dollar that you

5     spoke about earlier, and the six million dollars, did

6     those two numbers constitute the forty-four million

7     dollars in -- in gross sales that you testified to

8     earlier?

9                    A.    Yes, it did.

10                   Q.    And the Division then issued

11    notices of determination to Metro Enterprises

12    Corporation?

13                   A.    Yes.

14                   Q.    And did these numbers form the

15    basis for the notices?

16                   A.    Yes, it did.

17                   Q.    And is it also the same for

18    notices issued to Metro -- to John Scarfi, sorry, as

19    a responsible person for Metro?

20                   A.    Yes.

21                   MR. JACK:  I have no further questions

22    for this witness:

23                   A.L.J. RUSSO:  Thank you.  Mr. Bobrow,

24    cross examination?

25                   MR. BOBROW:  Your Honor, can we have a

```
 1                Metro Enterprises/John Scarfi - 7-15-19

 2      five-minute break please?

 3                     A.L.J. RUSSO:  Yes, we'll --

 4                     MR. BOBROW:  Thank you.

 5                     A.L.J. RUSSO:  -- we'll go off the

 6      record for five minutes for --.

 7                     The reporter:  We're off.

 8                     (Off record, 11:31 to 11:39)

 9                     A.L.J. RUSSO:  Back on the record.  We

10      took a five-minute recess and we're now back and let

11      me just remind you, you are still under oath.

12                     Cross examination at this time.

13                     MR. BOBROW:  Your Honor, I would like

14      to reserve my cross examination because Ms. Scala did

15      a very good and detailed explanation of how the

16      liability was computed.  But I think it's more

17      important in this case that we understand the

18      taxability and the respondent's position.  And to do

19      that, I'd like to put on my first witness who will go

20      into why the position is that we have a little

21      clarify everything for Your Honor, and for the

22      department as well.  So I think I'd like to reserve

23      on Ms. Scala and put on my first witness.

24                     A.L.J. RUSSO:  Ms. Scala, were you

25      going to be staying for -- for the rest of the day?
```

Page 52

```
1              Metro Enterprises/John Scarfi - 7-15-19
2                        THE WITNESS:  Yes.
3                        A.L.J. RUSSO:  Okay.  That's fine.
4        Then you're excused for now.  Mr. Bobrow, if you
5        could please call your first witness.
6                        MR. BOBROW:  Thank you.  I'd like to
7        call Jennifer Kinsley.
8                        A.L.J. RUSSO:  Please raise your right
9        hand.  Do you swear or affirm to tell the truth, the
10       whole truth and nothing but the truth?
11                       MS. KINSLEY:  Yes, I do.
12                       WITNESS; JENNIFER KINSLEY; Sworn
13                       A.L.J. RUSSO:  Okay.  You may proceed,
14       please.
15                       MR. BOBROW:  Thank you.
16                       DIRECT EXAMINATION
17                       BY MR. BOBROW:
18                       Q.   Could you please tell the Hearing
19       Officers and the Court today, what -- who is your
20       employer, where you live and what you do?
21                       A.   Yes, my name is Jennifer Kinsley,
22       K-I-N-S-L-E-Y.  I am an attorney licensed to practice
23       law in the State of Ohio, the State of Florida, the
24       Federal District Courts in Connecticut, a long list
25       of federal courts of appeals, the U.S. Supreme Court,
```

```
1              Metro Enterprises/John Scarfi - 7-15-19
2       et cetera.  I practice law as a solo practitioner in
3       the state of Ohio and I am also employed fulltime as
4       a tenured law professor at the Northern Kentucky
5       University, Salmon P. Chase College of Law, which is
6       in the Cincinnati metropolitan area.  I'm also the
7       Associate Dean for Professional Development at that
8       law school.  I've been practicing law since 1999.
9              Q.   Thank you.  The first thing I'd
10      like you to do for everybody's benefit is explain a
11      little bit about the history and background of this
12      case.  And -- and what the crux of the issue is
13      between the Department of Labor in New York and the
14      Department of Taxation in New York.
15             A.   So --
16             MR. JACK:  Judge, before we go on, I
17      mean, this -- I'm not sure, is this a fact witness or
18      an expert witness of some side?
19             MR. BOBROW:  This is an expert
20      witness, Your Honor.  She's --.
21             A.L.J. RUSSO:  An expert in what
22      regard?
23             MR. BOBROW:  In the sales tax -- sales
24      -- state and local taxation and sales tax.
25             A.L.J. RUSSO:  And what is the nature
```

1            Metro Enterprises/John Scarfi - 7-15-19

2       of her testimony?

3                    MR. BOBROW:  Her testimony is going to

4       explain why, for example, there are other courts that

5       have held what we called Mr. Jack refers to as the

6       sale of script, subject of tax.  And she also -- we

7       had filed a motion to hold this hearing in abeyance

8       and we explained the reason was two other ongoing

9       litigations that relate to the same legal issue we

10      are saying that we have here today.  And also the

11      parties, and Metro is a party to those other

12      litigations again which deal with the sales taxation

13      of script.  And she wants to explain why we filed

14      that motion for abeyance and the significance of it.

15                    THE WITNESS:  If I may, Your Honor, I

16      just --

17                    A.L.J. RUSSO:  No, no, no, not yet.

18      Mr. Jack --.

19                    MR. JACK:  I'm not sure -- I mean, I'm

20      just a little lost here, because I mean, who filed

21      the motion for, to hold the matter in abeyance?

22                    MR. BOBROW:  The petitioners have

23      filed a motion to hold this hearing in abeyance

24      because there are several other ongoing actions in

25      other courts, dealing with the sales taxation of

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 55

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2        script, and -- and Metro Enterprises is a party, it's
 3        totally relevant.
 4                      MR. JACK:  Well, I'm fully familiar
 5        with the -- the motion that you filed for summary
 6        judgment and to hold the matter in abeyance, but was
 7        it filed by you or by this witness?
 8                      MR. BOBROW:  It was filed -- it was
 9        prepared by this witness and I filed it.
10                      MR. JACK:  And, Judge, I mean, I don't
11        see how this person qualifies to testify as an expert
12        on anything in this -- in this case.  And -- and
13        yeah, that she's not a fact witness, I -- maybe she
14        is, but she have to quality how she -- she -- she
15        knows the facts that she would then testify about
16        here and I mean -- but she -- Mr. Bobrow claims that
17        she's an expert, I can't see for a qualification as
18        an expert testimony or her relevant to any testimony
19        here -- the relevance of her testimony to anything
20        that's going to be discussed here today.
21                      MR. BOBROW:  I just said that the
22        other actions from which was -- more than one, that
23        deals with the same sales taxability of the script
24        the witness prepared.
25                      THE WITNESS:  I don't mean to
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       interject, but I think I can clear this up.  And I do
 3       need for my own professor -- professional licensure
 4       to dispel the notion that I am an expert witness in
 5       state and local taxation.  I am not an expert in
 6       state and local taxation.  I am an expert in other
 7       legal matters that will not be relevant today.  I
 8       factually can offer information that I believe to be
 9       useful to Your Honor, because I represent related
10       entities in other litigation that has the exact same
11       subject matter as this case.
12                    A.L.J. RUSSO:  Okay.  As admitted by
13       the witness, she is not an expert in sales tax,
14       especially in particular state and local sales tax,
15       so she will not be qualified as an expert for
16       testimony.
17                    Therefore, opinion testimony will not
18       be allowed.  If you have questions for her with
19       regard to factual issues for which she has first-hand
20       knowledge of this matter, which is relevant, I'll
21       allow that type of testimony.  But there will not be
22       any opinion testimony as far as what she thinks of
23       the sales tax law.
24                    BY MR. BOBROW:  (Cont'g.)
25                    Q.   Could you explain what the other
```

1           Metro Enterprises/John Scarfi - 7-15-19

2       litigations are?  The two other litigations that deal

3       with this issue of sales taxability?

4                    A.   Yes, absolutely.  And so that the

5       record is clear, I'll preface my answer to that

6       question by identifying the ways that I connect to

7       those other lawsuits.  I have a longstanding

8       relationship with Mr. Capeci, who was in the room

9       this morning, and is a principal in two different

10      companies.  One is called M.L.B. Enterprises Corp.

11      and one is called 44th Enterprises Corp. and I have

12      represented both Mr. Capeci personally and those two

13      entities in a number of different lawsuits dealing

14      primarily with employment-related matters, lawsuits

15      filed against the entities or him personally, by

16      current or former employees.  I have also represented

17      those entities with respect to first amendment

18      challenges in federal court dealing with a

19      constitutional right of free speech.

20                   So over the years, I have developed a

21      strong working knowledge of Mr. Capeci's business

22      model, 44th Enterprises Corp. and what it does and

23      how it functions and M.L.B. Enterprises Corp and what

24      it does and how it functions as well.  I've

25      personally visited each of those businesses and have

1          Metro Enterprises/John Scarfi - 7-15-19

2      observations that I can make based on my own

3      investigation and observation in those businesses.

4              Now, that being said, you asked me

5      about different litigation related as I understand to

6      the subject of sales tax, the same question that is

7      being addressed today.  And there are two different

8      pieces of litigation currently pending, where the

9      question of sales tax and script is raised.  One of

10     them is a case entitled Dennis versus 44th

11     Enterprises et al.  There's a number of other parties

12     to that and I would have to see the pleading to give

13     you the whole name of it.  But the -- the short title

14     is Dennis versus 44th Enterprises.

15             That case began because Ms. Dennis,

16     who was a -- or is a former employee of 44th

17     Enterprises, a dancer, filed a lawsuit against 44th

18     and Mr. Capeci alleging violations of the Fair Labor

19     Standards Act, the New York Labor Law and other labor

20     related regulations.

21             She claims, in essence, that she was

22     not paid what she was owed as an employee working at

23     44th.  That case has now transformed into a much

24     larger legal proceeding because it is now an

25     interpleader action.  So 44th Enterprises filed an

1            Metro Enterprises/John Scarfi - 7-15-19

2        interpleader complaint as part of its answer to the

3        class action complaint filed by Ms. Dennis.  And 44th

4        Enterprises, in filing that interpleader, also

5        brought in Metro Enterprises and Mr. Scarfi, your

6        client Mr. Bobrow, as -- as cross defendants in that

7        case.  44th Enterprises additionally interpleaded the

8        tax department as a party into that interpleader

9        action as well.  And the claims in that case deal

10       with a conflict between Fair Labor Standards Act, New

11       York Labor Law and the presumption that money paid by

12       a customer to a service employee is a gratuity on the

13       one hand, and then the tax department's position on

14       the other hand that that same money is actually money

15       belonging to the employer and subject to sales tax.

16                   And so that question of Labor Law on

17       the one hand Tax Law, on the other hand is teed up

18       exactly in the same way that it is here in that

19       interpleader action which is pending in Manhattan.

20                   Q.   And what's the forum?

21                   A.   It's the Supreme Court in

22       Manhattan.

23                   Q.   Okay.

24                   A.   And then -- that's the first

25       piece.  And then there is another lawsuit, which

```
1              Metro Enterprises/John Scarfi - 7-15-19
2       M.L.B. Enterprises has filed.  And I should clarify
3       because we're listing a lot of parties that M.L.B.
4       Enterprises is not a party to the interpleader
5       action, only 44th Enterprises is and Mr. Capeci,
6       Metro and Mr. Scarfi and the tax department and Ms.
7       Dennis and the class, she represents lot of parties.
8       A shorter with the parties exists in the federal
9       lawsuit.  So another federal action has been filed in
10      the Southern District of Manhattan, which is M.L.B.
11      Enterprises only, not Mr. Capeci, just the
12      corporation against the tax department.
13                  And that case also seeks to
14      declaratory judgment resolving the tension that I've
15      outlined between Labor Law on the one hand, both
16      federal and state and then State Tax Law on the other
17      hand.
18                  Q.   Uh-huh.  Thank you.  What do you
19      see as the adverse consequences of -- of these two --
20      these two suits?  By that I mean, can Mr. Scarfi
21      and/or Metro be put in a position of owing the same
22      money to the Labor Department and the Tax Department?
23                  A.   So that --
24                  MR. JACK:  Judge, I'm going to have to
25      object to this question because it's going to call
```

1            Metro Enterprises/John Scarfi - 7-15-19

2       for her expert opinion and what she thinks is -- and

3       how she thinks is going to affect that tax periods

4       here.  And what the witness has just done for the

5       last five minutes or so is -- is described the

6       posture of these matters that are before the district

7       court, the Federal District Court and the Supreme

8       Court in Manhattan.  What we're here today to talk

9       about is a sales tax not transactions allegedly

10      conducted by Metro Enterprises Corp. and these

11      various entities was subject to sales tax.  It has

12      nothing to do with a wage labor dispute.  I mean, if

13      you look at the motion filed by Mr. Bobrow in

14      attempts to paint these -- these -- these things as

15      if they're the same thing that the receipts of a club

16      are nothing but gratuities, and nobody has any right

17      to assert that sales taxes is due on them.  I mean,

18      those are factual allegations that you would have to

19      decide -- would have to decide -- sorry, whether or

20      not they're actually true and whether or not the

21      department is -- is filing the tax gratuities.  This

22      witness can't add anything to that from what I'm

23      hearing here, I mean, what she's done is described

24      the posture again of these things in the District

25      Court and in the Supreme Court.  She can't add

Page 62

```
1            Metro Enterprises/John Scarfi - 7-15-19
2       anything else, that's going to be of any very value
3       or of have any relevance to these proceedings.
4                    A.L.J. RUSSO:  Your objection is
5       sustained.  As I already instructed you, Mr. Bobrow,
6       I was not going to accept opinion testimony from this
7       witness.  I said if she's specifically has factual
8       knowledge of the case that's before us that that was
9       the proper testimony to accept.
10                   As far as the status of other pending
11      cases, that's something that's open to public record.
12      And if you wish to cite it in your briefs, you
13      certainly may, but I'm interested in factual
14      testimony regarding the issues before us today.  So
15      if you have questions for her with that regard, that
16      she has first-hand knowledge, you may continue.
17                   BY MR. BOBROW:  (Cont'g.)
18                   Q.   Jennifer, in any of these
19      proceedings, have any of these courts confirmed the
20      fact that the dances are employees?
21                   MR. JACK:  Objection, Judge.  I mean,
22      again, if you look at the filings and you look at
23      even just the summary motions filed, but
24      interestingly, what petitioners seem to fail to
25      include in that motion that they file is their answer
```

1            Metro Enterprises/John Scarfi - 7-15-19

2       to Mrs. Dennis' complaint and in the answer,

3       petitioners state that these performers are in fact

4       independent contractors, not employees.

5                  So Ms. Dennis alleged that she's an

6       employee, petitioner responded by saying, "You're not

7       an employee, you're -- you're an independent

8       contractor".  So what they're attempting to do now is

9       to make you believe that their position has been that

10      these are employees of the club.  That's not been

11      their position, that's going to become clear to you

12      once you -- you review the entire record in this

13      matter.

14                  Again, this witness can't add or

15      subtract anything from this.  As you said, these are

16      all public records, that can easily be referenced in

17      briefs and arguments and wherever else, but this

18      witness can't do anything to add or subtract from the

19      papers that's been filed in those -- in these courts,

20      whether it'd the Federal District Court or the

21      Supreme Court in Manhattan.  Those papers were filed

22      and responded to.  And -- and again, the response --

23      petitioner's response is conveniently omitted from

24      the motion for summary determination that Mr. Bobrow

25      filed and it's obvious why.  Because in this motion

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       he is claiming, these are employees of the club.  As
 3       if you weren't -- you wouldn't do your own due
 4       diligence and -- and figure out that, oh, you didn't
 5       claim that in your response to -- to the summons
 6       filed, you claim they were independent contractors,
 7       since when did you start claiming that they're --
 8       they're in fact employees, that's simply an
 9       allegation by Mrs. Dennis and the class that they're
10       employees, which petitioners opposed.  So again, this
11       witness, she can testify about factual issues to do
12       with -- with the sales tax assessments against Metro
13       and against Mr. Scarfi, but anything else would just
14       be her opinion as to what she thinks this means and
15       what she thinks, how she thinks this is going to
16       affect Metro and Mr. Scarfi and so on and so which is
17       all opinion that if she had qualified as an expert
18       witness, she would have been able to offer, but she
19       can't because she admitted that she isn't an expert.
20                    MR. BOBROW:  Jennifer, is there
21       anything Mr. Osborne is saying that is inaccurate?
22                    THE WITNESS:  Yes, there are several
23       things.
24                    A.L.J. RUSSO:  No, no, no, that's --
25       that's not correct for her to opine on what Mr. Jack
```

1           Metro Enterprises/John Scarfi - 7-15-19

2      is saying when I rule on the objections.  I agree

3      with Mr. Jack.  Again, if she has factual knowledge

4      regarding this particular case, that's the

5      appropriate line of testimony.  The other cases are

6      in different jurisdictions, there has been no final

7      outcome in them, she cannot opine what the final

8      outcome is going to be.  I'm, at this point, only

9      interested in facts bearing on this specific case for

10     which she has personal knowledge.  If you have

11     questions in that regard, you can continue with this

12     witness.  Otherwise, it's time to move on to another

13     witness.

14                 BY MR. BOBROW:  (Cont'g.)

15                 Q.   Jennifer, is there anything

16     factual you can add to this case?

17                 A.   Yes, as a part of my

18     representation of Mr. Capeci and his two business

19     entities, I have conducted lots of personal

20     investigation about his business model, the way his

21     business operates, who the significant people are

22     that he contracts with and does business with and

23     having a very solid working understanding of how the

24     business model functions.

25                 Q.   What is the relationship between

1                Metro Enterprises/John Scarfi - 7-15-19

2      M.L.B. and Metro Enterprises?

3                        A.   It's contractual.

4                        Q.   You know, the way I used to think

5      about it is it's -- I go into Walmart, I see a

6      Citibank A.T.M. machine.  Is there any analogy to be

7      drawn between the A.T.M. machine and the -- and the

8      store?

9                        A.   Well, if you're asking me what

10     M.L.B. and Metro contract to do --

11                       Q.   Yes.

12                       A.   -- I can definitely explain how

13     that contract works and what it is about.  So as the

14     Court probably already knows and I'll be in 44th

15     operate adult nightclubs.  They sell drinks of the

16     alcoholic and non-alcoholic variety, they have a

17     space where people can come in, there's music

18     playing, you know, it's -- it's similar to any sort

19     of traditional nightclub that any of us may have been

20     to.

21                       And then in various locations within

22     the business establishments, there are performers who

23     are engaging in dance performances.  Some of those

24     occur on a public stage area and then some of those

25     occur in rooms that are smaller than -- than the

800.523.7887                                    Associated Reporters Int'l., Inc.

```
1              Metro Enterprises/John Scarfi - 7-15-19
2         general public area.  To facilitate customers being
3         able to offer gratuities to the dancers who are
4         performing both in the public space and then in the
5         party rooms.  M.L.B. and 44th have contracted with
6         Metro which is a financial processing company to run
7         credit cards for customers who wish to offer
8         gratuities to the dancers.
9                   And so Metro provides machines in the
10        club establishments which will, in essence, just spit
11        out a voucher enabling the customer to offer a credit
12        card gratuity to the entertainers as opposed to cash.
13                  Now, from 44th and -- and -- and
14        M.L.B.'s perspective, that's a necessary service that
15        they need for their customers because there are
16        A.T.M. withdrawal limit.  So certainly one option,
17        business option or decision that Mr. Capeci in
18        running these companies could have made was to just
19        put an A.T.M. machine in the business.  And I think
20        we've all been to places like cash restaurants or
21        where you get your nails done or something like that,
22        where there might be an A.T.M. there so that you can
23        go withdraw cash and pay that way.  But banks have
24        limits on daily withdrawals from your A.T.M. or from
25        your bank account.  And so Mr. Capeci made a business
```

Page 68

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       decision that it would be in the best interest of his
 3       customers to contract with a company like Metro,
 4       enabling them to, in essence, put the gratuities that
 5       they desire to spend on their credit card, which --
 6       and then they could go above that daily A.T.M. limit.
 7                 Q.   Thank you.
 8                 MR. BOBROW:  I had earlier asked you
 9       about the motion for summary determination.  So I
10       want to put it in the record.
11                 A.L.J. RUSSO:  I'm going to mark for
12       identification purposes, Petitioner's Exhibit One.
13       And is this the complete document that you had filed
14       --
15                 MR. BOBROW:  Yes.
16                 A.L.J. RUSSO:  -- previously?  Okay.
17       All right and --.
18                 BY MR. BOBROW:  (Cont'g.)
19                 Q.   Jennifer --
20                 A.L.J. RUSSO:  Sorry, I was going to
21       accept into the records since we --
22                 MR. BOBROW:  Thank you.
23                 A.L.J. RUSSO:  -- already have it in
24       our file.  I will accept into the record,
25       Petitioner's Exhibit One.
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19

 2                      BY MR. BOBROW:  (Cont'g.)

 3                      Q.   Jennifer, did you prepare this

 4      motion for determining -- summary determination?

 5                      A.   May -- may I actually look at the

 6      Court's copy --

 7                      A.L.J. RUSSO:  Oh, I'm sorry, yeah.

 8                      THE WITNESS:  -- I just want to make

 9      sure that I'm looking at the same exact thing --.

10                      MR. BOBROW:  Right.

11                      A.L.J. RUSSO:  Sure.  Bear with me.

12                      THE WITNESS:  -- just to be careful.

13                      MR. BOBROW:  That's fine.

14                      A.L.J. RUSSO:  Handing the witness

15      Exhibit One.

16                      THE WITNESS:  Thank you.

17                      Okay.  I have reviewed what's been

18      marked as Exhibit One.  And I participated in the

19      preparation of this document.  I did not solely

20      author it.

21                      BY MR. BOBROW:  (Cont'g.)

22                      Q.   What was the purpose of the

23      document?

24                      A.   The purpose of the document was

25      to seek a summary determination from this court under
```

1                Metro Enterprises/John Scarfi - 7-15-19

2        its rules for summary determination.

3                        Q.   And why did you think that was

4        appropriate?

5                        A.   Well, the -- the tax appeals

6        rules provide a mechanism for seeking summary

7        determination.  And these were valid legal arguments

8        that, I believe, your client wanted to raise in this

9        proceeding.

10                       Q.   Thank you.

11                       MR. BOBROW:  I'm finished, Your Honor.

12                       A.L.J. RUSSO:  Okay.  This -- I've

13       accepted Exhibit One --

14                       MR. BOBROW:  Thank you.

15                       A.L.J. RUSSO:  -- into the record.

16       You're -- you're done with your Direct?

17                       MR. BOBROW:  Yes.

18                       A.L.J. RUSSO:  Okay.  Mr. -- Mr. Jack,

19       cross-examination?

20                       MR. JACK:  Sure, Judge.  Thanks.

21                       CROSS EXAMINATION

22                       BY MR. JACK:

23                       Q.   And so the -- the script sale

24       function that Metro performs is an integral function

25       in these clubs, correct?

Page 71

1            Metro Enterprises/John Scarfi - 7-15-19

2                      A.   I wouldn't call it integral.  It

3     facilitates customers being able to offer gratuities

4     to employees.

5                      Q.   And when you say gratuities here,

6     what do you mean?

7                      A.   I mean gratuities that belong to

8     employees.

9                      Q.   So the money that you describe

10    actually belonged to the employee.  And who are those

11    employees?

12                     A.   The employees are the dancers.

13                     Q.   And they are employees of whom?

14    Who employs them?

15                     A.   M.L.B and 44th.

16                     Q.   Okay.  So these employees, the

17    money that Metro sales or receives from the sale of

18    the script belong to these employees, correct?

19                     A.   Yes, it does.

20                     Q.   Okay.  Did Metro or 44th or any

21    of these other entities ask their dancers as far as

22    you know whether they want their monies to be handled

23    this way?

24                     A.   Yes, in fact, they did.  There

25    are two different sets of contracts.  There's a

Page 72

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       contract that the employees maintain with M.L.B. or
 3       44th, whichever club they are working at.  And then
 4       there's a separate contract that the entertainers
 5       maintain with Metro.  The contract that the
 6       entertainers maintain with M.L.B. and 44th most
 7       definitely indicates that all script paid to them by
 8       customers belongs to them.
 9              Q.   So this was an idea that came
10       from the employees?  That says this is the way you
11       want, you can handle all the money?
12              A.   I can't speak to the origin of
13       the idea.  The contract is very clear that the
14       employees will keep script paid to them by customers
15       as their own property.  And that is actually in the
16       employee's best interest because they can actually be
17       paid gratuities above and beyond daily A.T.M. limits.
18              Q.   Okay.  That's good for everybody.
19       So the thirty-eight million dollars here in -- in
20       sales that Metro made belongs to these employees?
21              A.   I don't believe that any sales
22       have been made.  There is money that has been
23       processed.  The entertainers -- that is the
24       entertainer's money because it was a gratuity paid to
25       them directly by customers.
```

Page 73

1              Metro Enterprises/John Scarfi - 7-15-19

2                      Q.   So that's thirty-eight million

3      dollars in gratuities you're saying?

4                      A.   Yes.

5                      Q.   Okay.  So what portion of that is

6      for the dance fees that were charged to the patrons

7      for the dancers?

8                      A.   Patrons were never charged the

9      dance fees.  Patrons paid gratuities to entertainers

10     of their own volition, of their own choice and then a

11     negotiated transaction between the employee and the

12     customer.

13                     Q.   Oh, so they negotiated the

14     gratuity?

15                     A.   The gratuities could have been

16     discussed at some point, yes.

17                     Q.   Oh, that's --.

18                     A.   That's not a dictated or

19     mandatory transaction.  There are no dance fees that

20     are mandatory ever for anyone.  There are no dance

21     fees that the club sets or dictates.

22                     Q.   Okay.  And have you -- have you

23     looked at the books and records for any of these

24     entities that you claim to have knowledge of the

25     operation?

1              Metro Enterprises/John Scarfi - 7-15-19

2                        A.    Books, I'm not -- you would have.

3         I -- I understand the term books to be a term of --

4         art in the tax context and because I am not a tax

5         expert you would need to clarify for me what you mean

6         by books for me to fully answer that.  Records, yes,

7         I have looked at records.

8                        Q.    What records did you look at?

9                        A.    I've looked at tax returns.  I've

10        looked at contracts.  I've looked at arbitration

11        agreements.  I've looked at legal pleadings.  There

12        are likely more.  Those are the ones that come to the

13        top of my head.

14                       Q.    Did you look at any general

15        ledgers?

16                       A.    Bank ledgers, no, I have not

17        looked at those.

18                       Q.    And so --?

19                       A.    I have looked at some bank

20        records.  But I have not looked at what I would call

21        a ledger in -- in and out list of transactions.  I

22        have not looked at that.

23                       Q.    Have you looked in the records

24        where it shows that Metro is paying over the entirety

25        of these thirty-eight million dollars to the -- to

```
 1                    Metro Enterprises/John Scarfi - 7-15-19
 2       the people to whom it belong?
 3                         A.   No, Metro doesn't pay the
 4       thirteen million dollars to the --.
 5                         Q.   Thirty-eight.
 6                         A.   Thirty-eight million, I'm sorry.
 7       I misunderstood you.  Metro doesn't pay thirty-eight
 8       million dollars.  Metro keeps a twenty percent
 9       processing fee from customers at the beginning.  And
10       a ten percent redemption fee from entertainers at the
11       end.  So I'd have to do the math and with -- I mean,
12       I have a pen here but that might be difficult for me
13       to do without a calculator.
14                         Q.   All right.  So let's see.  So
15       there's thirty-eight million dollars in -- in sales
16       that the department asserted was from the sale of
17       script and Metro keeps what -- twenty percent you
18       said of that?
19                         A.   No.  So first of all, script is
20       not sold.  Script is not a tangible thing like this
21       pen or this binder clip or my shoes that someone
22       could just go buy.  Script is a processed credit card
23       transaction.
24                         Q.   Okay.
25                         A.   Now, would you remind me the rest
```

1            Metro Enterprises/John Scarfi - 7-15-19

2       of your question because you -- you were saying sale

3       of script and I just want to be clear that script is

4       not a thing like these two items in my hand.

5                        Q.   Yeah, and again, I mean, you're

6       not here to offer your opinion -- I mean, so the

7       Judge would decide whether the -- is true or whether

8       the -- that exchange is a sale.

9                        But the question is Metro has sold

10      thirty-eight million dollars -- oh, Metro took in

11      receipts for thirty-eight million dollars for --

12      where customers handed over their -- their credit

13      cards to Metro.  And added -- for the period involved

14      here, that added up to thirty-eight million dollars.

15      You're saying that Metro keeps twenty percent which I

16      think would roughly be three million four hundred

17      thousand dollars?

18                       A.   Yeah, right.

19                       Q.   Thereabouts?

20                       A.   Sure.

21                       Q.   So there's thirty-five million

22      dollars left then, roughly?

23                       A.   Right.

24                       Q.   That belongs to the dancers?

25                       A.   Yes, I am -- I will be completely

1            Metro Enterprises/John Scarfi - 7-15-19

2        candid.  I am not a great math person.  So to the

3        extent that you are asking me to compute precise

4        mathematical numbers in my head right now.  I'm not

5        able to do that.

6                        Q.   No.  I'm not ask --.

7                        A.   But, yes, whatever thirty percent

8        -- and actually it's -- it doesn't work out to be

9        thirty percent.  Because hopefully, I can do this

10       correctly without a calculator.  If you, if a

11       customer wants to tip a dancer a hundred dollars.

12       Let's say we'll start with a round number.  They

13       would run a credit card transaction with Metro for a

14       hundred and twenty dollars.  Twenty dollars stays

15       with Metro as Metro's processing fee.  A hundred

16       dollars goes to the customer to give to the

17       entertainer.

18                        Then when the entertainer takes that

19       hundred dollars of script and redeems it back with

20       Metro, Metro keeps another ten dollars which is the

21       ten percent redemption fee.  So that means that much

22       of the hundred and twenty dollars, Metro has thirty.

23       And the entertainer has ninety.  Percent wise, I

24       think that's three fours, right?

25                        Q.   Okay.  All right.  So -- so

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 78

1              Metro Enterprises/John Scarfi - 7-15-19

2        there's ninety dollars that belongs to the

3        entertainer.  Did you look at any books, any records,

4        whatever that's it, that ninety -- that ninety

5        dollars were transferred from Metro to these dancers?

6                    A.   Yes, the contracts.

7                    Q.   No, the contract says what

8        suppose, what -- what allegedly is going to happen.

9        Did you look at any books and records that

10       demonstrated that -- that transfer from Metro to the

11       dancers actually took place?

12                   A.   Yes, so I have seen --.

13                   Q.   What books and records did you

14       look at?

15                   A.   You would have to show them to me

16       for tell -- for me to tell you that I've actually

17       seen those.  I can categorically describe for you

18       what I've seen.  But again, it's not in front of me.

19       So you and I might be talking about different

20       documents.  I just want the record to be clear there,

21       that I'm not looking at any set of documents.  I'm

22       just --

23                   Q.   Okay.

24                   A.    -- describing categorically for

25       you what I've seen.

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                   Q.   Just -- just so that we're clear.
 3      I mean, what I'm asking about is if you saw any
 4      account in the records that says, Metro owes Mrs.
 5      Dennis five million dollars and this where Metro paid
 6      Mrs. Dennis, five million dollars.  Here is a
 7      canceled check, here is the accountant record that
 8      shows that that transfer actually took place.  Did
 9      you see anything like that?
10                   A.   I believe so.  And again, without
11      the document in front of me, I would have to see it
12      in order to tell you if I had seen it.  Do you
13      understand what I'm saying?
14                   Q.   I understand but --
15                   A.   Okay.
16                   MR. JACK:  -- and -- and I have no
17      further questions, Judge, thanks.
18                   A.L.J. RUSSO:  Thank you.  Mr. Bobrow,
19      any re-direct?
20                   MR. BOBROW:  Yes.
21                   RE-DIRECT EXAMINATION
22                   BY MR. BOBROW:
23                   Q.   Mr. Jack referred to the
24      transactions with Metro as the sale of script.  Is
25      that factually accurate?
```

Page 80

1              Metro Enterprises/John Scarfi - 7-15-19

2                    A.   No, it's --.

3                    MR. JACK:  Objection, Judge.  It's a

4      question that calls for his -- her opinion.

5                    A.L.J. RUSSO:  Sustained.

6                    MR. BOBROW:  Okay.

7                    BY MR. BOBROW:  (Cont'g.)

8                    Q.   How would you describe what Metro

9      does in converting credit cards?

10                   A.   As I understand what Metro does

11     and I speak as a person who has represented at a very

12     -- a business that has a contract with Metro and has

13     been in business with Metro for many years.

14                   Metro processes credit cards for

15     customers.  One of the -- so Metro incurs some cost

16     to it in doing that.  First, it has to pay the credit

17     card company their processing fee.  And those fees

18     vary, as I understand it, based on things like

19     rewards, points or free airline tickets, those things

20     that we, as consumers like to get from credit cards.

21     That -- that cost is actually incrementally passed

22     back to companies like Metro that process the card.

23                   So there's -- those fees are hard to

24     quantify, they're typically between two-and-a-half

25     percent on the low end and then up to maybe five or

1              Metro Enterprises/John Scarfi - 7-15-19

2        six percent on the high end, based on those rewards

3        points.  And then Metro also absorbs the risk of

4        charge backs.  So it is commonly known in

5        establishments like these, that some people will go

6        and spent quite a bit of money.  And then the next

7        day regret that they did that.  And they will call

8        their credit card company and put a holder on the

9        charge and that's called the charge back.  And so

10       Metro, rather than M.L.B. and 44th absorb -- absorbs

11       the risk of those charge backs.

12                    Q.   Uh-huh.

13                    MR. BOBROW:  Thank you.  No other

14       questions, Your Honor.

15                    A.L.J. RUSSO:  Thank you.  Nothing

16       further, Mr. Jack?

17                    MR. JACK:  Nothing further, Judge.

18                    A.L.J. RUSSO:  Okay.  I just have a

19       couple of questions

20                    THE WITNESS:  Yes, Your Honor.

21                    A.L.J. RUSSO:  So say a customer comes

22       into a club and has a credit card transaction through

23       Metro --

24                    THE WITNESS:  Yes.

25                    A.L.J. RUSSO:  -- purchases a hundred

1           Metro Enterprises/John Scarfi - 7-15-19

2     dollars of -- of script.  What sort of record do they

3     get of that transaction?

4                    THE WITNESS:  There's a -- like a

5     credit card receipt, a -- a piece of paper like spits

6     out of the credit card machine.  Like if you go to a

7     restaurant and they have the mobile terminal and it's

8     -- it's the thing out that it's a piece of paper.

9                    A.L.J. RUSSO:  And then do they

10    present that receipt when they want to redeem the --

11    the script?

12                   THE WITNESS:  The customer would give

13    it -- the customer cannot redeem a script.  Once the

14    customer has incurred the charge, that's their

15    charge.  They can give the script to the dancers who

16    then redeems it.  So yeah, they would just pass the

17    -- the paper.

18                   A.L.J. RUSSO:  So if they -- if they

19    want to use the script, they give it to -- to

20    whomever they're -- they're using a course --

21                   THE WITNESS:  Yes.

22                   A.L.J. RUSSO:  -- so that they

23    concede, actually have a hundred dollars of -- of

24    script.

25                   THE WITNESS:  Yes.

```
 1                Metro Enterprises/John Scarfi - 7-15-19
 2                          A.L.J. RUSSO:  Okay.  Can they use it
 3        to purchase alcoholic beverages at the club?
 4                          THE WITNESS:  No.
 5                          A.L.J. RUSSO:  Okay.  Anything further
 6        from either party?
 7                          MR. JACK:  No, Judge.
 8                          MR. BOBROW:  No, Judge.
 9                          A.L.J. RUSSO:  Okay.  Thank you.
10        You're excused.
11                          THE WITNESS:  Oh.
12                          MR. JACK:  Mr. --.
13                          A.L.J. RUSSO:  Okay.  You -- you've no
14        other questions for this, this witness.
15                          MR. JACK:  No, I don't.
16                          A.L.J. RUSSO:  Okay.  You're excused.
17                          THE WITNESS:  Thank you, Your Honor.
18                          A.L.J. RUSSO:  And we will go off the
19        record for a moment.
20                          (Off the record, 12:24 to 12:24)
21                          A.L.J. RUSSO:  So we took a brief
22        restroom break.  If you'd call your next witness, Mr.
23        Bobrow.
24                          MR. BOBROW:  Yes.  Mr. John Scarfi,
25        please, is my next witness?
```

1               Metro Enterprises/John Scarfi - 7-15-19

2                         A.L.J. RUSSO:  Okay.  Sir, raise your

3       right hand.  Do you swear or affirm to tell the

4       truth, the whole truth and nothing but the truth?

5                         MR. SCARFI:  Absolutely.

6                         WITNESS; JOHN SCARFI; Sworn

7                         A.L.J. RUSSO:  Okay.  You may proceed.

8                         DIRECT EXAMINATION

9                         BY MR. BOBROW:

10                        Q.   John, could you tell -- tell us

11      your -- you -- where you live, what businesses you're

12      in --

13                        A.   All right.  My name is John

14      Scarfi.  I own Metro Enterprises one hundred percent.

15      I'm an officer.  I'm a director.  I'm the only

16      shareholder.  Graduated from college and what else do

17      I get?  I go to Las Vegas every year.  And I go to

18      seminars and I listen to attorneys in the adult

19      entertainment industries speak on the requirements

20      that we have to follow for the Internal Revenue

21      Service, U.S. Department of Labor, New York State

22      Labor Law and occasionally, New York State Department

23      of Tax and Finance.

24                        So it's important in my position that

25      I understand how all four of those government

1              Metro Enterprises/John Scarfi - 7-15-19

2        agencies work and do the best I can to implement

3        those rules because if I make a mistake, I am

4        personally liable, every single one of -- could be

5        dancers, could be government, one never knows.

6                        Q.   Can you tell us how long you've

7        been in this industry?

8                        A.   I've been in this industry

9        twenty-five years.

10                       Q.   Okay.  And could you tell us how

11       Metro operates?

12                       A.   Operates?

13                       Q.   And interaction with M.L.B.

14                       A.   Absolutely.  So if a customer

15       comes in the club and he wants to pay a dancer with

16       cash, he pays it with cash.  She keeps all the money.

17       He wants to come in the club, and he wants to pay

18       with a -- with a check, he can walk in the club and

19       hand her a check.  He can walk in the club with a

20       gift card that he's happened to pick over at Duane

21       Reid and hand it to her.  And she will sit and talk

22       with him.  She might dance with him.  She can run a

23       credit card on her own terminal, on her phone.

24                       Today's technology or you get paid for

25       performing her services.  But if our -- I'm the

1          Metro Enterprises/John Scarfi - 7-15-19

2      customer who wants to go to the A.T.M. machine, where

3      he would pay a ten percent fee to get a hundred

4      dollars and he could take that hundred dollars.  And

5      he can give it to that dancer and that's the other

6      way he could do.  Now, if he doesn't -- he didn't

7      stop at Duane Reid, his A.T.M. card is maxed out.

8      And he doesn't have any cash left in his pocket.  He

9      can run his credit card through my terminal.  And for

10     twenty percent fee I will give him that hundred

11     dollars which then he can give to that entertainer

12     the same thing he gave it to the other time.  And

13     when she redeems it, I take ten percent.  I do not

14     show the ninety dollars that she got on my federal

15     income tax return.  Only the twenty and the ten,

16     which basically mathematically is twenty-five percent

17     of the hundred and twenty dollars.  So the ninety

18     dollars never comes on my federal income tax returns

19     because I don't consider it my money.  And that's a

20     very important distinction because you got to follow

21     the fairly but standard tax and New York State Labor

22     Law that interwinds with this tax issue.  How you

23     handle that money is determinative if it's subject to

24     sales tax or it's a gratuity.  They have the

25     government here loves to talk about executive club

1           Metro Enterprises/John Scarfi - 7-15-19

2       and they like to talk about -- and they like to talk

3       about hustler.  But at one case they just don't want

4       to talk about is Hart versus Ricks from the Southern

5       District of New York.  And I don't understand why.

6       Could it be with all the case that they have or

7       independent contractor cases.  And Southern District

8       of New York is the only case where the dancers are

9       employees.  And they tell us when it's a gratuity and

10      when it's not.  And so by following those rules, all

11      these monies were a gratuity always was.  We don't

12      include it in the employer's gross receipts.  We only

13      include the service charge and the Court says if it's

14      not included in your gross receipts and the customer

15      paid it to the entertainer, it is their property as a

16      matter of law.  So that's the federal government.

17      That's what they're telling me.  And we have the

18      state over here.  They say it's our policy -- it's

19      our policy.  We charge sales tax on all script no

20      matter what.  Doesn't matter if they are employees,

21      doesn't matter anything.  We charge sales tax.  You

22      figure it out.  And that's why we're here today.

23                  Q.   John, can you -- can you explain

24      why you filed these interpleader actions and the

25      effect of the interpleader actions --

1           Metro Enterprises/John Scarfi - 7-15-19

2                      A.    Absolutely.

3                      Q.    -- on this action?

4                      A.    Absolutely.  It was the greatest

5      opportunity in my life to end this.  Because we had

6      the dancers who's suing me for millions of dollars

7      because they say it's their money which it is.  And

8      they say I unlawfully withheld ten percent which I

9      may or may not have, that's for the Court -- Judge to

10     decide.  But then I have the tax department say no,

11     no, no.  That's not their money.  That's his money

12     and your money.  And you owe a sales tax.  I said you

13     both can't be right.  Only one of you can be right.

14     So what do they do.  They filed a motion to dismiss,

15     to get themselves out of the case.  I said, hey, wait

16     a minute, they're here, you are here, fight it out

17     with them, it's not my money.  But they refused to do

18     that.  But they did say on the way out the door, if

19     the Court determines that it is a gratuity, there's

20     no tax due.

21                     Q.    Thank you.

22                     A.    That's where we're at.  Any other

23     questions?

24                     Q.    Yes.  Tell -- tell me --

25     actually, no, I'll stop here.

```
 1                Metro Enterprises/John Scarfi - 7-15-19
 2                         A.L.J. RUSSO:  Thank you.  Mr. Jack?
 3       Cross?
 4                         MR. JACK:  Sure, Judge.
 5                         CROSS EXAMINATION
 6                         BY MR. JACK:
 7                         Q.   Mr. Scarfi --
 8                         A.   Yes, sir.
 9                         Q.   -- Metro has two lines of
10       business, correct?
11                         A.   Yes, refer dancers, process
12       credit cards.
13                         Q.   So with regard to the referral --
14                         A.   Yes, sir.
15                         Q.    -- part of it.  How do you make
16       money, on that part?
17                         A.   How do I make money referring the
18       dancers?
19                         Q.   Yeah.
20                         A.   Well, I refer dancers to various
21       clubs because guys like to look at different girls,
22       get a girl from one club to another club that's good
23       for business.  I make money when customers use the
24       credit card terminal, to pay the entertainers.  I get
25       a twenty percent processing fee.  Now, if he go to an
```

Page 90

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2      A.T.M. machine, he gets ten percent processing fee.
 3      But he doesn't have the credit risk that I have
 4      because A.T.M. money comes out of your checking
 5      account.  And credit card is credit.  They can charge
 6      it back.
 7                      Q.   Okay.  And it's --.
 8                      A.   It's a service charge.
 9                      Q.   It's true, isn't it, that the ten
10      percent fee that you withhold --
11                      A.   That's true, I with -- withhold
12      ten percent.
13                      Q.   -- when the script is redeemed --
14                      A.   Correct.
15                      Q.   -- you withhold that because you
16      consider that your payment for the referral service?
17                      A.   I consider that a referral fee,
18      or service charge.  It covers my four percent to five
19      percent with the credit card companies and charge
20      back stuff, yes.
21                      Q.   And that's -- and also for
22      referring the dancers, correct?
23                      A.   Yes.
24                      Q.   So -- I mean, but you don't keep
25      track of any of the cash transactions, correct?
```

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2                    A.    Keep track of all of it.
 3                    Q.    You keep track of --?
 4                    A.    I kept books and records every
 5       single day.  There's a credit, there's a receipt says
 6       ten thousand dollars, let's call it twelve.  Two
 7       thousand dollars is mine, ten thousand dollars is the
 8       dancers', I have a book.  Every dollar in the book,
 9       the girl signs her name every single day of every
10       week and every club.  The receipt matches the money
11       that gets paid out.  I'm in the middle with an I.R.S.
12       sort of things, the tax department and all of my
13       books and records were there.  And they're complete.
14       And just as a reminder, it reminded me that I.R.S.
15       They have their own rules too.  So you could pay
16       somebody over six hundred dollars, you have to issue
17       ten ninety-nine.  But because the I.R.S. considers
18       this in this industry, this is a payment from the
19       customer to the dancer.  I don't have to issue ten
20       ninety-nine.  That's their regulation.  No ten
21       ninety-nine because it's not me paying the dancer, it
22       was the customer paying the dancer.  So I don't have
23       issues on that dancers.
24                    A.L.J. RUSSO:  Oh, I'm just going to
25       interject for a moment.
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                      THE WITNESS:  Oh, yeah.
 3                      A.L.J. RUSSO:  Just be -- be careful
 4      about hitting the table --
 5                      THE WITNESS:  I'm sorry.
 6                      A.L.J. RUSSO:  -- because there's a
 7      microphone there that's taking the testimony.  So
 8      that's going to interfere with recording and the
 9      Court reporter's going to have a hard time --
10                      THE WITNESS:  Got it.
11                      A.L.J. RUSSO:  -- describing your
12      testimony lately.
13                      THE WITNESS:  Go ahead, Jack.  Ask me
14      -- go ahead.  Go away.
15                      BY MR. JACK:  (Cont'g.)
16                      Q.   So the customer who withdraws a
17      hundred dollars from this A.T.M. --.
18                      A.   No, not from -- from the A.T.M.?
19      Or from me?
20                      Q.   From the A.T.M.
21                      A.   Okay.  Go ahead.
22                      Q.   And pays the dancer --
23                      A.   Uh-huh.
24                      Q.    -- that hundred dollars in the
25      cash --
```

1              Metro Enterprises/John Scarfi - 7-15-19

2                     A.    Uh-huh.

3                     Q.    -- how do you keep track of that?

4                     A.    Out of the A.T.M. machine.

5                     Q.    How do you keep track of that

6        payment?

7                     A.    I'm confused.  You're talking

8        about my credit card terminal or A.T.M. machine?  I

9        have nothing to do with the A.T.M. machine.

10                    Q.    So do you keep track -- I asked

11       you just now, whether you keep track of all, if any

12       of it?

13                    A.    I keep track with the payments

14       the customers make with the script.  I don't keep

15       track with the money the guys take out of the A.T.M.

16       machine.  Those girls, that customer goes to the

17       A.T.M. machine withdraw five thousand dollars, give a

18       hundred dollars to everybody in the room and I would

19       have no one, would have any idea, not me, not the

20       only -- owner of the club.  Those girls keep all the

21       money.  Whether if they get -- that club does not

22       sell dancers for profit.  Those girls collect every

23       single dollar, whether it's twenty dollars or a

24       hundred dollars.

25                    MR. BOBROW:  John, don't hit the

```
1               Metro Enterprises/John Scarfi - 7-15-19
2       table.  Don't -- don't hit the table.
3                    THE WITNESS:  Oh, can't hit the table.
4       Go ahead.
5                    BY MR. JACK:  (Cont'g.)
6                    Q.   So you don't keep track of the
7       cash, is that what --
8                    A.   Absolutely, no keep of -- no
9       track of cash at all.
10                   Q.   Okay.
11                   A.   You didn't know that?  Oh, ask
12      the questions.  Go ahead.
13                   Q.   No, I didn't.  No, I said --.
14                   A.   Okay.  Just curious.  I thought
15      -- I think that we do another.  No, we do not keep
16      track of any cash.  Every dollar they get, they keep
17      it.
18                   Q.   You have one employee, correct?
19                   A.   Correct.
20                   Q.   And how many clubs do you have
21      this agreement with?
22                   A.   Four in New York.
23                   Q.   And do you have the agreement
24      with any clubs anywhere else?
25                   A.   Yeah, New Jersey.
```

1                Metro Enterprises/John Scarfi - 7-15-19

2                          Q.   Okay.  And it's true, isn't it,

3         that you use the club employees to run the

4         transactions that take place in the Court?

5                          A.   I'm trying to explain.  I guess

6         here we go, you're going to say, well, the club

7         employees swipe the credit card there?  Well you

8         know, when the dancers an employee and the club

9         employees are employee, they're both employees.  So

10        if I'm a waitress, and I'm getting a tip from a

11        customer and the bartender runs the card.  I don't

12        see what that relevance that is to the fact that

13        ninety dollars is still her money.

14                         Q.   So is it true or not that that

15        the club employees are the ones --

16                         A.   They're all employees.  So --.

17                         A.L.J. RUSSO:  Let him -- let him --

18                         THE WITNESS:  Yes.

19                         A.L.J. RUSSO:  -- finished the

20        question, please.

21                         THE WITNESS:  Yes, the answer's yes.

22                         BY MR. JACK:  (Cont'g.)

23                         Q.   Who -- who are the employees,

24        what do you mean by that?

25                         A.   Dancers, waitresses, bartenders,

Page 96

1                    Metro Enterprises/John Scarfi - 7-15-19

2          they're all employees --

3                         Q.    Okay.

4                         A.    -- of the club.

5                         Q.    And who maintains those -- who --

6          who -- who does those entries on behalf of Metro when

7          the customer walks in and purchases their --.

8                         A.    Who swipes the card?

9                         Q.    Whatever needs to be done with

10         regard to the swiping the card?

11                        A.    A waitress, bartender, a host.

12                        Q.    Okay.  Do you have any reason --

13         is there any reason why you would incur payments to

14         the clubs or in -- or vice versa?

15                        A.    I've no payments to the club.

16                        Q.    You make no payments, Metro makes

17         no payments to the club?

18                        A.    No.

19                        Q.    Okay.  And the club makes no

20         payments to Metro then?

21                        A.    No.

22                        Q.    Did you get any loans from any

23         other clubs at any point during the audit period?

24                        A.    Yeah, there was one club during

25         the audit period -- period.  Did I get a loan.  I

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       wouldn't call it a loan.  Either my credit card
 3       terminal went down or their credit card terminal went
 4       down.  And he swapped out terminals for -- I don't
 5       know, could have been six months.  But the I.R.S.
 6       makes allowances for that --
 7                   Q.   So --
 8                   A.   -- when they send you the ten
 9       ninety-nine K.  They asked you, have anybody else
10       used your credit card terminal?  So you report to the
11       I.R.S. that yes, they used this credit card terminal
12       or I let somebody use my credit card terminal.  So it
13       was all reported correctly.  There's no --.
14                   Q.   So --?
15                   A.   I don't pay the club any money.
16       They don't pay me any money.
17                   Q.   So in that instance where the
18       credit card terminal went down you use the club's
19       credit card --
20                   A.   Yeah.
21                   Q.   -- terminal to run to your --
22                   A.   Yeah.
23                   Q.   -- transaction?
24                   A.   Yes.
25                   MR. JACK:  Okay.  I don't have any
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       further questions, Judge.
 3                      A.L.J. RUSSO:  Thank you.  Mr. Bobrow,
 4       any re-direct?
 5                      MR. BOBROW:  Yes, I do have another
 6       question, Your Honor.
 7                      REDIRECT EXAMINATION
 8                      BY MR. BOBROW:
 9                      Q.   I'll give you copy, John.
10                      A.   You asked me to read that?
11                      A.L.J. RUSSO:  Do you want me to mark
12       these for identification as the same exhibit or two
13       separate numbers?
14                      MR. BOBROW:  Yes, please.
15                      A.L.J. RUSSO:  Two separate numbers?
16                      MR. BOBROW:  Yes, please.
17                      A.L.J. RUSSO:  I will mark for
18       identification purposes, Exhibit Two and Three.  What
19       I'm marking as two is the one with the date, January
20       7th, 2011 at the top, and one I'm marking as Three is
21       the date of July 30th, 2004 at the top.
22                      THE WITNESS:  Can you bring my glasses
23       out?
24                      MR. BOBROW:  Yeah, sure.
25                      A.L.J. RUSSO:  Go ahead.
```

800.523.7887                           Associated Reporters Int'l., Inc.

Page 99

1          Metro Enterprises/John Scarfi - 7-15-19
2                     BY MR. BOBROW:  (Cont'g.)
3                     Q.    In my opening statement, I
4      referred to the prior audit of Metro Enterprises, the
5      predecessor of Metro.
6                     A.    Yeah, Pacific Club Services.
7                     Q.    Right.  John, could you tell us
8      about the prior audit and can you tell us if Pacific
9      Club Holdings was operating or you operating in the
10     identical way they are?
11                    A.    Yes.  That audit lasted, I don't
12     know, four years, multiple trips to Albany.  Walton,
13     Plunkett, Mike Macaluso and they spent four-five
14     years with me.  We went over the whole operation,
15     they understood the operation and they issued me no
16     change so my understanding that everything I was
17     doing was perfectly fine.  I had conversations like I
18     said up in Albany and conversations with Devin.
19                    Q.    John, during that audit, did they
20     request Pacific to register as a vendor?
21                    A.    No, they did not.
22                    Q.    The issues that we're discussing
23     here today, issues that previously came up on the
24     prior audit?
25                    A.    Yes, I would say they were

ARII@courtsteno.com                              www.courtsteno.com

Page 100

1          Metro Enterprises/John Scarfi - 7-15-19

2     basically identical.  I changed the name from Pacific

3     Club Services because customers didn't like the word

4     club on their credit cards.  So I went with a more

5     generic name, Metro Enterprises.

6               Q.   Okay.  Yeah.  John, are you a

7     shareholder or do you have any ownership interests or

8     are you an officer of M.L.B. or 44th?

9               A.   No.

10              Q.   I left out one of the entities,

11    which is Lace.  Are you an officer director, do you

12    have any ownership interest?  Are you an employee of

13    Lace?

14              A.   I am not an officer.  I am not a

15    director.  I am not an employee.  I do not receive

16    any remuneration from any of those other corporate

17    entities.  I don't have any access to their tax

18    returns, financial statements, bank accounts.  I

19    really have no clue what goes on with their finances.

20              Q.   Are you saying you're -- as far

21    as you're concerned, you're totally independent from

22    these other clubs?

23              A.   I'm totally independent from

24    those clubs.

25              Q.   Thank you.

800.523.7887                          Associated Reporters Int'l., Inc.

Page 101

1               Metro Enterprises/John Scarfi - 7-15-19

2                     MR. BOBROW:  Your Honor, that's it.

3                     A.L.J. RUSSO:  Did you want to move to

4        admit Exhibits Two and Three?

5                     MR. BOBROW:  Yes, please.

6                     A.L.J. RUSSO:  Any objection, Mr. Jack

7                     MR. JACK:  No objection.

8                     A.L.J. RUSSO:  Okay.  I'll accept

9        Petitioner's Exhibits Two and Three into the record.

10       And Mr. Jack, did you have any more cross examination

11       for the witness?

12                    MR. JACK:  Yes, Judge.  I offer for

13       identification, hundred and nine pages of canceled

14       checks to the witness please, Judge, as Exhibit --

15                    A.L.J. RUSSO:  H.

16                    MR. JACK:  -- H.

17                    A.L.J. RUSSO:  I will mark for

18       identification purposes Exhibit H.

19                    MR. BOBROW:  Thank you.

20                    CROSS EXAMINATION

21                    BY MR. JACK:

22                    Q.  Mr. Scarfi, could you tell us

23       what's contained in these --?

24                    A.  Yes, those are checks from Metro

25       Enterprises and they are made out to Richard and

ARII@courtsteno.com                          www.courtsteno.com

1                Metro Enterprises/John Scarfi - 7-15-19

2       Jessica and Eureka, those are employees of the club.

3                      So what happened was, when the credit

4       card terminals spits out a receipt, customers wanted

5       to leave the waitress money.  So they would write, I

6       want to leave this girl, I don't know five dollars,

7       ten dollars whatever the amount was.  So that money

8       came into my account since it wasn't my money, I

9       wrote a check back to the person whose money it was.

10                     Q.   But these are checks -- these are

11      all checks all one hundred and nine pages were all

12      checks --.

13                     A.   Yes, that not only happened in

14      that one club.  So you had one club where the credit

15      card terminal print out a receipt and had extra line

16      on it so the customers could leave money for the

17      bartender or the waitress.  So I allowed that to

18      happen.  I didn't think I did anything illegal in

19      allowing that to happen.  They were making money, so

20      I allowed it to happen.  But then I gave them those

21      employees their money, it wasn't my money.  But it

22      only happened in that one club, to the best of my

23      knowledge, it did not happen at any of those other

24      three clubs in New York or any other clubs in New

25      Jersey.

Page 103

1              Metro Enterprises/John Scarfi - 7-15-19

2                     MR. JACK:  There are no objection,

3         Judge, the division would ask that Exhibit H.

4                     A.L.J. RUSSO:  H.

5                     MR. JACK:  Be admitted into evidence.

6                     A.L.J. RUSSO:  Any objections?

7                     MR. BOBROW:  No, Your Honor.

8                     A.L.J. RUSSO:  Okay.  I'll accept the

9         Division's Exhibit H into the record.

10                    MR. JACK:  And I have no further

11        questions, Judge.

12                    A.L.J. RUSSO:  Okay.  If you could

13        hand me H back, please.

14                    MR. BOBROW:  Returns that?

15                    A.L.J. RUSSO:  Yeah.  Thank you.

16                    MR. JACK:  But, actually, Judge, I

17        mean, this one, I'm going to offer for identification

18        for the witness packet containing ninety-four pages

19        as Exhibit I.

20                    A.L.J. RUSSO:  Marking for

21        identification purposes Exhibit I, and I am handing

22        it to Mr. Scarfi.

23                    THE WITNESS:  Yeah, okay.  I got it.

24        What's your question?

25                    BY MR. JACK:  (Cont'g.)

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                      Q.   Can you tell us what's on -- on
 3      the first page of Exhibit I?
 4                      A.   Yes.  First page of Exhibit I, it
 5      says dollars, amount a hundred and twenty dollars.
 6      So that would be a hundred dollars that was going to
 7      the entertainer and the twenty percent service
 8      charge, tip line for an additional tip, which at this
 9      point, we wouldn't allow them to do that anymore.
10      Total a hundred and twenty dollars.  Now, it says
11      they're not refundable.  There's a twenty percent
12      service charge.  They will only be honored at that
13      location.  They are subject to expiration and they're
14      only good for tipping purpose only.  You can't use
15      them for alcoholic beverages or private room fees,
16      yes, that's what it says.
17                      Q.   Okay.  And pages three through
18      ninety-four, are those, again, bank statements and
19      --?
20                      A.   Those are bank statements.
21                      Q.   -- and canceled checks --
22                      A.   Yes.
23                      Q.   -- for Metro?
24                      A.   Yes, and do you want me to talk
25      about that?
```

Associated Reporters Int'l., Inc.

Page 105

```
1              Metro Enterprises/John Scarfi - 7-15-19
2                        Q.   No.
3                        MR. JACK:  If there are no objection,
4         Judge --
5                        THE WITNESS:  I'll talk about that.
6                        MR. JACK:  -- I ask that Exhibit I be
7         admitted into evidence.
8                        A.L.J. RUSSO:  Any objections, Mr.
9         Bobrow?
10                       MR. BOBROW:  No.
11                       A.L.J. RUSSO:  Okay.  I'll accept the
12        Division's Exhibit I into the record.  Can you hand
13        me that, please?
14                       THE WITNESS:  Yeah.
15                       A.L.J. RUSSO:  Thank you.
16                       THE WITNESS:  Can I speak about bank
17        statements --
18                       A.L.J. RUSSO:  Only if there is --
19        only if there is a question pending, yes.
20                       THE WITNESS:  Okay, thank you.
21                       MR. JACK:  Division is going to offer
22        for identification a hundred and eighty-seven page
23        packet and offered as Division's Exhibit -- is it J?
24                       A.L.J. RUSSO:  J.  We're up to J.
25                       Marking for identification purposes
```

Associated Reporters Int'l., Inc.

1          Metro Enterprises/John Scarfi - 7-15-19

2     Division's Exhibit J and I'm handing it to the

3     witness.

4                    BY MR. JACK:  (Cont'g.)

5                    Q.   Again, Mr. Scarfi, the same

6     question, are these Metro's bank account information?

7                    A.   Yeah.

8                    Q.   Identification as Division's --

9                    A.L.J. RUSSO:  Are we done with J?

10                   MR. JACK:  Oh, yes.

11                   A.L.J. RUSSO:  And you'd like that the

12    record --

13                   MR. JACK:  If there is no objection,

14    Judge, the Division --

15                   `MR. BOBROW:  No objection.

16                   MR. JACK:  -- moves that Exhibit J be

17    admitted into evidence.

18                   A.L.J. RUSSO:  I accept into the

19    record the Division's Exhibit J.

20                   MR. JACK:  And the Division would like

21    to offer for identification as Division's Exhibit K,

22    twenty-two page document.

23                   A.L.J. RUSSO:  Marking for

24    identification purposes the Division's Exhibit K.

25                   BY MR. JACK:  (Cont'g.)

Page 107

1                   Metro Enterprises/John Scarfi - 7-15-19

2                            Q.   Mr. Scarfi, are these Metro's

3       file balances and transaction detail accounts?

4                            A.   To the best of my knowledge.

5                            MR. JACK:  If there are no objections,

6       Judge, Division moves that Exhibit --

7                            MR. BOBROW:  No -- no objection.

8                            MR. JACK:  -- K be admitted into

9       evidence?

10                           A.L.J. RUSSO:  I accept into the

11      record the Division's Exhibit K.

12                           MR. JACK:  Okay.  Judge, Division

13      offers for identification as Division's Exhibit L,

14      two hundred and seventy-four page packet and which

15      seems again, the content is bank information

16      belonging to Metro.

17                           A.L.J. RUSSO:  Marked for

18      identification Exhibit L.  I don't know if he wants

19      to ask you questions -- okay, hold on.

20                           BY MR. JACK:  (Cont'g.)

21                           Q.   Mr. Scarfi, again, are these bank

22      statements belong to Metro Enterprises?

23                           A.   To the best of my knowledge.

24                           MR. JACK:  If there are no objection,

25      Judge, the Division moves Z -- are we up to Z yet?

Page 108

1              Metro Enterprises/John Scarfi - 7-15-19

2                        A.L.J. RUSSO:  That's L, you still

3       have ways to go before Z.

4                        MR. JACK:  Exhibit L be admitted into

5       evidence.

6                        MR. BOBROW:  No objection.

7                        A.L.J. RUSSO:  I accept into the

8       record the Division's Exhibit L.

9                        MR. JACK:  The Division like to offer

10      for identification as Exhibit M, a packet containing

11      hundred and fifty-four pages.

12                       A.L.J. RUSSO:  Marking for

13      identification purposes Exhibit M.

14                       BY MR. JACK:  (Cont'g.)

15                       Q.   Mr. Scarfi, are these business

16      documents that belong to Metro Enterprises

17      cooperation?

18                       A.   To the best of my knowledge.

19                       MR. JACK:  And if there are no

20      objections, Judge, the Division moves that Exhibit M

21      be admitted into evidence.

22                       MR. BOBROW:  No objection.

23                       A.L.J. RUSSO:  I accept into the

24      record the Division's Exhibit M.

25                       MR. JACK:  And can the witness please

Associated Reporters Int'l., Inc.

Page 109

```
 1                Metro Enterprises/John Scarfi - 7-15-19
 2      see Exhibit M just that I have a set of question?
 3                     A.L.J. RUSSO:  Sure.
 4                     BY MR. JACK:  (Cont'g.)
 5                     Q.   If you can please turn to page
 6      twenty-one, the page number is on the bottom right-
 7      hand corner.  And -- and then twenty-two then which
 8      is the page after that.
 9                     A.   Page twenty-one.
10                     Q.   Yeah, then twenty-two now.  Can
11      you please turn to page twenty-two.
12                     A.   I don't see a number on that
13      page.
14                     Q.   Yeah, that's why --.
15                     A.   What page?
16                     Q.   That's why I ask you to look at
17      twenty-one because -- because it's black here you're
18      not seeing the page number.
19                     A.   Okay.
20                     Q.   What is this receipt for?
21                     A.   Credit card, looks like a batch
22      report.
23                     Q.   And is there a tip or a gratuity
24      anywhere on the batch report?
25                     A.   Yes, yes there is a tip line on
```

1               Metro Enterprises/John Scarfi - 7-15-19

2        there.  This is back in 2000 -- I don't know, I can't

3        see a date on there.  2000 -- it's like 2010.

4                         Q.   I'm asking about the actual --.

5                         A.   The tip line?

6                         Q.   No, the actual receipt from the

7        batch report that says Metro Enterprises --.

8                         A.   Yes, Metro Enterprises, 689 8th

9        Avenue.

10                        Q.   Okay.  So where is the tip line

11       in that half of the copy?

12                        A.   Where is the -- there is no tip

13       line on a batch report.

14                        Q.   Okay.  That's -- that was my

15       question of whether or not there was a tip line

16       there.

17                        A.   It isn't -- no, this is the end

18       of the night.

19                        Q.   I know, I understand what it

20       means.  So there is no tip --.

21                        A.   No, I wasn't sure.

22                        Q.   Yeah, there is no tip indicated

23       anywhere in the batch report, correct?

24                        A.   Well, when a customer puts a

25       credit card in the terminal and that receipt pops out

Page 111

1               Metro Enterprises/John Scarfi - 7-15-19

2        there could be a tip line, but at the end of the

3        night when you batch the whole day out, no, there's

4        no tip line.

5                    Q.   Do you have anything in any of

6        the documents I gave you where you could point to an

7        example where there is a tip line on the actual

8        receipt?

9                    A.   That isn't a receipt.

10                   Q.   No, I know I understand.

11                   A.   So --

12                   Q.   I understand that.

13                   A.   And if you're asking me do I have

14       one of those documents in front of me --

15                   Q.   Yeah.

16                   A.   -- right now, the answer is, I do

17       not.

18                   Q.   Yeah.  When you receive the

19       credit card payments from the patrons --?

20                   A.   When a customer runs his credit

21       card.

22                   Q.   Yeah.

23                   A.   Right.  The money comes into the

24       bank account from the merchant --

25                   Q.   Yes.

Page 112

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                        A.    -- services like visa,
 3         MasterCard, American Express.
 4                        Q.    And that money never enters your
 5         books and records, correct?  Except for their fees?
 6                        A.    That's correct.  And that's
 7         critically important.  I don't know how often I have
 8         to say this, critically important.  It makes the
 9         decision of whether it's your money or it's not your
10         money.  In fact, the Tribunal brought that issue up,
11         an executive club, in the little footnote.  They
12         said, well, you know, this money wasn't in the gross
13         receipts, it could have been a gratuity, but
14         unfortunately didn't raise the issue.  Those were
15         independent contractors.  Now, we're talking about
16         employees go right to the southern district, which my
17         understanding is that we're wrong, has precedential
18         value just as much as the Third Department or the
19         Tribunal.  The only case you got where the dancers
20         are employees and they get paid with script.  What
21         did the Court said?  If it's in the gross receipts,
22         it's the club's money.  We can offset the minimum
23         wage, but if it's not, it's their money, end of
24         story.  That's the federal rule.
25                        Let's go right to the state rule.
```

```
1            Metro Enterprises/John Scarfi - 7-15-19
2        This rule is easy to follow.  Any payment to a
3        service worker is a gratuity, period.  There is a
4        rebuttal presumption that only the employer can say
5        it's not a gratuity.  You already conceded that it
6        is.  So that's my answer to that question.
7                         Q.   So the money never enters in your
8        books and records?
9                         A.   No.
10                        Q.   And so you're not responsible,
11       are you, for getting it to the entertainers?  Are
12       you?
13                        A.   I don't know if I have a
14       fiduciary responsibility, like if you have sales tax
15       as a -- as a business owner have a fiduciary or
16       trustee responsibility to make sure that money goes
17       to the government, I think they do and I think maybe
18       I have a contractual relationship to make sure that
19       they get their money.  But yeah, I guess so.
20                        Q.   How do they get the money?
21                        A.   They bring their voucher.  It's
22       like anybody, if you're a waitress and you get paid a
23       gratuity on a credit card in your restaurant, to make
24       it really simple, people can understand this.  So
25       you've got a restaurant, you do ten thousand a week
```

800.523.7887                               Associated Reporters Int'l., Inc.

Page 114

1            Metro Enterprises/John Scarfi - 7-15-19

2       in food and beverage, but yet your bank statement

3       says twelve thousand, why?  Because the customers

4       left two thousand dollars on the credit card.  Does

5       that two thousand dollar show up on your financial

6       statement or gross receipts?  No, it does not.  Why?

7       Because it's not the business's money.  It's the wait

8       staff's money.  That's not a receipt.  It's the same

9       here.  It's not a receipt, it's a payment to the

10      dancer.  Now, you pay her with cash, there is no tax.

11      Pay her with a check, there is no tax.  You pay her

12      with a gift card, there is no tax.  And if you don't

13      include it in your gross receipts it's considered a

14      gratuity.  It's a matter of law.  That's the end of

15      the story.

16                  And none of your cases except for the

17      Southern District were employees.  You will think

18      it's unfair that you quote these three cases from all

19      the way upstate that have nothing to do with this

20      case.

21                  This law has been on the books for

22      thirty years, litigated all over the country.  Class

23      action lawyers love this because they never lose.  If

24      it's not in the receipts, they win.  That's why he's

25      going to lose.

Page 115

1              Metro Enterprises/John Scarfi - 7-15-19

2                    Q.   So what's their mechanism by

3      which the dancers get paid when they redeem their --?

4                    A.   They bring the script at the end

5      of the night, like if you are a waitress, you get a

6      tip on the credit card at the end of the night, you

7      go to the boss and they take the money out of the

8      cash scripts.  There's nothing illegal about

9      redeeming their script for cash at the end of the

10     night.

11                   Q.   Okay.  So --

12                   A.   Which the I.R.S. doesn't think

13     it's illegal.  It's been a practice in this industry

14     for years and years and years.

15                   Q.   So somebody who is dancing at

16     M.L.B. Enterprises --

17                   A.   Yes.

18                   Q.   -- at the end of the night, what

19     boss do they go to?

20                   A.   They go to their boss and whoever

21     the manager is.

22                   Q.   And their boss decides how much

23     money Metro owes them?

24                   A.   No, they have the receipts.  See

25     that's the whole purpose of script.  Script tells you

```
1           Metro Enterprises/John Scarfi - 7-15-19
2       I'm owed a hundred dollars.  I'm owed a thousand
3       dollars.  My name is Jane, it has her number on it in
4       three of the four clubs, there is a computer prints
5       out a voucher, Jane, number zero zero one, stick it
6       in the computer Jane gets her money, voucher is
7       extinguished.  That's how it works.
8                   Q.   Okay.  So do they get issued a
9       check or how do they get paid?
10                  A.   Cash.
11                  Q.   Why does they get --?
12                  A.   I go to the bank every week I
13      withdraw tens and sometimes a hundred thousand a week
14      in cash, that's perfectly legal.
15                  Q.   So you withdraw the cash and you
16      take it all -- make sure --.
17                  A.   Take it to the various clubs.
18                  Q.   Okay.
19                  A.   Yeah, to redeem the vouchers for
20      at the end of the night.
21                  Q.   And then the -- the bosses in the
22      various clubs use your cash and pay the girls at the
23      end of the night?
24                  A.   Yeah, it's not their money.  It's
25      always the employees' money.  It's never the club's
```

Page 117

1              Metro Enterprises/John Scarfi - 7-15-19

2        money.  None of this is ever the club's money.  The

3        ten percent that the A.T.M. machine gets that's not

4        the club's money.  The twenty percent service charge

5        I charge, that's not the club's money.  The ninety

6        dollars that the girl gets, that's legally always her

7        money.  You're confusing clubs like 677 which is a

8        juice bar, they don't sell alcohol.  They sell

9        dancers.  Customers come in with cash, they come in

10       with credit cards they go to the bar.  They say, I

11       want to buy five dances, they give the girl hundred

12       dollars he gets five tokens.  They give back the

13       tokens to the girls at the end of the night they

14       redeem it, but they included the money in there.

15       They sold the dance.  This doesn't happen here,

16       doesn't happen here.  Didn't happen in an executive

17       club, but whatever.  They didn't raise the issue.

18       But go right through Rick's, it's the easiest case in

19       the world, they're dancers.  That opinion is quoted

20       by every district court judge since 2014 -- 2014 --

21       '19 -- '16 the fourth Circuit Court of Appeal quotes

22       our judge right there in the southern district.  It's

23       a big deal.

24                   Q.   Do you know if any of these clubs

25       had entertainers walk in off the street and say, I

Page 118

1               Metro Enterprises/John Scarfi - 7-15-19

2       want to work here or did -- did they all come through

3       Metro?

4                    A.   Let's put it to you this way.   I

5       don't -- if you're -- you walk into a place and

6       establishment, there are rights that are assigned to

7       you by the federal government and New York State.

8       You can't sign away those rights, you're going to

9       call it employment rights.   If somebody walked into a

10      club and says, I will work for five dollars an hour.

11      The law says you can't do that.   You can't work for

12      less than the minimum wage.   You can't work for less

13      than what the government says you can work.   So if

14      they walk in there and they work, as far as the

15      government is concerned, you're an employee.

16                   Q.   Did Metro provide all of the

17      dancers for M.L.B.?

18                   A.   No.

19                   Q.   And in your affidavit to the

20      Supreme Court in Manhattan you said that you sent

21      over five thousand --.

22                   A.   Yeah, thousands -- thousands --

23      thousands.   I can't say a girl here and there and

24      walk into the place, I'm not there all the time.

25                   Q.   Walk in through what place, the

1           Metro Enterprises/John Scarfi - 7-15-19

2    club you're in?

3                 A.   Into the club.  I don't know if

4    they let a girl in to the building and work and she

5    didn't work, I couldn't honestly tell you that.

6                 Q.   As far as you know, you are the

7    primary supplier for the -- for the dancers for these

8    four clubs in New York?

9                 A.   I refer dancers to the clubs.

10                MR. JACK:  Okay.  I have no further

11   questions, Judge.

12                A.L.J. RUSSO:  Thank you.  Mr. Bobrow,

13   anything further for this witness?

14                MR. BOBROW:  Yes, one question.

15                REDIRECT EXAMINATION

16                BY MR. BOBROW:

17           Q.   John --

18           A.   Yes.

19           Q.   -- didn't you have an I.R.S.

20   audit and what did the I.R.S. conclude with respect

21   to the --?

22                A.   Well, look, I can only tell you

23   that as far as the I.R.S. is concerned everything

24   that I'm doing is A-Okay.  And I mean, I'm going to

25   say it anyway, whether anybody wants to listen.  They

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 120

1                Metro Enterprises/John Scarfi - 7-15-19

2       said that I'm right, tax department is wrong.

3                      Q.    They said that the --

4                      A.    That was from the I.R.S.

5                      Q.    -- the receipts they said were --

6       were not your receipts.

7                      A.    Correct.  So I don't have to

8       issue 1099.

9                      MR. BOBROW:  Okay.

10                     A.L.J. RUSSO:  Okay.  Thank you, Mr.

11      Scarfi.

12                     THE WITNESS:  You're welcome.  I had

13      to give --

14                     A.L.J. RUSSO:  Give him that back,

15      please.

16                     THE WITNESS:  Sorry about that.

17                     A.L.J. RUSSO:  Thank you.  Mr. Bobrow,

18      would you like to call your next witness before we

19      stop for lunch?

20                     MR. BOBROW:  Mr. Scarfi, he prefers

21      with his blood sugar --.

22                     A.L.J. RUSSO:  To take a break.

23                     THE WITNESS:  Yeah, I actually have --

24      actually I have blood sugar.

25                     A.L.J. RUSSO:  Okay.  All right.  So

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 121

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2       we will go off the record for forty-five minutes, if
 3       everybody could be back here at -- fifty minutes, so
 4       we'll be back here at two o'clock and we'll break for
 5       lunch at this point.
 6                      (Off the record)
 7                      A.L.J. RUSSO:  Are we back on the
 8       record?
 9                      THE REPORTER:  Yeah.
10                      A.L.J. RUSSO:  Okay.  Very good.  We
11       took a recess for lunch and now we are returning to
12       the record.
13                      Mr. Bobrow, your next witness, please.
14                      MR. BOBROW:  Thank you, Your Honor.
15       I'd like to take my opportunity to cross-examine the
16       auditor, Christine Scala.
17                      A.L.J. RUSSO:  Okay.  If you would
18       please take the stand.  You're still under oath from
19       this morning.
20                      CHRISTINE SCALA; recalled
21                      THE WITNESS:  Yes.
22                      CROSS-EXAMINATION
23                      BY MR. BOBROW:
24                      Q.   Hi, Christine, how are you?
25                      A.   Hi.
```

Page 122

1           Metro Enterprises/John Scarfi - 7-15-19

2                    Q.   When I was reading your audit,

3      page eleven to be specific you particularly said,

4      correct me if I'm wrong, that the dancers were

5      employees, what do you need to look at the -- what

6      --?

7                    A.   No, I -- I -- I do recall that.

8      I just want to just say one thing.  It was written by

9      the auditor but I did review it and, yes, it does say

10     that.

11                   Q.   Thank you.  Did you consider the

12     relationship between the dancers, employees and the

13     Fair Labor Standards Act with the New York Labor Act?

14                   A.   No.

15                   Q.   Also on page eleven, the

16     statement is made -- let me back up one second.

17     Earlier in your testimony this morning, I think you

18     said that the entities were operating as one

19     enterprise.

20                   A.   Yes.

21                   Q.   Do you recall?

22                   A.   Yes.

23                   Q.   And in the audit report itself

24     you say the two entities are co-vendors?

25                   A.   Yes.

Page 123

1        Metro Enterprises/John Scarfi - 7-15-19

2                    Q.    Could you explain what a co-

3        vendor is?

4                    A.    I could try.  It would be -- I

5        probably don't know the legal definition but what we

6        were trying to say was that the establishment, the

7        club, let's say Diamond Club for instance.  The two

8        entities, the two I.D. numbers that we're working

9        within that club really relied on each other for

10       sale.  So they would like almost dependent on each

11       other.

12                   Q.    Okay.  Let me just carry it one

13       step further then, you know, we do have this legal

14       expression, piercing the corporate veil.  Would you

15       say you were piercing the corporate veil in order --

16       in order to combine the companies?

17                   A.    Well, I'm going to say no and we

18       discussed this and the reason why is because we

19       determined or at least we were -- that was our

20       decision is to hold both of these companies as the

21       club.  We could not distinguish sales or transactions

22       from one as opposed to the other.  It was co-mingled.

23       It was unclear.  We got conflicting information, a

24       lot of crossover, so we could not clearly determine

25       it.  So to us it was all one company, one -- one

1            Metro Enterprises/John Scarfi - 7-15-19

2       establishment and all the sales under that roof were

3       -- was what we looked at.

4                    Q.   Right.  And I'm reading from the

5       M.L.B. audit report.  So are you saying you merged

6       them in a way so to speak Metro into M.L.B. or that

7       from an operational point of view, you view Metro as

8       part of M.L.B. or how would you describe it?

9                    A.   Well, we didn't merge anything.

10      Upon the review we could not clearly, really clearly,

11      distinguish the sales from one to the other because I

12      did see transactions in what was provided to me for

13      one entity and then I would see it for the other and

14      it was not really clear.  Employees working for both

15      companies being paid by both companies.  It was -- it

16      was not a clear cut, you know, definition.

17                   Q.   When you did the audit did you --

18      and I've heard this word from a number of witnesses

19      today, did you think of Metro as making sales of

20      script as opposed to as Mr. Scarfi testified

21      processing the credit card?

22                   A.   We -- we took it as he was

23      selling script.

24                   MR. BOBROW:  I have no other

25      questions.

800.523.7887                              Associated Reporters Int'l., Inc.

Page 125

1            Metro Enterprises/John Scarfi - 7-15-19

2                      A.L.J. RUSSO:  Thank you.  Mr. Jack,

3        any redirect at this point?

4                      MR. JACK:  Sure, Judge.

5                      REDIRECT EXAMINATION

6                      BY MR. JACK:

7                      Q.   When you -- when you testified

8        earlier today, you testified regarding the conduct of

9        the audit for the -- for the various entities,

10       M.L.B., 44th and specifically Lace and Stiletto.  I'm

11       going to show you for -- Judge, if I can, can I

12       present for identification the audit files for

13       Stiletto Entertainment L.L.C. --

14                      A.L.J. RUSSO:  Yes.

15                      MR. JACK:  -- as Exhibit --

16                      A.L.J. RUSSO:  I think we're at N at

17       this point.  N.

18                      MR. JACK:  N?

19                      A.L.J. RUSSO:  N as in Nancy.

20                      MR. BOBROW:  Objection, Your Honor.  I

21       don't believe this was part of Mr. Jack's hearing

22       memo and I have not had the opportunity to review

23       these documents.

24                      MR. JACK:  I'm not offering it into

25       evidence.  I'm just offering it for identification

ARII@courtsteno.com                              www.courtsteno.com

Page 126

1            Metro Enterprises/John Scarfi - 7-15-19

2       and ask a few questions.  And I ask a little bit of

3       leeway to be able to do that so that we can try to

4       unravel some of -- what's here before us and as your

5       witness just testified on cross and there appears --

6       appear to have been some confusions with the audit as

7       to what entity was doing -- performing what functions

8       as Mr. Scarfi himself testified.

9                      It wasn't even clear from his

10      testimony who is doing what.  I mean a machine broke,

11      does everybody use the machine for the entity that

12      was there.  Your witness testified about receiving

13      envelopes with documents from -- from all of the

14      entities in one envelope which in fact is what lead

15      to the audit of Metro Enterprises Corporation.

16                      So it's not unreasonable, I don't

17      think, to be able to ask the auditor a few questions

18      about Stiletto.

19                      A.L.J. RUSSO:  Right now you're not

20      offering it into the testimony or just into evidence,

21      you want me to mark it as evidence?

22                      MR. JACK:  I'm just going to ask you

23      to identify it.

24                      A.L.J. RUSSO:  Okay.  But so when he

25      offers, make -- raise your objection then, please, if

Page 127

```
 1                  Metro Enterprises/John Scarfi - 7-15-19
 2          he offers it.
 3                       BY MR. JACK:  (Cont'g.)
 4                       Q.   So going back to Stiletto, you
 5          testified earlier today that you conducted an audit
 6          of Stiletto LLC.  Is that correct?
 7                       A.   Yes, yes.
 8                       Q.   And do you know who conducted
 9          that audit?
10                       A.   It was the auditor -- it was not
11          Jenifer, it was Crystal Ricks.
12                       Q.   And do you supervise Crystal
13          Ricks?
14                       A.   I -- I did at the time.
15                       Q.   So were you involved in the
16          conduct of this audit similar to the way you were
17          involved in a M.L.B. in 44 --
18                       A.   Yes, I --
19                       Q.   -- audit?
20                       A.   Yes, I was.
21                       Q.   And you testified earlier that
22          you are uncertain as to whether or not the records
23          provided were adequate.  If you were to take a look
24          at the -- the audit file that's in front of you,
25          would you be able to confirm one way or the other
```

Page 128

1          Metro Enterprises/John Scarfi - 7-15-19

2     whether the division made a determination with

3     regards to the records?

4                    A.    Yes.

5                    MR. BOBROW:   Objection, Your Honor.

6     My concern here is that when I look at the audit

7     report, I see the name Glenn Oricchio.   Glenn

8     Oricchio was the witness we subpoenaed which couldn't

9     appear today because of his obligation in the

10    bankruptcy court in Florida.   So I don't have my

11    witness to address this audit report and I think that

12    is a distinct disadvantage.

13                   MR. JACK:   Judge --.

14                   MR. BOBROW:   Your Honor, I want to --

15    I want to say something else if I may.   I tried many

16    times to request Mr. Jack to meet with me to work on

17    stipulations, he did not return my phone calls, he

18    did not meet with me to do stipulations as is

19    required under the rules of the tribunal and a lot of

20    this could have been cleared up and this whole

21    hearing could have proceeded in a much more efficient

22    way if the office of Counsel had met with me to do

23    stipulations.

24                   MR. JACK:   Sure he didn't direct me to

25    meet with Mr. Bobrow but in any event I would have

Page 129

```
1           Metro Enterprises/John Scarfi - 7-15-19
2      glad to work on -- on stipulations if you had sent me
3      a proposed stipulations -- stipulation of facts but
4      that --.
5                 MR. BOBROW:  I asked you for a
6      meeting.  On July 20, in my letter I said we had a
7      meeting schedule, you cancelled the meeting and I
8      called you said let's reschedule it and I didn't hear
9      a single word from you after that.  And stipulations
10     are required.
11                MR. JACK:  Yes, meet -- but -- but
12     anyway that's -- that's beside the point.  I would
13     have gladly moved to proposed stipulation of facts
14     and see if there was anything that we can stipulate
15     but that didn't happen, Judge.  So the question is
16     whether or not the witness can answer the question
17     which I think is a relevant question to determine
18     whether or not the division was able to determine or
19     whether or not the division made any notes regarding
20     the adequacy of the books and records provided by one
21     of the entities that would consist -- that resulted
22     in -- in the assessment that was issued against Metro
23     Enterprises Corporation.
24                MR. BOBROW:  It's like an affidavit
25     without giving me the opportunity to question the
```

Page 130

1          Metro Enterprises/John Scarfi - 7-15-19

2     person that did the affidavit.

3                    A.L.J. RUSSO:  It's not -- it's not an

4     affidavit.  The -- the witness is here and you can

5     cross examine her if -- if Mr. Jack does move to have

6     any put into the record.  If it was something that

7     wasn't included in the hearing memo which I -- I

8     don't have in front of me at the moment.  If it

9     wasn't included in the hearing memo, then I'll give

10    you additional time if you request it after the

11    hearing to submit an affidavit from mister --

12                    MR. JACK:  Oricchio.

13                    A.L.J. RUSSO:  -- Mr. Oricchio in --

14    in regard to that that.

15                    MR. JACK:  And I would also hope you

16    give the appropriate weight to the testimony.

17                    A.L.J. RUSSO:  To the extent

18    necessary, yes.

19                    MR. JACK:  Thank you.

20                    A.L.J. RUSSO:  But I -- I will allow

21    the question.  If you could read it back because I'm

22    sure at this point you've forgotten the question.

23                    (Off the record discussion)

24                    BY MR. JACK:  (Cont'g.)

25                    Q.   The books and records provided by

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2      Stiletto were adequate?
 3                   A.   Yes.
 4                   Q.   And what was the conclusion?
 5                   A.   The conclusion was they were not
 6      adequate.
 7                   Q.   And what was the period covered
 8      by the audit of -- of Stiletto?
 9                   A.   The audit period was September
10      1st of '13 through February 28th of '14.
11                   Q.   And when you requested books and
12      records, did you request books and records for that
13      entire period?
14                   A.   Yes.
15                   Q.   Did you receive books and records
16      for that entire period?
17                   A.   No.
18                   Q.   Okay.  And at this time and I'm
19      not going to offer into evidence --
20                   A.L.J. RUSSO:  You're not offering it
21      into evidence --
22                   MR. JACK:  No.
23                   A.L.J. RUSSO:  -- and take -- yes,
24      take it back and I'll just --.
25                   MR. JACK:  And the division would
```

Page 132

1           Metro Enterprises/John Scarfi - 7-15-19

2      offer for identification as N again.

3                   A.L.J. RUSSO:  We'll call it O since I

4      have already marked N.

5                   MR. JACK:  Okay.

6                   A.L.J. RUSSO:  And we're just going to

7      skip N.

8                   MR. BOBROW:  Your Honor, I have the

9      same objection.

10                  A.L.J. RUSSO:  He hasn't -- he hasn't

11     offered it yet.  So if you could --

12                  MR. BOBROW:  Okay.

13                  A.L.J. RUSSO:  -- just hold off until

14     he actually offers it into evidence.

15                  So I will mark for identification

16     purposes Exhibit O.

17                  MR. JACK:  And even with the

18     objections.

19                  A.L.J. RUSSO:  Well, you haven't

20     offered it yet so unless you're offering it --.

21                  MR. JACK:  And -- well, I'm not

22     offering it to evidence -- I'm offering -- offered it

23     for identification and I'm going to ask same

24     questions basically.

25                  A.L.J. RUSSO:  Right.  So ask your

```
 1                   Metro Enterprises/John Scarfi - 7-15-19
 2           question and if he objects to your question then
 3           we'll rule at that point.
 4                              BY MR. JACK:   (Cont'g.)
 5                   Q.   Christine, can you tell us when
 6           you conducted the audit of Lace?
 7                   A.   This was also Cristal Ricks.
 8                   Q.   And were you Cristal Ricks'
 9           supervisor?
10                   A.   Yes.
11                   Q.   And did the division request book
12           and records from Lace?
13                   A.   Yes.
14                   Q.   Did they -- did the division
15           receive adequate books and records from Lace to
16           determine if the tax reported by Lace for the audit
17           period was accurate?
18                   A.   No.
19                   Q.   Did you request books and records
20           from Lace?
21                   A.   Yes.
22                   Q.   And received books and records?
23                   A.   Yes.
24                   Q.   Okay.  And so did they make a
25           determination as to whether or not the books and
```

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2      records were adequate?
 3                   A.   Yes.
 4                   Q.   And were they?
 5                   A.   No.
 6                   MR. JACK:  Okay.  Again, Judge, I'm
 7      not going to offer the following into evidence.  So
 8      if I can just --.
 9                   A.L.J. RUSSO:  Yeah.  You can just
10      take it back and we will just skip O.
11                   BY MR. JACK:  (Cont'g.)
12                   Q.   And let me just ask you some
13      questions regarding the audit.  When -- when -- well,
14      the audits in general, were either Cris -- Cristal
15      Rick's or Ms. Genovese would conduct these audits
16      did you accompany -- accompany to the field?
17                   A.   Yes.
18                   Q.   And when they met with the
19      taxpayer or the taxpayer's representative?
20                   A.   Yes.
21                   Q.   When you went -- and you
22      testified earlier that you actually visited -- I
23      don't know -- some of the establishments.  Did you
24      visit the establishment?  Which one did you visit if
25      so?
```

Page 135

1              Metro Enterprises/John Scarfi - 7-15-19

2                      A.   I visited M.L.B., 44th and I'm

3      not sure if it was Lace or Stiletto.  It was only one

4      of them.

5                      Q.   And did you come across any

6      information on those visit that indicated what

7      patrons were charged for when they purchased the --

8                      A.   Yeah.  So --

9                      Q.   -- the script?

10                     A.   -- early on in the audit of

11     M.L.B. and 44th, Jennifer and I had a tour of M.L.B.

12     and 44th by Mr. Capeci and we got a lot of

13     information that day as far as the operations.  So

14     what we were told that day was that there is a

15     separate register in the front for door admission

16     which did not go into the point of sale system.

17     There was a point of sale system for our drinks for

18     -- actually, I think also at the front it might have

19     been coat check and admissions.  I think that was

20     separate.  There was a P.O.S., point of sale, for the

21     bar and for room rentals and that was what went into

22     the point of sale.

23                     We were also told that in addition to

24     that that there is a credit card machine for the

25     processing of the purchases of scripts for dancers.

1          Metro Enterprises/John Scarfi - 7-15-19

2     And that's when we were told it was run by a

3     different company.  We were told that somebody who

4     goes in wants a private dance in a room would get two

5     charges.  They would get two separate credit card

6     charges and literally sign two separate credit card

7     receipts.  One would be for the room and one is for

8     the dancer.

9               In exchange, whatever amounts of funny

10    money or script that they purchase they would

11    actually get monopoly money, funny money.  They would

12    actually get in denominations of twenty dollars and

13    they would actually get that and they were able to go

14    and give it to this girl, give it to that girl,

15    whatever they chose and if they needed to buy more

16    they could buy more down the road.

17              We had asked the manager there for the

18    cost of these things and my memory -- I'm not going

19    to be able to remember the dollar amount but I know

20    that the dollar amount varied depending on the amount

21    of time in a room and the amount of -- and the type

22    of room.  Some rooms were bigger means more money.

23    Of course more time is more money and then the girls

24    would be according to -- to that.  So if it was a

25    girl for fifteen minutes there would be a price.  If

1          Metro Enterprises/John Scarfi - 7-15-19

2      there was a girl for half hour there would be a

3      price.  Also, what we were told at that time was that

4      all the entertainer were considered tenants.  We were

5      never told about employees or -- or anything else.

6      We were told -- and we were told absolutely they're

7      not independent contractors.  But we were told they

8      were tenants and each girl had a contract with the

9      club as a tenant and a landlord.

10          She would agree to pay a certain

11     amount of rent every day when she would work for her

12     -- for them allowing her to work there.  And that was

13     also was a schedule.  If she came in at, you know,

14     noon, it was one dollar amount but if she came in and

15     midnight it was a much higher amount.  So that's what

16     we were given and I do believe we also got copies of

17     these -- I don't know where they are but they're

18     somewhere, of these charges because they were up like

19     on the wall in the office.  So we did get copies of

20     those things.

21          MR. JACK:  Okay.  I have no further

22     questions, Judge.  Thank you.

23          A.L.J. RUSSO:  Thank you.  Any further

24     cross Mr. Bobrow?

25          MR. BOBROW:  Yes, Your Honor.

Page 138

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                      RECROSS EXAMINATION
 3              BY MR. BOBROW:
 4                      Q.   Let me get this out of the way.
 5      Do you recall if there was an opening or a future
 6      audit appointment between your office and --?
 7                      A.   I do not know -- no, I'm not -- I
 8      don't -- I'm not sure.
 9                      Q.   Thank you.  And that goes to the
10      question of cooperation whether there were more
11      documents to give.  Okay.  So you don't recall.
12                      A.   Yeah.  I really don't.
13                      Q.   Okay.  I believe you said that
14      there was some employees that were helping the club
15      and sometimes the employees would help Metro.  Can
16      you name any of those employees that worked for both
17      Metro and the club?
18                      A.    There is only one name that
19      really stands out in my head and I know that
20      somewhere I wrote down a lot of names but the one
21      name in my head I remember and I don't think it was
22      M.L.B. though, I think it was 44th, a girl name
23      Alisha Holland where I clearly saw her on the nine
24      forty-one so the, you know, the forms for withholding
25      for the club for 44th Enterprises but I also saw
```

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 139

1           Metro Enterprises/John Scarfi - 7-15-19

2       checks going to her from Metro.

3                   So we had questioned Mr. Scarfi or

4       perhaps a prior power of attorney about that and he

5       did say that that was tips and I asked him about why

6       did he pay the club and he said it was tips that

7       people would leave and I said, well, how would you

8       keep track of that and he told me that they keep

9       track of it and because they know how much that

10      they're entitled to and that that's -- so there was

11      no, you know, recording of it but that's what we were

12      told but I did see checks and that's the only name I

13      can independently remember.

14                  Q.   Do you remember the title, the

15      job function, of this person?

16                  A.   No.  I -- she was -- I was also

17      told that she had the ability to go to his bank and

18      withdraw money to bring it because she lives close by

19      or something, to bring it to the club and deposit it

20      in the safe.

21                  Q.   Do you recall if this person was

22      a manager of the club?

23                  A.   I don't recall.  I don't know.

24                  Q.   You also just a little while ago,

25      earlier from me -- let me read back.  I believe you

ARII@courtsteno.com                                    www.courtsteno.com

Page 140

1           Metro Enterprises/John Scarfi - 7-15-19
2       said -- you said you couldn't determine how Metro and
3       the club function.  So it was the auditors decision
4       based on the lack of clarity to basically combine
5       them.  Can you explain what you mean by a lack of
6       clarity?
7                    A.   We could not independently
8       determine that Metro's sole function was the credit
9       card processing for the sale of script and that the
10      club's sole function was the selling of, you know,
11      liquor and -- and the rooms.  It seemed that it was
12      sometimes the lines were skewed.  So that's why we
13      assessed it the way we did.
14                   Q.   You know, we were talking today
15      about, you know, general treatment of funny money and
16      script.  And what position the audit division has
17      with respect to these -- is that policy that the
18      audit division has that all scripts is subject to
19      sales tax?
20                   MR. JACK:  Objection, Judge, supposes
21      facts that are not in evidence.  There is no fact --
22      there is no evidence that the division has a policy
23      that all script sale was subject to tax.
24                   MR. BOBROW:  That policy is in the
25      audit -- there is language to that effect and there

Page 141

1            Metro Enterprises/John Scarfi - 7-15-19

2       was -- correct me if I'm wrong, that there were

3       discussions with people and fans, there were

4       discussions with the Office of counsel and they told

5       you, please correct me, that there was a policy that

6       is taxable and that you should go ahead and assess.

7                    THE WITNESS:  Okay.

8                    A.L.J. RUSSO:  I'm going to ask you

9       just to re -- rephrase the question please.

10                   BY MR. BOBROW:  (Cont'g.)

11                   Q.   Did people and office of counsel

12      or any other part of the department tell you to

13      assess because that was their policy?

14                   A.   I believe what was discussed and

15      what the decision was that we were going to hold the

16      receipts of the sale of script as taxable as

17      admissions to a place of amusement.

18                   Q.   And to the best of your

19      knowledge, is that a general policy in the department

20      with other clubs and --?

21                   A.   My experience, I don't know,

22      other than my own experience.

23                   Q.   What is your own experience

24      because you and I are running audit today, we -- we

25      do a lot of these audits --

Associated Reporters Int'l., Inc.

1           Metro Enterprises/John Scarfi - 7-15-19

2                    A.   I'm not supposed to talk about

3      that.

4                    Q.   Okay.

5                    A.   Sorry.

6                    Q.   So what is your experience with

7      the club?

8                    A.   My experience and also from

9      reading prior court decisions that the department

10     holds the sale of script as taxable as admission to a

11     place of amusement.  So that policy is in place.  The

12     policy doesn't specifically say the sale of script is

13     taxable but we consider that admission to -- you have

14     to buy that to be admitted.

15                   Q.   And then I guess after that what

16     would follow is the admission of taxable --?

17                   A.   Yes.

18                   Q.   Is there -- is there any reason

19     that -- that you know of that where the department is

20     not services?

21                   MR. JACK:  Objection, Judge.

22                   MR. BOBROW:  Thank you, Your Honor, I

23     have no questions.

24                   A.L.J. RUSSO:  Sustain that.  Mr.

25     Jack, anything further for this witness.

Page 143

1                Metro Enterprises/John Scarfi - 7-15-19

2                       MR. JACK:  No, Judge.

3                       A.L.J. RUSSO:  Thank you, you're

4          excused.  Mr. Bobrow, your next witness.

5                       MR. BOBROW:  I'd like to call Tony

6          Capeci.

7                       A.L.J. RUSSO:  Okay.  Mr. Capeci, if

8          you could please take the stand.  And please raise

9          your right hand.  Do you swear or affirm to tell the

10         truth, the whole truth and nothing but the truth?

11                      MR. CAPECI:  I do.

12                      THE WITNESS; ANTHONY CAPECI; Sworn

13                      A.L.J. RUSSO:  Okay.  You may proceed.

14                      THE REPORTER:  Sir, can you just spell

15         for me?  Your last name?

16                      THE WITNESS:  C-A-P-E-C-I.

17                      THE REPORTER:  Thank you.

18                      THE WITNESS:  Anthony, first name.

19                      A.L.J. RUSSO:  Marked for

20         identification petitioner's Exhibit Four.  Go ahead.

21                      MR. JACK:  Judge, before any questions

22         get asked I just want to figure out how this witness

23         can identify this document, I mean, I don't see his

24         name anywhere in it and --.

25                      MR. BOBROW:  You could ask it.

Page 144

1           Metro Enterprises/John Scarfi - 7-15-19

2                    A.L.J. RUSSO:  Mr. Bobrow, you're

3       going to lay the foundation for this?

4                    MR. BOBROW:  Yes, sure.

5                    THE WITNESS:  My name is on it, right

6       there, third line.  That'd be me.

7                    MR. BOBROW:  That's you?

8                    THE WITNESS:  Yeah, me.

9                    DIRECT EXAMINATION

10                   BY MR. BOBROW:

11                   Q.   Tony, can you explain to us what

12      you know about this document?  How it came about and

13      what it stands for?  And why were you involved with

14      this document?

15                   A.   Okay.  The -- the broad issue or

16      broad question here is I am the owner of M.L.B.

17      Enterprises and 44th Enterprises.  I was the owner of

18      West Point Enterprises for a brief period of time.

19                   Q.   Predecessor of?

20                   A.   Not a predecessor.

21                   Q.   Okay.

22                   A.   Different club located on 28th

23      Street.  I'm a C.P.A. by practice.  So I know quite a

24      bit of the book keeping, tax issues, the

25      correspondence, all of this and at various times the

Page 145

1              Metro Enterprises/John Scarfi - 7-15-19
2      various entities that I owned have been audited by
3      New York State Sales Tax.  This letter goes back when
4      the original audit of West 20th Street -- okay.
5                     Let's start at the very beginning.   In
6      the very beginning, the tax department audited a club
7      called Paradise where they received a large
8      assessment.  After that they audited the predecessor
9      owner of West 20th which was a convoluted story which
10     we don't need to go into now but we call it the
11     Marcelo case because Marcelo was audited, then they
12     audited West 20th.  And then when they audited West
13     20th because I was the owner of M.L.B. and 44th they
14     audited those two entities.  When they originally
15     audited West 20th, we engaged Mr. Bobrow as our
16     attorney at the time and he arranged for a meeting in
17     Albany with Joe Carzo and a bunch of other people
18     whose names I don't remember at the time.  But they
19     were represented by the Office of Counsel at that
20     meeting and it was me, Mr. Bobrow and Mark Kline
21     client from Hodgson Russ was representing the club
22     and at this meeting we discussed the issue of
23     dancers.  And were dancers taxable or non-taxable.
24                     At that meeting I gave my classic
25     example, a customer walks in off the street.  It's

1          Metro Enterprises/John Scarfi - 7-15-19

2     during the day, there is no admission charge.  Sit

3     downs, a dancer walks up to him.  He hands her twenty

4     dollars whether or not she does a dance or not.  He

5     then gets up and leave.  The discussion we had up in

6     Albany at that point was -- and I was grilled by a

7     number of State representatives.  We got a -- but

8     none of them could come up with an explanation why

9     that would be a sales taxable transaction.  They --

10    this whole issue of script, non-script became was

11    moot because everybody agreed at that meeting the

12    method of payment cannot affect taxability.  So if a

13    dancer is paid by credit card, cash, G.N.H., green

14    stamps, whatever, it doesn't affect taxability.  The

15    only thing, if the nature of the transactions is

16    taxable, it's taxable no matter how it's paid for.

17    How it is paid for can never determine if it's

18    taxable or not.

19                Based on that meeting three days later

20    or so Mr. Bobrow got a phone call from Joe Carzo, who

21    I think was the head of New York State Sales Tax at

22    the time, explaining to him that the determination by

23    the department was that if our facts and

24    circumstances agreed with what I described at the

25    meeting that they would hold that the dancers were

Page 147

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2      not taxable.  During all this -- course of all of
 3      this and administrative procedures that were done
 4      correctly and incorrectly, I wind up with a four
 5      million dollar assessment for sales tax on dancers.
 6      The two auditors at the time, Alton Plunkett and Mike
 7      Macalusio from the Brooklyn office, they did what --
 8      exactly what they were ordered to do by Joe Carzo
 9      which was doing audit of the facts and circumstances,
10      did the clubs operate the way that we described at
11      the meeting.  They determined that they did and
12      eventually through much trial and tribulation they
13      cancelled the four million dollar assessment in full.
14                   We agree to a few other small issues
15      on the audit but the dancers were never taxed at that
16      audit.  We went to a B.C.M.S. Conference for that
17      audit.  Alton Plunkett, the auditor at the time
18      testified at the audit, at the B.C.M.S. Conference I
19      should say, that the dancers were non-taxable.  Also
20      during this time the previous owner of West 20th
21      Street went to trial.  It was a responsible party
22      case but during that case they asked Mr. Plunkett on
23      the stand, were dancers taxable.  He said no.  Nobody
24      objected.  The -- so basically, this letter was
25      generated at some point during this whole period of
```

Page 148

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       arguing about whether or not dancers would be held
 3       taxable or not and it was from Nonie Manian, who was
 4       the head of New York State at the time, or from Carla
 5       Vassari on behalf of Nonie Manian stating that if,
 6       again, the story that we gave at the original meeting
 7       with Joe Carzo was true that dancers are not taxable.
 8                 So part of the relevance of this to
 9       today is that they never told me that dancers were
10       taxable and I don't understand frankly how the tax
11       department could tell me during the period that which
12       they are assessing now don't collect sales tax and
13       then they audit that period and said, oh, you should
14       have collected sales tax.  It doesn't make -- I think
15       it's a constitutional violation but I'm not a
16       constitutional lawyer so I don't want to raise that
17       but I believe it's a violation of my constitutional
18       rights that they can't tell me and it's not a rumor
19       they cancelled the four million dollar assessment.
20       So I know for a fact that the dancers were not
21       taxable.  They would've tried to collect the four
22       million dollars.
23                 So at some point -- if you want me to
24       go on, it's a long, long story here.  The State then
25       audited the second period.  They guaranteed us that
```

1              Metro Enterprises/John Scarfi - 7-15-19

2        they would never audit us again and three months

3        after we got the closing letter on the first order

4        which took a very long time to get, they audited us a

5        second period.  When they started the audit of the

6        second period, Ms. Scala and Ms. Genovese came to my

7        office and I said, oh, by the way we have this

8        agreement with the State the dancers are not taxable.

9        And they both say we know nothing about it.  Nobody

10       told us anything about that.  So I said okay.  I

11       called up first Mr. Scarpacci, then from him I got

12       back to Joe Carzo and we had a very long phone

13       conversation which I documented in a series of

14       letters because the State would never answer me in

15       writing.  They would talk to me on the phone but they

16       would never put anything in writing for some strange

17       reason.  They -- we came to an agreement then with

18       Mr. Carzo and Mr. Vanderlin --

19                  Q.   Vanderlin.

20                  A.   -- Vanderlin, who is his

21       underling that they actually stopped work on the

22       audit for a year.  Nothing happened while they tried

23       to come to a decision about the dance issue because I

24       kept saying to them you told me that dancers were not

25       taxable.  I read the law, I haven't seen a law

1            Metro Enterprises/John Scarfi - 7-15-19

2       change.  Why -- how do they suddenly become taxable?

3       And they couldn't give me an answer for a year.  They

4       finally call me up and said this case is getting old,

5       as an accommodation would you allow us to come back

6       in and finish the audit.  So I said yes but when it

7       comes to the issue of the dancers I want to have a

8       sit down meeting in Albany with Office of Counsel and

9       those in-charge because it's way above the pay level

10      of the field auditor because this was decided in

11      Albany way back when and they said okay before they

12      come to a conclusion on the dancers we will give you

13      the Courtesy of a meeting in Albany.

14                   The meeting never occurred.  In the

15      midst of the audit we still have open audit at this

16      point on the audit.  They issued notices of

17      determination.  Why, I never found out.  But it was

18      in the middle of it.  They never gave me an

19      explanation as to why they decided the dancers were

20      taxable or not.  Again, they never were able to give

21      me a reasonable explanation as to why dancers paid in

22      cash and dancers paid not by cash are treated

23      differently.  It's the same dance.

24                   Q.   Tell me between the other

25      entities we were talking about today, which were --

Page 151

1            Metro Enterprises/John Scarfi - 7-15-19
2       which are M.L.B., Metro, Lace, 44th what -- for the
3       record could -- what are your -- what is your
4       ownership interest or were you an officer, an
5       employee of any of these companies?  Could you
6       clarify that?
7                       A.   I was an owner and officer of
8       M.L.B. Enterprises and 44th Enterprises only.  To the
9       best of my knowledge John Scarfi is the sole owner
10      and officer of Metro Enterprises and Glen Oricchio is
11      the owner and officer of Stiletto and Lace but I
12      don't remember the -- their corporate names.
13                      Q.   So this morning before we broke
14      for lunch, Mr. -- Mr. Jack put into evidence a lot of
15      documents and when we looked at them some of them
16      were the cancelled checks.  This was Metro cancelled
17      checks, bank statements, journal entries, did you
18      want to clarify anything about those?
19                      A.   Yes, during the course of the
20      audit -- okay.  Back up two steps.  You have to
21      remember that not only am I the owner of the clubs,
22      I'm also a practicing C.P.A. and I've also known Mr.
23      Scarfi for about twenty-five years.  So the
24      relationship is he -- I did his personal taxes for
25      maybe twenty of those years.  So it was client

Page 152

```
 1                  Metro Enterprises/John Scarfi - 7-15-19
 2        professional as well as friendship and for a number
 3        of my clients, not just Mr. Scarfi and not just in
 4        the cabaret businesses but other businesses, I've
 5        been a signatory on bank accounts, mainly in the
 6        events that somebody gets hit by a bus, God forbid,
 7        and checks need to be cut immediately and the owner
 8        is not around.
 9                     I'm a, if I say so myself, a fairly
10        trusted professional.  A lot of these clients I've
11        known for forty years.  It's not unrealistic, they
12        need somebody they could trust to be who is around,
13        who is able to sign the check.  So in the stack of
14        documents that Mr. Jack provided you before there are
15        some checks on Metro's behalf where -- oh, well, no,
16        and I've notified Ms. Scala and Ms. Genovese at the
17        audit level that I believed that I was the signatory
18        at some point for Metro for that exact reason, that
19        in the event of an emergency I could sign a check.
20                     So there are few employee checks in
21        that stack of documents that was signed by me but
22        most of those were, I lost my check, I need my money,
23        John is not around, can you sign a check, I never
24        signed a check to withdraw money from the bank.
25                     I never signed a check for my own
```

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       benefit anything that I did was merely an
 3       accommodation not as a co-vendor or responsible party
 4       but as a friend of John's to sign checks in his
 5       absence and from my understanding of the law and,
 6       again, I'm a CPA, the difference between signing a
 7       check and being a co-vendor is basically night and
 8       day.
 9                    There are strict definitions in the
10       law as to what a co-vendor is and what a co-vendor
11       isn't and the arbitrary act of signing a check in no
12       way makes you a co-vendor or a responsible party.
13                    Now, Ms. Scala just testified that
14       they made some determination based on thin air, she
15       didn't quote any law sections that I heard that we
16       were co-vendors and it's one enterprise and getting
17       back to that she also stated that the books and
18       records are not separate, they are completely
19       separate.  Metro money doesn't go into M.L.B.'s,
20       Stiletto, Lace, 44th and Stiletto, Lace, 44th and
21       M.L.B. money does not go into Metro.  So I don't
22       understand her discussion stating that the -- and you
23       -- they give us the bank statements.  There is no co-
24       mingling of accounts.
25                    Q.   How do you know that?  Were you
```

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2      -- and are you the C.P.A. --?
 3                   A.   Well, I'm a C.P.A. -- well, I'm
 4      the owner of M.L.B. and 44th so I know that their
 5      money was distinct.  While I wasn't the accountant
 6      for Metro, I've known John a long time and I was
 7      influential and instrumental in setting it up so that
 8      I know how the companies work.  I've intimate
 9      knowledge and through the audit they know the same
10      thing that I'm telling you.  They saw the bank
11      statements where his credit cards terminals were
12      hooked up to his bank accounts.  Again, as John
13      testified earlier there was a brief period where and
14      I don't remember which way it went, him to me or me
15      to him, one of the terminals was out so we used the
16      other guy's terminal for a period of time and --
17                   Q.   What was the --
18                   A.   -- once the terminal --
19                   Q.   -- what was the period of time
20      you --
21                   A.   I don't -- I don't remember.
22                   Q.   Okay.
23                   A.   Listen, it's all foggy back
24      there, but there was a period time when we co-mingle
25      the terminals for brief period of time as an
```

Page 155

1              Metro Enterprises/John Scarfi - 7-15-19

2       accommodation between two separate business owners.

3       It's no different than two stores next door to each

4       other.  Hey, my card -- restaurants do it all the

5       time.  My credit card terminal is down, can I run

6       them on your machine.  You keep a list of the charges

7       and you give them the money.  It is a standard

8       business practice in the real world but it did, like

9       I say, it does not create a co-vendor situation any

10      way, shape or form.

11              Q.   One of the exhibits I asked John

12      to look at today was the no change letter for Pacific

13      Holdings.  What do you know of that?  That -- were

14      you involved in that or were you --?

15              A.   Yes, again, that was the audits

16      that came out of -- the original was forty -- West

17      20th Street audit that then became an M.L.B. audit

18      and 44th audit and we handled them at the same time.

19              You were the representative ultimately

20      for Pacific Club Services which was the predecessor

21      entity to Metro.  I handled 44th and M.L.B.

22              Essentially, what happened there was

23      it dragged on forever, the State, like I said before,

24      assessed me four million dollars for sales tax on

25      dancers.

1              Metro Enterprises/John Scarfi - 7-15-19

2                        They ultimately came to believe based

3       on Alton Plunkett's and Mike Macalusio's audit

4       findings that, no, the dances were not taxable.  We

5       settled on a fifty thousand dollar payment from

6       M.L.B. and a twenty-five thousand dollar payment from

7       44th because this audit had gone on for five years

8       and they wanted something to show their bosses that

9       they didn't waste time.  So we agreed to that but if

10      you read the audit, it doesn't state what was

11      taxable, wa -- wa-- what the deficiency was, it's

12      just they came out with an assessment for fifty and

13      twenty-five, we paid them.  They released the four

14      million dollar sales tax assessment.

15                       Q.   Was it -- what was your

16      understanding upon getting that no change letter for

17      the operation --?

18                       A.   The -- the understanding was

19      exactly what we had said up in Albany three or four

20      years before that the manner in which the clubs will

21      run under our facts and circumstances, dances were

22      not taxable and during the course of this audit I re-

23      contacted Joe Carzo and a bunch of other people.  Mr.

24      Osborne refused -- Mr. Jack I should say refused to

25      get on the phone but I know he was involved.  They

1          Metro Enterprises/John Scarfi - 7-15-19

2     would only talk to me on the phone, they wouldn't put

3     anything in writing and I kept asking them, what

4     changed?

5                    Why are you saying now dancers are

6     taxable and then they started to use audit reports

7     that came out after my audit period.  So how was I to

8     know?  Pick a year, 2015, that dances were taxable.

9     If there is a Court decision in 2016 that said they

10    were when I had it in writing from the State that

11    they weren't.

12                    Q.   Uh-huh, okay.  Thank you.

13                    A.L.J. RUSSO:  I'm sorry.

14                    MR. BOBROW:  I'm finished with direct.

15                    A.L.J. RUSSO:  Okay.  You have now

16    moved --.

17                    MR. BOBROW:  Okay.  Wait -- wait --

18    wait -- wait, excuse me.

19                    MR. JACK:  You didn't move --.

20                    A.L.J. RUSSO:  You haven't moved

21    Exhibit Four into the record yet.  Did you want to do

22    that?

23                    MR. BOBROW:  I couldn't hear you,

24    Judge.

25                    A.L.J. RUSSO:  You haven't moved

Page 158

1            Metro Enterprises/John Scarfi - 7-15-19

2       Exhibit Four into the record.  Did you want to admit

3       that?

4                    MR. BOBROW:  Four being the letter,

5       I'm sorry.

6                    A.L.J. RUSSO:  The letter -- the

7       December 24th --.

8                    MR. BOBROW:  I would like to -- Mr.

9       Capeci's name is in the letter.

10                   A.L.J. RUSSO:  Mr. Jack, any

11      objections to that?

12                   MR. JACK:  I have no objections,

13      Judge.

14                   A.L.J. RUSSO:  Okay.  I'll accept

15      petitioner's Exhibits Four into the record.  And you

16      did have more questions or --

17                   MR. BOBROW:  Yes.

18                   A.L.J. RUSSO:  Okay.

19                   BY MR. BOBROW:  (Cont'g.)

20                   Q. Because -- again, because Glenn

21      Oricchio is not here, I just went to put on the

22      record, to the best of your knowledge, does his clubs

23      differ from your clubs or could you helps us

24      understand what his -- how his clubs operate because

25      he is not here?

Page 159

1              Metro Enterprises/John Scarfi - 7-15-19

2                        A.   Again, as a professional I've

3         done work for Glenn over the years, various matters.

4         Yeah, right.  I might've done sales tax for him years

5         ago.  So I am quite knowledgeable about the way that

6         he was running the clubs at that time but then things

7         could change.  But similar -- he ran the clubs very

8         similar to the way that I ran my clubs and the

9         relationship between Metro Enterprises and his two

10        clubs were similar if not exactly the same as the way

11        that I ran my clubs.

12                       Q.   Are you familiar with the Third

13        Department decision in April?

14                       A.   Yes, we have an issue before the

15        Third Department and they came back and they stated

16        that the issue of whether dances -- the dance tips --

17        the script is taxable or not should be made on a

18        factual basis on an individual case -- case by case

19        basis based on the facts and circumstances of that

20        case that there should not be a broad swath that, oh,

21        it's script it's taxable.  It depends on the facts

22        and circumstances in which it's being used.

23                       Q.   Well, maybe this will refresh

24        your recollection did they use language to the effect

25        it depended on the relationship between the dancers,

Page 160

1              Metro Enterprises/John Scarfi - 7-15-19

2       the petitioners, the club?

3                        A.   Exactly.  And that relationship

4       whether or not they are employees, independent

5       contractors, tenants, Martians whatever will

6       determine -- should be used to determine whether or

7       not those -- that purchase of script is taxable or

8       not.

9                        Q.   Yes, obviously, I just want to

10      know if -- if -- if this is true or not that

11      Christine Scala's audit report could not have taken

12      the Third Department decision into effect because her

13      audit report pre-dated that but knowing and reading

14      her audit report, did she in her audit report cover

15      the criteria the Third Department looked at?

16                       A.   Not only did she not use any --

17      use the criteria as described in the Third

18      Department, she never even discussed the issue as to

19      whether or not the dancers were deemed to be

20      employees or not with us.  We totally discussed them

21      being tenants and the first time we found out that

22      the State was holding them as employees is when we

23      received the audit report through a FOIL request.

24                       So she did no underlying work.  It --

25      it -- they pulled it out of thin air that they were

Page 161

```
1              Metro Enterprises/John Scarfi - 7-15-19
2       employees but we tend to agree with them at this
3       point.
4                      Q.   I -- I -- I would say, you tend
5       to -- it's -- it's -- it's sort of evolving, I guess.
6       Is that what's happening?
7                      A.   Yes, we were involved in a number
8       of different lawsuits in a never -- a number of
9       different venues.  Jennifer testified to before we
10      have a class action lawsuit by dancers and -- well,
11      to give the history to the Court it all started
12      twenty some odd years ago when we opened the clubs.
13      I always felt that there had to be a -- clubs at that
14      point treated the dancers as independent contractors
15      or employees and I didn't think either one really fit
16      the definition.  We hired an attorney from Minnesota
17      who was very active in the adult entertainment
18      industry and she recommended that we do the leases
19      and create this whole situation where the dancers
20      would be deemed to be tenants.
21                     Unfortunately, that was twenty some
22      odd years ago and the laws have evolved greatly
23      thereafter.  I spoke to that attorney, Ms. Thomas,
24      maybe a year or two ago and she said, yeah, it
25      doesn't work anymore.  The Courts have pretty much
```

Page 162

1           Metro Enterprises/John Scarfi - 7-15-19

2      universally determined that these dancers are

3      employees.

4                     Q.    Within the -- your club and what

5      you know about the other clubs, do the clubs set

6      prices for their entertainers or anything?

7                     A.    Again, this was discussed with

8      Ms. Genovese on a -- Ms. Scala was not always at

9      every appointment, Ms. Genovese was.  So it was

10     discussed with one or both at the time the -- in

11     order to create harmony in the workplace we have a

12     suggested minimum of a twenty dollar dance fee and if

13     you go to any club that twenty dollar is pretty much

14     everywhere.

15                    However, if you sat down with a girls

16     and said, hey, I only got ten dollars tonight can I

17     give you ten dollars and she wants to do a dance, she

18     does a dance, nobody stops it.  If the dancer says I

19     don't like the way you look I want two hundred

20     dollars to do a dance, she gets two hundred dollars

21     for the dance.

22                    There is no enforcement of any type of

23     price structure as far as the dance what the dancer

24     receives or not.  She could a hundred dances for

25     free, her time, nobody stops her or cares, whatever.

Page 163

1          Metro Enterprises/John Scarfi - 7-15-19

2                     So it's -- it's -- there is no price

3          structure as far as the tip that the customer gives

4          to the dancer.  There -- our price structure for

5          rooms as somebody was -- Ms. Scala was testifying too

6          that if you stayed for fifteen minutes it's this much

7          for this sized room and whatever, whatever, whatever,

8          but there is no price structure at all as far as the

9          tips that the dancers receive.

10                    Q.   People have testified today that

11         Metro sells script, you being a C.P.A., is that

12         accurate?

13                    A.   No.  The way that the business

14         was organized is that Metro Enterprises had each

15         entertainer sign a contract with them allowing Metro

16         Enterprises to process their credit cards for tips on

17         their behalf.  So since it's a contractual

18         relationship between the dancer, employee and Metro,

19         the money that Metro collects is not their money,

20         it's always been the dancers' money and as a tip,

21         it's always been the dancers' money.  The Federal

22         Labor Standards Act emphasizes that greatly that it's

23         always the employees' money.

24                    So it would be wrong -- it would be

25         like saying American Express, to give you a broad

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 164

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       example, sells eighty billion dollars a year -- there
 3       income is eighty billion dollars a year because
 4       people charge eighty billion dollars on American
 5       Express.  No, American Express makes the three to six
 6       percent that they charge as a fee on the transaction
 7       but the underlying transaction is not American
 8       Express's revenue and when you pull American
 9       Express's financial statements all those transactions
10       that the customers used -- now the customers, you get
11       your American Express bill and hopefully at the end
12       of the month you pay it.  You send the check to
13       American Express.  It's not American Express's money.
14       its Macy's money, its Amazon's money, it's whoever's
15       money where you bought, whatever you bought and I've
16       never heard that argument outside of this court ever
17       raised that money held by a processor is deemed to be
18       theirs, it's not.
19            The -- the underlying -- the income
20       portion is the receipt of the financial transmitter,
21       the underlying portion belongs to the customers or
22       the store where they spent the money dependent and
23       that's a basic tenent of accounting and like I say,
24       sales tax is not auditing American Express today for
25       all the transactions that they did, that they
```

Page 165

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2        collected the money on.  So why they would be doing
 3        it to Metro is again beyond my expertise.
 4                    Q.   What other sources of revenue
 5        that an entertainer or a dancer would have as an
 6        employee?
 7                    A.   They are employees as -- as of
 8        this point.  So the only way that an employee can
 9        make money is either a wage which is deemed to be
10        paid by the employer or a tip which is deemed to be
11        paid by the customer.  The customer -- the tip, both
12        of which are included in their gross wages.  Now, I
13        just want to clarify something that you guys were
14        discussing before, while I think of it because you
15        brought it up.
16                    When -- for the brief period of time
17        that Metro Enterprises was allowing other employees
18        other than dancers to receive tips and they were
19        processing the credit cards for it, those tips were
20        reported back to M.L.B. and/or 44th or whichever
21        company it was and put it on the W-2s.  It was
22        included in the individuals' income tax on the W-2.
23                    So there was knowledge of it, there
24        was reporting of it, it wasn't mystery money, since
25        it was paid by credit card we know how much the
```

1          Metro Enterprises/John Scarfi - 7-15-19

2     person received, we were under the responsibility to

3     put it on their W-2 and we did.  So if you look at

4     the W-2s of M.L.B. or 44th you will see cash tips and

5     credit cards tips and that was part of the credit

6     card tips and for some reason Ms. Scala didn't see

7     that or didn't recognize that, I don't why.

8                    Q.   So the customer can -- can -- can

9     only give a tip to a dancer you are saying?

10                   A.   Customer could give a tip to

11    anyone that they feel like they could give me a tip

12    if they really like me but the use of script was only

13    to give credit cards tips to dancers.  They could

14    give cash tips to the -- and during the course of an

15    evening one customer might have done all three.  He

16    might have given a dancer forty dollars in cash that

17    he had, then he went to the A.T.M. and took out a

18    hundred dollars and gave her that and then he was out

19    of cash and his -- reached his A.T.M. limit so then

20    he goes to buying script.

21                   So in the course of an -- in the end,

22    his cash tips or his credit cards tips could go to a

23    waitress or a host, a bouncer or whoever he wanted,

24    the door girl any -- like I said, anybody can tip

25    anybody.  But we limited the use of script only to

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 167

1          Metro Enterprises/John Scarfi - 7-15-19
2     dancers because dancers are the only ones who had the
3     contractual obligate -- contractual relationship with
4     Metro Enterprises, the other people didn't.  So John
5     would be taking -- John being Metro Enterprises would
6     taking their money illegally if he processed their
7     script sales because he didn't have agreements with
8     them.
9               Q.   Is that the purpose of the
10    interpleader suit?
11              A.   That's part of the purpose of the
12    interpleader suit.  That -- you have to believe the
13    suit is basically saying I can't pay the same money
14    to two different governmental agencies.  New York
15    State Sales Tax or -- two different entities, New
16    York State Sales Tax is saying on one hand that the
17    money belongs to them, one the other hand the dancers
18    and the Department of Labor through the Federal Labor
19    -- Fair Labor Standards Act is saying that the money
20    really belongs solely and exclusively to the dancer
21    because you can't tax a tip.
22              MR. BOBROW:  Thank you.
23              A.L.J. RUSSO:  Mr. Jack?
24              MR. JACK:  Sure.  Thank you, Judge.
25              CROSS EXAMINATION

Page 168

1              Metro Enterprises/John Scarfi - 7-15-19

2                   BY MR. JACK:

3                   Q.   Mr. Scarfi, do you -- you've been

4        in --

5                   A.   He is up there.

6                   Q.   Mr. Capeci, sorry.  Sorry to mix

7        you up.

8                   A.   I'm the good looking one.

9                   Q.   I agree.  You've been involved in

10       these clubs for a long time, haven't you?

11                  A.   Yes.

12                  Q.   And you've known Mr. Bobrow also

13       for a long time?

14                  A.   Yes, at this point.

15                  Q.   And so the audits that you

16       described that you testified about including the

17       P.C.S. audit and Frank Marchello, club V.I.P.,

18       twenty-twenty all of those audits, you are fully

19       familiar with what was going on.  Weren't you?

20                  A.   I was a consultant to Marchello,

21       The Estate.

22                  Q.   And for -- in the Marchello case,

23       I mean the Department insisted that the sale of the

24       script was subject to tax --

25                  A.   No.

Page 169

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                   Q.   -- and how do you --
 3                   A.   No, no.  The Marchello case was a
 4      responsible party case --
 5                   Q.   Uh-huh.
 6                   A.   -- and the discussion was whether
 7      or not John Vargo and --
 8                   MR. BOBROW:  Asland.
 9                   THE WITNESS:  -- Steve Asland were
10      responsible parties as well as The Estate of --
11      what's Marchello's, first name?  I forgot.
12                   MR. BOBROW:  Frank.
13                   BY MR. JACK:  (Cont'g.)
14                   Q.   Frank.
15                   A.   Frank Marchello.  During the
16      course of that trial, Alton Plunkett, as a matter of
17      fact, my good friend, testified that dancers were not
18      taxable but it was never an issue before the Court.
19      The only issue before the Court was whether or not
20      Marchello -- The Estate of -- Frank Marchello was a
21      responsible party, therefore, his estate.  The Court
22      decided one way, it got appealed, got it re-tried,
23      got appealed again.  On the appeal one of -- the
24      justice who wrote the decision said, oh, by the way,
25      it's in my opinion that dances should be taxable.
```

Page 170

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2      Now, that's what's known as --.
 3                      MR. BOBROW:  Is that what you were
 4      looking for?
 5                      THE WITNESS:  Yeah, give me the word.
 6                      A.L.J. RUSSO:  Please don't instruct
 7      the witness.
 8                      THE WITNESS:  Okay.  Don't coach me
 9      but there is a word for it which everybody here knows
10      but me at this point.  That it's not admissible, it's
11      not -- it's just a statement that a judge made.
12                      Unfortunately, in a subsequent case
13      the State brought it up and the poor representation
14      that that club had at the time did not object to it
15      and it got built into another decision and that's
16      what everybody started citing but we discussed that
17      in length on the phone with Mr. Carzo and all those
18      other people who I was having my phone conversations
19      as to why Marchello wouldn't apply because there is a
20      different set of facts and circumstances.
21                      So even if you did want to deem that
22      the dances at the Old V.I.P. club, which was the club
23      in question, were taxable their facts and
24      circumstances were completely different than mine and
25      they rang the dances up in the cash register.  They
```

Page 171

1            Metro Enterprises/John Scarfi - 7-15-19

2       didn't segregate them at all.  So they were part of

3       their receipts and not my argument.

4                    But the State -- because as I said

5       they brought it up to me on the phone few times,

6       ultimately agreed that it didn't apply to us because

7       that's not how we ran the club.

8                    BY MR. JACK:  (Cont'g.)

9            Q.    What I am -- okay.  At any rate

10      with the Frank Marchello case there were three

11      separate club setup direct, Club V.I.P., Prestige and

12      V.I.P. Incorporated.  Do you remember that?

13           A.    Okay.  I probably know more than

14      you do about how that whole thing was set up.

15           Q.    Oh, that's good you can tell me

16      that?

17           A.    Yeah.  Frank Marchello was the

18      original owner.

19           Q.    Uh-huh.

20           A.    He decided that he no longer

21      wanted to run the club.  He hired John Vargas --

22           Q.    Vargo.

23           A.    -- Vargo, who used to be -- he

24      used to work for us a thousand years ago, so I knew

25      John also.

Page 172

1              Metro Enterprises/John Scarfi - 7-15-19

2                   Q.    What do you mean us?

3                   A.    He worked for one of the clubs, I

4       think the predecessor club to M.L.B. even before I

5       owned it.  Another one of my clients owned it.

6                   Q.    Uh-huh.

7                   A.    Vargo took it over, he was

8       working in partnership with Steve Asland.  They

9       created three different corporations and they had

10      three different pots of money and -- but it was all

11      controlled by Vargo and Asland.  It wasn't a third

12      party.  It wasn't outsider, it was nothing similar to

13      the way that -- our ins -- our club was run where we

14      have just a credit card -- again, the credit card

15      processing is on behalf of the dancers.  They didn't

16      have anything like that there.  They just had three

17      different -- they were divvying up and through

18      discussions with Steve Asland back in the day, he did

19      it because they were afraid if they didn't pay the

20      liquor bill they would stop shipping liquor.  So they

21      wanted to have three different pools of money to pull

22      from when they had to pay things.  And it was for

23      their convenience and in that Marchello decision they

24      pretty much decided that they were operating as one.

25                  Q.    But there, the club in the

Page 173

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2     Marchello that sold the script only sold the script,
 3     correct?
 4                   A.   But they included it in the gross
 5     receipts.
 6                   Q.   But they only sold script,
 7     correct?  Is that -- that was the only claim --.
 8                   A.   One of the three entities I think
 9     was to sell the script.
10                   Q.   Right.
11                   A.   Right.
12                   Q.   That was the only function of
13     that entity was to sell the script.
14                   A.   But again, it was owned by Vargo
15     and Asland or one or the other, and it was part of
16     the -- they included it as part of their gross
17     receipts, they didn't segregate.
18                   Q.   So it means -- were you confused
19     at this time?  You mean you have any discussion with
20     people in auditing -- and they seem to be telling you
21     something?
22                   A.   Asland.  Okay.  If you want to go
23     back to that -- that audit ash -- the Tax Department
24     never looked at the books and records because before
25     they got to the audit Vargo died, Asland wouldn't co-
```

Page 174

1                Metro Enterprises/John Scarfi - 7-15-19

2        operate and they assessed off the top.  What -- what

3        Plunkett did and I know this for a fact because

4        Plunkett told -- he had done a previous audit on

5        Paradise and I know Paradise had two million in

6        receipts or ten million in receipts and they assessed

7        them two million dollars or whatever it was.  V.I.P.

8        had forty million dollars in receipts, so he assessed

9        the eight dollars, then they removed the book and

10       records in Marchello, so it's not a very good example

11       to use.

12                   Q.   But in any event, I mean, all

13       along in those cases the Division was -- additional

14       tax on the sale of script, correct?

15                   A.   No.

16                   Q.   Isn't that what the tribunal

17       eventually decided in Marchello?

18                   A.   No, script had nothing to do with

19       it.  The Judge said in the dis -- in the -- in the

20       tribunal decision after the second appeal that in his

21       opinion he felt dances were taxable.

22                He didn't mention script, he didn't

23       mentioned cash, he said dances.  The only -- this

24       recent development of where the Tax Department is

25       saying that script is taxable is a new development

1            Metro Enterprises/John Scarfi - 7-15-19

2       and it didn't come out of Marchello.

3                       Q.   Yes, I mean, I'm sorry.  But the

4       dicta that you referred to --

5                       A.   Thank you.

6                       Q.   -- comes from -- comes from the

7       Marchello case, correct?

8                       A.   It comes from there.

9                       Q.   Okay.  So in -- in that case the

10      tribunal said the sale of scripts will be taxable.

11      You think it's dicta I mean, the Judge can decide

12      whether it's dicta or not?

13                      A.   It is dicta because it's not --

14      it's not in the -- if you look at what the tribunal

15      was asked to review, it's not there.

16                      Q.   Okay.

17                      A.   Nowhere in it does it state --

18      they were -- it was solely a responsible party case.

19                      Q.   Okay.  But these things were

20      going on all at the same point, right?  Your -- your

21      --.

22                      A.   By the time the third -- the --

23      the -- the second appeal was heard was late into -- I

24      -- I don't remember the date but it was years

25      afterwards.

Page 176

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2                     Q.   Yes.  Forget the second appeal
 3       and when the assessments were issued and at about the
 4       same time that you were having the meetings in Albany
 5       and whatever it is you were doing, correct?  The
 6       assessments to Frank Marchello and V.I.P. club and
 7       John Vargo and whoever else.
 8                     A.   Those assessments --
 9                     Q.   Yeah.
10                     A.   -- were issued before my audit.
11                     Q.   Before your audit?
12                     A.   Yeah.
13                     Q.   Okay.  So there -- okay.  I have
14       no further questions, Judge.
15                     A.L.J. RUSSO:  Thank you Mr. Bobrow,
16       any re-direct?
17                     MR. BOBROW:  Yes.
18                     RE-DIRECT EXAMINATION
19                     BY MR. BOBROW:
20                     Q.   And since we are talking about
21       the Marchello case and I was counsel for Frank
22       Marchello, do you recall and this is a key fact which
23       we -- we should understand.  I recall and do you
24       recall -- let me rephrase it.
25                     Do you recall whether there was an
```

Page 177

1           Metro Enterprises/John Scarfi - 7-15-19

2       operating agreement for the three corporations that,

3       you know, the attorney had drafted and I thought that

4       distinguished Marchello that there was one operating

5       agreement that -- that pulls together the functions

6       of the three corporations whereas here in the case

7       today --.

8                   MR. JACK:  Objection, Judge.

9                   A.L.J. RUSSO:  Yeah.

10                  MR. JACK:   This is going to read like

11      -- I hope Mr. Bobrow is going to take -- kind of

12      raise his hand based on the testimony he has given,

13                  A.L.J. RUSSO:  Sustained.

14                  BY MR. BOBROW:  (Cont'g.)

15                  Q.   Do you recall such an --.

16                  A.L.J. RUSSO:  Sustained, we're facing

17      this.

18                  BY MR. BOBROW:  (Cont'g.)

19                  Q. -- do you recall such an operating

20      agreement?

21                  A.   Yes.

22                  Q.   And what was the purpose of the

23      operating agreement?

24                  A.   That was ultimately the downfall

25      of the Marchello responsible-party case.  Under New

Page 178

1              Metro Enterprises/John Scarfi - 7-15-19

2       York State Liquor Law, if I just -- that's basically

3       the problem with all of these cases and all of these

4       issues, there are so many different taxing and

5       governmental agencies involved.  It's very hard to be

6       in compliance with everybody at the same time.  The

7       tragic mistake that the Marchello -- Frank Marchello

8       made is they had one operating agreement to operate

9       the club with these three different corporations and

10      that operating agreement was deemed to be -- you're

11      not -- under New York State Liquor Law, you are not

12      allowed to have somebody operate a license under your

13      name and that's how they lost Marchello and then

14      ultimately The Estate --.

15                    A.L.J. RUSSO:  Anything else, Mr.

16      Bobrow?

17                    MR. BOBROW:  No further questions.

18                    A.L.J. RUSSO:  Anything else, Mr.

19      Jack?

20                    MR. JACK:  I mean I just wanted to --

21                    A.L.J. RUSSO:  Okay.

22                    RE-CROSS EXAMINATION

23                    BY MR. JACK:

24                    Q.   So with your business model where

25      you have these employees that you've admit that

Associated Reporters Int'l., Inc.

```
 1              Metro Enterprises/John Scarfi - 7-15-19
 2         M.L.B. Enterprises which you own and 44th Enterprises
 3         is the employer of these dances -- dancers, correct?
 4                        A.   Now, yes.
 5                        Q.   Now?
 6                        A.   Now.
 7                        Q.   So they weren't -- you weren't
 8         the employer during the time the audit was conducted?
 9                        A.   It seems to be that the --
10         ultimately the --  going to say, yes, I was based on
11         prior F.L.S.A. decisions that have been made it looks
12         like a fait accompli that they're going to say
13         through the entire period they were in fact employees
14         although at the -- initially I thought they were
15         tenants.  And as I said before your audit report
16         states they're employees.  So that's not in fact a
17         question here.
18                        Q.   And --
19                        A.   I don't know how you determine
20         it.  I don't know why you determined it but you
21         determined it.  So you can't go back on it now.
22                        Q.   If you're the employer and you're
23         responsible for the receipt of the employees?
24                        A.   No.  Employees voluntarily under
25         Federal and State Income Tax Law, I would assume it
```

1            Metro Enterprises/John Scarfi - 7-15-19

2        would be, employees are required to -- it's suggested

3        that employees fill out tip forms and provide you

4        with the amount of tips that they received.  Also,

5        there is a federal law if your tips are less than

6        fifteen -- if the tips that the employees voluntarily

7        tell you about are less than fifteen percent of your

8        gross receipts, you're supposed to gross it up and

9        attribute more to the employees' wages than what they

10       actually report it to you.  Again, it's sort of at a

11       crossroads here.  That's going to be decided in the

12       class-action lawsuit because at the time we weren't

13       treating them as employees so there was no reporting

14       because we weren't treating them as employees.  But

15       now the Courts are telling us that they were, in

16       fact, employees.

17                    Q.   But during the period in issue

18       then you saw no reason why you should keep track of

19       any of these money that the dancers were receiving

20       from the patrons?

21                    A.   There is no requirement in any

22       business to be -- my business, your business, any

23       restaurant you go to out here, there is no

24       requirement for the employer to track how much money

25       the employee makes in tips.

```
 1             Metro Enterprises/John Scarfi - 7-15-19

 2                       Q.   And so --?

 3                       A.   There is a suggestion that the

 4        employee should report to the employer that amount on

 5        a tip slip and I forget the form number because I'm

 6        getting old.  But there is a form number out there

 7        that the tip slip that they -- they voluntarily are

 8        supposed to tell you how much they made.  But it's

 9        not the employer's responsibility to track the tip.

10                       If you go out to have lunch and you

11        have a twenty dollar meal and you leave a hundred

12        dollar tip on the table, the employer doesn't know

13        nor care.

14                       Q.   And so you have no records

15        anywhere that would say --?

16                       A.   Me and every other business in

17        the United States.

18                       Q.   Okay.  Well, it's actually about

19        you.  You --.

20                       A.   But you're making it sound like

21        it's something I do.  It's not something I do, it's

22        something that everybody does.  There is no legal

23        requirement, to my knowledge and somewhat

24        knowledgeable on the fact, where an employer is

25        responsible to track how much tips his employee
```

1            Metro Enterprises/John Scarfi - 7-15-19

2      receives because it's impossible.  You go out to

3      lunch, you have a twenty dollar sandwich, you drop a

4      hundred bill on the table because you thought the

5      waiter or waitress was cute.  He takes it, puts it in

6      his pocket.  How could it be the employer's

7      responsibility to tell the government that that

8      hundred dollars went to that employee?  He has no

9      knowledge of it.  So you can't require an employer to

10     walk on water or to report tips that he has no

11     knowledge of.  Me and everybody else.

12            Q.   Okay.  Let's try this again.  You

13     have no records anywhere that would show what portion

14     of the script, if any, was used for dance fees and

15     what portion was used for gratuities, do you?

16            A.   There are no dance fees, so the

17     answer is zero.  So I've got plenty of records that

18     shows zero.

19            Q.   So --.

20            A.   Where are you going?  You're

21     trying to get me to say something that's not true.

22            Q.   The --.

23            A.   The dancers are not -- the dance

24     -- the money that was received by the dancers is

25     dancer money.  It is not club money.  It does not go

Page 183

1            Metro Enterprises/John Scarfi - 7-15-19

2       through my bank account.  The portion of which went

3       through Metro Enterprises' bank account was under a

4       contractual obligation between the dancer and Metro

5       and it was never included in Metro's gross receipts.

6                    So it's not Metro's money, it's not my

7       money, it's the dancers' money.  And under the

8       Federal Labor Standards Act that money has now been

9       deemed to be tips.  Any money paid directly from a

10      customer to an employee, it doesn't matter if it's a

11      dancer, a waitress, a bartender, a chef or whatever,

12      if it's paid directly from the customer to the

13      employee, it's deemed to be a tip.  That's under the

14      Federal Labor Act.  The State Act is even more

15      restrictive.

16                    Q.   Are you finished?  So does it

17      mean you have no record of any of this?

18                    A.   I have records of everything but

19      I can't have a record of nothing.  You're asking me a

20      question that's unfair because you're not asking me a

21      question with a yes or no answer.  Do those records

22      exist?  No, because there are no records --

23                    Q.   Okay.

24                    A.   -- because they can't exist.

25      They don't belong.  There is no such thing.  Now, if

1            Metro Enterprises/John Scarfi - 7-15-19

2       you're asking me whether Metro Enterprises has

3       records, they do.  But you never asked that question.

4                    MR JACK:  I have no further questions.

5                    A.L.J. RUSSO:  Thank you.

6                    MR. JACK:  Thanks.

7                    A.L.J. RUSSO:  Mr. Bobrow, anything

8       further?

9                    MR. BOBROW:  Yes.  Thank you.

10                   REDIRECT EXAMINATION

11                   BY MR. BOBROW:  (Cont'g.)

12                   Q.   We've been talking about how the

13      characterization of the service employees has changed

14      over the years.  Would it be fair to say that you

15      mischaracterized them in the past, these tenants, and

16      now you're enlightened that they should be employees?

17                   A.   I am enlightened for a class

18      action lawsuit that my treatment of them in the past

19      was incorrect and should be -- again, there is no

20      decision in the case yet.  I'm assuming that that's

21      the way the decision is going to go, based on all the

22      case law that we've read that pretty much brings that

23      to bear.

24                   MR. BOBROW:  And I just want the

25      record to show that we did issue a subpoena to Brett

800.523.7887                          Associated Reporters Int'l., Inc.

1                Metro Enterprises/John Scarfi - 7-15-19

2        Cohen, who was counsel to the dancers, and the

3        entertainers and he refused to appear.  We wanted to

4        put more information on the record.

5                        No further questions.

6                        A.L.J. RUSSO:  Okay.  I just have a

7        couple of questions for you, Mr. Capeci.

8                        EXAMINATION

9                        BY THE A.L.J.

10                       So -- so is it fair to say that during

11       the period in issue, if you were not treating the

12       entertainers as employees, you're not withholding any

13       taxes for them at that time?

14                       THE WITNESS:  Right.  Which is part of

15       the class action lawsuit, yes.

16                       A.L.J. RUSSO:  And were you paying any

17       workers' compensation insurance for them during that

18       period?

19                       THE WITNESS:  Again, no, because we

20       didn't deem them to be employees at that time.

21                       A.L.J. RUSSO:  Thank you.  Anything

22       further for this witness?

23                       MR. JACK:  No, Judge.  Thank you.

24                       A.L.J. RUSSO:  Okay.  Thank you.

25       You're excused.

Page 186

1                Metro Enterprises/John Scarfi - 7-15-19

2                          THE WITNESS:  Thank you.

3                          A.L.J. RUSSO:  Let me make sure that

4              it's the same copy that I have -- Okay.  Mr. Bobrow,

5              your next witness.

6                          MR. BOBROW:  I'd like to re-call John

7              Scarfi for one to two questions.

8                          (Recalled John Scarfi)

9                          A.L.J. RUSSO:  Mr. Scarfi.  I'll swear

10             you again since you have been excused.  Do you swore

11             or affirm to tell the truth, the whole truth and

12             nothing but the truth?

13                         MR. SCARFI:  Yes.

14                         THE WITNESS:  JOHN SCARFI; Sworn

15                         A.L.J. RUSSO:  Go ahead.

16                         DIRECT EXAMINATION

17                         BY MR. BOBROW:

18                         Q.   When I was recently talking to

19             Christine, I asked her this was the issue, could she

20             name employees that worked for both companies and

21             questions along those lines.  Could you clarify what

22             the -- how the -- the clubs and Metro operated with

23             respect to sharing employees or having employees help

24             each other?

25                         A.   Alisha Holland worked for the

Page 187

1                Metro Enterprises/John Scarfi - 7-15-19

2       club.  She lived next door to the bank.  The bank

3       wouldn't release the money unless she was a signer on

4       the account.  I couldn't make it to the bank all the

5       time so I had to put her in order to sign her on the

6       account to pick up the money and bring it to the

7       club.

8                          Q.   Was she compensated for that?

9                          A.   No.

10                         Q.   How would you characterize it?

11      As a favor?

12                         A.   It's just a favor.  Small

13      business, that's all.  Nothing more, never paid her.

14                         Q.   Is there anything else you want

15      to add with respect to, you know, employees operating

16      like that with --?

17                         A.   No, I don't want to add.  Well,

18      you have employees that run credit cards.  The

19      waitress runs a credit card, bartender runs a credit

20      card for the waitress, it doesn't change it from that

21      being the waitress's tip.  It runs through a

22      restaurant's checking account, it doesn't change it

23      from being a tip.  So I go by what the law tells me

24      is a tip.  And as far as treating the girls, I

25      treated it the way I thought I was supposed to treat

Page 188

1           Metro Enterprises/John Scarfi - 7-15-19

2      it.  It's on the law, you know.  You can't -- you

3      don't decide who is an employee, the Court tells you

4      they're an employee, it's retroactive.  Six, seven,

5      eight years.  So it's big, big trouble.

6                   Q.   John, could you tell us what

7      would happen if you, I'll say messed up or did

8      something wrong with the employee tips?

9                   A.   Yeah.  I'm hold -- it's double or

10     triple damages plus legal fees.  If I unlawfully

11     withheld a percentage of their tip which is what

12     they're claiming that I did.

13                  Q.   So in other words, they're

14     claiming they're entitled to one hundred percent of

15     the tips without any sales tax applied to it.

16                  A.   Correct.  But I don't think the

17     government is arguing that their sales tax if it's a

18     tip.  At least in the interpleader they can see that

19     if it was a tip it's not served under sales tax.

20     They just said it was our burden to prove that it was

21     a tip.  I said, "Well, under which law do you want to

22     prove it under, state law or the federal law."

23     They're all going to be deemed employees, you've

24     already deemed them.  I've never met a government

25     agency in my life, workman's comp, disability, tax

1           Metro Enterprises/John Scarfi - 7-15-19

2      department that never said -- they only say that

3      dancers are employees, always.  They don't care what

4      you say.  And so they finding them out to be

5      employees.

6                     Q.   Are you saying that a hundred

7      percent of what a customer gives in script to the

8      dancer is a tip?

9                     A.   Yes, because there is only two

10     ways you can pay an employee, wages and gratuities.

11     Those were the only two sources of income for service

12     worker.  To be a wage it had to be paid by the

13     employer out of the employer's gross receipts.

14                     If it's not a wage, the government

15     says it's a tip.  It's really a simple test, not very

16     complicated.  It had to be paid out of the employer's

17     gross receipts and it had to be paid by the employer.

18     Otherwise, it's a gratuity.  That's why you always

19     lose, you can't win.

20                     Q.   And it sounded from the

21     discussion today, you know, nobody tells the customer

22     how much of a tip, it's purely discretionary with the

23     customer?

24                     A.   It's purely discretionary.  There

25     is a minimum suggested, but even that is an I.R.S.

1          Metro Enterprises/John Scarfi - 7-15-19

2      regulations.  The I.R.S. says that you can't say the

3      word mandatory.  You go to a restaurant today and

4      used to say eighteen percent mandatory, gratuity for

5      six people or more.  You can't say that anymore.  You

6      have to say minimum suggested.  But all the Courts

7      will say -- in our cases will say, well, the customer

8      have a right to choose what girl he wanted.  Yes.

9      Did he have to choose -- did he have a choice to pay

10     her more money?  Yes, you lose.  It's a tip.

11                    MR. BOBROW:  No further questions.

12                    A.L.J. RUSSO:  Mr. Jack, anything

13     further?

14                    MR. JACK:  No questions, Judge.

15                    A.L.J. RUSSO:  You're excused.  Thank

16     you.  Mr. Bobrow, your next witness.

17                    MR. BOBROW:  No further witnesses,

18     Your Honor.

19                    A.L.J. RUSSO:  Okay.  Thank you.  Mr.

20     Jack, does the Division have anything further at this

21     time?

22                    MR. JACK:  Nothing further, Judge.

23     Thank you.

24                    A.L.J. RUSSO:  Okay.  All right.  Will

25     both sides want to be presenting post hearing briefs?

Page 191

1          Metro Enterprises/John Scarfi - 7-15-19

2                    MR. JACK:  Yes, Judge.

3                    MR. BOBROW:  Yes, Judge.

4                    A.L.J. RUSSO:  Okay.  We'll go off the

5     record for a moment so I can look at my calendar --

6                    MR. BOBROW:  Sure.

7                    A.L.J. RUSSO:  -- and set up a

8     schedule.

9                    (Off record, 15:24 to 15:25)

10                   A.L.J. RUSSO:  Okay.  For the briefing

11    schedule and I am allowing time for the transcript to

12    come out.  Mr. Bobrow, you're aware that you need to

13    make arrangements with the Court reporter --

14                   MR. BOBROW:  Yes.

15                   A.L.J. RUSSO:  -- for the hearing

16    transcript?  Okay.  So the petitioner's brief will be

17    due September 9th, 2019.

18                   The Division's brief will be due

19    October 15th, 2019.

20                   The petitioner's reply brief will be

21    due November 5th, 2019.  It's the responsibility of

22    the parties to meet this schedule.  All requests for

23    extensions must be in writing, stating the reason for

24    the request and filed within the time limits

25    prescribed for the filing of briefs.  Any briefs or

800.523.7887                              Associated Reporters Int'l., Inc.

Page 192

1        Metro Enterprises/John Scarfi - 7-15-19

2    other documents not filed in accordance with the

3    schedule will be returned to the party that filed

4    them.

5              Parties are responsible for sending

6    copies of anything submitted to the division of tax

7    appeals to the other party as well.  Each party is

8    responsible for meeting their due dates regardless of

9    whether they received anything from the other party.

10             Now before we do closing arguments let

11   me just state once I close the record no additional

12   documents will be accepted.  With that in mind, Mr.

13   Jack, do you have anything further for the Division?

14             MR. JACK:  No, Judge.

15             A.L.J. RUSSO:  Mr. Bobrow, do you have

16   anything further?

17             MR. BOBROW:  No, Your Honor.

18             A.L.J. RUSSO:  Okay.  Thank you.  Will

19   parties be making closing arguments?  Mr. Jack.

20             MR. JACK:  Yes, Judge.

21             A.L.J. RUSSO:  Okay.  You may make

22   your closing argument now.

23             CLOSING ARGUMENT

24             MR. JACK:  Okay.  At some point,

25   Judge, you're going to get back and you're going to

800.523.7887                        Associated Reporters Int'l., Inc.

Page 193

1              Metro Enterprises/John Scarfi - 7-15-19

2        look at this record and I hope you can figure out

3        what's going on here in a way.  But there is -- I

4        don't think it's going to be easy.  And we can start

5        with the motion for summary determination that Mr.

6        Bobrow filed and refers to a Notice to admit that he

7        filed on June 18th, except it was actually filed on

8        June 20th and so the implication in there is, I mean,

9        it's filed in June 18th, it's supposed -- of course,

10       by the time I respond, my response would have been

11       late had I responded to it two days -- within two

12       days of the due date, it would have been late and --

13       and you would see that in the record when -- when you

14       -- when you look at it and -- and that's just the tip

15       of the iceberg, you know what I mean, every fact you

16       look at evolves based on the argument that these

17       petitioners are trying to make and it keeps changing.

18                    So by the time you get to look at the

19       briefs, I'm sure you're going to hear somewhat

20       different arguments from the ones that were provided

21       here today.  But the crux of the issue really is

22       whether or not Metro Enterprises Corp. and John

23       Scarfi were responsible for the taxes of M.L.B.

24       Enterprises Corporation and 44th Enterprises

25       Corporation, Lace and Stiletto.  And that's the issue

ARII@courtsteno.com                        www.courtsteno.com

1           Metro Enterprises/John Scarfi - 7-15-19

2      with regard to the bar sales, coat checks and

3      whatever else.  The thirty eight million dollars in

4      additional sales that were assessed against Metro for

5      the sale of script, I think that's a well-settled

6      area and this is no different from any other strip

7      club where the sale of script or the funny money and

8      used the funny money to purchase lap dances in a

9      strip club and the Tribunal for the first time in --

10     in Frank Marchello determined that those receipts

11     were subject to tax, of course, Mr. Bobrow has

12     referred to it as dicta and the tribunal has to --

13     have determined that it's not dicta.  In fact,

14     couldn't determine that Mr. Marchello and John Vargo

15     and Steve Lat -- Asland or anybody else for that

16     matter were responsible for taxes if there wasn't an

17     underlying liability.  So it's -- it's well settled

18     that these sales are subject to sales tax.

19                And when Mr. Doyle filed his petition

20     for Metro and John Scarfi, the petition clearly

21     states that the script was used to pay dance fees and

22     to pay gratuities.

23                Well, based on what happened here

24     today I'm sure that is going to have to change also

25     because Mr. Capeci and Mr. Scarfi both claimed that

Page 195

1           Metro Enterprises/John Scarfi - 7-15-19

2       this is all gratuity, I mean there is -- none of it

3       is dance fees.  But that's -- that's totally opposite

4       to what they themselves claimed in the petition,

5       which is the same thing that they claimed in all of

6       the filings before the Supreme Court of Manhattan and

7       before the Federal District Court.

8                   So, again, the facts as they're

9       presented by these petitioners would change and these

10      witnesses are not credible as to what occurred in

11      this establishment or these establishments.  I mean,

12      whether or not it was a one esta -- one establishment

13      or multiple establishments it's still up to question.

14      I mean, Mr. Capeci has testified and he still feels

15      like he can easily refer to P.C.S. and whoever else

16      the predecessors were as us.  It's the same entity,

17      it's the same people operating these clubs and what

18      they've done and what they continue to do is continue

19      to structure the operations in such a way that they

20      can make claims like -- like and this is all a

21      gratuity, none of this belongs to either M.L.B.

22      Enterprises, 44th Enterprises, Lace, Stiletto or

23      Metro, it all belongs to the girls.

24                  And funny they don't bring any of the

25      girls to testify that this money actually belongs to

Page 196

Metro Enterprises/John Scarfi - 7-15-19

2    them because -- and when you look at the Ms. Dennis'

3    claim in the -- in the -- in the Supreme Court, she

4    is not claiming that this money belongs to her.  She

5    is claiming that the gratuity portion belongs to her.

6    I think these dancers are smart enough to understand

7    that thirty eight million dollars are receipts that

8    go through an enterprise, it doesn't belong to me.  I

9    mean after you've the fees and whatever else, the

10   remainder still doesn't belong to me because I'm not

11   the one who operates this business.  And Mr. Scarfi

12   does, Mr. Capeci does and Glenn Oricchio does.  These

13   are the ones who operate the business.  We're simply

14   working here and when we work there, they refused to

15   pay us minimum wages and they refused to pay us the

16   gratuity that we made.

17              Well, I don't think these people would

18   be fighting for the gratuity if they will get in the

19   millions of dollars that go to through these places

20   that never appear on the books of Metro, never appear

21   on the books of M.L.B., 44th or any of these

22   different businesses.

23              So I mean, one other thing that a good

24   business practice would be to say here is this money

25   that we received in for the sale of script or as they

Page 197

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       call it for the credit card processing and since it
 3       belongs to -- to these entertainers, we're going to
 4       make sure that we have an audit trail that shows the
 5       money was paid to them.  No, they don't do that.
 6       What do they do?  Take hundreds of thousand dollars
 7       in cash to a safe in the club and they pay off
 8       everybody in cash so there is no track of it.  And
 9       then they can claim that all of the money went to the
10       dancers.
11                 Meanwhile, they're getting sued
12       because the dancers are claiming that not only did I
13       not get all of the money that the club makes, I
14       didn't even get minimum wages or the tips that were
15       paid to me.
16                 And, again, there is a clear
17       distinction between the tips that's a question here
18       and the dance fees.  People clearly paid a fee to the
19       club for the dances that these girls performed.
20                 The club received that fee but the
21       club has no record to show that this is the fee that
22       we received and/or this is the portion of -- of any
23       fee or any exchange for script that can be called a
24       gratuity, I mean, that record doesn't exist.
25                 Mr. Scarfi and Mr. Capeci admit that
```

1          Metro Enterprises/John Scarfi - 7-15-19

2      it doesn't exist.  So there is no way possible for

3      them to demonstrate that any portion of -- of these

4      receipts were actually gratuity.

5               But, again, the issue really is with

6      regard to the six million dollars in additional sales

7      from the bar, from the coat check and wherever else

8      can the Division hold Mr. Scarfi and Metro

9      Enterprises responsible and you heard the testimony

10     the machine breaks charge to the other machine.

11     Obviously, Metro can't function with Mr. Scarfi and

12     one employee when Metro has this operation in eight

13     clubs going on at the same time.  So, yeah, that's --

14     that's no problem, we're all friends, we just use the

15     employees from -- from those businesses to perform

16     the functions of Metro.

17               So where is the distinction and the

18     division between these entities.  And Mr. Scarfi

19     testified and he said there was no reason whatsoever

20     for Metro to pay any moneys to M.L.B. or any of these

21     other businesses and the reverse you said is also

22     true.  And at the time he was staring at Exhibit H

23     and he talked about a check payment to Richard

24     Kennedy, Jessica, is it Jessica -- No.

25               A.L.J. RUSSO:  No, that's -- that's

```
1            Metro Enterprises/John Scarfi - 7-15-19
2       somebody else.
3                    MR. JACK:  But -- but -- but then the
4       next one he talks about is -- I can't read it.  But
5       in between that is a check to M.L.B. Enterprises for
6       twenty-one thousand nine hundred and seventy-five
7       dollars.  He doesn't mention that one.  I'm sure
8       there is going to be an explanation when you get your
9       brief as to why measuring the -- as paying M.L.B.
10      Enterprises twenty-one thousand dollars when Mr.
11      Scarfi has already testified that there is no
12      scenario under which Metro is paying any money to --
13      to M.L.B.
14                   But when you -- when you go on Exhibit
15      H to page five, there is another check to M.L.B. for
16      sixteen thousand and fifty dollars.  If you go on to
17      page six, I think there is another one for sixteen
18      thousand and fifty dollars.  So I'm sure by the time
19      you finish going through this, I mean, there'll be
20      thousands of dollars that's going from -- from Metro
21      to, I mean, based on this as far as -- to M.L.B.
22      Enterprises without any explanation or any reason
23      why.  And so -- and the question is, did these
24      auditors, when they were doing this audit and they
25      were given envelopes with receipts that some belong
```

Associated Reporters Int'l., Inc.

Page 200

```
 1            Metro Enterprises/John Scarfi - 7-15-19
 2       to Metro, some belong to M.L.B., some belong to Lace
 3       and Stiletto and whatever else, did they have a
 4       reasonable basis for determining then that, you know
 5       what, we can't figure out what's going on here but it
 6       appears that Metro is paying the employees from
 7       M.L.B. and M.L.B.'s employees were performing
 8       functions for Metro and Metro appears to be an agent
 9       for -- for -- for M.L.B. and vis e versa.  But it's
10       going to be painted in the way that these auditors
11       didn't know what they were doing.  I mean, they're
12       just making all of these claims and there is no basis
13       for these claims.  Of course there is.
14                    I mean, of course, if you have an
15       entity with no business reason whatsoever, paying
16       thousands of dollars to an entity -- entity that
17       operates from the same premises and using the
18       employees and Mr. Vargo having -- I mean not Vargo,
19       Mr. Scarfi having checks signing authority for 44th
20       Enterprises and M.L.B. Enterprises and -- and -- and
21       whoever else and Mr. Capeci, the reverse.  Of course,
22       they had a reasonable basis for determining that --
23       that Metro and Mr. Scarfi were responsible for the
24       taxes, the additional taxes from the food and
25       beverage sales -- not food, but the beverage sales
```

Page 201

```
 1              Metro Enterprises/John Scarfi - 7-15-19

 2       from these clubs.

 3                    And again, there would be an

 4       explanation, just like in his papers to the Court.

 5       Mr. Doyle said that there was a girl, Alisha Holland

 6       or whoever the person was, is justifying that Mr.

 7       Scarfi and she is just signing these checks and then

 8       running back and forth and putting hundreds of

 9       thousand dollars -- dollars in the -- in the -- in

10       the safe for these clubs so the clubs can operate but

11       there is -- there is really no business relationship.

12       That's just -- these are just -- so all of the

13       evidence, in fact, points to what the auditor

14       testified that the Division couldn't tell who was

15       responsible for what and why because these

16       businesses, these individuals all appeared to be

17       agents, that each of them is performing functions,

18       and I mean on behalf of each other with authority to

19       act on behalf of each other.  I mean M.L.B. claims to

20       be the employer of their entertainers but Metro is

21       the one -- Metro is the entity that determine what

22       hours they're going to work and gives them a schedule

23       and controlled these employees.  There is nothing on

24       the record that says that any of these entertainers

25       appeared anywhere in the books and records for 44th
```

Associated Reporters Int'l., Inc.

Page 202

1             Metro Enterprises/John Scarfi - 7-15-19

2        Enterprises, M.L.B. Enterprises, Lace or Stiletto.

3                     Mr. Capeci said himself, there is no

4        record and there is no -- there is nothing whatsoever

5        that says these were employees of these clubs.  So

6        who then is the employer?  Isn't it the person or the

7        entity that hired them, set their schedule and

8        controlled the time and the places where they work?

9                     And you would also see that here

10       they're claiming that Metro Enterprises had two

11       streams of income.  One was the -- the twenty percent

12       upfront charge on the sale of script.  The second was

13       the ten percent redemption fee which are the papers

14       filed again by Mr. Doyle, by Mr. Bobrow and everybody

15       else says that was the fee for the referral that

16       Metro collected when it referred these dancers to

17       these clubs.  That's how it made its money, but they

18       can sit here and tell you, well, we don't even need

19       to keep track of cash and dancers could dance for

20       free and whatever else.  If a dancer dances for free,

21       Metro doesn't make any money because the customer

22       doesn't have to buy a script and pay a script to --

23       to the dancer.  If a dancer receives ten thousand

24       dollars in cash by their -- their own testimony,

25       Metro doesn't make any money because they don't keep

1              Metro Enterprises/John Scarfi - 7-15-19

2       track of this cash.  So how then did they get their

3       referral fee that the -- the dancers are supposedly

4       contractually obligated to pay to Metro.

5                    So by the time you -- you weave

6       through all of this, hopefully you get to a point

7       where you can figure out what is the truth from Mr.

8       Scarfi's testimony, Mr. Capeci's testimony.  And with

9       regard to the estoppel argument that he appeared to

10      be making with the letter from the Tax Department

11      while these -- while Mr. Bobrow is receiving this

12      letter, he is also litigating the division tax, the

13      very receipts that he is claiming these people have

14      no way of knowing should have been subject to tax.

15                   He was the one Mr. -- Mr. Bobrow

16      involved in that litigation, he litigated the Frank

17      Marchello case and as Mr. Capeci says he was also

18      involved in litigation so there is no estoppel

19      argument here.  And -- and these taxpayers can claim

20      that they reasonably relied on any information that's

21      contained in that letter.  When you get to look in at

22      -- you would see it refers to a specific refund claim

23      which if they present information, books and records

24      to support the claim, then maybe you will be granted.

25      That's all it says.

Page 204

1          Metro Enterprises/John Scarfi - 7-15-19

2                    But even if it had said something

3      else, there is no estoppel argument when the very

4      attorney and the individual, Mr. Capeci, who is so

5      connected to these businesses couldn't claim that

6      they didn't know while they were discussing these

7      matters with -- with the audit and whoever else, that

8      the Division's position was that the transactions at

9      issue are subject to tax.  That's what the Frank

10     Marchello case is and all of the cases that came

11     after said those are the arguments that were being

12     made.  And -- but of course you would see there have

13     been no change audit and whatever else that's --

14     that's being submitted with a summary determination

15     motion.

16                    Obviously, each audit stands in its

17     own and even if the same auditor conducts an audit, a

18     follow-up audit, he or she can reach a different

19     conclusion than that -- what was reached before.

20                    So there is no way that Mr. Bobrow or

21     any of his clients can claim that they reasonably

22     relied on any information contained in the letter.

23     And in that letter the question that remains is,

24     okay, given everything that has occurred here today,

25     can the Division of Tax Appeals rely on Mr. Capeci's

1          Metro Enterprises/John Scarfi - 7-15-19

2     testimony to be credible with regard to whatever

3     discussions took place in -- in Albany.  I don't

4     know, I wasn't there, in fact,  he can testified I

5     refused to get involved in these discussions with

6     these people.  But on his voir dire he characterizes

7     the letter in a certain way.  Is that the truth?  I

8     don't know but based on his incredible testimony here

9     today it is difficult, for the Division of Tax

10    Appeals to hold that he is a credible witness who

11    credibly testified about the discussions with the

12    folks in Albany or wherever the meeting took place.

13              But nonetheless, at the same time when

14    all of this was going on the Division was litigating

15    cases and issuing assessments holding the very same

16    transactions taxable.  That doesn't present an

17    estoppel argument because even if there was reliance,

18    the reliance wasn't reasonable.

19              Hopefully, like I said, you can get to

20    the bottom of this and you can figure it all out but

21    the issues to me are clear and the conclusion here

22    should be clear that, one, the sale of script is

23    taxable.  This was the sale of script and nobody here

24    explained how if you walk up to a machine and you got

25    a receipt that said twenty thousand dollars how you

Page 206

1              Metro Enterprises/John Scarfi - 7-15-19

2         would then go and decide how are you going to use

3         that receipt.  And of course, you got the receipt and

4         you got the script in exchange for that you can then

5         go and decide what room you wanted to go to and what

6         entertainer you wanted to pay for dances.  So but the

7         testimony seems to indicate no, you just got a

8         voucher for twenty dollars.  Well, that would defeat

9         the purpose, wouldn't it, of that individual being

10        able to then say this is who I want to spend it on.

11                    So those were the issues.  I mean,

12        those -- these are the facts that you would -- you

13        would -- you would have before you and the Division

14        submits to you that there is -- the petitioner has

15        provided no evidence whatsoever that the Division

16        made any error in either assessing the sale of

17        script, I mean, assessing -- an assessment for the

18        sale on the script or assessing additional tax

19        against and Metro Enterprises and Mr. Scarfi.

20                    Thank you, Judge.

21                    A.L.J. RUSSO:  Thank you, Mr. Jack.

22        For purposes of housekeeping, you had mentioned the

23        Notice to Admit which was part of the summary

24        determination motion.  The Division did receive your

25        response to the Notice to Admit.  It hasn't been made

1               Metro Enterprises/John Scarfi - 7-15-19

2       part of the record but it's part of Division Tax

3       Appeals file.  Do you want to make that a part of the

4       records for purposes of completeness?

5                       MR. JACK:  Sure, Judge.  Especially if

6       Mr. Bobrow is claiming that he didn't receive it.

7                       A.L.J. RUSSO:  You did not receive the

8       response to the Notice to Admit yet?  Have you

9       received that?

10                      MR. BOBROW:  Only today.

11                      A.L.J. RUSSO:  Okay.  But you do --

12      you do have it now.  Okay.

13                      MR. BOBROW:  Yeah, I did not receive

14      it in my office.

15                      A.L.J. RUSSO:  So Mr. Osborne, you'd

16      like to put that into the record?

17                      MR. JACK:  Yes, Judge.

18                      A.L.J. RUSSO:  Okay.

19                      MR. JACK:  Actually, there were two

20      notices, I mean, one dated June -- actually, there

21      were three.  One dated June 18th, one dated June 20th

22      and one dated June 25th.

23                      A.L.J. RUSSO:  I only have the

24      Division's July 10th response.

25                      MR. JACK:  Right.  That's the response

Page 208

1          Metro Enterprises/John Scarfi - 7-15-19

2      that's from July 10, the other Notice to Admit was

3      filed on June 25th so it -- it was --.

4                 MR. BOBROW:  There were two, correct.

5      Two Notices to Admit.  The 20th and the 25th.

6                 MR. JACK:  So it is the 20th then.

7                 MR. BOBROW:  The first one was faxed

8      to you on the 20th.  And then it was overnighted and

9      then the second one was the same thing on the 25th it

10     was faxed and then overnighted.

11                MR. JACK:  Okay.

12                A.L.J. RUSSO:  So the one I have looks

13     like it's in response to the June 20th Notice to

14     Admit.

15                MR. BOBROW:  That's the one that I

16     received this morning.

17                A.L.J. RUSSO:  Okay.

18                MR. JACK:  I have the one from the

19     25th June, Judge.

20                MR. BOBROW:  Did you give that to me

21     this morning?

22                MR. JACK:  Yeah.

23                A.L.J. RUSSO:  Okay.  So I will mark

24     these and take them into the record as Division's

25     Exhibit -- the response dated July 10th will be

Page 209

1           Metro Enterprises/John Scarfi - 7-15-19

2      Exhibit P and the response dated July 15th, 2019 will

3      be accepted as Exhibit Q.  All right.

4                     Mr. Bobrow, your closing argument,

5      please.

6                     CLOSING ARGUMENT

7                     MR. BOBROW:  Yes.  Your Honor, this

8      case is fairly simple.  And the -- the issue we

9      really need to consider first and it doesn't always

10     apply to this case, is that we have an assessment

11     made in 2018 based upon an audit report in 2018 and

12     on April of this year the Third Department with the

13     caption Metro Enterprises versus New York State Tax

14     Department comes up with a memorandum and order which

15     the petitioners here feels directly affects the issue

16     that we've been talking about the whole day.

17                    So how do we handle this?  Because

18     when the auditor discuss the work she did and I asked

19     her this question, she did not really, as the Third

20     Department commanded, you know, analyze the

21     relationship between the plaintiffs, the dancers and

22     the registered clubs, the audit report is devoid of

23     this.

24                    So the petitioners here would not

25     object in light of the recent Third Department

Page 210

```
 1          Metro Enterprises/John Scarfi - 7-15-19
 2      decision to leave and remand the case to the audit
 3      division so that now the auditor will have an
 4      opportunity to comply with what the Third Department
 5      says is the criteria for determining whether or not
 6      script is subject to sales tax.
 7                  So that's sort of a unique question we
 8      have in this case now.  Because it's the same parties
 9      with the same legal issue, and the Third Department
10      couldn't, as Mr. Jack believes, it's so simple, just
11      a script is taxable they refused to.  So that's my
12      first point that I think is maybe, you know, should
13      determine what else is done.
14                  In my opening statements I said the
15      distinction between a lot of these other cases as Mr.
16      Capeci testified to a lot is that the clubs back then
17      treated the dancers as independent contractors or
18      tenants but the audit report says they were employees
19      and we're -- we're in agreement with that.
20                  So we have a basic distinct factual
21      distinction in this case because as Mr. Capeci said
22      an employee can only have two revenue sources.  A
23      revenue source from the employer and then the
24      customer can also provide funds to the employee.  But
25      it says in accordance with the labor law and
```

Page 211

1              Metro Enterprises/John Scarfi - 7-15-19

2        accounting the way Mr. Capeci describes it.  If the

3        funds are going to the dancer from the customer,

4        that's it, gratuitous tip.  This, you know, no one --

5        the customer -- he said -- I asked him this question,

6        the customer does not have to give the dancer any

7        specific amount, it simply if he is satisfied like

8        the waitress, he could give a larger tip, if he is

9        not satisfied he can give a smaller tip.

10                   So that distinguishes all these other

11        cases including Marchello and the cases that came

12        after Marchello and then the other basic distinction

13        with Marcello, which Mr. Capeci remembered, which was

14        there was an operating agreement and the operating

15        agreement had the effect of pulling everything

16        together, the three entities.  Whereas through most

17        of the testimony here today, we've established that

18        we have on the record, let me say, that these

19        entities were totally separate, no interlocking

20        shareholders, no interlocking officers, owners,

21        employees these were totally separate parties which

22        distinguishes the facts in this case from the facts

23        in the earlier cases.

24                   The record should show if you've heard

25        that I still -- I only received the admissions today.

Page 212

1           Metro Enterprises/John Scarfi - 7-15-19

2       I did not receive them in my office.  Mr. Jack did

3       have the correct mailing address but I don't know why

4       I did not get them.

5                   And finally, I would like to

6       understand why I requested a meeting to discuss

7       stipulations.  I did not understand Mr. Jack's answer

8       before.  Why did he not come back to me and work with

9       me for my July 20th letter where I said, "You

10      canceled the first meeting, let's reschedule and

11      let's work on stipulations."  It's one of the rules.

12      Thank you.

13                  A.L.J. RUSSO:  Thank you, Mr. Bobrow.

14      Okay.  If there is nothing further from either party

15      at this point, I'm going to close the record.  For

16      one final time Mr. Osborne, anything further?

17                  MR. JACK:  Just -- just one --

18                  A.L.J. RUSSO:  Mr. Jack.

19                  MR. JACK:  Yes.  -- point.  I just

20      want to make it clear that you understand what Mr.

21      Bobrow says something would remind me in the parties

22      that the Division doesn't agree for anything to be

23      remanded anywhere and I don't want them to

24      misconstrue that that's something that was agreed to

25      at any point.  The Third Department's opinion and

Page 213

1            Metro Enterprises/John Scarfi - 7-15-19

2        audit that he was referring to and saying that there

3        is no reason why something can't be remanded for

4        further review and so that the auditor can look at

5        this.  Again, based on the Third Department -- Third

6        Department's audit, there is -- that's not something

7        that the Division would even consider and I just want

8        to make that clear.

9                  A.L.J. RUSSO:  Thank you, Mr. Jack.

10       Mr. Bobrow, at this point anything further before I

11       close the record?

12                  MR. BOBROW:  No, Your Honor.

13                  A.L.J. RUSSO:  Okay.  Thank you.  That

14       will conclude the matter for John Scarfi and Metro

15       Enterprises.  Thank you all for being here.

16                       (Off the record, 15:57)

17

18

19

20

21

22

23

24

25

800.523.7887                              Associated Reporters Int'l., Inc.

Page 214

1           Metro Enterprises/John Scarfi - 7-15-19

2   STATE OF NEW YORK

3   I, KATHERINE WOLLEBEN, do hereby certify that the

4   foregoing was reported by me, in the cause, at the time

5   and place, as stated in the caption hereto, at Page 1

6   hereof; that the foregoing typewritten transcription

7   consisting of pages 1 through 213, is a true record of all

8   proceedings had at the hearing.

9               IN WITNESS WHEREOF, I have hereunto

10  subscribed my name, this the 26th day of July 2019.

11

12

13  KATHERINE WOLLEBEN, Reporter

14

15

16

17

18

19

20

21

22

23

24

25

ARII@courtsteno.com                              www.courtsteno.com

## A

**A-Okay** 119:24
**A.L.J** 1:17 3:18 6:2,10,17,19,21
7:3,7,11,14,17 8:11,15,19,22
8:25 9:4,7 11:5,8,16,23 12:6
12:13,21 13:6,12,18 15:12,15
15:22 18:19,23 19:2,8 31:13
31:15,19 32:25 33:7 50:23
51:3,5,9,24 52:3,8,13 53:21
53:25 54:17 56:12 62:4 64:24
68:11,16,20,23 69:7,11,14
70:12,15,18 79:18 80:5 81:15
81:18,21,25 82:9,18,22 83:2,5
83:9,13,16,18,21 84:2,7 89:2
91:24 92:3,6,11 95:17,19 98:3
98:11,15,17,25 101:3,6,8,15
101:17 103:4,6,8,12,15,20
105:8,11,15,18,24 106:9,11,18
106:23 107:10,17 108:2,7,12
108:23 109:3 119:12 120:10,14
120:17,22,25 121:7,10,17
125:2,14,16,19 126:19,24
130:3,13,17,20 131:20,23
132:3,6,10,13,19,25 134:9
137:23 141:8 142:24 143:3,7
143:13,19 144:2 157:13,15,20
157:25 158:6,10,14,18 167:23
170:6 176:15 177:9,13,16
178:15,18,21 184:5,7 185:6,9
185:16,21,24 186:3,9,15
190:12,15,19,24 191:4,7,10,15
192:15,18,21 198:25 206:21
207:7,11,15,18,23 208:12,17
208:23 212:13,18 213:9,13
**A.L.J.s** 7:19
**A.T.M** 66:6,7 67:16,19,22,24
68:6 72:17 86:2,7 90:2,4
92:17,18,20 93:4,8,9,15,17
117:3 166:17,19
**A.U** 32:10
**abeyance** 54:7,14,21,23 55:6
**ability** 139:17
**able** 10:17 28:22 29:7 30:14
45:9 64:18 67:3 71:3 77:5
126:3,17 127:25 129:18 136:13
136:19 150:20 152:13 206:10
**absence** 153:5
**absolutely** 24:22 57:4 84:5
85:14 88:2,4 94:8 137:6

**absorb** 81:10
**absorbs** 81:3,10
**accept** 32:25 62:6,9 68:21,24
101:8 103:8 105:11 106:18
107:10 108:7,23 158:14
**accepted** 11:25 12:8,15,24 13:8
13:14 70:13 192:12 209:3
**access** 100:17
**accommodation** 150:5 153:3 155:2
**accompany** 134:16,16
**accompli** 179:12
**account** 4:20 29:18 67:25 79:4
90:5 102:8 106:6 111:24 183:2
183:3 187:4,6,22
**accountant** 79:7 154:5
**accounting** 164:23 211:2
**accounts** 30:20,21 37:16 38:2
100:18 107:3 152:5 153:24
154:12
**accts** 4:21
**accurate** 79:25 133:17 163:12
**ACKERMAN** 2:4
**act** 58:19 59:10 122:13,13
153:11 163:22 167:19 183:8,14
183:14 201:19
**action** 58:25 59:3,9,19 60:5,9
88:3 114:23 161:10 184:18
185:15
**actions** 54:24 55:22 87:24,25
**active** 161:17
**actual** 110:4,6 111:7
**add** 61:22,25 63:14,18 65:16
187:15,17
**added** 39:22 76:13,14
**addition** 37:25 135:23
**additional** 10:9 14:12,19 15:6,7
20:14 33:12 37:21 38:4,25
39:10,19 41:5 43:11,16 45:5
45:11,20 49:25 104:8 130:10
174:13 192:11 194:4 198:6
200:24 206:18
**additionally** 59:7
**address** 17:13,23 128:11 212:3
**addressed** 58:7
**adequacy** 44:13 129:20
**adequate** 40:21 44:16,18 46:4,9
49:12 127:23 131:2,6 133:15
134:2
**administrative** 9:18 147:3

admissible 170:10
admission 14:10 22:14 23:7
  33:14 38:9 135:15 142:10,13
  142:16 146:2
admissions 22:11,16 135:19
  141:17 211:25
admit 5:5,7 101:4 158:2 178:25
  193:6 197:25 206:23,25 207:8
  208:2,5,14
admitted 32:22 56:12 64:19
  103:5 105:7 106:17 107:8
  108:4,21 142:14
adult 66:15 84:18 161:17
adverse 60:19
advising 18:14
affect 61:3 64:16 146:12,14
affidavit 118:19 129:24 130:2,4
  130:11
affirm 19:3 52:9 84:3 143:9
  186:11
afraid 172:19
agencies 85:2 167:14 178:5
agency 2:8 18:14,16 188:25
agent 17:3 200:8
agents 201:17
ago 21:23 29:13 139:24 159:5
  161:12,22,24 171:24
agree 65:2 137:10 147:14 161:2
  168:9 212:22
agreed 146:11,24 156:9 171:6
  212:24
agreement 94:21,23 149:8,17
  177:2,5,20,23 178:8,10 210:19
  211:14,15
agreements 15:4 74:11 167:7
ahead 92:13,14,21 94:4,12 98:25
  141:6 143:20 186:15
air 153:14 160:25
airline 80:19
al 58:11
Albany 2:9 99:12,18 145:17
  146:6 150:8,11,13 156:19
  176:4 205:3,12
alcohol 117:8
alcoholic 66:16 83:3 104:15
Alisha 138:23 186:25 201:5
allegation 64:9
allegations 61:18
alleged 63:5

allegedly 61:9 78:8
alleging 58:18
allow 56:21 104:9 130:20 150:5
allowances 97:6
allowed 56:18 102:17,20 178:12
allowing 102:19 137:12 163:15
  165:17 191:11
Alton 147:6,17 156:3 169:16
Alvan 8:6
ALVIN 2:4
Amazon's 164:14
amendment 57:17
American 112:3 163:25 164:4,5,7
  164:8,11,13,13,24
amount 40:22 46:5 47:7 102:7
  104:5 136:19,20,20,21 137:11
  137:14,15 180:4 181:4 211:7
amounts 47:19 136:9
amusement 13:24 141:17 142:11
analogy 66:6
analyze 209:20
and/or 60:21 165:20 197:22
answer 4:7,12 12:4,6 13:3,6
  34:14 36:4 57:5 59:2 62:25
  63:2 74:6 111:16 113:6 129:16
  149:14 150:3 182:17 183:21
  212:7
answer's 95:21
Anthony 3:15 24:25 143:12,18
anybody 97:9 113:22 119:25
  166:24,25 194:15
anymore 104:9 161:25 190:5
anyway 49:15 119:25 129:12
apologize 48:2
appeal 117:21 169:23 174:20
  175:23 176:2
appealed 169:22,23
appeals 1:2 2:6 11:25 12:24
  52:25 70:5 192:7 204:25
  205:10 207:3
appear 126:6 128:9 185:3 196:20
  196:20
APPEARANCES 2:2
appeared 201:16,25 203:9
appears 126:5 200:6,8
applied 43:8 188:15
apply 44:25 170:19 171:6 209:10
appointment 21:5 138:6 162:9
appropriate 10:22 65:5 70:4
  130:16

800.523.7887                                                    Associated Reporters Int'l., Inc.

**approximate** 36:3
**Approximately** 28:18
**April** 17:7 159:13 209:12
**arbitrary** 153:11
**arbitration** 74:10
**area** 53:6 66:24 67:2 194:6
**areas** 25:21
**arguing** 148:2 188:17
**argument** 3:19,20 13:20 164:16
 171:3 192:22,23 193:16 203:9
 203:19 204:3 205:17 209:4,6
**arguments** 10:8 63:17 70:7
 192:10,19 193:20 204:11
**arranged** 145:16
**arrangement** 30:15
**arrangements** 191:13
**art** 74:4
**Article** 1:6,12
**Articles** 9:13
**ash** 173:23
**asked** 49:11 58:4 68:8 93:10
 97:9 98:10 129:5 136:17 139:5
 143:22 147:22 155:11 175:15
 184:3 186:19 209:18 211:5
**asking** 66:9 77:3 79:3 110:4
 111:13 157:3 183:19,20 184:2
**Asland** 169:8,9 172:8,11,18
 173:15,22,25 194:15
**assert** 61:17
**asserted** 75:16
**assess** 141:6,13
**assessed** 14:6,10 140:13 155:24
 174:2,6,8 194:4
**assessing** 148:12 206:16,17,18
**assessment** 129:22 145:8 147:5
 147:13 148:19 156:12,14
 206:17 209:10
**assessments** 64:12 176:3,6,8
 205:15
**assigned** 9:18 118:6
**Associate** 53:7
**assume** 6:25 179:25
**assuming** 184:20
**attached** 12:22
**attempt** 40:2 45:7
**attempting** 63:8
**attempts** 61:14
**attorney** 8:6 21:16 24:15 41:9
 41:10 52:22 139:4 145:16
 161:16,23 177:3 204:4

**attorneys** 84:18
**attribute** 180:9
**audience** 6:4
**audit** 4:15 5:2,11,12 10:15
 14:22 17:24 18:6 20:5,14,17
 20:17,24 21:12,22,24,24 22:2
 23:21 24:19,24 26:19,23 27:3
 27:18 28:8,19 31:2,25 32:3,5
 32:9,10,16 33:17 34:18 35:2,3
 35:6 37:4 38:20 40:14 41:19
 44:7 45:22 96:23,25 99:4,8,11
 99:19,24 119:20 122:2,23
 124:5,17 125:9,12 126:6,15
 127:5,9,16,19,24 128:6,11
 131:8,9 133:6,16 134:13
 135:10 138:6 140:16,18,25
 141:24 145:4 147:9,15,16,17
 147:18 148:13 149:2,5,22
 150:6,15,15,16 151:20 152:17
 154:9 155:17,17,18 156:3,7,10
 156:22 157:6,7 160:11,13,14
 160:14,23 168:17 173:23,25
 174:4 176:10,11 179:8,15
 197:4 199:24 204:7,13,16,17
 204:18 209:11,22 210:2,18
 213:2,6
**audited** 17:4 42:22 43:9 145:2,6
 145:8,11,12,12,14,15 148:25
 149:4
**auditing** 21:14 38:3 164:24
 173:20
**auditor** 17:5 19:23 20:13 21:5,6
 31:11 121:16 122:9 126:17
 127:10 147:17 150:10 201:13
 204:17 209:18 210:3 213:4
**auditors** 20:6,7,11 140:3 147:6
 199:24 200:10
**audits** 20:7 134:14,15 141:25
 155:15 168:15,18
**August** 12:4,7 13:3,7
**author** 69:20
**authority** 200:19 201:18
**automatically** 17:11
**available** 45:9
**Avenue** 2:5 110:9
**aware** 191:12

**B**

**B** 4:2,6 12:9
**B.C.M.S** 147:16,18

ARII@courtsteno.com                                              www.courtsteno.com

**back** 7:20 18:16 29:23 43:13
  47:15 49:10 51:9,10 77:19
  80:22 81:9 90:6,20 102:9
  103:13 110:2 117:12 120:14
  121:3,4,7 122:16 127:4 130:21
  131:24 134:10 139:25 145:3
  149:12 150:5,11 151:20 153:17
  154:23 159:15 165:20 172:18
  173:23 179:21 192:25 201:8
  210:16 212:8
**background** 53:11
**backs** 81:4,11
**balances** 107:3
**bank** 4:18,20,23,25 29:6,17,18
  30:11,12,19,21,22,24,25 33:10
  37:5,16 38:2 67:25 74:16,19
  100:18 104:18,20 105:16 106:6
  107:15,21 111:24 114:2 116:12
  139:17 151:17 152:5,24 153:23
  154:10,12 183:2,3 187:2,2,4
**bankruptcy** 128:10
**banks** 67:23
**bar** 25:20 117:8,10 135:21 194:2
  198:7
**Barbara** 1:17 9:17
**bartender** 95:11 96:11 102:17
  183:11 187:19
**bartenders** 95:25
**base** 10:12
**based** 33:11 58:2 80:18 81:2
  140:4 146:19 153:14 156:2
  159:19 177:12 179:10 184:21
  193:16 194:23 199:21 205:8
  209:11 213:5
**basic** 164:23 210:20 211:12
**basically** 18:10 86:16 100:2
  132:24 140:4 147:24 153:7
  167:13 178:2
**basis** 31:5 50:15 159:18,19
  200:4,12,22
**batch** 109:21,24 110:7,13,23
  111:3
**bear** 10:9 69:11 184:23
**bearing** 65:9
**began** 58:15
**beginning** 75:9 145:5,6
**behalf** 96:6 148:5 152:15 163:17
  172:15 201:18,19
**Behuniak** 7:21

**believe** 31:25 56:8 63:9 70:8
  72:21 79:10 125:21 137:16
  138:13 139:25 141:14 148:17
  156:2 167:12
**believed** 152:17
**believes** 210:10
**belong** 71:7,18 75:2 107:22
  108:16 183:25 196:8,10 199:25
  200:2,2
**belonged** 71:10
**belonging** 59:15 107:16
**belongs** 72:8,20 76:24 78:2
  164:21 167:17,20 195:21,23,25
  196:4,5 197:3
**benefit** 53:10 153:2
**best** 21:20 36:4 38:21 41:13
  68:2 72:16 85:2 102:22 107:4
  107:23 108:18 141:18 151:9
  158:22
**beverage** 27:8 114:2 200:25,25
**beverages** 14:13 38:9 83:3
  104:15
**beyond** 72:17 165:3
**big** 117:23 188:5,5
**bigger** 136:22
**bill** 164:11 172:20 182:4
**billion** 164:2,3,4
**binder** 75:21
**bit** 49:6 53:11 81:6 126:2
  144:24
**black** 109:17
**blood** 120:21,24
**Bobrow** 2:4 3:3,5,6,8,9,11,12,13
  3:13,15,16,18,20 6:20,22 7:6
  8:6,6 11:3,7 15:13,14,19 16:5
  31:17 32:24 50:23,25 51:4,13
  52:4,6,15,17 53:19,23 54:3,22
  55:8,16,21 56:24 59:6 61:13
  62:5,17 63:24 64:20 65:14
  68:8,15,18,22 69:2,10,13,21
  70:11,14,17 79:18,20,22 80:6
  80:7 81:13 83:8,23,24 84:9
  93:25 98:3,5,8,14,16,24 99:2
  101:2,5,19 103:7,14 105:9,10
  106:15 107:7 108:6,22 119:12
  119:14,16 120:9,17,20 121:13
  121:14,23 124:24 125:20 128:5
  128:14,25 129:5,24 132:8,12
  137:24,25 138:3 140:24 141:10
  142:22 143:4,5,25 144:2,4,7

144:10 145:15,20 146:20
157:14,17,23 158:4,8,17,19
167:22 168:12 169:8,12 170:3
176:15,17,19 177:11,14,18
178:16,17 184:7,9,11,24 186:4
186:6,17 190:11,16,17 191:3,6
191:12,14 192:15,17 193:6
194:11 202:14 203:11,15
204:20 207:6,10,13 208:4,7,15
208:20 209:4,7 212:13,21
213:10,12
**book** 91:8,8 133:11 144:24 174:9
**books** 17:2 22:5 23:22 24:2,3,7
25:8 26:24 28:10,12,15 29:3
29:14 35:15 40:16,17 44:9
46:2 49:11,19 73:23 74:2,3,6
78:3,9,13 91:4,13 112:5 113:8
114:21 129:20 130:25 131:11
131:12,15 133:15,19,22,25
153:17 173:24 196:20,21
201:25 203:23
**boss** 115:7,19,20,22
**bosses** 116:21 156:8
**bottom** 34:17,24 37:17 109:6
205:20
**bought** 164:15,15
**bouncer** 166:23
**break** 51:2 83:22 120:22 121:4
**breakdown** 37:3
**breaks** 198:10
**Brett** 184:15
**brief** 83:21 144:18 154:13,25
165:16 191:16,18,20 199:9
**briefing** 191:10
**briefs** 10:9 62:12 63:17 190:25
191:25,25 193:19
**bring** 98:22 113:21 115:4 139:18
139:19 187:6 195:24
**brings** 184:22
**broad** 144:15,16 159:20 163:25
**broke** 126:10 151:13
**Brooklyn** 147:7
**brought** 59:5 112:10 165:15
170:13 171:5
**building** 2:8 119:4
**built** 170:15
**bunch** 145:17 156:23
**burden** 10:10 188:20
**bus** 152:6

**business** 11:22 29:2 32:19 57:21
65:18,20,21,22,24 66:22 67:17
67:19,25 80:12,13 89:10,23
108:15 113:15 155:2,8 163:13
178:24 180:22,22,22 181:16
187:13 196:11,13,24 200:15
201:11
**business's** 114:7
**businesses** 57:25 58:3 84:11
152:4,4 196:22 198:15,21
201:16 204:5
**businessman** 18:7
**buy** 75:22 117:11 136:15,16
142:14 202:22
**buying** 166:20

---

**C**

**C** 3:2 4:8 12:15
**C-A-P-E-C-I** 143:16
**C.P.A** 144:23 151:22 154:2,3
163:11
**cabaret** 152:4
**calculator** 75:13 77:10
**calendar** 191:5
**call** 9:7 18:20,22 19:14,16
21:21 52:5,7 60:25 71:2 74:20
81:7 83:22 91:6 97:2 118:9
120:18 132:3 143:5 145:10
146:20 150:4 197:2
**called** 6:6,16,24 54:5 57:10,11
81:9 129:8 145:7 149:11
197:23
**calling** 26:18
**calls** 80:4 128:17
**canceled** 79:7 101:13 104:21
212:10
**cancelled** 4:16 129:7 147:13
148:19 151:16,16
**candid** 77:2
**Capeci** 3:15 6:7 7:9,16 24:25
25:2,5 57:8,12 58:18 60:5,11
65:18 67:17,25 135:12 143:6,7
143:11,12 168:6 185:7 194:25
195:14 196:12 197:25 200:21
202:3 203:17 204:4 210:16,21
211:2,13
**Capeci's** 57:21 158:9 203:8
204:25
**caption** 209:13 214:5
**card** 16:20 26:4 29:2,5,20 30:8

30:10,12 31:3 37:16 41:17
67:12 68:5 75:22 77:13 80:17
80:22 81:8,22 82:5,6 85:20,23
86:7,9 89:24 90:5,19 93:8
95:7,11 96:8,10 97:2,3,10,11
97:12,18,19 102:4,15 109:21
110:25 111:19,21 113:23 114:4
114:12 115:6 124:21 135:24
136:5,6 140:9 146:13 155:4,5
165:25 166:6 172:14,14 187:19
187:20 197:2
**cards** 67:7 76:13 80:9,14,20
89:12 100:4 117:10 154:11
163:16 165:19 166:5,13,22
187:18
**care** 181:13 189:3
**careful** 69:12 92:3
**cares** 162:25
**Carla** 148:4
**carry** 123:12
**Carzo** 145:17 146:20 147:8 148:7
149:12,18 156:23 170:17
**case** 4:15 6:11 16:7,9,13,16,18
18:18 20:10,22,22 32:2 51:17
53:12 55:12 56:11 58:10,15,23
59:7,9 60:13 62:8 65:4,9,16
87:3,6,8 88:15 112:19 114:20
117:18 145:11 147:22,22 150:4
159:18,18,18,20 168:22 169:3
169:4 170:12 171:10 175:7,9
175:18 176:21 177:6,25 184:20
184:22 203:17 204:10 209:8,10
210:2,8,21 211:22
**cases** 16:10,16,18,23 20:8,23
31:8 62:11 65:5 87:7 114:16
114:18 174:13 178:3 190:7
204:10 205:15 210:15 211:11
211:11,23
**cash** 67:12,20,23 85:16,16 86:8
90:25 92:25 94:7,9,16 114:10
115:8,9 116:10,14,15,22 117:9
146:13 150:22,22 166:4,14,16
166:19,22 170:25 174:23 197:7
197:8 202:19,24 203:2
**categorically** 78:17,24
**cause** 214:4
**cents** 35:5 47:5
**certain** 25:18 27:7 35:15 49:7
137:10 205:7

**certainly** 15:25 62:13 67:16
**certify** 214:3
**cetera** 53:2
**challenges** 57:18
**change** 18:6,9 99:16 150:2
155:12 156:16 159:7 187:20,22
194:24 195:9 204:13
**changed** 100:2 157:4 184:13
**changing** 193:17
**characterization** 184:13
**characterize** 187:10
**characterizes** 205:6
**charge** 42:20 81:4,9,9,11 82:14
82:15 87:13,19,21 90:5,8,18
90:19 104:8,12 117:4,5 146:2
164:4,6 198:10 202:12
**charged** 30:8 73:6,8 135:7
**charges** 14:10 26:4 29:5,21
33:14 136:5,6 137:18 155:6
**Chase** 53:5
**check** 23:6 25:19 27:8,9 79:7
85:18,19 102:9 114:11 116:9
135:19 152:13,19,22,23,24,25
153:7,11 164:12 198:7,23
199:5,15
**checking** 90:4 187:22
**checks** 4:16 101:14,24 102:10,11
102:12 104:21 139:2,12 151:16
151:17 152:7,15,20 153:4
194:2 200:19 201:7
**chef** 183:11
**choice** 73:10 190:9
**choose** 190:8,9
**chose** 136:15
**Christine** 3:4 8:9 18:22 19:7,15
19:16 31:23 33:9 121:16,20,24
133:5 160:11 186:19
**Cincinnati** 53:6
**Circuit** 117:21
**circumstances** 146:24 147:9
156:21 159:19,22 170:20,24
**cite** 62:12
**Citibank** 66:6
**citing** 170:16
**claim** 64:5,6 73:24 173:7 196:3
197:9 203:19,22,24 204:5,21
**claimed** 194:25 195:4,5
**claiming** 64:2,7 188:12,14 196:4
196:5 197:12 202:10 203:13
207:6

**claims** 55:16 58:21 59:9 195:20
  200:12,13 201:19
**clarify** 6:20 51:21 60:2 74:5
  151:6,18 165:13 186:21
**clarity** 140:4,6
**class** 59:3 60:7 64:9 114:22
  161:10 184:17 185:15
**class-action** 180:12
**classic** 145:24
**clear** 56:2 57:5 63:11 72:13
  76:3 78:20 79:2 124:14,16
  126:9 197:16 205:21,22 212:20
  213:8
**cleared** 128:20
**clearly** 123:24 124:10,10 138:23
  194:20 197:18
**client** 59:6 70:8 145:21 151:25
**clients** 152:3,10 172:5 204:21
**clip** 75:21
**close** 139:18 192:11 212:15
  213:11
**closing** 3:19,20 10:8 32:12
  149:3 192:10,19,22,23 209:4,6
**club** 13:25 14:9,13 17:17 21:25
  22:2,9 23:21,23 24:5,16,24
  25:4 26:14,21,24 27:6,9,18
  28:2,5 30:4,5 33:15 46:13
  61:15 63:10 64:2 67:10 72:3
  73:21 81:22 83:3 85:15,17,18
  85:19 86:25 89:22,22 91:10
  93:20,21 95:3,6,8,15 96:4,15
  96:17,19,24 97:15 99:6,9
  100:3,4 102:2,14,14,22 112:11
  117:17 118:10 119:2,3 123:7,7
  123:9,21 137:9 138:14,17,25
  139:6,19,22 140:3 142:7
  144:22 145:6,21 155:20 160:2
  162:4,13 168:17 170:14,22,22
  171:7,11,11,21 172:4,13,25
  176:6 178:9 182:25 187:2,7
  194:7,9 197:7,13,19,20,21
**club's** 30:12,12 112:22 116:25
  117:2,4,5
**club's** 97:18 140:10
**clubs** 14:15 21:15 24:4 27:13
  29:18,24 30:3,15,18 36:25
  37:8,19,21 38:3,7,10,16,18
  70:25 89:21 94:20,24 96:14,23
  100:22,24 102:24,24 116:4,17
  116:22 117:7,24 119:8,9

141:20 147:10 151:21 156:20
158:22,23,24 159:6,7,8,10,11
161:12,13 162:5,5 168:10
172:3 186:22 195:17 198:13
201:2,10,10 202:5,17 209:22
210:16
**clue** 100:19
**co-** 123:2 153:23 173:25
**co-mingle** 154:24
**co-mingled** 123:22
**co-vendor** 17:3 153:3,7,10,10,12
  155:9
**co-vendors** 122:24 153:16
**coach** 170:8
**coat** 23:5 25:19 27:8,10 135:19
  194:2 198:7
**Cohen** 185:2
**collect** 93:22 148:12,21
**collected** 148:14 165:2 202:16
**collects** 163:19
**college** 53:5 84:16
**column** 46:21 47:15
**combine** 123:16 140:4
**combined** 37:6
**come** 6:8 17:19 24:11 37:14,23
  48:7 66:17 74:12 85:17 117:9
  117:9 118:2 135:5 146:8
  149:23 150:5,12 175:2 191:12
  212:8
**comes** 18:16 47:17 81:21 85:15
  86:18 90:4 111:23 150:7 175:6
  175:6,8 209:14
**comfortable** 19:14
**coming** 6:22 47:9
**commanded** 209:20
**commonly** 81:4
**comp** 188:25
**companies** 57:10 67:18 80:22
  90:19 123:16,20 124:15,15
  151:5 154:8 186:20
**company** 67:6 68:3 80:17 81:8
  123:25 136:3 165:21
**compared** 39:22 41:22
**compensated** 187:8
**compensation** 185:17
**complaint** 59:2,3 63:2
**complete** 26:23 68:13 91:13
**completely** 76:25 153:18 170:24
**completeness** 207:4

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 222

completes 13:16
compliance 178:6
complicated 189:16
comply 210:4
computation 43:16,19
compute 77:3
computed 43:7 44:20 51:16
computer 40:4,6,10 46:14 116:4
  116:6
concede 82:23
conceded 113:5
concern 128:6
concerned 100:21 118:15 119:23
conciliation 10:15
conclude 119:20 213:14
conclusion 10:6 131:4,5 150:12
  204:19 205:21
conduct 20:17 21:12 24:19 26:23
  27:17 32:16 40:14 44:6 45:22
  125:8 127:16 134:15
conducted 20:18 61:10 65:19
  127:5,8 133:6 179:8
conducting 21:24,25 23:21 28:8
conducts 204:17
Conference 147:16,18
confirm 127:25
confirmed 62:19
conflict 59:10
conflicting 123:23
confused 93:7 173:18
confusing 37:9 38:20 117:7
confusions 126:6
conjunction 32:5
connect 57:6
connected 204:5
Connecticut 52:24
consents 14:22,24 15:3,5,8
consequences 60:19
consider 10:17 86:19 90:16,17
  122:11 142:13 209:9 213:7
considered 11:4,9 29:4 114:13
  137:4
considers 91:17
consist 129:21
consisting 214:7
constitute 50:6
constitutional 57:19 148:15,16
  148:17
consultant 168:20

consumers 80:20
Cont'g 31:22 33:8 56:24 62:17
  65:14 68:18 69:2,21 80:7
  92:15 94:5 95:2 99:2 103:25
  106:4,25 107:20 108:14 109:4
  127:3 130:24 133:4 134:11
  141:10 158:19 169:13 171:8
  177:14,18 184:11
contacted 156:23
contained 101:23 203:21 204:22
containing 103:18 108:10
contains 36:9
contends 14:14
content 107:15
context 74:4
continue 18:8 62:16 65:11
  195:18,18
contract 66:10,13 68:3 72:2,4,5
  72:13 78:7 80:12 137:8 163:15
contracted 67:5
contractor 63:8 87:7
contractors 16:16 63:4 64:6
  112:15 137:7 160:5 161:14
  210:17
contracts 28:20,23 65:22 71:25
  74:10 78:6
contractual 66:3 113:18 163:17
  167:3,3 183:4
contractually 203:4
controlled 172:11 201:23 202:8
convenience 172:23
conveniently 63:23
conversation 149:13
conversations 24:14,20 99:17,18
  170:18
converting 80:9
convoluted 145:9
cooperation 108:17 138:10
copies 11:21 15:24 137:16,19
  192:6
copy 16:4 31:17 33:4 69:6 98:9
  110:11 186:4
corner 109:7
corp 1:4 9:9 11:24 12:11,14
  25:10 38:19 57:10,11,22,23
  61:10 193:22
corporate 100:16 123:14,15
  151:12
corporation 11:21 14:7,11,18
  20:25 21:13 24:13 28:9 39:4

40:9 44:7,21,24 50:12 60:12
126:15 129:23 193:24,25
**corporations** 172:9 177:2,6
178:9
**correct** 6:19 49:17,21 64:25
70:25 71:18 89:10 90:14,22,25
94:18,19 110:23 112:5,6 120:7
122:4 127:6 141:2,5 173:3,7
174:14 175:7 176:5 179:3
188:16 208:4 212:3
**correctly** 18:15 77:10 97:13
147:4
**correspondence** 32:11 144:25
**cost** 80:15,21 136:18
**counsel** 2:7 7:25 8:3,5 18:4
128:22 141:4,11 145:19 150:8
176:21 185:2
**country** 114:22
**couple** 29:13 81:19 185:7
**course** 32:19 82:20 136:23 147:2
151:19 156:22 166:14,21
169:16 193:9 194:11 200:13,14
200:21 204:12 206:3
**court** 7:22 9:5 17:10 31:8 52:19
52:25 57:18 59:21 61:7,7,8,25
61:25 63:20,21 66:14 69:25
87:13 88:9,19 92:9 95:4
112:21 117:20,21 118:20
128:10 142:9 157:9 161:11
164:16 169:18,19,21 188:3
191:13 195:6,7 196:3 201:4
**Court's** 69:6
**Courtesy** 150:13
**courts** 52:24,25 54:4,25 62:19
63:19 161:25 180:15 190:6
**cover** 12:7 13:3,7 160:14
**covered** 131:7
**covers** 90:18
**CPA** 153:6
**create** 155:9 161:19 162:11
**created** 172:9
**credible** 195:10 205:2,10
**credibly** 205:11
**credit** 26:3 29:2,5,20 30:8,10
30:12 31:3 37:16 41:17 67:7
67:11 68:5 75:22 76:12 77:13
80:9,14,16,20 81:8,22 82:5,6
85:23 86:9 89:12,24 90:3,5,5
90:19 91:5 93:8 95:7 97:2,3
97:10,11,12,18,19 100:4 102:3

102:14 109:21 110:25 111:19
111:20 113:23 114:4 115:6
117:10 124:21 135:24 136:5,6
140:8 146:13 154:11 155:5
163:16 165:19,25 166:5,5,13
166:22 172:14,14 187:18,19,19
197:2
**Cris** 134:14
**Cristal** 133:7,8 134:14
**criteria** 160:15,17 210:5
**critically** 112:7,8
**cross** 3:5,8,11,16 50:24 51:12
51:14 59:6 70:21 89:3,5
101:10,20 126:5 130:5 137:24
167:25
**cross-examination** 10:6 70:19
121:22
**cross-examine** 121:15
**crossover** 123:24
**crossroads** 180:11
**crux** 53:12 193:21
**Crystal** 127:11,12
**curious** 94:14
**current** 57:16
**currently** 19:17 20:6 58:8
**customer** 59:12 67:11 73:12
77:11,16 81:21 82:12,13,14
85:14 86:2 87:14 91:19,22
92:16 93:16 95:11 96:7 110:24
111:20 145:25 163:3 165:11,11
166:8,10,15 183:10,12 189:7
189:21,23 190:7 202:21 210:24
211:3,5,6
**customers** 67:2,7,15 68:3 71:3
72:8,14,25 75:9 76:12 80:15
89:23 93:14 100:3 102:4,16
114:3 117:9 164:10,10,21
**cut** 124:16 152:7
**cute** 182:5

---

### D

**D** 3:2,2 4:2,10 12:25
**D.O** 32:11
**D.T.A** 9:9
**daily** 67:24 68:6 72:17
**damages** 188:10
**dance** 26:7,10,11 30:6,9,10 31:7
66:23 73:6,9,19,20 85:22
117:15 136:4 146:4 149:23
150:23 159:16 162:12,17,18,20

162:21,23 182:14,16,23 194:21
195:3 197:18 202:19
**dancer** 23:15 58:17 77:11 85:15
86:5 91:19,21,22 92:22 114:10
136:8 146:3,13 162:18,23
163:4,18 165:5 166:9,16
167:20 182:25 183:4,11 189:8
202:20,23,23 211:3,6
**dancers** 26:7 67:3,8 71:12,21
73:7 76:24 78:5,11 82:15 85:5
87:8 88:6 89:11,18,20 90:22
91:23 93:22 95:8,25 112:19
115:3 117:9,19 118:17 119:7,9
122:4,12 135:25 145:23,23
146:25 147:5,15,19,23 148:2,7
148:9,20 149:8,24 150:7,12,19
150:21,22 155:25 157:5 159:25
160:19 161:10,14,19 162:2
163:9 165:18 166:13 167:2,2
167:17 169:17 172:15 179:3
180:19 182:23,24 185:2 189:3
196:6 197:10,12 202:16,19
203:3 209:21 210:17
**dancers'** 91:8 163:20,21 183:7
**dances** 22:25 62:20 117:11 156:4
156:21 157:8 159:16 162:24
169:25 170:22,25 174:21,23
179:3 194:8 197:19 202:20
206:6
**dancing** 115:15
**data** 45:8,10
**date** 1:16 98:19,21 110:3 175:24
193:12
**dated** 12:4,7,14,22 13:3,7,13
207:20,21,21,22 208:25 209:2
**dates** 192:8
**day** 51:25 81:7 91:5,9 111:3
135:13,14 137:11 146:2 153:8
172:18 209:16 214:10
**day's** 41:11
**daybooks** 28:19,19,23
**days** 146:19 193:11,12
**deal** 54:12 57:2 59:9 117:23
**dealing** 54:25 57:13,18
**deals** 55:23
**dealt** 16:10
**Dean** 53:7
**December** 9:14 158:7
**decide** 61:19,19 76:7 88:10
175:11 188:3 206:2,5

**decided** 21:20 150:10,19 169:22
171:20 172:24 174:17 180:11
**decides** 115:22
**decision** 10:12 67:17 68:2 112:9
123:20 140:3 141:15 149:23
157:9 159:13 160:12 169:24
170:15 172:23 174:20 184:20
184:21 210:2
**decisions** 20:13 142:9 179:11
**declaratory** 60:14
**deem** 170:21 185:20
**deemed** 160:19 161:20 164:17
165:9,10 178:10 183:9,13
188:23,24
**defeat** 206:8
**defendants** 59:6
**deficiency** 9:12 156:11
**deficiency/revision** 1:5,11
**definitely** 66:12 72:7
**definition** 6:8 123:5 124:16
161:16
**definitions** 153:9
**demonstrate** 198:3
**demonstrated** 78:10
**Dennis** 58:10,14,15 59:3 60:7
63:5 64:9 79:5,6
**Dennis'** 63:2 196:2
**denominations** 136:12
**department** 17:9,10,14,19 18:5
19:20,22 20:2 21:10 51:22
53:13,14 59:8 60:6,12,22,22
61:21 75:16 84:21,22 88:10
91:12 112:18 120:2 141:12,19
142:9,19 145:6 146:23 148:11
159:13,15 160:12,15,18 167:18
168:23 173:23 174:24 189:2
203:10 209:12,14,20,25 210:4
210:9 213:5
**department's** 22:3 59:13 212:25
213:6
**depended** 159:25
**dependent** 123:10 164:22
**depending** 136:20
**depends** 17:16 159:21
**deposit** 139:19
**deposits** 37:5,6,16,19
**describe** 29:23 71:9 78:17 80:8
124:8
**described** 16:11 29:8 30:20
49:22 61:5,23 146:24 147:10

160:17 168:16
**describes** 211:2
**describing** 78:24 92:11
**description** 4:3 5:14
**desire** 68:5
**detail** 4:21 107:3
**detailed** 51:15
**determination** 1:6,12 9:12,19
  11:6,22 12:19 40:24 44:13
  50:11 63:24 68:9 69:4,25 70:2
  70:7 128:2 133:25 146:22
  150:17 153:14 193:5 204:14
  206:24
**determinative** 86:23
**determine** 10:21 14:17 15:6 25:4
  25:6,8 28:23 29:8,12,15 30:14
  30:24 34:2,6 39:9,18 40:21
  41:4 43:16,25 44:12 45:5 46:5
  49:24 123:24 129:17,18 133:16
  140:2,8 146:17 160:6,6 179:19
  194:14 201:21 210:13
**determined** 29:14 33:11,18 35:16
  41:20 42:13,24 45:20 48:23
  123:19 147:11 162:2 179:20,21
  194:10,13
**determines** 88:19
**determining** 69:4 200:4,22 210:5
**developed** 39:23 41:23 49:9
  57:20
**development** 53:7 174:24,25
**Devin** 99:18
**devoid** 209:22
**Diamond** 123:7
**dicta** 175:4,11,12,13 194:12,13
**dictated** 73:18
**dictates** 73:21
**died** 173:25
**differ** 158:23
**difference** 153:6
**different** 16:12,14 22:10 33:23
  34:11 45:7 57:9,13 58:5,7
  65:6 71:25 78:19 89:21 136:3
  144:22 155:3 161:8,9 167:14
  167:15 170:20,24 172:9,10,17
  172:21 178:4,9 193:20 194:6
  196:22 204:18
**differentiates** 16:18
**differently** 15:16 150:23
**difficult** 75:12 205:9

**DiFiore** 7:20
**digital** 15:25
**diligence** 64:4
**dire** 205:6
**direct** 3:5,8,11,15 19:10 52:16
  70:16 84:8 128:24 144:9
  157:14 171:11 186:16
**directly** 72:25 183:9,12 209:15
**director** 84:15 100:11,15
**dis** 174:19
**disability** 188:25
**disadvantage** 128:12
**discretionary** 189:22,24
**discuss** 209:18 212:6
**discussed** 55:20 73:16 123:18
  141:14 145:22 160:18,20 162:7
  162:10 170:16
**discussing** 99:22 165:14 204:6
**discussion** 130:23 146:5 153:22
  169:6 173:19 189:21
**discussions** 141:3,4 172:18
  205:3,5,11
**dismiss** 88:14
**dispel** 56:4
**dispute** 61:12
**distinct** 128:12 154:5 210:20
**distinction** 86:20 197:17 198:17
  210:15,21 211:12
**distinguish** 123:21 124:11
**distinguished** 177:4
**distinguishes** 211:10,22
**distributes** 17:17
**district** 52:24 60:10 61:6,7,24
  63:20 87:5,7 112:16 114:17
  117:20,22 195:7
**division** 4:4 9:22 10:2 11:19,24
  12:3,5,16,24 13:2,4 14:6,10
  14:14,17,25 15:6,7,11 18:21
  21:25 25:3 26:23 28:8,16
  31:10 32:4,15,18,22 33:25
  34:6 35:15 36:10 37:13 38:13
  39:2 40:14,17 44:6,9,12 45:25
  48:18 49:20,24 50:10 103:3
  105:21 106:14,20 107:6,12,25
  108:9,20 128:2 129:18,19
  131:25 133:11,14 140:16,18,22
  174:13 190:20 192:6,13 198:8
  198:18 201:14 203:12 204:25
  205:9,14 206:13,15,24 207:2
  210:3 212:22 213:7

**Division's** 12:2,6,9,15,25 13:6
  13:8,14 31:12,16 32:25 103:9
  105:12,23 106:2,8,19,21,24
  107:11,13 108:8,24 191:18
  204:8 207:24 208:24
**divvying** 172:17
**document** 5:14 12:11 13:10 31:11
  31:24 32:14 33:4 40:5 68:13
  69:19,23,24 79:11 106:22
  143:23 144:12,14
**documented** 149:13
**documents** 9:23,25 10:14 11:10
  11:18 12:17,22 13:17 15:21,23
  32:12 38:8 40:3 78:20,21
  108:16 111:6,14 125:23 126:13
  138:11 151:15 152:14,21 192:2
  192:12
**doing** 18:8,15 80:16 99:17
  119:24 126:7,10 147:9 165:2
  176:5 199:24 200:11
**dollar** 37:14,22,23 47:19 50:4
  91:8 93:23 94:16 114:5 136:19
  136:20 137:14 147:5,13 148:19
  156:5,6,14 162:12,13 181:11
  181:12 182:3
**dollars** 18:17 35:5,17,20 36:7
  37:20 39:8 42:19 43:12 47:4,5
  47:13 48:17,19 49:25 50:5,7
  72:19 73:3 74:25 75:4,8,15
  76:10,11,14,17,22 77:11,14,14
  77:16,19,20,22 78:2,5 79:5,6
  82:2,23 86:4,4,11,14,17,18
  88:6 91:6,7,7,16 92:17,24
  93:17,18,23,24 95:13 102:6,7
  104:5,5,6,10 114:4 116:2,3
  117:6,12 118:10 136:12 146:4
  148:22 155:24 162:16,17,20,20
  164:2,3,4 166:16,18 174:7,8,9
  182:8 194:3 196:7,19 197:6
  198:6 199:7,10,16,18,20
  200:16 201:9,9 202:24 205:25
  206:8
**door** 22:11,14,16 88:18 135:15
  155:3 166:24 187:2
**double** 188:9
**downfall** 177:24
**downs** 146:3
**Doyle** 194:19 201:5 202:14
**drafted** 177:3

**dragged** 155:23
**drawn** 66:7
**drinks** 66:15 135:17
**drop** 182:3
**Duane** 85:20 86:7
**due** 14:5,12,19 15:7 23:11 33:18
  38:5 40:22 43:16 61:17 64:3
  88:20 191:17,18,21 192:8
  193:12
**duties** 20:4

### E

**e** 3:2,2,2 4:2,2,11 13:8 200:9
**earlier** 25:18 30:20 33:10 50:5
  50:8 68:8 122:17 125:8 127:5
  127:21 134:22 139:25 154:13
  211:23
**early** 135:10
**easier** 11:12
**easiest** 117:18
**easily** 63:16 195:15
**easy** 113:2 193:4
**effect** 87:25 140:25 159:24
  160:12 211:15
**efficient** 128:21
**eight** 9:9,10,10,10 42:11 43:3
  47:4 50:4 174:9 188:5 194:3
  196:7 198:12
**eighteen** 190:4
**eighty** 49:2,2 164:2,3,4
**eighty-** 48:10 49:2
**eighty-five** 39:8
**eighty-one** 31:11 37:11 49:2
**eighty-seven** 48:19 105:22
**eighty-six** 37:7
**eighty-two** 49:3
**either** 10:15 15:8 83:6 97:2
  134:14 161:15 165:9 195:21
  206:16 212:14
**eleven** 122:3,15
**Elizabeth** 8:2
**emergency** 152:19
**emphasizes** 163:22
**employed** 19:18 53:3
**employee** 58:16,22 59:12 63:6,7
  71:10 73:11 94:18 95:8,9
  100:12,15 118:15 151:5 152:20
  163:18 165:6,8 180:25 181:4
  181:25 182:8 183:10,13 188:3
  188:4,8 189:10 198:12 210:22

210:24
**employee's** 72:16
**employees** 16:17 57:16 62:20
  63:4,10 64:2,8,10 71:4,8,11
  71:12,13,16,18 72:2,10,14,20
  87:9,20 95:3,7,9,9,15,16,23
  96:2 102:2,21 112:16,20
  114:17 122:5,12 124:14 137:5
  138:14,15,16 160:4,20,22
  161:2,15 162:3 165:7,17
  178:25 179:13,16,23,24 180:2
  180:3,6,13,14,16 184:13,16
  185:12,20 186:20,23,23 187:15
  187:18 188:23 189:3,5 198:15
  200:6,7,18 201:23 202:5
  210:18 211:21
**employees'** 116:25 163:23 180:9
**employer** 52:20 59:15 113:4
  165:10 179:3,8,22 180:24
  181:4,12,24 182:9 189:13,17
  201:20 202:6 210:23
**employer's** 87:12 181:9 182:6
  189:13,16
**employment** 118:9
**employment-related** 57:14
**employs** 71:14
**enabling** 67:11 68:4
**ended** 26:18
**enforcement** 162:22
**engaged** 145:15
**engaging** 66:23
**enlightened** 184:16,17
**enterprise** 11:24 122:19 153:16
  196:8
**Enterprises** 1:4 9:9 11:20 12:8
  12:11,14 14:6,11,18 17:25
  18:2 20:25 21:12 24:13 25:10
  28:9,10 40:9,14,18,21 43:17
  43:24 44:7,10,20,24 50:11
  55:2 57:10,11,22,23 58:11,14
  58:17,25 59:4,5,7 60:2,4,5,11
  61:10 66:2 84:14 99:4 100:5
  101:25 107:22 108:16 110:7,8
  115:16 126:15 129:23 138:25
  144:17,17,18 151:8,8,10 159:9
  163:14,16 165:17 167:4,5
  179:2,2 184:2 193:22,24,24
  195:22,22 198:9 199:5,10,22
  200:20,20 202:2,2,10 206:19
  209:13 213:15

**Enterprises'** 183:3
**Enterprises/John** 1:1 2:1 3:1
  4:1 5:1 6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1 93:1 94:1
  95:1 96:1 97:1 98:1 99:1
  100:1 101:1 102:1 103:1 104:1
  105:1 106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1 114:1
  115:1 116:1 117:1 118:1 119:1
  120:1 121:1 122:1 123:1 124:1
  125:1 126:1 127:1 128:1 129:1
  130:1 131:1 132:1 133:1 134:1
  135:1 136:1 137:1 138:1 139:1
  140:1 141:1 142:1 143:1 144:1
  145:1 146:1 147:1 148:1 149:1
  150:1 151:1 152:1 153:1 154:1
  155:1 156:1 157:1 158:1 159:1
  160:1 161:1 162:1 163:1 164:1
  165:1 166:1 167:1 168:1 169:1
  170:1 171:1 172:1 173:1 174:1
  175:1 176:1 177:1 178:1 179:1
  180:1 181:1 182:1 183:1 184:1
  185:1 186:1 187:1 188:1 189:1
  190:1 191:1 192:1 193:1 194:1
  195:1 196:1 197:1 198:1 199:1
  200:1 201:1 202:1 203:1 204:1
  205:1 206:1 207:1 208:1 209:1
  210:1 211:1 212:1 213:1 214:1
**enters** 112:4 113:7
**entertainer** 30:7 77:17,18,23
  78:3 86:11 87:15 104:7 137:4
  163:15 165:5 206:6
**entertainer's** 72:24
**entertainers** 16:15 17:18 28:20
  67:12 72:4,6,23 73:9 75:10
  89:24 113:11 117:25 162:6
  185:3,12 197:3 201:20,24

**entertainment** 13:24 14:9 45:23
  49:12 84:19 125:13 161:17
**entire** 31:25 49:8 63:12 131:13
  131:16 179:13
**entirety** 74:24
**entities** 6:23 21:15 27:20 38:20
  56:10 57:13,15,17 61:11 65:19
  71:21 73:24 100:10,17 122:18
  122:24 123:8 125:9 126:14
  129:21 145:2,14 150:25 167:15
  173:8 198:18 211:16,19
**entitled** 58:10 139:10 188:14
**entity** 17:4,17 21:17,21 24:17
  25:23 26:16 28:3 41:21 42:5
  43:14 124:13 126:7,11 155:21
  173:13 195:16 200:15,16,16
  201:21 202:7
**entries** 96:6 151:17
**envelope** 41:12,12,18 126:14
**envelopes** 41:11 44:3 126:13
  199:25
**Eric** 7:24
**error** 39:24 41:23,24 42:10,24
  43:2,2,6,25 44:20,25 48:9,13
  49:9 206:16
**especially** 56:14 207:5
**essence** 58:21 67:10 68:4
**Essentially** 155:22
**esta** 195:12
**established** 211:17
**establishment** 118:6 123:6 124:2
  134:24 195:11,12
**establishments** 66:22 67:10 81:5
  134:23 195:11,13
**estate** 168:21 169:10,20,21
  178:14
**estimation** 27:17
**estoppel** 203:9,18 204:3 205:17
**et** 53:2 58:11
**Eureka** 102:2
**evening** 166:15
**event** 128:25 152:19 174:12
**events** 152:6
**eventually** 28:14 147:12 174:17
**everybody** 72:18 93:18 121:3
  126:11 146:11 170:9,16 178:6
  181:22 182:11 197:8 202:14
**everybody's** 53:10
**evidence** 10:11 16:3 17:13 32:23
  103:5 105:7 106:17 107:9

108:5,21 125:25 126:20,21
  131:19,21 132:14,22 134:7
  140:21,22 151:14 201:13
  206:15
**evolved** 161:22
**evolves** 193:16
**evolving** 161:5
**exact** 33:4 56:10 69:9 152:18
**exactly** 20:3 22:7 24:11 27:23
  59:18 147:8 156:19 159:10
  160:3
**examination** 3:5,5,6,6,8,8,9,11
  3:11,12,12,13,13,15,16,16,17
  3:18,18 19:10 50:24 51:12,14
  52:16 70:21 79:21 84:8 89:5
  98:7 101:10,20 119:15 125:5
  138:2 144:9 167:25 176:18
  178:22 184:10 185:8 186:16
**examine** 130:5
**example** 54:4 111:7 145:25 164:2
  174:10
**exchange** 76:8 136:9 197:23
  206:4
**exclusively** 167:20
**excuse** 10:7 12:23 157:18
**excused** 52:4 83:10,16 143:4
  185:25 186:10 190:15
**executed** 14:22,24 15:8
**executive** 86:25 112:11 117:16
**exhibit** 11:11 12:2,9,15,25 13:8
  13:14 31:12,16 32:22 33:2,5
  34:16 36:9 68:12,25 69:15,18
  70:13 98:12,18 101:14,18
  103:3,9,19,21 104:3,4 105:6
  105:12,23 106:2,16,19,21,24
  107:6,11,13,18 108:4,8,10,13
  108:20,24 109:2 125:15 132:16
  143:20 157:21 158:2 198:22
  199:14 208:25 209:2,3
**exhibits** 101:4,9 155:11 158:15
**exist** 27:21 183:22,24 197:24
  198:2
**exists** 60:8
**expensive** 27:11
**experience** 141:21,22,23 142:6,8
**expert** 53:18,19,21 55:11,17,18
  56:4,5,6,13,15 61:2 64:17,19
  74:5
**expertise** 165:3

**expiration** 104:13
**explain** 53:10  54:4,13  56:25
  66:12  87:23  95:5  123:2  140:5
  144:11
**explained** 54:8  205:24
**explaining** 146:22
**explanation** 51:15  146:8  150:19
  150:21  199:8,22  201:4
**Express** 112:3  163:25  164:5,5,11
  164:13,24
**Express's** 164:8,9,13
**expression** 16:8  123:14
**extend** 14:23  15:4
**extensions** 191:23
**extent** 15:22  77:3  130:17
**extinguished** 116:7
**extra** 102:15
**extraction** 40:3
**extrapolated** 39:24  41:23

---

### F

**F** 3:2  4:13  13:14
**F.L.S.A** 179:11
**facilitate** 67:2
**facilitates** 71:3
**facing** 177:16
**fact** 11:9  14:3  16:14  53:17
  55:13  62:20  63:3  64:8  71:24
  95:12  112:10  126:14  140:21
  148:20  169:17  174:3  176:22
  179:13,16  180:16  181:24
  193:15  194:13  201:13  205:4
**facts** 16:12,12  55:15  65:9  129:3
  129:13  140:21  146:23  147:9
  156:21  159:19,21  170:20,23
  195:8  206:12  211:22,22
**factual** 56:19  61:18  62:7,13
  64:11  65:3,16  159:18  210:20
**factually** 56:8  79:25
**fail** 62:24
**fair** 58:18  59:10  122:13  167:19
  184:14  185:10
**fairly** 86:21  152:9  209:8
**fait** 179:12
**familiar** 55:4  159:12  168:19
**fans** 141:3
**far** 56:22  62:10  71:21  100:20
  118:14  119:6,23  135:13  162:23
  163:3,8  187:24  199:21
**favor** 187:11,12

**faxed** 208:7,10
**February** 1:7,13  9:15,16  131:10
**federal** 32:12  52:24,25  57:18
  60:8,9,16  61:7  63:20  86:14,18
  87:16  112:24  118:7  163:21
  167:18  179:25  180:5  183:8,14
  188:22  195:7
**fee** 30:8,9,10,11  75:9,10  77:15
  77:21  80:17  86:3,10  89:25
  90:2,10,17  162:12  164:6
  197:18,20,21,23  202:13,15
  203:3
**feel** 166:11
**feels** 195:14  209:15
**fees** 23:11  26:7,10,11  31:7  73:6
  73:9,19,21  80:17,23  104:15
  112:5  182:14,16  188:10  194:21
  195:3  196:9  197:18
**felt** 161:13  174:21
**fiduciary** 113:14,15
**field** 134:16  150:10
**fifteen** 136:25  163:6  180:6,7
**Fifth** 2:5
**fifty** 121:3  156:5,12  199:16,18
**fifty-four** 108:11
**fifty-one** 42:18
**fifty-six** 47:25
**fight** 88:16
**fighting** 196:18
**figure** 48:4  64:4  87:22  143:22
  193:2  200:5  203:7  205:20
**figures** 34:18
**file** 4:15  18:12  32:2  33:17  35:8
  62:25  68:24  107:3  127:24
  207:3
**filed** 11:4,20  12:4,18  13:4  54:7
  54:13,20,23  55:5,7,8,9  57:15
  58:17,25  59:3  60:2,9  61:13
  62:23  63:19,21,25  64:6  68:13
  87:24  88:14  191:24  192:2,3
  193:6,7,7,9  194:19  202:14
  208:3
**files** 5:2  125:12
**filing** 59:4  61:21  191:25
**filings** 62:22  195:6
**fill** 180:3
**final** 12:10  13:9  65:6,7  212:16
**finally** 17:6  48:7  150:4  212:5
**Finance** 19:20  84:23

**finances** 100:19
**financial** 67:6 100:18 114:5
 164:9,20
**find** 35:24
**finding** 41:19 189:4
**findings** 156:4
**fine** 8:25 52:3 69:13 99:17
**finish** 150:6 199:19
**finished** 70:11 95:19 157:14
 183:16
**first** 9:21 10:3 13:22,23 16:9
 17:24 18:20 19:24 20:5 21:5
 29:23 34:16,23 51:19,23 52:5
 53:9 57:17 59:24 75:19 80:16
 104:3,4 143:18 149:3,11
 160:21 169:11 194:9 208:7
 209:9 210:12 212:10
**first-hand** 56:19 62:16
**fit** 161:15
**five** 9:10 20:6 35:4,5 48:7,8,16
 48:16 51:6 61:5 79:5,6 80:25
 90:18 93:17 102:6 117:11,12
 118:10,21 156:7 199:15
**five-minute** 51:2,10
**Florida** 52:23 128:10
**foggy** 154:23
**FOIL** 160:23
**folks** 205:12
**follow** 9:20 10:23 33:6 84:20
 86:20 113:2 142:16
**follow-up** 204:18
**followed** 10:3
**following** 10:10 87:10 134:7
**food** 114:2 200:24,25
**footnote** 112:11
**forbid** 152:6
**foregoing** 214:4,6
**forever** 155:23
**forget** 176:2 181:5
**forgot** 169:11
**forgotten** 130:22
**form** 50:14 155:10 181:5,6
**former** 57:16 58:16
**forms** 138:24 180:3
**forth** 201:8
**forty** 152:11 155:16 166:16
 174:8
**forty-eight** 48:8,17
**forty-five** 121:2

**forty-four** 35:3,16,19 37:6 50:6
**forty-one** 138:24
**forty-six** 32:11 37:12
**forty-three** 42:19
**forum** 59:20
**found** 38:5 45:12 48:18 150:17
 160:21
**foundation** 144:3
**four** 5:13 9:10,10 30:17 35:4
 36:25 37:4,5,6,16,19 39:7
 42:11 43:3,12 76:16 84:25
 90:18 94:22 99:12 116:4 119:8
 143:20 147:4,13 148:19,21
 155:24 156:13,19 157:21 158:2
 158:4,15
**four-five** 99:13
**fours** 77:24
**fourth** 117:21
**Frank** 9:6 168:17 169:12,14,15
 169:20 171:10,17 176:6,21
 178:7 194:10 203:16 204:9
**frankly** 148:10
**free** 57:19 80:19 162:25 202:20
 202:20
**friend** 153:4 169:17
**friends** 198:14
**friendship** 152:2
**front** 45:14 78:18 79:11 111:14
 127:24 130:8 135:15,18
**full** 26:19 147:13
**fulltime** 53:3
**fully** 55:4 74:6 168:18
**function** 29:25 70:24,24 139:15
 140:3,8,10 173:12 198:11
**functions** 57:23,24 65:24 126:7
 177:5 198:16 200:8 201:17
**funds** 210:24 211:3
**funny** 13:23 16:11,21 17:20
 136:9,11 140:15 194:7,8
 195:24
**further** 18:9 50:21 79:17 81:16
 81:17 83:5 98:2 103:10 119:10
 119:13 123:13 137:21,23
 142:25 176:14 178:17 184:4,8
 185:5,22 190:11,13,17,20,22
 192:13,16 212:14,16 213:4,10
**future** 138:5

| G |
|---|

**G** 3:2  4:14  31:13,14,16,20  32:22

33:2,5 34:16 36:9
**G-E-E** 7:25
**G-R-I-L-L-O** 9:6
**G.N.H** 146:13
**Gee** 7:24,24
**general** 67:2 74:14 134:14
 140:15 141:19
**generally** 10:11
**generated** 147:25
**generic** 100:5
**Genovese** 21:7,8,11,24 23:20
 25:3 26:6,15 134:15 149:6
 152:16 162:8,9
**Genovese's** 25:22 28:9
**getting** 95:10 113:11 150:4
 153:16 156:16 181:6 197:11
**gift** 85:20 114:12
**girl** 89:22 91:9 102:6 117:6,11
 118:23 119:4 136:14,14,25
 137:2,8 138:22 166:24 190:8
 201:5
**girls** 89:21 93:16,20,22 116:22
 117:13 136:23 162:15 187:24
 195:23,25 197:19
**give** 7:22 23:12 31:17 33:21
 36:2 58:12 77:16 82:12,15,19
 86:5,10,11 93:17 98:9 117:11
 117:12 120:13,14 130:9,16
 136:14,14 138:11 150:3,12,20
 153:23 155:7 161:11 162:17
 163:25 166:9,10,11,13,14
 170:5 208:20 211:6,8,9
**given** 21:19 137:16 166:16
 177:12 199:25 204:24
**gives** 15:5 163:3 189:7 201:22
**giving** 15:23 129:25
**glad** 129:2
**gladly** 129:13
**glasses** 98:22
**Glen** 151:10
**Glenn** 128:7,7 158:20 159:3
 196:12
**go** 10:20 27:9,13 28:2 29:23
 40:2 41:13 43:13 47:11,15
 48:4 51:5,19 53:16 66:5 67:23
 68:6 75:22 81:5 82:6 83:18
 84:17,17 86:2 89:25 92:13,14
 92:14,21 94:4,12 95:6 98:25
 108:3 112:16,25 115:7,19,20
 116:12 117:10,18 121:2 135:16

136:13 139:17 141:6 143:20
 145:10 148:24 153:19,21
 162:13 166:22 173:22 179:21
 180:23 181:10 182:2,25 184:21
 186:15 187:23 190:3 191:4
 196:8,19 199:14,16 206:2,5,5
**God** 152:6
**goes** 77:16 93:16 100:19 113:16
 136:4 138:9 145:3 166:20
**going** 6:5,16,24 8:13 9:20 10:23
 15:23,24,25 16:13 17:12 26:20
 27:25 33:3 49:14 51:25 54:3
 55:20 60:24,25 61:3 62:2,6
 63:11 64:15 65:8 68:11,20
 78:8 91:24 92:8,9 95:6 103:17
 104:6 105:21 114:25 118:8
 119:24 123:17 125:11 126:22
 127:4 131:19 132:6,23 134:7
 136:18 139:2 141:8,15 144:3
 168:19 175:20 177:10,11
 179:10,12 180:11 182:20
 184:21 188:23 192:25,25 193:3
 193:4,19 194:24 197:3 198:13
 199:8,19,20 200:5,10 201:22
 205:14 206:2 211:3 212:15
**good** 16:5 18:25 19:2,12,13 36:3
 51:15 72:18 89:22 104:14
 121:10 168:8 169:17 171:15
 174:10 196:23
**government** 84:25 85:5 86:25
 87:16 113:17 118:7,13,15
 182:7 188:17,24 189:14
**governmental** 167:14 178:5
**Graduated** 84:16
**granted** 203:24
**gratuities** 61:16,21 67:3,8 68:4
 71:3,5,7 72:17 73:3,9,15
 182:15 189:10 194:22
**gratuitous** 211:4
**gratuity** 59:12 67:12 72:24
 73:14 86:24 87:9,11 88:19
 109:23 112:13 113:5,23
 114:14 189:18 190:4 195:2,21
 196:5,16,18 197:24 198:4
**great** 77:2
**greatest** 88:4
**greatly** 161:22 163:22
**green** 146:13
**grilled** 146:6

**Grillo** 8:13,17  9:6
**gross** 34:25  42:15  48:5,10,11,17
  50:7  87:12,14  112:12,21  114:6
  114:13  165:12  173:4,16  180:8
  180:8  183:5  189:13,17
**guaranteed** 148:25
**guess** 27:14  95:5  113:19  142:15
  161:5
**guy's** 154:16
**guys** 89:21  93:15  165:13

---

### H

**H** 4:2,16  101:15,16,18  103:3,4,9
  103:13  198:22  199:15
**half** 110:11  137:2
**hallway** 6:6
**hand** 19:3  52:9  59:13,14,17,17
  60:15,17  76:4  84:3  85:19,21
  103:13  105:12  109:7  143:9
  167:16,17  177:12
**handed** 76:12
**handing** 69:14  103:21  106:2
**handle** 72:11  86:23  209:17
**handled** 71:22  155:18,21
**hands** 146:3
**handwritten** 28:19  29:4
**happen** 78:8  102:18,19,20,23
  117:15,16,16  129:15  188:7
**happened** 85:20  102:3,13,22
  149:22  155:22  194:23
**happening** 161:6
**hard** 16:4  80:23  92:9  178:5
**harmony** 162:11
**Hart** 87:4
**head** 74:13  77:4  138:19,21
  146:21  148:4
**hear** 9:18  129:8  157:23  193:19
**heard** 124:18  153:15  164:16
  175:23  198:9  211:24
**hearing** 4:8,13  10:13  12:12,13
  13:10,12  52:18  54:7,23  61:23
  125:21  128:21  130:7,9,11
  190:25  191:15  214:8
**held** 29:21  31:3  54:5  148:2
  164:17
**help** 138:15  186:23
**helping** 138:14
**helps** 158:23
**hereof** 214:6
**hereto** 214:5

**hereunto** 214:9
**hey** 88:15  155:4  162:16
**Hi** 121:24,25
**high** 81:2
**higher** 48:12  137:15
**hired** 161:16  171:21  202:7
**history** 53:11  161:11
**hit** 93:25  94:2,3  152:6
**hitting** 92:4
**Hodgson** 145:21
**hold** 31:7  54:7,21,23  55:6
  107:19  123:20  132:13  141:15
  146:25  188:9  198:8  205:10
**holder** 81:8
**holding** 160:22  205:15
**Holdings** 99:9  155:13
**holds** 142:10
**Holland** 138:23  186:25  201:5
**honestly** 119:5
**Honor** 50:25  51:13,21  53:20
  54:15  56:9  70:11  81:14,20
  83:17  98:6  101:2  103:7  121:14
  125:20  128:5,14  132:8  137:25
  142:22  190:18  192:17  209:7
  213:12
**honored** 104:12
**hooked** 154:12
**hope** 130:15  177:11  193:2
**hopefully** 34:13  38:22  77:9
  164:11  203:6  205:19
**host** 96:11  166:23
**hour** 118:10  137:2
**hours** 201:22
**housekeeping** 206:22
**hundred** 31:10  35:4,5  39:7  42:18
  46:8  47:4,4,12  48:16,17,19
  76:16  77:11,14,15,19,22  81:25
  82:23  84:14  86:3,4,10,17
  91:16  92:17,24  93:18,24
  101:13  102:11  104:5,6,10
  105:22  107:14  108:11  116:2,13
  117:11  162:19,20,24  166:18
  181:11  182:4,8  188:14  189:6
  199:6
**hundreds** 197:6  201:8
**hustler** 87:3

---

### I

**I.D** 21:19  38:3  123:8
**I.R.S** 91:11,14,17  97:5,11

115:12 119:19,20,23 120:4
  189:25 190:2
**iceberg** 193:15
**idea** 72:9,13 93:19
**identical** 99:10 100:2
**identification** 31:12,16 68:12
  98:12,18 101:13,18 103:17,21
  105:22,25 106:8,21,24 107:13
  107:18 108:10,13 125:12,25
  132:2,15,23 143:20
**identify** 126:23 143:23
**identifying** 57:6
**II** 19:23
**illegal** 102:18 115:8,13
**illegally** 167:6
**immediately** 152:7
**implement** 85:2
**implication** 193:8
**important** 51:17 84:24 86:20
  112:7,8
**importantly** 17:7
**impossible** 182:2
**impression** 16:9
**in-charge** 150:9
**inaccurate** 64:21
**inadequate** 29:5,15 39:25 40:25
  44:17 49:20
**include** 32:3 62:25 87:12,13
  114:13
**included** 32:8 43:19 87:14
  117:14 130:7,9 165:12,22
  173:4,16 183:5
**includes** 11:21 12:19
**including** 37:8 168:16 211:11
**income** 16:22,24,25,25 17:2
  86:15,18 164:3,19 165:22
  179:25 189:11 202:11
**incomplete** 27:3
**Incorporated** 45:23 171:12
**incorrect** 184:19
**incorrectly** 147:4
**increased** 43:10
**incredible** 205:8
**incrementally** 80:21
**incur** 96:13
**incurred** 82:14
**incurs** 80:15
**independent** 16:16 63:4,7 64:6
  87:7 100:21,23 112:15 137:7
  160:4 161:14 210:17

**independently** 139:13 140:7
**indicate** 206:7
**indicated** 110:22 135:6
**indicates** 72:7
**individual** 30:5 38:3 41:16
  159:18 204:4 206:9
**individually** 35:25
**individuals** 7:22 201:16
**individuals'** 165:22
**industries** 84:19
**industry** 85:7,8 91:18 115:13
  161:18
**influential** 154:7
**information** 16:2 20:15 21:19
  24:12 25:5,9,23 26:10,16
  33:10,11 41:7 48:6 49:7 56:8
  106:6 107:15 123:23 135:6,13
  185:4 203:20,23 204:22
**informed** 24:16 25:2 26:3
**initially** 24:8,25 25:7 28:14
  179:14
**inquired** 26:7
**ins** 172:13
**insisted** 168:23
**instance** 97:17 123:7
**instruct** 170:6
**instructed** 62:5
**instrumental** 154:7
**insurance** 185:17
**integral** 27:19 70:24 71:2
**interaction** 85:13
**interest** 68:2 72:16 100:12
  151:4
**interested** 62:13 65:9
**interestingly** 62:24
**interests** 100:7
**interfere** 92:8
**interject** 56:2 91:25
**interlocking** 211:19,20
**internal** 32:12 84:20
**interpleaded** 59:7
**interpleader** 58:25 59:2,4,8,19
  60:4 87:24,25 167:10,12
  188:18
**interwinds** 86:22
**intimate** 154:8
**introduce** 9:22
**investigation** 58:3 65:20
**involved** 17:16 20:10,16,24 21:2
  25:24 26:16 30:3 76:13 127:15

127:17 144:13 155:14 156:25
161:7 168:9 178:5 203:16,18
205:5
**involvement** 20:21
**issue** 13:19,22 14:2,3,20 15:2
15:10 18:3 35:12 53:12 54:9
57:3 86:22 91:16,19 112:10,14
117:17 120:8 144:15 145:22
146:10 149:23 150:7 159:14,16
160:18 169:18,19 180:17
184:25 185:11 186:19 193:21
193:25 198:5 204:9 209:8,15
210:9
**issued** 12:20 50:10,18 99:15
116:8 129:22 150:16 176:3,10
**issues** 11:22 15:11,16 18:4
56:19 62:14 64:11 91:23 99:22
99:23 144:24 147:14 178:4
205:21 206:11
**issuing** 205:15
**it'd** 63:20
**it's** 153:16 175:14
**items** 14:13 76:4

---

**J**

**J** 4:19 105:23,24,24 106:2,9,16
106:19
**Jack** 2:8 3:3,5,6,8,11,12,16,17
3:19 6:15,18 7:11,13 8:4,4,18
8:17,21,24 9:3,6,21 11:15,17
11:19 12:3,10,16 13:2,9,15,16
13:22 15:12 16:6 18:19,21
19:9,11 31:9,14,18,21,22
32:21 33:3,8 50:21 53:16 54:5
54:18,19 55:4,10 60:24 62:21
64:25 65:3 70:18,20,22 79:16
79:23 80:3 81:16,17 83:7,12
83:15 89:2,4,6 92:13,15 94:5
95:22 97:25 101:6,7,10,12,16
101:21 103:2,5,10,16,25 105:3
105:6,21 106:4,10,13,16,20,25
107:5,8,12,20,24 108:4,9,14
108:19,25 109:4 119:10 125:2
125:4,6,15,18,24 126:22 127:3
128:13,16,24 129:11 130:5,12
130:15,19,24 131:22,25 132:5
132:17,21 133:4 134:6,11
137:21 140:20 142:21,25 143:2
143:21 151:14 152:14 156:24
157:19 158:10,12 167:23,24

168:2 169:13 171:8 177:8,10
178:19,20,23 184:4,6 185:23
190:12,14,20,22 191:2 192:13
192:14,19,20,24 199:3 206:21
207:5,17,19,25 208:6,11,18,22
210:10 212:2,17,18,19 213:9
**Jack's** 125:21 212:7
**Jane** 116:3,5,6
**January** 98:19
**Jenifer** 127:11
**Jennifer** 3:7 21:7 52:7,12,21
62:18 64:20 65:15 68:19 69:3
135:11 161:9
**Jersey** 94:25 102:25
**Jessica** 102:2 198:24,24
**job** 139:15
**Joe** 145:17 146:20 147:8 148:7
149:12 156:23
**John** 1:10 3:10 8:8 9:8 12:17,22
13:8,11,13 50:18 83:24 84:6
84:10,13 87:23 93:25 98:9
99:7,19 100:6 119:17 151:9
152:23 154:6,12 155:11 167:4
167:5 169:7 171:21,25 176:7
186:6,8,14 188:6 193:22
194:14,20 213:14
**John's** 153:4
**journal** 151:17
**judge** 6:7,15 7:13,20,21 8:12
9:18 11:15 13:17 15:11 31:9
31:21 32:22 33:6 53:16 55:10
60:24 62:21 70:20 76:7 79:17
80:3 81:17 83:7,8 88:9 89:4
98:2 101:12,14 103:3,11,16
105:4 106:14 107:6,12,25
108:20 117:20,22 119:11 125:4
125:11 128:13 129:15 134:6
137:22 140:20 142:21 143:2,21
157:24 158:13 167:24 170:11
174:19 175:11 176:14 177:8
185:23 190:14,22 191:2,3
192:14,20,25 206:20 207:5,17
208:19
**judgment** 5:9 55:6 60:14
**juice** 117:8
**July** 1:16 98:21 129:6 207:24
208:2,25 209:2 212:9 214:10
**June** 11:25 12:14,23,24 13:13
193:7,8,9 207:20,21,21,22
208:3,13,19

**jurisdictional** 9:22  11:18  12:11
  12:17  13:10,17
**jurisdictions** 65:6
**justice** 169:24
**justifying** 201:6

---

## K

**K** 4:21  97:9  106:21,24  107:8,11
**K-I-N-S-L-E-Y** 52:22
**KATHERINE** 214:3,13
**keep** 16:15  33:2  72:14  90:24
  91:2,3  93:3,5,10,11,13,14,20
  94:6,8,15,16  139:8,8  155:6
  180:18  202:19,25
**keeping** 144:24
**keeps** 41:11  75:8,17  76:15  77:20
  85:16  193:17
**Kennedy** 198:24
**Kentucky** 53:4
**kept** 91:4  149:24  157:3
**key** 16:14  176:22
**kind** 177:11
**Kinsley** 3:7  52:7,11,12,21
**Kline** 145:20
**knew** 171:24
**know** 7:10,10,12  9:5  25:12,15
  26:12  27:5  45:13  66:4,18
  71:22  94:11  95:8  97:5  99:12
  102:6  107:18  110:2,19  111:10
  112:7,12  113:13  117:24  119:3
  119:6  123:5,13  124:16  127:8
  134:23  136:19  137:13,17  138:7
  138:19,24  139:9,11,23  140:10
  140:14,15  141:21  142:19
  144:12,23  148:20  149:9  153:25
  154:4,8,9  155:13  156:25  157:8
  160:10  162:5  165:25  171:13
  174:3,5  177:3  179:19,20
  181:12  187:15  188:2  189:21
  193:15  200:4,11  204:6  205:4,8
  209:20  210:12  211:4  212:3
**knowing** 160:13  203:14
**knowledge** 56:20  57:21  62:8,16
  65:3,10  73:24  102:23  107:4,23
  108:18  141:19  151:9  154:9
  158:22  165:23  181:23  182:9,11
**knowledgeable** 159:5  181:24
**known** 81:4  151:22  152:11  154:6
  168:12  170:2
**knows** 55:15  66:14  85:5  170:9

---

## L

**L** 4:22  107:13,18  108:2,4,8
**L.L.C** 125:13
**labor** 53:13  58:18,19,19  59:10
  59:11,16  60:15,22  61:12  84:21
  84:22  86:21  122:13,13  163:22
  167:18,18,19  183:8,14  210:25
**Lace** 38:13  45:10,23  46:2,5,8
  48:23  49:12,16,23  100:11,13
  125:10  133:6,12,15,16,20
  135:3  151:2,11  153:20,20
  193:25  195:22  200:2  202:2
**lack** 140:4,5
**landlord** 137:9
**language** 140:25  159:24
**lap** 194:8
**laptop** 15:21
**large** 145:7
**larger** 58:24  211:8
**Las** 84:17
**lasted** 99:11
**Lat** 194:15
**late** 175:23  193:11,12
**lately** 92:12
**law** 1:7,13  9:14,18  20:24  52:23
  53:2,4,5,8,8  56:23  58:19
  59:11,16,17  60:15,16  84:22
  86:22  87:16  114:14,21  118:11
  149:25,25  153:5,10,15  178:2
  178:11  179:25  180:5  184:22
  187:23  188:2,21,22,22  210:25
**laws** 161:22
**lawsuit** 58:17  59:25  60:9  161:10
  180:12  184:18  185:15
**lawsuits** 57:7,13,14  161:8
**lawyer** 148:16
**lawyers** 114:23
**lay** 144:3
**lead** 126:14
**leader** 19:24
**leases** 161:18
**leave** 102:5,6,16  139:7  146:5
  181:11  210:2
**led** 25:10
**ledger** 74:21
**ledgers** 74:15,16
**leeway** 126:3
**left** 8:17  76:22  86:8  100:10
  114:4

**legal** 54:9 56:7 58:24 70:7
  74:11 116:14 123:5,13 181:22
  188:10 210:9
**legally** 117:6
**length** 170:17
**let's** 22:13 33:22 43:13 75:14
  77:12 91:6 112:25 118:4 123:7
  129:8 145:5 182:12 212:10,11
**letter** 12:7 13:3,7 18:7,9 129:6
  145:3 147:24 149:3 155:12
  156:16 158:4,6,9 203:10,12,21
  204:22,23 205:7 212:9
**letters** 149:14
**level** 150:9 152:17
**liability** 29:9 30:24 51:16
  194:17
**liable** 85:4
**license** 178:12
**licensed** 52:22
**licensure** 56:3
**life** 88:5 188:25
**light** 209:25
**limit** 67:16 68:6 166:19
**limitation** 15:4
**limitations** 14:23
**limited** 166:25
**limits** 67:24 72:17 191:24
**line** 19:24 20:5 65:5 102:15
  104:8 109:25 110:5,10,13,15
  111:2,4,7 144:6
**lines** 89:9 140:12 186:21
**liquor** 22:19,20 140:11 172:20
  172:20 178:2,11
**list** 52:24 74:21 155:6
**listed** 43:14
**listen** 84:18 119:25 154:23
**listing** 60:3
**literally** 136:6
**litigated** 114:22 203:16
**litigating** 203:12 205:14
**litigation** 56:10 58:5,8 203:16
  203:18
**litigations** 54:9,12 57:2,2
**little** 23:6 37:9 45:6 49:6
  51:20 53:11 54:20 112:11
  126:2 139:24
**live** 52:20 84:11
**lived** 187:2
**lives** 139:18

**LLC** 127:6
**LLP** 2:4
**loan** 96:25 97:2
**loans** 96:22
**local** 53:24 56:5,6,14
**locate** 36:12,13
**located** 144:22
**location** 104:13
**locations** 66:21
**long** 8:25 19:25 52:24 85:6
  148:24,24 149:4,12 154:6
  168:10,13
**longer** 21:9 40:4 171:20
**longstanding** 57:7
**look** 22:23 33:20 34:15,16,23
  40:6 42:6 43:24 46:16 61:13
  62:22,22 69:5 74:8,14 78:3,9
  78:14 89:21 109:16 119:22
  122:5 127:23 128:6 155:12
  162:19 166:3 175:14 191:5
  193:2,14,16,18 196:2 203:21
  213:4
**looked** 35:15 40:9 46:12,15
  73:23 74:7,9,10,10,11,17,19
  74:20,22,23 124:3 151:15
  160:15 173:24
**looking** 16:2 20:14 22:2 25:3,11
  26:9,24 27:17 36:25 45:12,18
  46:11 49:4,13 69:9 78:21
  168:8 170:4
**looks** 47:24 109:21 179:11
  208:12
**lose** 114:23,25 189:19 190:10
**loss** 16:22
**lost** 54:20 152:22 178:13
**lot** 38:20,21 41:16 60:3,7
  123:24 128:19 135:12 138:20
  141:25 151:14 152:10 210:15
  210:16
**lots** 65:19
**love** 114:23
**loves** 86:25
**low** 80:25
**lunch** 120:19 121:5,11 151:14
  181:10 182:3
**Lyons** 8:2,2

---

| **M** |
|---|

**M** 4:24 108:10,13,20,24 109:2
**M.L.B** 17:4 38:13,24 39:2,4,5,10

39:12,16,17,20 40:9,14,17,21
41:15,19 42:5 45:8 49:23
57:10,23 60:2,3,10 66:2,10
67:5 71:15 72:2,6 81:10 85:13
100:8 115:16 118:17 124:5,6,8
125:10 127:17 135:2,11,11
138:22 144:16 145:13 151:2,8
153:21 154:4 155:17,21 156:6
165:20 166:4 172:4 179:2
193:23 195:21 196:21 198:20
199:5,9,13,15,21 200:2,7,9,20
201:19 202:2
**M.L.B.'s** 67:14 153:19 200:7
**Macalusio** 147:7
**Macalusio's** 156:3
**Macaluso** 99:13
**machine** 66:6,7 67:19 82:6 86:2
90:2 93:4,8,9,16,17 117:3
126:10,11 135:24 155:6 198:10
198:10 205:24
**machines** 67:9
**Macy's** 164:14
**mailing** 212:3
**maintain** 72:2,5,6
**maintains** 14:25 15:7 96:5
**majority** 30:21
**making** 20:13 102:19 124:19
181:20 192:19 200:12 203:10
**management** 18:5 20:15
**manager** 115:21 136:17 139:22
**mandatory** 73:19,20 190:3,4
**Manhattan** 59:19,22 60:10 61:8
63:21 118:20 195:6
**Manian** 148:3,5
**manner** 156:20
**Marcello** 211:13
**Marcelo** 145:11,11
**March** 1:7,13 9:15
**Marchello** 168:17,20,22 169:3,15
169:20,20 170:19 171:10,17
172:23 173:2 174:10,17 175:2
175:7 176:6,21,22 177:4,25
178:7,7,13 194:10,14 203:17
204:10 211:11,12
**Marchello's** 169:11
**mark** 11:11 31:15 68:11 98:11,17
101:17 126:21 132:15 145:20
208:23
**marked** 4:2 31:12 69:18 107:17
132:4 143:19

**marking** 98:19,20 103:20 105:25
106:23 108:12
**Martians** 160:5
**MasterCard** 112:3
**matches** 91:10
**math** 75:11 77:2
**mathematical** 77:4
**mathematically** 86:16
**matter** 1:3,9 9:8,19 10:2 12:8
12:12,14,22 13:7,11,13 21:3
54:21 55:6 56:11,20 63:13
87:16,20,20,21 114:14 146:16
169:16 183:10 194:16 213:14
**matters** 56:7 57:14 61:6 159:3
204:7
**maxed** 86:7
**meal** 181:11
**mean** 20:17 21:2 23:11 25:13,16
25:21 27:6 28:7 29:12,12,23
29:25 35:2,14 38:14,16 39:19
41:24 43:24 46:18,24 53:17
54:19,20 55:10,16,25 60:20
61:12,17,23 62:21 71:6,7 74:5
75:11 76:5,6 79:3 90:24 95:24
103:17 119:24 126:10 140:5
143:23 168:23 172:2 173:19
174:12 175:3,11 178:20 183:17
193:8,15 195:2,11,14 196:9,23
197:24 199:19,21 200:11,14,18
201:18,19 206:11,17 207:20
**means** 64:14 77:21 110:20 136:22
173:18
**meant** 18:7
**measuring** 199:9
**mechanism** 70:6 115:2
**meet** 128:16,18,25 129:11 191:22
**meeting** 129:6,7,7 145:16,20,22
145:24 146:11,19,25 147:11
148:6 150:8,13,14 192:8
205:12 212:6,10
**meetings** 21:16 176:4
**memo** 4:8 125:22 130:7,9
**memorandum** 14:21 17:7 209:14
**memory** 136:18
**mention** 174:22 199:7
**mentioned** 27:7 174:23 206:22
**merchant** 111:24
**merely** 153:2
**merge** 124:9

**merged** 124:5
**messed** 188:7
**met** 128:22 134:18 188:24
**method** 46:10 49:15 146:12
**methodology** 20:24 49:5
**methods** 49:22
**Metro** 1:1,4 2:1 3:1 4:1,20,21
  4:23,25 5:1 6:1 7:1,9 8:1 9:1
  9:8 10:1 11:1,20,23 12:1,8,11
  12:14 13:1 14:1,6,8,11,15,19
  15:1 16:1,22 17:1,3,24 18:1,2
  18:6,10,11 19:1 20:1,25 21:1
  21:12 22:1 23:1 24:1,12 25:1
  25:10 26:1,2,3,3,25 27:1 28:1
  28:8,10,13,17,21,24 29:1,16
  29:18,24 30:1,15,19 31:1 32:1
  33:1,10,12,18 34:1,2 35:1,8
  35:11,16 36:1 37:1,2,10,19
  38:1,2,17 39:1 40:1 41:1,16
  41:19 42:1 43:1,15 44:1,24
  45:1 46:1 47:1 48:1 49:1 50:1
  50:11,18,19 51:1 52:1 53:1
  54:1,11 55:1,2 56:1 57:1 58:1
  59:1,5 60:1,6,21 61:1,10 62:1
  63:1 64:1,12,16 65:1 66:1,2
  66:10 67:1,6,9 68:1,3 69:1
  70:1,24 71:1,17,20 72:1,5,20
  73:1 74:1,24 75:1,3,7,8,17
  76:1,9,10,13,15 77:1,13,15,20
  77:20,22 78:1,5,10 79:1,4,5
  79:24 80:1,8,10,12,13,14,15
  80:22 81:1,3,10,23 82:1 83:1
  84:1,14 85:1,11 86:1 87:1
  88:1 89:1,9 90:1 91:1 92:1
  93:1 94:1 95:1 96:1,6,16,20
  97:1 98:1 99:1,4,5 100:1,5
  101:1,24 102:1 103:1 104:1,23
  105:1 106:1 107:1,16,22 108:1
  108:16 109:1 110:1,7,8 111:1
  112:1 113:1 114:1 115:1,23
  116:1 117:1 118:1,3,16 119:1
  120:1 121:1 122:1 123:1 124:1
  124:6,7,19 125:1 126:1,15
  127:1 128:1 129:1,22 130:1
  131:1 132:1 133:1 134:1 135:1
  136:1 137:1 138:1,15,17 139:1
  139:2 140:1,2 141:1 142:1
  143:1 144:1 145:1 146:1 147:1
  148:1 149:1 150:1 151:1,2,10
  151:16 152:1,18 153:1,19,21

  154:1,6 155:1,21 156:1 157:1
  158:1 159:1,9 160:1 161:1
  162:1 163:1,11,14,15,18,19
  164:1 165:1,3,17 166:1 167:1
  167:4,5 168:1 169:1 170:1
  171:1 172:1 173:1 174:1 175:1
  176:1 177:1 178:1 179:1 180:1
  181:1 182:1 183:1,3,4 184:1,2
  185:1 186:1,22 187:1 188:1
  189:1 190:1 191:1 192:1 193:1
  193:22 194:1,4,20 195:1,23
  196:1,20 197:1 198:1,8,11,12
  198:16,20 199:1,12,20 200:1,2
  200:6,8,8,23 201:1,20,21
  202:1,10,16,21,25 203:1,4
  204:1 205:1 206:1,19 207:1
  208:1 209:1,13 210:1 211:1
  212:1 213:1,14 214:1
**Metro's** 26:5 27:16,18 28:25
  30:10,11 77:15 106:6 107:2
  152:15 183:5,6
**Metro's** 140:8
**metropolitan** 53:6
**microphone** 92:7
**middle** 46:20 91:11 150:18
**midnight** 137:15
**midst** 150:15
**might've** 159:4
**Mike** 99:13 147:6 156:3
**million** 18:17 35:4,16,19 36:7
  37:7,11,14,19,22,23 39:7
  42:18 43:12 49:24 50:4,5,6
  72:19 73:2 74:25 75:4,6,8,15
  76:10,11,14,16,21 79:5,6
  147:5,13 148:19,22 155:24
  156:14 174:5,6,7,8 194:3
  196:7 198:6
**millions** 88:6 196:19
**mind** 10:10 16:15 192:12
**mine** 91:7 170:24
**mingling** 153:24
**minimum** 112:22 118:12 162:12
  189:25 190:6 196:15 197:14
**Minnesota** 161:16
**minute** 21:23 34:9 37:7 88:16
**minutes** 29:13 51:6 61:5 121:2,3
  136:25 163:6
**mischaracterized** 184:15
**misconstrue** 212:24

**mistake** 85:3  178:7
**mister** 130:11
**misunderstood** 75:7
**mix** 168:6
**mobile** 82:7
**model** 57:22  65:20,24  178:24
**moment** 83:19  91:25  130:8  191:5
**money** 13:23  16:11,21  17:20
 59:11,14,14  60:22  71:9,17
 72:11,22,24  81:6  85:16  86:19
 86:23  88:7,11,11,12,17  89:16
 89:17,23  90:4  91:10  93:15,21
 95:13  97:15,16  102:5,7,8,9,16
 102:19,21,21  111:23  112:4,9
 112:10,12,22,23  113:7,16,19
 113:20  114:7,8  115:7,23  116:6
 116:24,25  117:2,2,4,5,7,14
 136:10,11,11,22,23  139:18
 140:15  152:22,24  153:19,21
 154:5  155:7  163:19,19,20,21
 163:23  164:13,14,14,15,17,22
 165:2,9,24  167:6,13,17,19
 172:10,21  180:19,24  182:24,25
 182:25  183:6,7,7,8,9  187:3,6
 190:10  194:7,8  195:25  196:4
 196:24  197:5,9,13  199:12
 202:17,21,25
**moneys** 198:20
**monies** 71:22  87:11
**monopoly** 136:11
**month** 164:12
**months** 40:11  47:18,25  97:5
 149:2
**moot** 146:11
**morning** 16:6  18:25  19:2,12,13
 57:9  121:19  122:17  151:13
 208:16,21
**motion** 5:9  11:5  54:7,14,21,23
 55:5  61:13  62:25  63:24,25
 68:9  69:4  88:14  193:5  204:15
 206:24
**motions** 11:3  62:23
**move** 65:12  101:3  130:5  157:19
**moved** 129:13  157:16,20,25
**moves** 32:22  106:16  107:6,25
 108:20
**multiple** 99:12  195:13
**music** 66:17
**mystery** 165:24

## N

**N** 3:2,2  4:2  5:2  125:16,17,18,19
 132:2,4,7
**nails** 67:21
**name** 7:23,24,25  9:5,17  21:19
 38:19  52:21  58:13  84:13  91:9
 100:2,5  116:3  128:7  138:16,18
 138:21,22  139:12  143:15,18,24
 144:5  158:9  169:11  178:13
 186:20  214:10
**named** 7:7
**names** 38:16  138:20  145:18
 151:12
**Nancy** 125:19
**nature** 28:25  53:25  146:15
**necessary** 20:15  33:17  67:14
 130:18
**need** 16:4  28:2,4,5  56:3  67:15
 74:5  122:5  145:10  152:7,12,22
 191:12  202:18  209:9
**needed** 21:21  28:6  30:13  136:15
**needs** 96:9
**negotiated** 73:11,13
**neither** 17:3
**never** 73:8  85:5  86:18  112:4
 113:7  114:23  116:25  137:5
 146:17  147:15  148:9  149:2,14
 149:16  150:14,17,18,20  152:23
 152:25  160:18  161:8  164:16
 169:18  173:24  183:5  184:3
 187:13  188:24  189:2  196:20,20
**new** 1:2  2:5,5,9  6:13,13  7:19
 19:19  30:15  37:3  53:13,14
 58:19  59:10  84:21,22  86:21
 87:5,8  94:22,25  102:24,24
 118:7  119:8  122:13  145:3
 146:21  148:4  167:14,15  174:25
 177:25  178:11  209:13  214:2
**night** 110:18  111:3  115:5,6,10
 115:18  116:20,23  117:13  153:7
**nightclub** 66:19
**nightclubs** 66:15
**nine** 43:14  47:25  101:13  102:11
 138:23  199:6
**ninety** 77:23  78:2,4,4  86:14,17
 95:13  117:5
**ninety-four** 48:8,16  103:18
 104:18
**ninety-nine** 91:17,20,21  97:9

**ninety-six** 48:2
**non-alcoholic** 66:16
**non-party** 6:5,8,11,14
**non-script** 146:10
**non-taxable** 145:23 147:19
**Nonie** 148:3,5
**noon** 137:14
**normal** 32:19
**Northern** 53:4
**note** 7:20
**notes** 129:19
**Notice** 4:8,13 5:5,7 11:22 12:12
  12:13 13:10,12 193:6 206:23
  206:25 207:8 208:2,13
**notices** 12:19 50:11,15,18
  150:16 207:20 208:5
**notified** 152:16
**notion** 56:4
**November** 46:24 47:2 191:21
**number** 6:3 21:19 34:25 37:14,18
  37:20,20,22,23 47:3,6 48:6
  57:13 58:11 77:12 109:6,12,18
  116:3,5 124:18 146:7 152:2
  161:7,8 181:5,6
**numbered** 36:16
**numbers** 9:9 35:2 50:3,6,14 77:4
  98:13,15 123:8
**NYS** 2:6

--- O ---

**o** 3:2,2 5:3 43:3 132:3,16
  134:10
**o'clock** 121:4
**oath** 51:11 121:18
**object** 60:25 170:14 209:25
**objected** 147:24
**objection** 32:24 62:4,21 80:3
  101:6,7 103:2 105:3 106:13,15
  107:7,24 108:6,22 125:20
  126:25 128:5 132:9 140:20
  142:21 177:8
**objections** 10:18 32:21 65:2
  103:6 105:8 107:5 108:20
  132:18 158:11,12
**objects** 133:2
**obligate** 167:3
**obligated** 203:4
**obligation** 128:9 183:4
**observation** 58:3
**observations** 58:2

**observing** 7:19
**obtained** 33:10
**obvious** 63:25
**obviously** 160:9 198:11 204:16
**occasionally** 84:22
**occur** 66:24,25
**occurred** 46:13 150:14 195:10
  204:24
**October** 47:2 191:19
**odd** 161:12,22
**offer** 11:20 12:17 31:10 56:8
  64:18 67:3,7,11 71:3 76:6
  101:12 103:17 105:21 106:21
  108:9 131:19 132:2 134:7
**offered** 27:6 105:23 132:11,20
  132:22
**offering** 125:24,25 126:20
  131:20 132:20,22,22
**offers** 12:3 13:2 107:13 126:25
  127:2 132:14
**office** 2:7 7:24 8:2,4 18:4
  128:22 137:19 138:6 141:4,11
  145:19 147:7 149:7 150:8
  207:14 212:2
**officer** 84:15 100:8,11,14 151:4
  151:7,10,11
**officers** 52:19 211:20
**offset** 112:22
**oh** 8:19 18:16 34:22 64:4 69:7
  73:13,17 76:10 83:11 91:24
  92:2 94:3,11 106:10 148:13
  149:7 152:15 159:20 169:24
  171:15
**Ohio** 52:23 53:3
**okay** 6:18 7:6,14,16 8:11,14,22
  8:24 9:7 11:16 13:18 16:5
  18:23 22:15,18 23:20 25:17,25
  28:7 32:14 33:20,24 34:19
  35:22 36:18,21,24,25 37:7,13
  39:3,15 48:4 52:3,13 56:12
  59:23 68:16 69:17 70:12,18
  71:16,20 72:18 73:5,22 75:24
  77:25 78:23 79:15 80:6 81:18
  83:2,5,9,13,16 84:2,7 85:10
  90:7 92:21 94:10,14 95:2 96:3
  96:12,19 97:25 100:6 101:8
  103:8,12,23 104:17 105:11,20
  107:12,19 109:19 110:10,14
  115:11 116:8,18 119:10 120:9
  120:10,25 121:10,17 123:12

126:24 131:18 132:5,12 133:24
134:6 137:21 138:11,13 141:7
142:4 143:7,13 144:15,21
145:4 149:10 150:11 151:20
154:22 157:12,15,17 158:14,18
170:8 171:9,13 173:22 175:9
175:16,19 176:13,13 178:21
181:18 182:12 183:23 185:6,24
186:4 190:19,24 191:4,10,16
192:18,21,24 204:24 207:11,12
207:18 208:11,17,23 212:14
213:13
**old** 150:4 170:22 181:6
**omitted** 63:23
**once** 30:4 63:12 82:13 154:18
  192:11
**ones** 74:12 95:15 167:2 193:20
  196:13
**ongoing** 54:8,24
**open** 10:7 62:11 150:15
**opened** 161:12
**opening** 3:3,3 13:19,21 15:16,18
  16:6 99:3 138:5 210:14
**operate** 66:15 147:10 158:24
  174:2 178:8,12 196:13 201:10
**operated** 14:14 186:22
**operates** 65:21 85:11,12 196:11
  200:17
**operating** 99:9,9 122:18 172:24
  177:2,4,19,23 178:8,10 187:15
  195:17 211:14,14
**operation** 73:25 99:14,15 156:17
  198:12
**operational** 124:7
**operations** 24:16 135:13 195:19
**opine** 64:25 65:7
**opinion** 56:17,22 61:2 62:6
  64:14,17 76:6 80:4 117:19
  169:25 174:21 212:25
**opportunity** 9:25 17:19 88:5
  121:15 125:22 129:25 210:4
**opposed** 64:10 67:12 123:22
  124:20
**opposite** 195:3
**option** 67:16,17
**order** 17:8,9 26:19 38:22 79:12
  123:15,16 149:3 162:11 187:5
  209:14
**ordered** 147:8

**organized** 163:14
**Oricchio** 128:7,8 130:12,13
  151:10 158:21 196:12
**origin** 72:12
**original** 40:3,5 49:10 145:4
  148:6 155:16 171:18
**originally** 21:4 145:14
**Osborne** 2:8 8:4 64:21 156:24
  207:15 212:16
**outcome** 65:7,8
**outline** 9:20
**outlined** 60:15
**outside** 6:4 7:2,4 164:16
**outsider** 172:12
**overall** 21:20
**overnighted** 208:8,10
**oversee** 20:7
**overseeing** 20:13
**owe** 18:17 88:12
**owed** 28:24 29:16 58:22 116:2,2
**owes** 33:12 79:4 115:23
**owing** 60:21
**owned** 145:2 172:5,5 173:14
**owner** 6:23 41:10 93:20 113:15
  144:16,17 145:9,13 147:20
  151:7,9,11,21 152:7 154:4
  171:18
**owners** 155:2 211:20
**ownership** 100:7,12 151:4

---

**P**

**P** 3:2 5:5 53:5 209:2
**P.C** 6:22
**P.C.S** 168:17 195:15
**P.O.S** 46:19 135:20
**Pacific** 99:6,8,20 100:2 155:12
  155:20
**packet** 103:18 105:23 107:14
  108:10
**page** 4:18 31:11 34:16,17,24
  36:16,19,22 37:17 38:11,12,15
  42:6,12,14,25 43:13 44:19
  45:11,19 46:11,16,21 47:9,11
  47:15,17 48:14 49:2 104:3,4
  105:22 106:22 107:14 109:5,6
  109:8,9,11,13,15,18 122:3,15
  199:15,17 214:5
**pages** 4:21 5:4 36:15 49:2
  101:13 102:11 103:18 104:17
  108:11 214:7

**paid** 26:7 46:5 58:22 59:11 72:7
 72:14,17,24 73:9 79:5 85:24
 87:15 91:11 112:20 113:22
 115:3 116:9 124:15 146:13,16
 146:17 150:21,22 156:13
 165:10,11,25 183:9,12 187:13
 189:12,16,17 197:5,15,18
**paint** 61:14
**painted** 200:10
**paper** 82:5,8,17
**papers** 32:12 36:9,13 42:2,4,4
 43:20 48:3 63:19,21 201:4
 202:13
**Paradise** 145:7 174:5,5
**parenthesis** 38:12
**part** 7:12 11:4,9 16:25 20:19
 31:7 59:2 65:17 89:15,16
 124:8 125:21 141:12 148:8
 166:5 167:11 171:2 173:15,16
 185:14 206:23 207:2,2,3
**participated** 69:18
**particular** 24:24 25:11 56:14
 65:4
**particularly** 122:3
**parties** 17:16,16 54:11 58:11
 60:3,7,8 169:10 191:22 192:5
 192:19 210:8 211:21 212:21
**partnership** 172:8
**party** 6:14 7:4 9:24 54:11 55:2
 59:8 60:4 67:5 83:6 147:21
 153:3,12 169:4,21 172:12
 175:18 192:3,7,7,9 212:14
**pass** 82:16
**passed** 80:21
**patron** 30:6
**patrons** 23:12 73:6,8,9 111:19
 135:7 180:20
**pay** 13:24 14:9 23:8,10,15 33:14
 35:11 67:23 75:3,7 80:16
 85:15,17 86:3 89:24 91:15
 97:15,16 114:10,11,11 116:22
 137:10 139:6 150:9 164:12
 167:13 172:19,22 189:10 190:9
 194:21,22 196:15,15 197:7
 198:20 202:22 203:4 206:6
**paying** 30:7 74:24 91:21,22
 185:16 199:9,12 200:6,15
**payment** 90:16 91:18 93:6 113:2
 114:9 146:12 156:5,6 198:23

**payments** 93:13 96:13,15,16,17
 96:20 111:19
**pays** 85:16 92:22
**pen** 75:12,21
**pending** 58:8 59:19 62:10 105:19
**people** 6:3,16 7:18 27:9,13
 65:21 66:17 75:2 81:5 113:24
 139:7 141:3,11 145:17 156:23
 163:10 164:4 167:4 170:18
 173:20 190:5 195:17 196:17
 197:18 203:13 205:6
**percent** 46:8 75:8,10,17 76:15
 77:7,9,21,23 80:25 81:2 84:14
 86:3,10,13,16 88:8 89:25 90:2
 90:10,12,18,19 104:7,11 117:3
 117:4 164:6 180:7 188:14
 189:7 190:4 202:11,13
**percentage** 43:11 188:11
**perfectly** 99:17 116:14
**perform** 198:15
**performances** 23:12 66:23
**performed** 197:19
**performers** 63:3 66:22
**performing** 67:4 85:25 126:7
 200:7 201:17
**performs** 70:24
**period** 1:7,13 31:2 35:12 37:4
 49:7,8 76:13 96:23,25,25
 113:3 131:7,9,13,16 133:17
 144:18 147:25 148:11,13,25
 149:5,6 154:13,16,19,24,25
 157:7 165:16 179:13 180:17
 185:11,18
**periods** 9:14 61:3
**person** 14:7 50:19 55:11 77:2
 80:11 102:9 130:2 139:15,21
 166:2 201:6 202:6
**personal** 65:10,19 151:24
**personally** 57:12,15,25 85:4
**persons** 14:19
**perspective** 67:14
**pertains** 6:15
**petition** 1:3,9 4:5,10 7:15 9:11
 11:20,23 12:5,18,21 13:5
 14:20 194:19,20 195:4
**petitioner** 2:3 6:11,12 10:11
 15:9 17:8 18:13 63:6 206:14
**petitioner's** 10:4 63:23 68:12
 68:25 101:9 143:20 191:16,20

**petitioner's** 5:8,9 158:15
**petitioners** 8:7 15:9 54:22
  62:24 63:3 64:10 160:2 193:17
  195:9 209:15,24
**petitions** 9:8
**pgs** 4:20
**phone** 85:23 128:17 146:20
  149:12,15 156:25 157:2 170:17
  170:18 171:5
**phonetic** 8:9
**phrase** 15:16
**pick** 85:20 157:8 187:6
**picked** 29:5 31:2
**picking** 37:25
**picture** 21:20 26:19 27:4
**piece** 59:25 82:5,8
**pieces** 58:8
**piercing** 123:14,15
**place** 78:11 79:8 95:4 118:5,24
  118:25 141:17 142:11,11 205:3
  205:12 214:5
**places** 67:20 196:19 202:8
**plaintiffs** 209:21
**playing** 66:18
**pleading** 58:12
**pleadings** 74:11
**please** 10:9,19 11:17 13:19
  15:17 18:20 19:3 31:21,24
  36:17 45:4 47:23 51:2 52:5,8
  52:14,18 83:25 95:20 98:14,16
  101:5,14 103:13 105:13 108:25
  109:5,11 120:15 121:13,18
  126:25 141:5,9 143:8,8 170:6
  209:5
**plenty** 182:17
**Plunkett** 99:13 147:6,17,22
  169:16 174:3,4
**Plunkett's** 156:3
**plus** 188:10
**pocket** 86:8 182:6
**point** 10:24 11:16 17:2,22 37:22
  37:23 38:8 40:2 42:11 43:3,12
  45:7,9,12,21 46:12,14 48:10
  48:11 49:6 65:8 73:16 96:23
  104:9 111:6 121:5 124:7 125:3
  125:17 129:12 130:22 133:3
  135:16,17,20,22 144:18 146:6
  147:25 148:23 150:16 152:18
  161:3,14 165:8 168:14 170:10
  175:20 192:24 203:6 210:12

  212:15,19,25 213:10
**points** 10:10 80:19 81:3 201:13
**policy** 87:18,19 140:17,22,24
  141:5,13,19 142:11,12
**pools** 172:21
**poor** 170:13
**pops** 110:25
**portion** 26:5 73:5 164:20,21
  182:13,15 183:2 196:5 197:22
  198:3
**position** 10:2 22:3 51:18,20
  59:13 60:21 63:9,11 84:24
  140:16 204:8
**possible** 26:22 198:2
**post** 190:25
**posture** 61:6,24
**pots** 172:10
**power** 21:16 24:15 41:9,10 139:4
**practice** 52:22 53:2 115:13
  144:23 155:8 196:24
**practicing** 53:8 151:22
**practitioner** 53:2
**pre-** 14:9
**pre-dated** 160:13
**precedential** 112:17
**precise** 77:3
**predecessor** 18:2,6,10 99:5
  144:19,20 145:8 155:20 172:4
**predecessors** 195:16
**preface** 57:5
**prefers** 120:20
**premises** 200:17
**preparation** 69:19
**prepare** 69:3
**prepared** 32:4,15,18 55:9,24
**prescribed** 191:25
**present** 9:25 10:3 11:10 16:13
  33:4 82:10 125:12 203:23
  205:16
**presented** 10:12,16,24 195:9
**presenting** 190:25
**PRESIDING** 1:17
**Prestige** 171:11
**presumption** 59:11 113:4
**pretty** 41:20 161:25 162:13
  172:24 184:22
**previous** 147:20 174:4
**previously** 10:14 68:16 99:23
**price** 136:25 137:3 162:23 163:2
  163:4,8

**prices** 162:6
**primarily** 57:14
**primary** 27:14 119:7
**principal** 57:9
**print** 102:15
**prints** 116:4
**prior** 16:10,15,18 31:8 99:4,8
  99:24 139:4 142:9 179:11
**private** 22:24,25 23:8 30:6,6
  104:15 136:4
**privy** 15:25
**probably** 45:14 66:14 123:5
  171:13
**problem** 178:3 198:14
**procedural** 15:20
**procedures** 9:20 10:23 11:2,14
  147:3
**proceed** 19:9 52:13 84:7 143:13
**proceeded** 128:21
**proceeding** 7:5,8,12 58:24 70:9
**proceedings** 10:16,19 62:3,19
  214:8
**process** 21:17 80:22 89:11
  163:16
**processed** 26:3 72:23 75:22
  167:6
**processes** 80:14
**processing** 67:6 75:9 77:15
  80:17 89:25 90:2 124:21
  135:25 140:9 165:19 172:15
  197:2
**processor** 164:17
**professional** 53:7 56:3 152:2,10
  159:2
**professor** 53:4 56:3
**profit** 16:21 93:22
**proof** 10:10
**proper** 40:22 46:5 62:9
**properly** 14:6,17,24 15:8
**property** 72:15 87:15
**proposed** 129:3,13
**prove** 188:20,22
**provide** 23:25 30:19 70:6 118:16
  180:3 210:24
**provided** 29:3 44:3 49:20 124:12
  127:23 129:20 130:25 152:14
  193:20 206:15
**provides** 29:19 67:9
**public** 62:11 63:16 66:24 67:2,4

**pull** 164:8 172:21
**pulled** 160:25
**pulling** 211:15
**pulls** 177:5
**purchase** 16:20 83:3 136:10
  160:7 194:8
**purchased** 135:7
**purchases** 81:25 96:7 135:25
**purely** 189:22,24
**purpose** 69:22,24 104:14 115:25
  167:9,11 177:22 206:9
**purposes** 31:16 68:12 98:18
  101:18 103:21 105:25 106:24
  108:13 132:16 206:22 207:4
**put** 16:3 17:12,18 48:12 51:19
  51:23 60:21 67:19 68:4,10
  81:8 118:4 130:6 149:16
  151:14 157:2 158:21 165:21
  166:3 185:4 187:5 207:16
**puts** 110:24 182:5
**putting** 201:8

---

## Q

**Q.E** 46:17,20,21,23
**qualification** 55:17
**qualified** 56:15 64:17
**qualifies** 55:11
**quality** 55:14
**quantify** 80:24
**quarter** 38:6,7 39:21,23 40:12
  40:13 41:4,8 42:16,16 44:4,4
  46:22 48:20
**quarters** 47:19
**question** 14:16 15:20 17:18
  33:23 34:14,23 36:4 49:10
  57:6 58:6,9 59:16 60:25 76:2
  76:9 80:4 95:20 98:6 103:24
  105:19 106:6 109:2 110:15
  113:6 119:14 129:15,16,17,25
  130:21,22 133:2,2 138:10
  141:9 144:16 170:23 179:17
  183:20,21 184:3 195:13 197:17
  199:23 204:23 209:19 210:7
  211:5
**questioned** 25:22 139:3
**questions** 10:22,23,25 11:13
  50:21 56:18 62:15 65:11 79:17
  81:14,19 83:14 88:23 94:12
  98:2 103:11 107:19 119:11
  124:25 126:2,17 132:24 134:13

800.523.7887
Associated Reporters Int'l., Inc.

Page 245

137:22 142:23 143:21 158:16
176:14 178:17 184:4 185:5,7
186:7,21 190:11,14
**quite** 81:6 144:23 159:5
**quote** 114:18 153:15
**quoted** 117:19
**quotes** 117:21

### R

**R** 3:2
**raise** 14:20 19:3 52:8 70:8 84:2
112:14 117:17 126:25 143:8
148:16 177:12
**raised** 15:2 18:3 58:9 164:17
**raising** 18:3
**ran** 159:7,8,11 171:7
**rang** 170:25
**rate** 39:24 41:23,24 42:10,24
43:2,2,6,25 44:20,25 48:9,13
49:9 171:9
**re-** 156:22
**re-call** 186:6
**RE-CROSS** 178:22
**re-determination** 9:11
**re-direct** 79:19,21 98:4 176:16
176:18
**re-tried** 169:22
**reach** 204:18
**reached** 166:19 204:19
**read** 98:10 130:21 139:25 149:25
156:10 177:10 184:22 199:4
**reading** 48:3 122:2 124:4 142:9
160:13
**real** 155:8
**really** 16:7,20 18:7 27:21,21
47:16 100:19 113:24 123:9
124:10,14 138:12,19 161:15
166:12 167:20 189:15 193:21
198:5 201:11 209:9,19
**reason** 27:15 39:24 54:8 96:12
96:13 123:18 142:18 149:17
152:18 166:6 180:18 191:23
198:19 199:22 200:15 213:3
**reasonable** 150:21 200:4,22
205:18
**reasonably** 203:20 204:21
**rebuttal** 113:4
**recall** 21:11 122:7,21 138:5,11
139:21,23 176:22,23,24,25
177:15,19

**recalled** 121:20 186:8
**receipt** 82:5,10 91:5,10 102:4
102:15 109:20 110:6,25 111:8
111:9 114:8,9 164:20 179:23
205:25 206:3,3
**receipts** 16:19,24 26:11 31:3,4
41:12,13,15,15,15,16,17,19,21
42:16,22 44:3 48:5 61:15
76:11 87:12,14 112:13,21
114:6,13,24 115:24 120:5,6
136:7 141:16 171:3 173:5,17
174:6,6,8 180:8 183:5 189:13
189:17 194:10 196:7 198:4
199:25 203:13
**receive** 28:12,16 49:8 100:15
111:18 131:15 133:15 163:9
165:18 206:24 207:6,7,13
212:2
**received** 11:24 12:23 18:6 25:22
28:19 40:20 41:18 44:4 49:6
133:22 145:7 160:23 166:2
180:4 182:24 192:9 196:25
197:20,22 207:9 208:16 211:25
**receives** 71:17 162:24 182:2
202:23
**receiving** 126:12 180:19 203:11
**recess** 51:10 121:11
**recognize** 166:7
**recollection** 49:18 159:24
**recommended** 161:18
**record** 7:17,23 10:20 11:4,9
15:24 22:5 51:6,8,9 57:5
62:11 63:12 68:10,24 70:15
78:20 79:7 82:2 83:19,20
101:9 103:9 105:12 106:12,19
107:11 108:8,24 121:2,6,8,12
130:6,23 151:3 157:21 158:2
158:15,22 183:17,19 184:25
185:4 191:5,9 192:11 193:2,13
197:21,24 201:24 202:4 207:2
207:16 208:24 211:18,24
212:15 213:11,16 214:7
**recorded** 42:23 46:14
**recording** 92:8 139:11
**records** 4:23,25 23:22 24:2,3,7
25:8 26:25 28:10,13,15 29:3,8
29:14 35:15 39:25 40:10,17,20
40:25 44:10,14,16 45:13,21
46:2,4,8 49:11,12,19 63:16
68:21 73:23 74:6,7,8,20,23

78:3,9,13 79:4 91:4,13 112:5
113:8 127:22 128:3 129:20
130:25 131:12,12,15 133:12,15
133:19,22 134:2 153:18 173:24
174:10 181:14 182:13,17
183:18,21,22 184:3 201:25
203:23 207:4
**Recross** 3:6,12,17 138:2
**redeem** 82:10,13 115:3 116:19
117:14
**redeemed** 90:13
**redeeming** 115:9
**redeems** 77:19 82:16 86:13
**redemption** 75:10 77:21 202:13
**redetermination** 1:5,11
**redirect** 3:6,9,12,13,13,16,18
98:7 119:15 125:3,5 184:10
**refer** 11:12 15:21 33:2 89:11,20
119:9 195:15
**referenced** 63:16
**referral** 89:13 90:16,17 202:15
203:3
**referred** 41:25 79:23 99:4 175:4
194:12 202:16
**referring** 11:6 89:17 90:22
213:2
**refers** 54:5 193:6 203:22
**refresh** 159:23
**refund** 1:6,12 9:12 203:22
**refundable** 104:11
**refused** 88:17 156:24,24 185:3
196:14,15 205:5 210:11
**regard** 24:12 44:13 49:23 53:22
56:19 62:15 65:11 89:13 96:10
130:14 194:2 198:6 203:9
205:2
**regarding** 10:22,25 11:13 62:14
65:4 125:8 129:19 134:13
**regardless** 192:8
**regards** 128:3
**register** 18:12 38:5,6 39:21
42:17 99:20 135:15 170:25
**registered** 209:22
**regret** 81:7
**regulation** 91:20
**regulations** 58:20 190:2
**Reid** 85:21 86:7
**relate** 54:9
**related** 6:23 14:3 17:4 56:9
58:5,20

**relationship** 57:8 65:25 113:18
122:12 151:24 159:9,25 160:3
163:18 167:3 201:11 209:21
**release** 187:3
**released** 156:13
**relevance** 55:19 62:3 95:12
148:8
**relevant** 55:3,18 56:7,20 129:17
**reliance** 205:17,18
**relied** 123:9 203:20 204:22
**rely** 204:25
**remainder** 196:10
**remaining** 7:18
**remains** 204:23
**remand** 210:2
**remanded** 212:23 213:3
**remarks** 16:6
**remember** 28:16 49:6 136:19
138:21 139:13,14 145:18
151:12,21 154:14,21 171:12
175:24
**remembered** 211:13
**remind** 51:11 75:25 212:21
**reminded** 91:14
**reminder** 91:14
**remitted** 42:20
**removed** 174:9
**remuneration** 100:16
**rent** 137:11
**rentals** 25:20 38:9 135:21
**repeated** 38:14
**rephrase** 141:9 176:24
**reply** 191:20
**report** 25:19 32:4,9,10 39:2
97:10 109:22,24 110:7,13,23
122:23 124:5 128:7,11 160:11
160:13,14,14,23 179:15 180:10
181:4 182:10 209:11,22 210:18
**reported** 16:24 35:2 38:10 40:22
42:10 43:8,8 45:2 47:8 48:9
48:12,16 97:13 133:16 165:20
214:4
**reporter** 7:22 9:5 51:7 121:9
143:14,17 191:13 214:13
**reporter's** 92:9
**reporting** 39:23 41:22 48:13
165:24 180:13
**reports** 157:6
**represent** 56:9

**representation** 65:18  170:13
**representative** 24:21,24  134:19
 155:19
**representatives** 15:9  146:7
**represented** 57:12,16  80:11
 145:19
**representing** 9:21  145:21
**represents** 60:7
**request** 10:8  23:22  28:10  40:17
 44:9  46:2  99:20  128:16  130:10
 131:12  133:11,19  160:23
 191:24
**requested** 40:16  131:11  212:6
**requests** 10:20  191:22
**require** 182:9
**required** 128:19  129:10  180:2
**requirement** 180:21,24  181:23
**requirements** 84:19
**reschedule** 129:8  212:10
**research** 20:14,24
**reserve** 51:14,22
**resolving** 60:14
**respect** 57:17  119:20  140:17
 186:23  187:15
**respond** 193:10
**responded** 63:6,22  193:11
**respondent's** 51:18
**response** 12:5  13:4  63:22,23
 64:5  193:10  206:25  207:8,24
 207:25  208:13,25  209:2
**responsibility** 113:14,16  166:2
 181:9  182:7  191:21
**responsible** 14:4,7,19  50:19
 113:10  147:21  153:3,12  169:4
 169:10,21  175:18  179:23
 181:25  192:5,8  193:23  194:16
 198:9  200:23  201:15
**responsible-party** 177:25
**rest** 7:21  51:25  75:25
**restaurant** 82:7  113:23,25
 180:23  190:3
**restaurant's** 187:22
**restaurants** 67:20  155:4
**restrictive** 183:15
**restroom** 83:22
**resulted** 129:21
**retroactive** 188:4
**return** 86:15  128:17
**returned** 192:3

**returning** 121:11
**returns** 18:12  32:13  35:9  74:9
 86:18  100:18  103:14
**revenue** 16:19  22:11  34:13  84:20
 164:8  165:4  210:22,23
**revenues** 22:22
**reverse** 198:21  200:21
**review** 20:8,10  22:5  38:5  45:21
 63:12  122:9  124:10  125:22
 175:15  213:4
**reviewed** 39:21  44:5  69:17
**revision** 9:12
**rewards** 80:19  81:2
**Richard** 101:25  198:23
**Rick's** 117:18  134:15
**Ricks** 87:4  127:11,13  133:7
**Ricks'** 133:8
**right** 19:3  29:22  34:15  36:15
 38:14  45:14  47:10,14  52:8
 57:19  61:16  68:17  69:10  75:14
 76:18,23  77:4,24,25  84:3,13
 88:13,13  99:7  111:16,23
 112:16,25  117:18,22  120:2,25
 124:4  126:19  132:25  143:9
 144:5  159:4  173:10,11  175:20
 185:14  190:8,24  207:25  209:3
**right-** 109:6
**rights** 118:6,8,9  148:18
**risk** 81:3,11  90:3
**road** 136:16
**role** 27:18,19
**roof** 124:2
**room** 7:18  8:23  25:20  30:7,8,11
 38:9  57:8  93:18  104:15  135:21
 136:4,7,21,22  163:7  206:5
**rooms** 22:24  23:9  66:25  67:5
 136:22  140:11  163:5
**roughly** 32:7  49:25  76:16,22
**round** 77:12
**rule** 10:19  65:2  112:24,25  113:2
 133:3
**rules** 70:2,6  85:3  87:10  91:15
 128:19  212:11
**rumor** 148:18
**run** 67:6  77:13  85:22  86:9  95:3
 97:21  136:2  155:5  156:21
 171:21  172:13  187:18
**running** 67:18  141:24  159:6
 201:8

**runs** 16:21 30:10 95:11 111:20
  187:19,19,21
**Russ** 145:21
**Russo** 1:17 6:2,10,17,19,21 7:3
  7:7,11,14,17 8:11,15,19,22,25
  9:4,7,17 11:5,8,16,23 12:6,13
  12:21 13:6,12,18 15:12,15,22
  18:19,23 19:2,8 31:13,15,19
  32:25 33:7 50:23 51:3,5,9,24
  52:3,8,13 53:21,25 54:17
  56:12 62:4 64:24 68:11,16,20
  68:23 69:7,11,14 70:12,15,18
  79:18 80:5 81:15,18,21,25
  82:9,18,22 83:2,5,9,13,16,18
  83:21 84:2,7 89:2 91:24 92:3
  92:6,11 95:17,19 98:3,11,15
  98:17,25 101:3,6,8,15,17
  103:4,6,8,12,15,20 105:8,11
  105:15,18,24 106:9,11,18,23
  107:10,17 108:2,7,12,23 109:3
  119:12 120:10,14,17,22,25
  121:7,10,17 125:2,14,16,19
  126:19,24 130:3,13,17,20
  131:20,23 132:3,6,10,13,19,25
  134:9 137:23 141:8 142:24
  143:3,7,13,19 144:2 157:13,15
  157:20,25 158:6,10,14,18
  167:23 170:6 176:15 177:9,13
  177:16 178:15,18,21 184:5,7
  185:6,16,21,24 186:3,9,15
  190:12,15,19,24 191:4,7,10,15
  192:15,18,21 198:25 206:21
  207:7,11,15,18,23 208:12,17
  208:23 212:13,18 213:9,13

---

### S

**S** 3:2
**safe** 139:20 197:7 201:10
**sale** 13:23 14:8,12 16:11,25
  17:11,15 21:18 22:12,19,20
  23:7,13 25:21 26:4 27:6 31:6
  33:12,18 34:5 35:20,23 36:15
  37:10 38:2,8 40:2 45:7,9,12
  45:21 46:12,14 48:10,11 49:7
  54:6 70:23 71:17 75:16 76:2,8
  79:24 123:10 135:16,17,20,22
  140:9,23 141:16 142:10,12
  168:23 174:14 175:10 194:5,7
  196:25 202:12 205:22,23
  206:16,18

**sales** 1:6,12 9:13 13:25 14:5
  17:12,15 19:23 22:24 23:18
  25:19,20 29:21 34:2,3,5,25
  35:8,11,16,17,22 36:14 37:21
  38:4,10,25 39:10,10,19,19
  41:5,14 42:10,19,22 43:8,9,9
  43:10,11 44:25 45:5,12,20
  46:5 47:7 48:8,10,11,17 49:25
  50:7 53:23,23,24 54:12,25
  55:23 56:13,14,23 57:3 58:6,9
  59:15 61:9,11,17 64:12 71:17
  72:20,21 75:15 86:24 87:19,21
  88:12 113:14 123:21 124:2,11
  124:19 140:19 145:3 146:9,21
  147:5 148:12,14 155:24 156:14
  159:4 164:24 167:7,15,16
  188:15,17,19 194:2,4,18,18
  198:6 200:25,25 210:6
**Salmon** 53:5
**sandwich** 182:3
**sat** 162:15
**satisfied** 211:7,9
**saw** 42:17 79:3 138:23,25 154:10
  180:18
**saying** 43:2 54:10 63:6 64:21
  65:2 73:3 76:2,15 79:13
  100:20 124:5 149:24 157:5
  163:25 166:9 167:13,16,19
  174:25 189:6 213:2
**says** 18:16 34:17,25 37:18,21
  46:17,21,23 72:10 78:7 79:4
  87:13 91:5 104:5,10,16 110:7
  114:3 118:10,11,13 162:18
  189:15 190:2 201:24 202:5,15
  203:17,25 210:5,18,25 212:21
**Scala** 3:4 8:9,9 18:22,25 19:6,7
  19:12,15 51:14,23,24 121:16
  121:20 149:6 152:16 153:13
  162:8 163:5 166:6
**Scala's** 160:11
**scantily-dressed** 27:15
**Scarfi** 1:1,10 2:1 3:1,10 4:1,10
  4:13 5:1 6:1 7:1 8:1,8 9:1
  9:8 10:1 11:1 12:1,17,18,20
  12:22 13:1,8,11,13 14:1,7,12
  14:15,18 15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1

43:1 44:1 45:1 46:1 47:1 48:1
49:1 50:1,18 51:1 52:1 53:1
54:1 55:1 56:1 57:1 58:1 59:1
59:5 60:1,6,20 61:1 62:1 63:1
64:1,13,16 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1,24 84:1,5
84:6,14 85:1 86:1 87:1 88:1
89:1,7 90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1,22 102:1 103:1,22
104:1 105:1 106:1,5 107:1,2
107:21 108:1,15 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
120:11,20 121:1 122:1 123:1
124:1,20 125:1 126:1,8 127:1
128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1
138:1 139:1,3 140:1 141:1
142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1
151:9,23 152:1,3 153:1 154:1
155:1 156:1 157:1 158:1 159:1
160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1,3
169:1 170:1 171:1 172:1 173:1
174:1 175:1 176:1 177:1 178:1
179:1 180:1 181:1 182:1 183:1
184:1 185:1 186:1,7,8,9,13,14
187:1 188:1 189:1 190:1 191:1
192:1 193:1,23 194:1,20,25
195:1 196:1,11 197:1,25 198:1
198:8,11,18 199:1,11 200:1,19
200:23 201:1,7 202:1 203:1
204:1 205:1 206:1,19 207:1
208:1 209:1 210:1 211:1 212:1
213:1,14 214:1
**Scarfi's** 203:8
**Scarpacci** 149:11
**scenario** 14:4 199:12
**schedule** 129:7 137:13 191:8,11
191:22 192:3 201:22 202:7
**school** 53:8
**script** 14:8 17:11,15,15,17
21:18 23:7,14,14 26:4 31:6
33:12,19 34:6 35:20,23 36:15
37:2,11 38:2,17 54:6,13 55:2
55:23 58:9 70:23 71:18 72:7

72:14 75:17,19,20,22 76:3,3
77:19 79:24 82:2,11,13,15,19
82:24 87:19 90:13 93:14
112:20 115:4,9,25,25 124:20
124:23 135:9 136:10 140:9,16
140:23 141:16 142:10,12
146:10 159:17,21 160:7 163:11
166:12,20,25 167:7 168:24
173:2,2,6,9,13 174:14,18,22
174:25 182:14 189:7 194:5,7
194:21 196:25 197:23 202:12
202:22,22 205:22,23 206:4,17
206:18 210:6,11
**scripts** 115:8 135:25 140:18
175:10
**seats** 6:4
**second** 33:21 122:16 148:25
149:5,6 174:20 175:23 176:2
202:12 208:9
**sections** 153:15
**see** 6:3 22:4 27:15 28:2 36:14
38:20 47:21 48:5,13 55:11,17
58:12 60:19 66:5 75:14 79:9
79:11 95:12 109:2,12 110:3
115:24 124:12,13 128:7 129:14
139:12 143:23 166:4,6 188:18
193:13 202:9 203:22 204:12
**seeing** 109:18
**seek** 69:25
**seeking** 70:6
**seeks** 60:13
**seen** 78:12,17,18,25 79:12
149:25
**sees** 15:11 18:14
**segregate** 171:2 173:17
**sell** 66:15 93:22 117:8,8 173:9
173:13
**selling** 124:23 140:10
**sells** 163:11 164:2
**seminars** 84:18
**send** 97:8 164:12
**sending** 192:5
**senior** 18:4
**sense** 38:22
**sent** 118:20 129:2
**separate** 7:8,15 25:23 26:16
38:21 72:4 98:13,15 135:15,20
136:5,6 153:18,19 155:2
171:11 211:19,21

**separately** 42:21
**September** 47:2 131:9 191:17
**series** 149:13
**serious** 18:18
**served** 188:19
**service** 59:12 67:14 84:21 87:13
 90:8,16,18 104:7,12 113:3
 117:4 184:13 189:11
**services** 85:25 99:6 100:3 112:2
 142:20 155:20
**set** 6:4 16:12 78:21 109:2 162:5
 170:20 171:14 191:7 202:7
**sets** 71:25 73:21
**setting** 154:7
**settled** 156:5 194:17
**setup** 171:11
**seven** 9:10,10 37:11 42:11,18
 43:3 47:12,25 48:11 188:4
**seventy** 42:6
**seventy-** 47:11
**seventy-eight** 47:17
**seventy-five** 199:6
**seventy-four** 44:19 47:5 107:14
**seventy-one** 42:12,14,15,25
**seventy-seven** 47:9 48:14
**seventy-six** 45:11,19 46:11,17
**shape** 155:10
**shareholder** 84:16 100:7
**shareholders** 211:20
**sharing** 186:23
**shipping** 172:20
**shoes** 75:21
**short** 58:13
**shorter** 60:8
**show** 31:19 42:25 47:12 78:15
 86:14 114:5 125:11 156:8
 182:13 184:25 197:21 211:24
**shows** 42:10,15 45:11,19 47:7
 74:24 79:8 182:18 197:4
**side** 10:7,8 38:14 53:18
**sides** 190:25
**sign** 118:8 136:6 152:13,19,23
 153:4 163:15 187:5
**signatory** 152:5,17
**signed** 28:20 152:21,24,25
**signer** 187:3
**significance** 54:14
**significant** 65:21
**signing** 153:6,11 200:19 201:7

**signs** 91:9
**similar** 43:15 48:23 49:16 66:18
 127:16 159:7,8,10 172:12
**simple** 113:24 189:15 209:8
 210:10
**simpler** 20:23
**simply** 64:8 196:13 211:7
**single** 85:4 91:5,9 93:23 129:9
**sir** 7:23 84:2 89:8,14 143:14
**sit** 6:5 85:21 146:2 150:8
 202:18
**situation** 155:9 161:19
**six** 9:11 36:7 37:22,23 48:10,18
 49:24 50:5 81:2 91:16 97:5
 164:5 188:4 190:5 198:6
 199:17
**sixteen** 199:16,17
**sixty-** 43:13
**sixty-nine** 36:16,19,23 37:18
 38:12
**sixty-six** 35:5
**sized** 163:7
**skewed** 140:12
**skip** 132:7 134:10
**slip** 181:5,7
**small** 147:14 187:12
**smaller** 66:25 211:9
**smart** 196:6
**sold** 37:2 38:17 75:20 76:9
 117:15 173:2,2,6
**sole** 140:8,10 151:9
**solely** 69:19 167:20 175:18
**solid** 65:23
**solo** 53:2
**somebody** 91:16 97:12 115:15
 118:9 136:3 152:6,12 163:5
 178:12 199:2
**someone's** 27:25
**somewhat** 181:23 193:19
**sorry** 8:15 19:19 22:8 25:14
 33:21 34:8,14,19,20,22 36:6
 37:8,9 39:15,19 45:15 46:22
 47:16 50:18 61:19 68:20 69:7
 75:6 92:5 120:16 142:5 157:13
 158:5 168:6,6 175:3
**sort** 66:18 82:2 91:12 161:5
 180:10 210:7
**sound** 181:20
**sounded** 189:20

**source** 40:3,5 210:23
**sources** 165:4 189:11 210:22
**southern** 60:10 87:4,7 112:16
 114:17 117:22
**space** 66:17 67:4
**speak** 72:12 80:11 84:19 105:16
 124:6
**specific** 5:14 25:9 65:9 122:3
 203:22 211:7
**specifically** 62:7 125:10 142:12
**speech** 57:19
**spell** 143:14
**spelled** 7:25
**spelling** 8:10
**spend** 68:5 206:10
**spent** 81:6 99:13 164:22
**spit** 67:10
**spits** 82:5 102:4
**spoke** 50:5 161:23
**stack** 152:13,21
**staff's** 114:8
**stage** 66:24
**stamped** 11:24 12:23
**stamps** 146:14
**stand** 18:24 121:18 143:8 147:23
**standard** 86:21 155:7
**Standards** 58:19 59:10 122:13
 163:22 167:19 183:8
**stands** 138:19 144:13 204:16
**stapled** 41:17
**staring** 198:22
**start** 64:7 77:12 145:5 193:4
**started** 6:2 149:5 157:6 161:11
 170:16
**starting** 12:18 49:5
**state** 1:2 6:13,13 10:19 13:19
 19:19 52:23,23 53:3,24 56:5,6
 56:14 60:16,16 63:3 84:21,22
 86:21 87:18 112:25 118:7
 145:3 146:7,21 148:4,24 149:8
 149:14 155:23 156:10 157:10
 160:22 167:15,16 170:13 171:4
 175:17 178:2,11 179:25 183:14
 188:22 192:11 209:13 214:2
**stated** 42:21 153:17 159:15
 214:5
**statement** 3:3,3 13:21 15:17,18
 99:3 114:2,6 122:16 170:11
**statements** 4:18,20 29:6,17
 30:22,24 31:2 100:18 104:18

 104:20 105:17 107:22 151:17
 153:23 154:11 164:9 210:14
**states** 179:16 181:17 194:21
**stating** 148:5 153:22 191:23
**status** 62:10
**statute** 14:23
**statutory** 15:4
**stay** 6:25
**stayed** 163:6
**staying** 51:25
**stays** 8:14 77:14
**step** 123:13
**steps** 151:20
**Steve** 169:9 172:8,18 194:15
**stick** 116:5
**Stiletto** 38:13 45:10,19 48:23
 49:16,23 125:10,13 126:18
 127:4,6 131:2,8 135:3 151:11
 153:20,20 193:25 195:22 200:3
 202:2
**stipulate** 129:14
**stipulation** 129:3,13
**stipulations** 128:17,18,23 129:2
 129:3,9 212:7,11
**stop** 86:7 88:25 120:19 172:20
**stopped** 149:21
**stops** 162:18,25
**store** 66:8 164:22
**stores** 155:3
**story** 112:24 114:15 145:9 148:6
 148:24
**strange** 149:16
**streams** 22:11,23 34:13 202:11
**street** 117:25 144:23 145:4,25
 147:21 155:17
**strict** 153:9
**strictly** 37:15
**strip** 13:25 14:2,9,13,15 21:15
 21:25 22:2,9 23:21,23 24:4,5
 24:24 25:4,21 26:24 27:6,9,13
 27:18 28:2 29:24 33:15 36:25
 194:6,9
**stripper** 23:8,10,11,15
**strippers** 28:2,3,4,5
**strong** 57:21
**structure** 29:24 162:23 163:3,4
 163:8 195:19
**structured** 27:21
**stuff** 90:20

**subject** 10:6 13:25 17:12,15,20 25:19 34:2,6 35:17 39:11,20 41:5 54:6 56:11 58:6 59:15 61:11 86:23 104:13 140:18,23 168:24 194:11,18 203:14 204:9 210:6
**submit** 10:9 11:10 16:4 130:11
**submits** 206:14
**submitted** 10:14 192:6 204:14
**subpoena** 184:25
**subpoenaed** 6:8,24 30:22 128:8
**subscribed** 214:10
**subsequent** 170:12
**subtract** 63:15,18
**subtracted** 42:23 48:7
**suddenly** 150:2
**sued** 197:11
**sugar** 120:21,24
**suggested** 162:12 180:2 189:25 190:6
**suggestion** 181:3
**suing** 88:6
**suit** 167:10,12,13
**suits** 60:20
**summarized** 41:25
**summary** 5:9 11:5 55:5 62:23 63:24 68:9 69:4,25 70:2,6 193:5 204:14 206:23
**summons** 64:5
**supervise** 127:12
**supervisor** 19:24 20:5 133:9
**supplier** 119:7
**support** 10:2 203:24
**suppose** 78:8
**supposed** 142:2 180:8 181:8 187:25 193:9
**supposedly** 203:3
**supposes** 140:20
**Supreme** 52:25 59:21 61:7,25 63:21 118:20 195:6 196:3
**sure** 11:19 18:21 42:3 46:8 53:17 54:19 69:9,11 70:20 76:20 89:4 98:24 109:3 110:21 113:16,18 116:16 125:4 128:24 130:22 135:3 138:8 144:4 167:24 186:3 191:6 193:19 194:24 197:4 199:7,18 207:5
**Sustain** 142:24
**sustained** 62:5 80:5 177:13,16

**swapped** 97:4
**swath** 159:20
**swear** 19:3 52:9 84:3 143:9 186:9
**swipe** 95:7
**swipes** 96:8
**swiping** 96:10
**swore** 186:10
**Sworn** 3:4,7,10 19:7 52:12 84:6 143:12 186:14
**system** 135:16,17

---

### T

**T** 4:2
**table** 92:4 94:2,2,3 181:12 182:4
**take** 18:23 34:10 36:13 38:24 41:14 86:4,13 93:15 95:4 115:7 116:16,17 120:22 121:15 121:18 127:23 131:23,24 134:10 143:8 177:11 197:6 208:24
**taken** 34:8 160:11
**takes** 77:18 182:5
**talk** 22:13 61:8 85:21 86:25 87:2,2,4 104:24 105:5 142:2 149:15 157:2
**talked** 198:23
**talking** 24:4 39:4 78:19 93:7 112:15 140:14 150:25 176:20 184:12 186:18 209:16
**talks** 199:4
**tangible** 75:20
**tapes** 38:5,6 39:22 43:12
**tax** 1:2,6,7,12,13 2:6 9:13,14 11:24 12:24 13:25 14:11,12 15:7 16:25 17:12,15,20 18:5 19:23 20:24 25:19 28:24 29:9 29:16 30:24 31:3 33:12,18 34:3,7,20 35:8,11,17 38:10 39:11,18,20 40:22 41:5 42:19 42:20,21 43:16 46:6 48:22,23 53:23,24 54:6 56:13,14,23 58:6,9 59:8,13,15,17 60:6,12 60:16,22 61:3,9,11,21 64:12 70:5 74:4,4,9 84:23 86:15,18 86:21,22,24 87:19,21 88:10,12 88:20 91:12 100:17 113:14 114:10,11,12 120:2 133:16 140:19,23 144:24 145:3,6

146:21 147:5 148:10,12,14
155:24 156:14 159:4 164:24
165:22 167:15,16,21 168:24
173:23 174:14,24 179:25
188:15,17,19,25 192:6 194:11
194:18 203:10,12,14 204:9,25
205:9 206:18 207:2 209:13
210:6
**taxability** 51:18 55:23 57:3
146:12,14
**taxable** 14:3,13 22:4,7,7,16,20
23:2,16 29:21 31:7 37:21 38:4
42:10,22 43:8,9,9,10,11 44:25
45:11,20 141:6,16 142:10,13
142:16 145:23 146:9,16,16,18
147:2,23 148:3,7,10,21 149:8
149:25 150:2,20 156:4,11,22
157:6,8 159:17,21 160:7
169:18,25 170:23 174:21,25
175:10 205:16,23 210:11
**taxation** 9:22 19:20 53:14,24
54:12,25 56:5,6
**taxed** 31:4 147:15
**taxes** 14:4,19 61:17 151:24
185:13 193:23 194:16 200:24
200:24
**taxing** 178:4
**taxpayer** 15:5 16:24 23:25 42:20
44:4 48:15 134:19
**taxpayer's** 134:19
**taxpayers** 203:19
**taxpayers'** 24:20 46:14
**team** 19:24
**technology** 85:24
**teed** 59:17
**tell** 19:4 31:23 33:16,16 36:14
36:20 38:25 42:7 45:4 47:22
48:25 52:9,18 78:16,16 79:12
84:3,10,10 85:6,10 87:9 88:24
88:24 99:7,8 101:22 104:2
119:5,22 133:5 141:12 143:9
148:11,18 150:24 171:15 180:7
181:8 182:7 186:11 188:6
201:14 202:18
**telling** 87:17 154:10 173:20
180:15
**tells** 115:25 187:23 188:3
189:21
**ten** 18:17 48:2 75:10 77:20,21
86:3,13,15 88:8 90:2,9,12

91:6,7,17,19,20 97:8 102:7
113:25 117:3 162:16,17 174:6
202:13,23
**tenant** 137:9
**tenants** 137:4,8 160:5,21 161:20
179:15 184:15 210:18
**tend** 161:2,4
**tenent** 164:23
**tens** 116:13
**tension** 60:14
**tenured** 53:4
**term** 74:3,3
**terminal** 82:7 85:23 86:9 89:24
93:8 97:3,3,10,11,12,18,21
102:15 110:25 154:16,18 155:5
**terminals** 97:4 102:4 154:11,15
154:25
**test** 42:16 189:15
**testified** 25:17 29:12,13 33:9
36:8 50:7 124:20 125:7,8
126:5,8,12 127:5,21 134:22
147:18 153:13 154:13 161:9
163:10 168:16 169:17 195:14
198:19 199:11 201:14 205:4,11
210:16
**testifies** 10:5
**testify** 8:13 55:11,15 64:11
195:25
**testifying** 8:18,20 9:2 163:5
**testimony** 6:6 10:7 54:2,3 55:18
55:18,19 56:16,17,21,22 62:6
62:9,14 65:5 92:7,12 122:17
126:10,20 130:16 177:12 198:9
202:24 203:8,8 205:2,8 206:7
211:17
**thank** 9:3 13:18 15:12 16:5
18:19 19:8 33:7 50:23 51:4
52:6,15 53:9 60:18 68:7,22
69:16 70:10,14 79:18 81:13,15
83:9,17 88:21 89:2 98:3
100:25 101:19 103:15 105:15
105:20 119:12 120:10,17
121:14 122:11 125:2 130:19
137:22,23 138:9 142:22 143:3
143:17 157:12 167:22,24 175:5
176:15 184:5,9 185:21,23,24
186:2 190:15,19,23 192:18
206:20,21 212:12,13 213:9,13
213:15

**thanks** 70:20  79:17  184:6
**That'd** 144:6
**that's** 64:8
**that's** 64:9
**theirs** 164:18
**Thereabouts** 76:19
**they're** 64:9
**thin** 153:14  160:25
**thing** 16:17  24:19  44:2,23  45:17
   53:9  61:15  69:9  75:20  76:4
   82:8  86:12  122:8  146:15
   154:10  171:14  183:25  195:5
   196:23  208:9
**things** 23:6  27:7  29:22  61:14,24
   64:23  80:18,19  91:12  136:18
   137:20  159:6  172:22  175:19
**think** 13:25  18:17  27:2,23  47:16
   47:16  49:19  51:16,22  56:2
   66:4  67:19  70:3  76:16  77:24
   94:15  102:18  113:17,17  114:17
   115:12  122:17  124:19  125:16
   126:17  128:11  129:17  135:18
   135:19  138:21,22  146:21
   148:14  161:15  165:14  172:4
   173:8  175:11  188:16  193:4
   194:5  196:6,17  199:17  210:12
**thinks** 56:22  61:2,3  64:14,15,15
**third** 17:8,9,14,19  112:18  144:6
   159:12,15  160:12,15,17  172:11
   175:22  209:12,19,25  210:4,9
   212:25  213:5,5
**thirteen** 75:4
**thirty** 50:4  77:7,9,22  114:22
   194:3  196:7
**thirty-** 36:6
**thirty-eight** 35:4  37:11,14,19
   72:19  73:2  74:25  75:5,6,7,15
   76:10,11,14
**thirty-five** 76:21
**Thomas** 161:23
**thou** 39:7
**thought** 34:19  94:14  177:3
   179:14  182:4  187:25
**thousand** 35:4  39:8  42:18  47:13
   48:16,19  76:17  91:6,7,7  93:17
   113:25  114:3,4,5  116:2,13
   118:21  156:5,6  171:24  197:6
   199:6,10,16,18  201:9  202:23
   205:25
**thousands** 118:22,22,23  199:20
   200:16

**three** 5:12  32:10  37:7  47:18,18
   47:25  76:16  77:24  98:18,20
   101:4,9  102:24  104:17  114:18
   116:4  146:19  149:2  156:19
   164:5  166:15  171:10  172:9,10
   172:16,21  173:8  177:2,6  178:9
   207:21  211:16
**tickets** 80:19
**time** 10:9,25  15:6  25:11  31:9
   34:10  36:13  41:20  51:12  65:12
   86:12  92:9  118:24  127:14
   130:10  131:18  136:21,23  137:3
   144:18  145:16,18  146:22  147:6
   147:17,20  148:4  149:4  154:6
   154:16,19,24,25  155:5,18
   156:9  159:6  160:21  162:10,25
   165:16  168:10,13  170:14
   173:19  175:22  176:4  178:6
   179:8  180:12  185:13,20  187:5
   190:21  191:11,24  193:10,18
   194:9  198:13,22  199:18  202:8
   203:5  205:13  212:16  214:4
**times** 15:2  128:16  144:25  171:5
**tip** 77:11  95:10  104:8,8  109:23
   109:25  110:5,10,12,15,20,22
   111:2,4,7  115:6  163:3,20
   165:10,11  166:9,10,11,24
   167:21  180:3  181:5,7,9,12
   183:13  187:21,23,24  188:11,18
   188:19,21  189:8,15,22  190:10
   193:14  211:4,8,9
**tipping** 104:14
**tips** 139:5,6  159:16  163:9,16
   165:18,19  166:4,5,6,13,14,22
   166:22  180:4,5,6,25  181:25
   182:10  183:9  188:8,15  197:14
   197:17
**title** 58:13  139:14
**today** 7:5,19  8:13  10:13,16
   52:19  54:10  55:20  56:7  58:7
   61:8  62:14  87:22  99:23  124:19
   125:8  127:5  128:9  140:14
   141:24  148:9  150:25  155:12
   163:10  164:24  177:7  189:21
   190:3  193:21  194:24  204:24
   205:9  207:10  211:17,25
**Today's** 85:24
**tokens** 117:12,13
**told** 21:17  24:15  26:2  30:2,4,9
   30:17  135:14,23  136:2,3  137:3

137:5,6,6,7 139:8,12,17 141:4
148:9 149:10,24 174:4
**tonight** 162:16
**Tony** 143:5 144:11
**top** 38:11,12 74:13 98:20,21
174:2
**total** 25:8 31:3 34:20 37:8,9,18
37:18,21 47:25 104:10
**totaled** 36:2 37:5
**totally** 55:3 100:21,23 160:20
195:3 211:19,21
**totals** 47:21,22
**tour** 30:3 135:11
**track** 90:25 91:2,3 93:3,5,10,11
93:13,15 94:6,9,16 139:8,9
180:18,24 181:9,25 197:8
202:19 203:2
**traditional** 66:19
**tragic** 178:7
**trail** 197:4
**transaction** 73:11,19 75:23
77:13 81:22 82:3 97:23 107:3
146:9 164:6,7
**transactions** 21:18,21 22:5
25:18 26:5 29:2,20 37:10
38:21 46:13 61:9 74:21 79:24
90:25 95:4 123:21 124:12
146:15 164:9,25 204:8 205:16
**transcribed** 30:25 41:22 47:20
**transcript** 191:11,16
**transcription** 214:6
**transfer** 78:10 79:8
**transferred** 78:5
**transformed** 58:23
**transmitter** 164:20
**transpired** 26:13
**treat** 187:25
**treated** 150:22 161:14 187:25
210:17
**treating** 180:13,14 185:11
187:24
**treatment** 140:15 184:18
**trial** 147:12,21 169:16
**tribulation** 147:12
**tribunal** 112:10,19 128:19
174:16,20 175:10,14 194:9,12
**tried** 128:15 148:21 149:22
**triple** 188:10
**trips** 99:12

**trouble** 188:5
**true** 17:11 61:20 76:7 90:9,11
95:2,14 148:7 160:10 182:21
198:22 214:7
**truly** 17:24
**trust** 152:12
**trusted** 152:10
**trustee** 113:16
**truth** 19:4,4,5 52:9,10,10 84:4
84:4,4 143:10,10,10 186:11,11
186:12 203:7 205:7
**try** 123:4 126:3 182:12
**trying** 25:4,6 35:24 47:24 48:3
95:5 123:6 182:21 193:17
**turn** 36:16 109:5,11
**twelve** 20:3 91:6 114:3
**twenty** 32:11 47:4,13 75:8,17
76:15 77:14,14,22 86:10,15,17
89:25 93:23 104:5,7,10,11
117:4 136:12 146:3 151:25
161:12,21 162:12,13 181:11
182:3 202:11 205:25 206:8
**twenty-five** 85:9 86:16 151:23
156:6,13
**twenty-one** 109:6,9,17 199:6,10
**twenty-seven** 47:5
**twenty-twenty** 168:18
**twenty-two** 106:22 109:7,10,11
**two** 5:10 7:19 9:9,10 21:14,15
27:20 28:18 29:22 30:13 31:10
32:11 34:13 37:11 38:7,7 39:7
39:7,8 40:11,11 43:12 50:3,6
54:8 57:2,9,12 58:7 60:19,20
65:18 71:25 76:4 89:9 91:6
98:12,15,18,19 102:14 107:14
114:4,5 121:4 122:24 123:7,8
136:4,5,6 145:14 147:6 151:20
155:2,3 159:9 161:24 162:19
162:20 167:14,15 174:5,7
186:7 189:9,11 193:11,11
202:10 207:19 208:4,5 210:22
**two-and-a-half** 80:24
**type** 56:21 136:21 162:22
**typewritten** 214:6
**typical** 24:18
**typically** 20:9,20 27:5 80:24

---

**U**

**U.S** 52:25 84:21
**Uh-huh** 60:18 81:12 92:23 93:2

157:12 169:5 171:19 172:6
**ultimately** 155:19 156:2 171:6
  177:24 178:14 179:10
**unable** 40:5
**uncertain** 127:22
**unclear** 123:23
**underling** 149:21
**underlying** 160:24 164:7,19,21
  194:17
**understand** 25:12,15 51:17 58:5
  74:3 79:13,14 80:10,18 84:25
  87:5 110:19 111:10,12 113:24
  148:10 153:22 158:24 176:23
  196:6 212:6,7,20
**understanding** 65:23 99:16
  112:17 153:5 156:16,18
**understood** 99:15
**unfair** 114:18 183:20
**unfortunately** 112:14 161:21
  170:12
**unilateral** 15:5
**unique** 210:7
**United** 181:17
**universally** 162:2
**University** 53:5
**unlawfully** 88:8 188:10
**unravel** 126:4
**unrealistic** 152:11
**unreasonable** 126:16
**upfront** 202:12
**upset** 18:13
**upstate** 114:19
**use** 1:6,12 15:20 16:8,9 28:22
  29:7 30:23 40:5 82:19 83:2
  89:23 95:3 97:12,18 104:14
  116:22 126:11 157:6 159:24
  160:16,17 166:12,25 174:11
  198:14 206:2
**useful** 56:9
**usually** 20:12 22:10

---
### V
**V.I.P** 168:17 170:22 171:11,12
  174:7 176:6
**valid** 70:7
**value** 62:2 112:18
**Vanderlin** 149:18,19,20
**Vargas** 171:21
**Vargo** 169:7 171:22,23 172:7,11
  173:14,25 176:7 194:14 200:18

200:18
**varied** 136:20
**varies** 20:12,22
**variety** 66:16
**various** 61:11 66:21 89:20
  116:17,22 125:9 144:25 145:2
  159:3
**vary** 80:18
**Vassari** 148:5
**Vegas** 84:17
**veil** 123:14,15
**vendor** 18:11 99:20 123:3
**venues** 161:9
**versa** 96:14 200:9
**versus** 58:10,14 87:4 209:13
**vice** 96:14
**view** 124:7,7
**violation** 148:15,17
**violations** 58:18
**vis** 200:9
**visa** 112:2
**visit** 134:24,24 135:6
**visited** 57:25 134:22 135:2
**voir** 205:6
**volition** 73:10
**voluntarily** 179:24 180:6 181:7
**voucher** 67:11 113:21 116:5,6
  206:8
**vouchers** 116:19

---
### W
**W-2** 165:22 166:3
**W-2s** 165:21 166:4
**wa** 156:11
**wa--** 156:11
**wage** 61:12 112:23 118:12 165:9
  189:12,14
**wages** 165:12 180:9 189:10
  196:15 197:14
**wait** 7:2,4 37:7 88:15 114:7
  157:17,17,18,18
**waiter** 182:5
**waitress** 95:10 96:11 102:5,17
  113:22 115:5 166:23 182:5
  183:11 187:19,20 211:8
**waitress's** 187:21
**waitresses** 95:25
**walk** 30:4 33:16 85:18,19 117:25
  118:5,14,24,25 182:10 205:24
**walked** 118:9

800.523.7887                                      Associated Reporters Int'l., Inc.

Page 257

**walks** 96:7 145:25 146:3
**wall** 137:19
**Walmart** 66:5
**Walton** 99:12
**want** 7:18 16:3 17:2,22 22:4
  25:7 31:19 33:2 34:13 35:25
  68:10 69:8 71:22 72:11 76:3
  78:20 82:10,19 87:3 98:11
  101:3 102:6 104:24 117:11
  118:2 122:8 126:21 128:14,15
  143:22 148:16,23 150:7 151:18
  157:21 158:2 160:9 162:19
  165:13 170:21 173:22 184:24
  187:14,17 188:21 190:25
  206:10 207:3 212:20,23 213:7
**wanted** 15:19 26:12 33:5 70:8
  102:4 156:8 166:23 171:21
  172:21 178:20 185:3 190:8
  206:5,6
**wants** 30:6 54:13 77:11 85:15,17
  85:17 86:2 107:18 119:25
  136:4 162:17
**wasn't** 102:8,21 110:21 112:12
  126:9 130:7,9 154:5 165:24
  172:11,12 194:16 205:4,18
**waste** 156:9
**water** 182:10
**way** 11:12 24:23 27:21,24 33:23
  34:12 43:23 59:18 65:20 66:4
  67:23 71:23 72:10 86:6 88:18
  99:10 114:19 118:4 124:6
  127:16,25 128:22 138:4 140:13
  147:10 149:7 150:9,11 153:12
  154:14 155:10 159:5,8,10
  162:19 163:13 165:8 169:22,24
  172:13 184:21 187:25 193:3
  195:19 198:2 200:10 203:14
  204:20 205:7 211:2
**ways** 57:6 108:3 189:10
**we'll** 31:15 51:3,5 77:12 121:4
  121:4 132:3 133:3 191:4
**we're** 16:12 17:12 51:7,10 60:3
  61:8 79:2 87:22 88:22 99:22
  105:24 112:15,17 123:8 125:16
  132:6 177:16 196:13 197:3
  198:14 210:19,19
**we've** 67:20 184:12,22 209:16
  211:17
**weave** 203:5

**week** 91:10 113:25 116:12,13
**weight** 130:16
**welcome** 120:12
**well-settled** 14:2 15:3,10 16:7
  194:5
**went** 21:4,5 30:11 40:8 97:3,3
  97:18 99:14 100:4 134:21
  135:21 147:16,21 154:14
  158:21 166:17 182:8 183:2
  197:9
**weren't** 29:7 40:10 64:3 157:11
  168:19 179:7,7 180:12,14
**West** 144:18 145:4,9,12,12,15
  147:20 155:16
**whatsoever** 24:9 198:19 200:15
  202:4 206:15
**WHEREOF** 214:9
**whichever** 72:3 165:20
**whoever's** 164:14
**win** 114:24 189:19
**wind** 147:4
**wise** 77:23
**wish** 11:11 62:12 67:7
**withdraw** 67:23 93:17 116:13,15
  139:18 152:24
**withdrawal** 67:16
**withdrawals** 67:24
**withdraws** 92:16
**withheld** 88:8 188:11
**withhold** 90:10,11,15
**withholding** 138:24 185:12
**witness** 6:12,14 10:5 15:20
  18:20,22,23 19:7 31:20 33:5
  50:22 51:19,23 52:2,5,12
  53:17,18,20 54:15 55:7,9,13
  55:24,25 56:4,13 61:4,22 62:7
  63:14,18 64:11,18,22 65:12,13
  69:8,12,14,16 81:20,24 82:4
  82:12,21,25 83:4,11,14,17,22
  83:25 84:6 92:2,5,10,13 94:3
  95:18,21 98:22 101:11,14
  103:18,23 105:5,14,16,20
  106:3 108:25 119:13 120:12,16
  120:18,23 121:13,21 126:5,12
  128:8,11 129:16 130:4 141:7
  142:25 143:4,12,16,18,22
  144:5,8 169:9 170:5,7,8
  185:14,19,22 186:2,5,14
  190:16 205:10 214:9

Associated Reporters Int'l., Inc.

**witnesses** 6:5,16,25 9:25 10:3,4 17:13,23 124:18 190:17 195:10
**WOLLEBEN** 214:3,13
**women** 27:15
**word** 100:3 124:18 129:9 170:5,9 190:3
**words** 188:13
**work** 24:16 32:12 36:9,12,13 42:2,3,4 43:20 48:3 77:8 85:2 118:2,10,11,12,13,14 119:4,5 128:16 129:2 137:11,12 149:21 154:8 159:3 160:24 161:25 171:24 196:14 201:22 202:8 209:18 212:8,11
**worked** 19:25 37:2 138:16 172:3 186:20,25
**worker** 113:3 189:12
**workers'** 185:17
**working** 57:21 58:22 65:23 72:3 123:8 124:14 172:8 196:14
**workman's** 188:25
**workplace** 162:11
**works** 29:19 66:13 116:7
**world** 117:19 155:8
**would've** 148:21
**wouldn't** 64:3 71:2 97:2 104:9 157:2 170:19 173:25 187:3 206:9
**write** 102:5
**writing** 149:15,16 157:3,10 191:23
**written** 122:8
**wrong** 18:9 112:17 120:2 122:4 141:2 163:24 188:8
**wrote** 102:9 138:20 169:24

---

**X**

---

**X** 3:2 4:2,2

---

**Y**

---

**yeah** 45:16 55:13 69:7 76:5,18 82:16 89:19 92:2 94:25 96:24 97:20,22 98:24 99:6 100:6 103:15,23 105:14 106:7 109:10 109:14 110:22 111:15,18,22 113:19 116:19,24 118:22 120:23 121:9 134:9 135:8 138:12 144:8 159:4 161:24 170:5 171:17 176:9,12 177:9 188:9 198:13 207:13 208:22

**year** 84:17 149:22 150:3 157:8 161:24 164:2,3 209:12
**years** 20:3 28:18 57:20 80:13 85:9 99:12,14 114:22 115:14 115:14,14 151:23,25 152:11 156:7,20 159:3,4 161:12,22 171:24 175:24 184:14 188:5
**York** 1:2 2:5,5,9 6:13,13 19:19 30:16 37:3 53:13,14 58:19 59:11 84:21,22 86:21 87:5,8 94:22 102:24 118:7 119:8 122:13 145:3 146:21 148:4 167:14,16 178:2,11 209:13 214:2

---

**Z**

---

**Z** 107:25,25 108:3
**zero** 35:7 42:11 116:5,5 182:17 182:18

---

**0**

---

**1**

---

**1** 1:7,13 214:5,7
**1-7-11** 5:11
**10** 208:2
**102** 3:12 5:10,12
**105** 3:12
**106** 4:16
**107** 4:18
**109** 120:8
**10th** 12:15 13:13 207:24 208:25
**11/30/13** 42:17 44:5
**11:31** 51:8
**11:39** 51:8
**110** 4:19
**111** 4:21
**112** 4:22,24
**12** 4:5,6,8
**12:24** 83:20,20
**12223** 2:9
**124** 3:13
**126** 3:5
**13** 4:10,11,13 46:24 131:10
**130** 3:6 5:2
**138** 5:3
**14** 3:3 131:10
**143** 3:6
**149** 5:13
**15** 1:16

**15:24** 191:9
**15:25** 191:9
**15:57** 213:16
**150** 3:15
**15th** 191:19 209:2
**16** 3:3 117:21
**175** 3:16
**180** 4:20
**184** 3:16
**186** 3:17
**18th** 193:7,9 207:21
**19** 3:5 117:21
**192** 3:18
**193** 3:18
**194** 3:13
**1999** 53:8
**1st** 9:14,15 131:10

---
**2**
---

**20** 129:6
**2000** 12:23 110:2,3
**2004** 98:21
**2008** 9:14,15
**2010** 110:3
**2011** 18:15 98:20
**2013** 47:2
**2014** 1:7,13 9:15,16 117:20,20
**2015** 157:8
**2016** 157:9
**2018** 11:25 12:4,7,24 13:4,7
 209:11,11
**2019** 1:16 12:15 13:13 191:17,19
 191:21 209:2 214:10
**203** 3:19
**20th** 145:4,9,12,13,15 147:20
 155:17 193:8 207:21 208:5,6,8
 208:13 212:9
**213** 214:7
**217** 5:5,6
**218** 3:20
**22** 4:21
**24th** 158:7
**25th** 207:22 208:3,5,9,19
**26th** 214:10
**28** 1:6,7,12,13 9:13
**286** 5:4
**28th** 9:15,16 131:10 144:22
**29** 1:6,12 9:13

---
**3**
---

**30th** 98:21
**32** 4:14

---
**4**
---

**44** 127:17
**44th** 38:13 39:12 43:15,17,23
 44:7,10,20 45:2,8 49:23 57:11
 57:22 58:10,14,16,17,23,25
 59:3,7 60:5 66:14 67:5,13
 71:15,20 72:3,6 81:10 100:8
 125:10 135:2,11,12 138:22,25
 144:17 145:13 151:2,8 153:20
 153:20 154:4 155:18,21 156:7
 165:20 166:4 179:2 193:24
 195:22 196:21 200:19 201:25

---
**5**
---

**54** 3:8
**5th** 191:21

---
**6**
---

**666** 2:5
**677** 117:7
**689** 110:8

---
**7**
---

**7-15-19** 1:1 2:1 3:1 4:1 5:1 6:1
 7:1 8:1 9:1 10:1 11:1 12:1
 13:1 14:1 15:1 16:1 17:1 18:1
 19:1 20:1 21:1 22:1 23:1 24:1
 25:1 26:1 27:1 28:1 29:1 30:1
 31:1 32:1 33:1 34:1 35:1 36:1
 37:1 38:1 39:1 40:1 41:1 42:1
 43:1 44:1 45:1 46:1 47:1 48:1
 49:1 50:1 51:1 52:1 53:1 54:1
 55:1 56:1 57:1 58:1 59:1 60:1
 61:1 62:1 63:1 64:1 65:1 66:1
 67:1 68:1 69:1 70:1 71:1 72:1
 73:1 74:1 75:1 76:1 77:1 78:1
 79:1 80:1 81:1 82:1 83:1 84:1
 85:1 86:1 87:1 88:1 89:1 90:1
 91:1 92:1 93:1 94:1 95:1 96:1
 97:1 98:1 99:1 100:1 101:1
 102:1 103:1 104:1 105:1 106:1
 107:1 108:1 109:1 110:1 111:1
 112:1 113:1 114:1 115:1 116:1
 117:1 118:1 119:1 120:1 121:1
 122:1 123:1 124:1 125:1 126:1
 127:1 128:1 129:1 130:1 131:1
 132:1 133:1 134:1 135:1 136:1

```
137:1 138:1 139:1 140:1 141:1
142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1
152:1 153:1 154:1 155:1 156:1
157:1 158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1 166:1
167:1 168:1 169:1 170:1 171:1
172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1
182:1 183:1 184:1 185:1 186:1
187:1 188:1 189:1 190:1 191:1
192:1 193:1 194:1 195:1 196:1
197:1 198:1 199:1 200:1 201:1
202:1 203:1 204:1 205:1 206:1
207:1 208:1 209:1 210:1 211:1
212:1 213:1 214:1
```

**7-30-04** 5:12
**71** 5:8
**73** 3:8
**7th** 98:20

---
**8**
---

**83** 3:9
**87** 3:11
**8th** 11:25  12:4,7,23,24  13:4,7
110:8

---
**9**
---

**92** 3:11
**94** 4:18
**9th** 191:17